LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170
Fax: (702) 382-1169

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: BK-S-16-15388-mkn |
| | Chapter 11 |
| SUPERIOR LINEN, LLC, | |
| Debtor. | Date: OST PENDING |
| | Time: OST PENDING |

**MOTION FOR APPROVAL PURSUANT TO: (I) 11 U.S.C. §§ 105(a), 363, AND 365 AND FED. R. BANKR. P. 2002, 6004, 6006, 9007 AND 9014 AUTHORIZING (A) SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND DESIGNATION RIGHTS; AND (II) APPROVAL OF SETTLEMENT AND RELEASE AGREEMENT PURSUANT TO FED. R. BANKR. P. 9019 WITH THE CITY OF NORTH LAS VEGAS AND ICON PAC NEVADA OWNER POOL 3, NEVADA LLC, AND ASSUMPTION AND ASSIGNMENT OF AGREEMENT**

Superior Linen, LLC, a Nevada limited liability company, as debtor and debtor in possession (the "Debtor" or "Superior Linen" as applicable), hereby respectfully submits its motion (the "Motion") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and LR 2002, 6004, 9014 and 9019, for entry an order approving the sale of substantially all of the Debtor's assets (the "Sale") free and clear of any and all liens, claims, encumbrances and interests; approving the assumption and assignment of certain executory contracts and unexpired leases, and designation rights, all

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

pursuant to the terms and conditions of an Asset Purchase Agreement (the "APA"); and approving a proposed Settlement and Release Agreement (the "North Las Vegas Settlement Agreement") with the City of North Las Vegas (the "City") and Icon Pac Nevada Owner Pool 3, Nevada LLC (the "Landlord") as part of the foregoing transaction. The proposed transaction is with Las Vegas Linen LLC (the "Buyer"), an affiliate of PureStar Group, a large linen and laundry services concern with operations across the United States, Mexico and the Bahamas.

This Motion is based upon the points and authorities herein, the *Declaration of Robert E. Smith* and the *Declaration of Edward Kim* filed concurrently herewith, the *Omnibus Declaration of Robert E. Smith in Support of Debtor's Initial Emergency Motions and Related Relief* (the "Omnibus Declaration") [ECF No. 7], the papers and pleadings on file with the Court in this bankruptcy case, judicial notice of which are respectfully requested, and any oral argument presented to the Court at the hearing on this Motion. Further, the following documents accompany this Motion and are incorporated herein: **Exhibit 1** - Sale Order; **Exhibit 2** - APA; **Exhibit 3** - North Las Vegas Settlement Agreement.[1]

## I. JURISDICTION AND VENUE

1. The Debtor is a full service commercial laundry company providing the entire spectrum of laundry services to hotels and food and beverage managed restaurants and clubs.

2. On September 30, 2016 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing its bankruptcy case (the "Chapter 11 Case"). Debtor is authorized to operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. An Official Committee of Unsecured Creditors (the "Committee") has been formed and retained counsel in this case.

3. The Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 1001(b)(1). This is a core proceeding

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

---

[1] Although the Debtor believes these documents are reasonably complete, however, they are subject to further negotiation and approvals through the hearing on the Sale. The Debtor will endeavor to advise all principal parties and the Court of any changes in a timely fashion, including through the circulation and filing of redline comparisons reflecting any changes.

pursuant to 28 U.S.C. § 157(b).  The Debtor consents to the entry of final orders by the bankruptcy judge.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  STATEMENT OF FACTS

### A.    Relevant Events in the Debtor's Chapter 11 Case.

4.     The Omnibus Declaration details the Debtor's business and capital structure, including the its pre-petition secured loans and the events leading to its Chapter 11 Case.  As of the Petition Date, the Debtor owed RD VII Investments, LLC ("RD VII"), its senior secured lender, the sum of $10,535,905, and Midwest Community Development Fund VII, L.L.C. ("MCDF VII"), its junior secured lender, the sum of $8,052,998.  See Claim Nos. 35 and 30.

5.     On October 3, 2016, the Debtor filed a *Stipulation By and Between the Debtor and RD VII Investments, LLC for Consent to Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2), and Granting Adequate Protection Pursuant to 11 U.S.C. §§ 362 and 363(e)* (the "Cash Collateral Stipulation") [ECF No. 12], a *Motion for Approval of the Cash Collateral Stipulation* (the "Cash Collateral Motion") [ECF No. 13], and a *Motion for an Order: (I) Authorizing Superpriority Post-Petition Financing; et al.* (the "First DIP Financing Motion") [ECF No. 14].  The First DIP Financing Motion requested approval to borrow up to $1,000,000 from RD VII on a super-priority post-petition basis.  The Court later entered final orders granting the DIP Financing Motion and the Cash Collateral Motion, as modified by the revised versions of the operative documents attached to those orders [ECF Nos. 150 and 151].

6.     On December 13, 2016, the Court entered an order [ECF No. 146] granting the Committee, and failing that, Baltic Linen Company, Inc. ("Baltic Linen"), derivative standing to commence, prosecute and settle causes of action that would otherwise be brought by the Debtor or its estate including but not limited to as against RD VII pursuant to the release of claims provision in the Cash Collateral Stipulation.  This order originally required the actions be commenced by mid-January 2017, however, this deadline has since been extended numerous times, and most recently extended to June 21, 2017.  [ECF Nos. 194, 195, 226, 230, and 322].

7.     On December 30, 2016, the Debtor filed a motion seeking to reject any alleged sublease(s) it had regarding the premises out of which it previously operated, which is located at

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

125 S. 13th Street, Las Vegas, Nevada (the "13th Street Property"), including with any of New Image Dry Cleaning, LLC, New Image Dry Cleaners, LLC, Max Enterprises, LLC and/or any other alleged sublessee for that location [ECF No. 164]. The Debtor later withdrew this motion to reject without prejudice, however, the existence and validity of any alleged sublease for the 13th Street Property was and remains disputed. Additionally, the alleged sublease also included a lease by the Debtor of certain of its personal property, as sublessor and owner thereof.

8.      Separate and apart from the alleged sublease, with respect to the master lease for the 13th Street Property, wherein the Debtor is the tenant, the Debtor has entered into a series of stipulations and orders extending the deadline for the Debtor to assume or reject its rights as tenant under the master lease through May 29, 2017 [ECF Nos. 199, 203, 396, and 397].

9.      In early January 2017, the Cosmopolitan Hotel-Casino Las Vegas (the "Cosmopolitan") ceased delivering linen to the Debtor, which resulted in a significant interruption and impact on the Debtor's business. The Cosmopolitan contract was a very large contract for the Debtor that ultimately proved to be unprofitable over its approximate five month timeframe, and caused a significant interruption in the Debtor's business.

10.      Pursuant to section 365(d)(4) of the Bankruptcy Code, and subject to a potential ability to extend the foregoing deadline per that statute, the Debtor generally must assume or reject an unexpired lease of nonresidential real property within one 120 days of the Petition Date, which, in this case, made the deadline originally January 28, 2017, unless otherwise extended by agreement with the applicable landlord or ordered by the Court (the "Assumption/Rejection Deadline"). The Assumption/Rejection Deadline is important in the case at hand because the Debtor's operations, including both its laundry and linen processing facility and its corporate offices, are operated out leased premises located at 4501 Mitchell Street, North Las Vegas, Nevada 89081 in the Nellis Industrial Park (the "Premises"). Specifically, on or about July 26, 2011, Superior Linen, as tenant, entered into a Lease Agreement (as amended, the "Lease Agreement") with Prologis NA3, LLC ("Prologis"), as original landlord, which space was later expanded pursuant to various amendments. In or about 2015, the Landlord, as successor to Prologis, took over the Lease Agreement of the Premises as

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

1    landlord and has remained as such during the pendency of this Chapter 11 Case.

2        11.    Superior Linen is also obligated to pay certain sums to the City over time as and

3    for a "regional connection fee" for industrial laundries (the "Connection Fees") as well as

4    normal monthly utility charges.    Prior to the Petition Date, Superior Linen entered into a

5    settlement and payment arrangement with the City, however, Superior Linen ceased making

6    payments pursuant to that agreement, and the City thus eventually recorded a Notice of Lien for

7    Unpaid Utilities Charges against the Premises in the Official Records of the County Recorder,

8    Clark County, Nevada on September 22, 2016 at Instrument No. 20160922-0000141 (the

9    "Notice of Lien") in the amount of $893,667.33.    The recordation of the Notice of Lien on the

10    Premises is also a breach of the Lease Agreement by Superior Linen. See Claim Nos. 33 and 34.

11        12.    Given that the original Assumption/Rejection Deadline was set to expire on

12    January 28, 2017, the Debtor and the Landlord conferred and determined that, in order to allow

13    them to continue their discussions, among other reasons, it was in their best interests to agree to

14    extend the Assumption/Rejection Deadline for the Lease Agreement voluntarily an additional

15    sixty (60) days, and thus through and including March 29, 2017 (the "Extension Period").    As a

16    result on January 27, 2017, as later approved by the Court, the parties entered into a stipulation,

17    which, among other matters: (a) the Debtor was to remain current on a post-petition go forward

18    basis on all regular monthly rent and expense payments owing to the Landlord under the Lease

19    Agreement in its current form; and (b) commencing on February 15, 2016, and on or before the

20    15th of each and every month thereafter during the Extension Period, the Debtor was to pay the

21    sum of $20,000 each month to the City as and for a partial payment of the outstanding

22    Connection Fees (the "Connection Fee Payment").

23        13.    On January 23, 2017, the Debtor filed its *Second Emergency Motion for an*

24    *Order:  (I) Authorizing Super-Priority Post-Petition Financing, et al.* (the "Second DIP Loan

25    Motion") [ECF No. 208], which requested authorization and approval to borrow additional post-

26    petition financing of up to $750,000 from RD VII on a super-priority post-petition basis.    As

27    explained in the Second DIP Loan Motion, Debtor required additional funds and prior to the

28    originally projected date in the First Budget of the end of January for various reasons.    First, its

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Original DIP Loan was only projected to last through roughly January 2017, and thus the timeframe contemplated in that arrangement was nearly completed. Second, various items varied from the First Budget, including but not limited to a proposed utility deposit of $85,000 to the City and other related adequate protection payments for the benefit of the Landlord and the City. Fourth, the Debtor also historically experiences a seasonal reduction in its business during the Winter months and thus reduced profitability, whereas in the Spring and Summer months with the advent of pool season and the resulting increased linen usage by its hospitality customers, experiences substantially increased business and improved profitability. The Court held various hearings on interim approval of the Second DIP Loan, and has entered a series of orders authorizing the entire borrowing [ECF Nos. 239 and 261].

14.     On January 24, 2017, the Office of the United States Trustee (the "UST") filed a motion seeking to appoint a chapter 11 trustee, or to convert the Debtor's case to chapter 7 (the "Trustee/Conversion Motion") [ECF No. 218], which was joined by the Committee [ECF No. 256] and various other parties. On March 1, 2017, the Court held an evidentiary hearing on the Trustee/Conversion Motion, and later entered a written order [ECF No. 322] denying the UST's request to appoint a chapter 11 trustee, and conditionally denying the conversion of the case to chapter 7, subject to the following terms and conditions: (a) that any sale of all or substantially all of the Debtor's business must occur, if at all, no later than June 14, 2017; (b) any additional debtor in possession financing requested or obtained by the Debtor must include at least $45,000 in funds paid as an additional "carveout" for the Committee's professionals; (c) the deadline for the Committee and/or creditor Baltic Linen Co., Inc. to file derivative actions or other claims as described in the orders granting them derivative standing is extended through June 21, 2017. The Trustee/Conversion Motion was a significant and unfortunate distraction in the Chapter 11 Case.

15.     On March 6, 2017, the Debtor filed its *Third Emergency Motion for an Order: (I) Authorizing Superpriority Post-Petition Financing, et al.* (the "Third DIP Financing Motion") [ECF No. 326], which sought authorization and approval to borrow additional post-petition financing of up to $875,000 from RD VII. As explained in the Third DIP Financing

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

Motion, the Debtor sought this additional financing in order to support the Debtor pending a transaction of its business--whether a reorganization or sale--and by the Court-imposed deadline of June 14, 2017. Further, the Debtor noted that such funding was needed given that various of the Debtor's customers unlawfully terminated their agreements with and withheld payments from the Debtor.

16.    On March 9, 2017, the Court entered an interim order [ECF No. 348] approving the Third DIP Financing Motion on an interim basis to the extent of $350,000, and on March 30, 2017, entered a final order authorizing the Third DIP Financing Motion on a final basis [ECF No. 401]. The terms of the Third DIP Financing only authorize the Debtor to borrow additional funds, but still leaves in RD VII's discretion whether it will provide any such further loans. Understandably, and in light of the substantial funds RD VII has already lent to the Debtor on a pre and post-petition basis, as well as the precipitous erosion in the Debtor's value from and after the Petition Date, RD VII did not loan any additional funds to the Debtor, including the remaining balance of the approved Third DIP Financing. The total principal amount the Debtor has borrowed under the terms of its various DIP financings is the sum of $2,100,000.

17.    The parties were unable to agree to a further extension of the Assumption/Rejection Deadline for the Lease Agreement of the Premises, and thus, as a result, and in order to avoid losing its Lease, on March 30, 2017 the Debtor filed a motion seeking to assume its Lease Agreement with the Landlord for the Premises [ECF No. 403]. This motion was set for hearing on May 17, 2017, but which was continued by stipulation of the parties in light of the imminent filing of the Sale Motion to May 24, 2017.

18.    In addition to the timing pressures regarding the Debtor's Lease Agreement for the Premises, various of the Debtor's customers have either taken actions, including some unilaterally and improperly, and/or filed motions seeking to compel the Debtor to assume or reject their respective linen and laundry services agreements, and/or for relief from the automatic stay to terminate such agreements, which are at various stages of being heard and decided. These customers include large customers such as the Cosmopolitan, The Palms Casino Resort, The Riverside Resort and Casino (Laughlin) ("Riverside"), the M Resort Spa Casino (the "M

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Resort"), as well as smaller accounts like The Downtown Grand (the "Downtown Grand").

19.    First, on February 27, 2017, the Cosmopolitan filed a motion to compel assumption or rejection of its laundry services agreement with the Debtor, or in the alternative for stay relief, which was set for hearing on March 10, 2017 [ECF No. 301]. Shortly prior to the hearing, the Debtor and Cosmopolitan stipulated to a termination of their agreement, which stipulation was approved by the Court [ECF Nos. 371 and 373], but with a full reservation of rights by the parties as a result of the events occurring related to that agreement.

20.    Second, on February 28, 2017, the M Resort filed a motion to compel assumption or rejection of its laundry services agreement with the Debtor [ECF No. 311], which the Court granted at a hearing on April 5, 2017, although no order has been submitted or entered on that matter. Thereafter on April 14, 2017, the Debtor filed a motion to assume its agreement with the M Resort [ECF No. 418], which matter was originally set for hearing on May 17, 2017, however, the parties agrees to continue the hearing on it until May 24, 2017 in light of the imminent filing of the Sale Motion. Granting this Motion and entering the Sale Order will moot the Debtor's pending motion to assume its contract with the M Resort.

21.    Third, on March 24, 2017, Riverside filed a motion for relief from the automatic stay to terminate its laundry services agreement with the Debtor, or in the alternative, to compel assumption or rejection of the agreement, which was originally set for hearing on April 19, 2017 [ECF No. 383], however, the parties agreed to set the matter over for an evidentiary hearing, which has since been continued to June 25, 2017 [ECF Nos. 427 and 436] in light of the imminent filing of this Sale Motion. Granting this Motion and entering the Sale Order will moot the Riverside's pending motion and the related evidentiary hearing.

22.    Fourth, on February 1, 2017, the Downtown Grand filed a motion to compel assumption or rejection of its laundry services agreement with the Debtor [ECF No. 244], which was granted without opposition by the Debtor [ECF No. 353]. On March 11, 2017, the Debtor filed a motion to assume its agreement with the Downtown Grand, however, as of the hearing on April 19, 2017, the Debtor was unable to get a sale of its business, including this contract, , and thus lost this contract [ECF No. 428].

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

23.     The Debtor's contracts with its customers are valuable contracts and losing additional contracts will further compromise the value of the Debtor's business, including the instant proposed Sale.  As such, the pendency of these various motions filed by the Debtor's customers, just like the pendency of the Assumption/Rejection Deadline as to the Debtor's Lease with the Landlord, create significant timing pressures on the Debtor to consummate a transaction.  As a result of the foregoing, an expedited transaction involving the Debtor's assets is of utmost importance in order to preserve and protect the remaining value of the assets proposed to be sold, and so as to maximize recoveries.

24.     Additionally, although the parties began significant discussions to document this proposed transaction more than a month ago, it has involved many moving parts, including discussions and assurances with existing customers, as well as the negotiation of the North Las Vegas Settlement Agreement, before it could be filed with the Court, all of which involved substantial undertakings.  Notwithstanding the Debtor's best efforts to manage its cash flow and juggle its cash management, given the length of time this proposed transaction took to document, the Debtor has accrued significant additional post-petition administrative liabilities in operating its business unprofitably during this time period, which liabilities will only increase if there are any delays in the approval process.

25.     Shortly after the filing of this Motion, the Debtor also anticipates working with the Committee, the UST, and other creditor constituencies regarding a proposed chapter 11 plan of liquidation to finalize the remainder of the Chapter 11 Case, post-closing of the Sale, in and orderly and timely fashion.

**B.     The Marketing and Sale Efforts.**

26.     On or about November 7, 2016, Province, Inc. ("Province") entered into an Engagement Agreement (the "Engagement Agreement") with the Debtor as financial advisors in order to assist with a potential sale of the business [ECF No. 119], which application the Court has approved [ECF No. 297].  As detailed in the Engagement Agreement, Province was contracted to render certain professional services detailed below:

(a)     Review and analysis of the business, financial condition and prospects of

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

the Company, including the forecasts to be included in marketing materials;

(b)    Based on Province's prior interactions and knowledge of acquisitive behavior of similar companies and investors, identify those companies or investors (together with any other interested parties, "Sale Counterparties") to be invited to a sale process of the Company, including the stalking horse credit bid by existing 1st lien creditors (together, the "Sale Transaction");

(c)    Prepare Sale Transaction marketing materials for distribution to prospective Sale Counterparties;

(d)    Provide valuation support and related analyses to the Company;

(e)    Launch the Sale Transaction, with the goal of execution within a timeframe deemed by Province and by Company to be adequate for a successful execution and within market conventions;

(f)    Assist the Company in negotiations with any such Sale Counterparties and advise the Company as to the financial terms and structure of the Sale Transaction;

(g)    If necessary, participate in hearings before the bankruptcy court with respect to matters upon which Province has provided advice.

27.    Province pre-marketed the asset to several bidders that were well known to Province in mid-January 2017 and officially launched the Sale Transaction on January 21, 2017. In particular, Province contacted 82 strategic and financial investors and received preliminary indications of interest from 10 financial sponsor investors and 7 strategic investors, with 12 investors executing Non-Disclosure Agreements.  Since then, Province engaged in telephonic discussions, in-person meetings, and due diligence and analyses with potential Sale Counterparties.  Together with the Company, Province has worked to select and consummate a Sale Transaction with the Buyer.

28.    Key milestones and events over the course of the Sale Transaction are summarized below:

(a)    Sale Transaction was scheduled to launch first week of January 2017; however, operational disruptions toward the end of December 2016 forced the Company

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

to cancel a large hotel contract at the beginning of January 2017, given the operating and financial considerations of the terms of the contract.  All financial projections and marketing materials were subsequently re-created and vetted with management;

(b)    Week of January 9:  Finished revising teaser and Confidential Information Memo ("CIM") and revised a valuation analysis prepared for Company to provide guidance on value and on expectations;

(c)    Week of January 16:  Targeted launch to clients with whom Province has a close relationship and who have previously invested in distressed situations and/or outsourced services companies, with the goal of obtaining early feedback prior to general launch – 2 strategic buyers, 2 financial sponsor buyers, and 1 high net worth investor;

(d)    End of January 2017 to February 2, 2017:  Finalize financial projections and general launch with marketing materials sent to broad group of investors, including 57 financial sponsor investors and 20 strategic investors;

(e)    Middle through End of January 2017:  Further revisions to financial projections and marketing materials necessary given cancelation of several small contracts and revisions to expected sale process timeframe to accommodate modified launch timeline;

(f)    Mid-February 2017:  Company suffered a significant boiler failure that halted operations for several days and which caused a large client to subsequently cancel its contract;

(g)    On February 15, 2017:  Subsequent to the boiler failure, Province conducted the first on-premises management presentation with a strategic buyer ("Strategic A"), who subsequently indicated (1) an informal and non-binding valuation range that well exceeded liquidation value and (2) a timeframe needed to secure approvals and acquisition funding that, at that point, was in-line with the Sale Transaction timeline;

(h)    Toward the end of February 2017:  Company received notice that it was not qualified to proceed under a medium, non-hotel contract (which would have

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

11

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

comprised ~5% of 2017 projected volumes) and several other non-hotel clients notified the Company of contract terminations stemming from previous operational issues (comprised ~7% of 2017 projected volumes);

(i)      Throughout February through March 2017:  Large clients continued to file various motions related to prospective contract rejections – Downtown Grand on February 1, M Resort on February 28 and Riverside on March 24;

(j)      On March 7, 2017:   Province and Company conducted an on-site management presentation with the management team of a large, regional commercial laundry company ("Strategic B"), after a month of telephonic discussions and due diligence.   Subsequent discussions with Strategic B regarding transaction valuation reached an impasse, with Strategic B unable or unwilling to offer transaction consideration even approaching the hypothetical liquidation value of the Company. Subsequent efforts by Province and Company to creatively structure a potential transaction with Strategic B also proved to be unsuccessful;

(k)      While the NDA was sent to Buyer in mid-February, Province spent much of March 2017 negotiating with Buyer; in early April 2017, Buyer submitted a non-binding letter of intent reflecting most of the terms evidenced in the Asset Purchase Agreement between Buyer and Company.  Buyer proceeded with its environmental, legal and other due diligence review of the Company;

(l)      On April 25, 2017, after numerous communications with Strategic A while Province and Company were negotiating with Buyer, Strategic A notified Province and Company of its inability to fully fund a proposed acquisition of the Company and of its intent to discontinue participation in the Sale Transaction;

29.      Around the same time as (l) above, Province and the Company received an unsolicited request from another regional laundry company ("Strategic C") for an ad hoc due diligence meeting with management.  As a result of Province's marketing efforts, Strategic C had learned of the proposed Sale Transaction but quickly discontinued its exploratory efforts in the days after the meeting with management.

30.     Based upon Province's experience and in light of the specific facts and circumstances of the Company's situation and the Chapter 11 Case, it believes that adequate efforts have been made since Province's involvement to market the Debtor's assets for sale and to solicit offers to purchase the business as a going concern.  Province further believes that the offer made by the Buyer as set forth in the APA is the highest and best price attainable for these assets, given the difficult and time sensitive circumstances of this case.

31.     Based on Province's continuing assessment of the Company's valuation with respect to ongoing changes in the composition of the Company's client portfolio and our discussions with numerous Sale Counterparties, Province believes that the Company's sale as a going concern to Buyer at the terms presented in the APA is likely to provide significantly more value to creditors than in a liquidation.  Given the competitive dynamics, the tenuous nature of client relationships evinced throughout the Sale Transaction process, and the Company's current financial state, a liquidation of the Company would be catastrophic and result in little value:

(a)     RDVII has indicated that it will not provide additional funding under the DIP credit facility currently in place;

(b)     The prospect of ongoing insolvency and lack of a well-capitalized sponsor that would support the Company will likely cause many more clients to attempt to reject their contracts, given the costly, future risk of business interruptions for these clients;

(c)     Such a pattern has already evidenced itself, with numerous clients leaving for cause or attempting to establish a basis or fallback position for canceling or rejecting their contracts;

(d)     This exodus of clients, many for reasons out of the control of the current management of the Company, diminished the competitive tension of the Sale Transaction process, and therefore Company valuation, as many financial investors that were interested were either deeply discouraged by these events or the shrinking implied enterprise value of the Company prevented their participation by fund mandate and/or investment charter;

(e)     Only some fractional value for inventory and equipment, certain

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

receivables and whatever client contracts that remain in place is likely to be achieved in a liquidation scenario.

**C.    The Proposed APA.**

32.    Set forth below is a summary of the material terms of the APA, however, this description is intended as a summary of certain salient terms only, and is qualified in its entirety by reference to the APA. Capitalized terms used but not defined in this have the meaning given them in the APA.

**a. Purchase and Sale of Assets.** Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and subject to the terms and conditions set forth herein and the Sale Order, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in the assets that relate to, or are used or held for the use in connection with the Business (the "**Purchased Assets**"), free and clear of all Encumbrances, but excluding the Excluded Assets. The Purchased Assets shall include the following assets of the Business, as of the date of Closing (defined below):

i.   All accounts receivable, notes receivable, and employee receivables, and any security, claim, remedy or other right related to any of the foregoing, whether accruing before or after the Closing Date (the "Accounts Receivable");

ii.  All fixed assets and tangible personal property, including, equipment, furniture, fixtures, machinery, tools, vehicles, data processing and office equipment, supplies, computers, and telephones, including all tangible personal property listed in Section 1.01(b) of the Disclosure Schedules;

iii. Subject to Section 1.08, all customer contracts generating or contributing to Seller's revenues, as listed on Section 1.01(c) of the Disclosure Schedules ("Customer Contracts"), and as otherwise agreed to by the Buyer and Seller;

iv.  All inventory, packaging, supplies, parts and other inventories, including new and used linens, and including all inventory listed in Section 1.01(d) of the Disclosure Schedules ("Inventory");

v.   All Books and Records;

vi.  The Lease Agreement dated July 26, 2011, and all amendments thereto (the "Lease Agreement"), with respect to the premises leased by the Seller located at 4501 Mitchell Street, North Las Vegas, Nevada 89081 (the "Leased Property");

vii. The North Las Vegas Settlement Agreement

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

14

viii.   All going concern value and goodwill of the Business;

ix.   All know-how, confidential or proprietary information, technical information, data, process technology, plans and drawings of Seller relating to the operations of the Business and all employee manuals relating to the Business;

x.   Any rights Seller may have in the name "Superior Linen" and all Intellectual Property owned by Seller;

xi.   All prepaid expenses, advance payments, security, refunds, and deposits to the extent related to the Business, the Purchased Assets or the Assumed Liabilities;

xii.   All Permits, including Environmental Permits, which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets, to the extent such Permits are transferable;

xiii.   Except as set forth in Section 1.02 of the Disclosure Schedules, all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities;

xiv.   All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to the Business or any Purchased Assets or the Assumed Liabilities;

xv.   Except as set forth in Section 1.02 of the Disclosure Schedules, all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise; and

xvi.   All other assets used in the operation of the Business, unless an Excluded Asset specifically excluded in Section 1.02 below, including those set forth in Section 1.01(p) of the Disclosure Schedules.

**b.   Excluded Assets.**   Notwithstanding the foregoing, the Purchased Assets shall not include any of the following assets (the "**Excluded Assets**"):

i.   Seller's company minute book and ownership ledger;

ii.   All Contracts, other than the Assumed Contracts (the "Excluded Contracts");

iii.   Any and all cash in Seller's bank accounts set forth in Section 1.02 of the Disclosure Schedules and as of the close of business on the day immediately preceding the Closing; and

iv.  All of Seller's assets listed in Section 1.02 of the Disclosure Schedules, *which Excluded Assets shall include, but not be limited to all Avoidance Actions and all Insider Claims*.

**c.  Assumption of Liabilities.**  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge the liabilities and obligations set forth below, but, other than with respect to the North Las Vegas Settlement Agreement, only to the extent that such liabilities and obligations do not relate to any breach, default or violation by Seller on or prior to the Closing (collectively, the "Assumed Liabilities"):

i.  $750,000 of Seller's Liabilities under the North Las Vegas Settlement Agreement, including $60,000 to be paid by Buyer at Closing in accordance with the North Las Vegas Settlement Agreement;

ii.  All trade accounts payable to third parties in connection with the Business accruing or invoiced after the Closing Date for work, services, materials, or products performed or provided to or purchased by Buyer by third parties;

iii.  All Liabilities under the Lease Agreement accruing after the Closing; and

iv.  All Liabilities in respect of the Assumed Contracts listed on Section 1.03(d) of the Disclosure Schedules that are properly assigned to Buyer, but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller on or prior to the Closing.

v.  Other than the Assumed Liabilities, Buyer shall not assume any liabilities or obligations of Seller or the Business of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created, and all other liabilities shall be retained, paid, performed, and discharged solely by Seller.

**d.  Total Consideration.**  The aggregate consideration for the Purchased Assets shall be (a) $1,850,000 in cash; (b) up to $200,000 in cash for specified equipment not identified in **Section 1.01(b)** of the Disclosure Schedules which shall be agreed to by Buyer and Seller at or prior to Closing (the sum of (a) inclusive with (b) being the "**Cash Purchase Price**" which shall be subject to adjustment pursuant to **Section 1.09** below); plus (c) the assumption of the Assumed Liabilities (the "**Total Consideration**").

**e.  Designated Contracts.**  At or prior to Closing, the Buyer shall designate in writing to Seller those Customer Contracts (the "**Designated Contracts**") that it elects not to assume at Closing but will instead operate under during the 60-day period following the Closing (the "**Negotiation Period**"). During the Negotiation Period (i) Seller, to the maximum extent permitted by law shall act as Buyer's

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

agent in order to obtain for Buyer the benefits under the Designated Contracts and shall cooperate with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer, and (ii) the Buyer will negotiate with the counterparties to the Designated Contracts amendments thereto or new contracts that will supersede such Designated Contracts, providing for terms and conditions satisfactory to Buyer in its sole discretion.  At the conclusion of the Designation Period, Buyer shall notify Seller of the Designated Contracts that it has not renegotiated to its satisfaction, and Seller shall reject such Designated Contracts.

**f.  Purchase Price Adjustment.**

i.  **Closing Adjustment.**  No later than one (1) Business Day prior to the Closing Date, Seller shall deliver to the Buyer a statement (the "Estimated Closing AR Statement") setting forth its good faith estimate of Closing Net AR Amount (the "Estimated Closing Net AR Amount") with supporting calculations in reasonable detail. "Closing Net AR Amount" shall mean (A) the Accounts Receivable of the Seller included in the Purchased Assets, net of reserves in accordance with GAAP, minus (B) $500,000 (the "Target Net AR Amount"); provided, however, that for purposes of this Section 1.09, the Closing Net AR Amount shall not be greater than $800,0000 (so that the maximum positive adjustment to the Purchase Price under this Section 1.09 will not exceed $300,000).  The "Closing Adjustment" shall be an amount equal to the excess, if any, of the Target Net AR Amount over the Estimated Net AR Amount.  The Cash Purchase Price shall be reduced by the amount of the Closing Adjustment (if any). If the Estimated Closing Net AR Amount exceeds the Target Net AR Amount, the Cash Purchase Price shall not be adjusted at the Closing but shall be subject to adjustment following the Closing as provided in Section 1.09(c) below.

ii.  **Post-Closing Adjustment**. Within sixty (60) days after the Closing Date, Buyer shall prepare and deliver to Seller a statement setting forth its calculation of the Closing Net AR Amount with supporting calculations in reasonable detail (the "Closing AR Amount Statement").  The post-closing adjustment shall be an amount equal to (A) the Closing Net AR Amount, as finally determined pursuant to this Section 1.09, minus (B) Target Net AR Amount, minus (C) (if applicable) the Closing Adjustment (the "Post-Closing Adjustment").  If the Post-Closing Adjustment is a positive number, then the Cash Purchase Price shall be increased by the Post-Closing Adjustment and Buyer shall pay to Seller an amount equal to the Post-Closing Adjustment.  If the Post-Closing Adjustment is a negative number, then the Cash Purchase Price shall be reduced by an amount equal to the Post-Closing Adjustment, which shall be immediately paid to Buyer by the Seller.

**g.  Closing**.   Subject to the terms and conditions in the APA, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place within three (3) Business Days after the entry of the Sale Order.

**h. Additional Carveout.** The APA also provides for a deposit of $45,000 for the benefit of a litigation trust and in an effort to allow for an orderly closeout of the remainder of the Chapter 11 Case post-close.

### III. LEGAL ARGUMENT

**A.  Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests.**

33.  Pursuant to Bankruptcy Code section 363(f), a debtor-in-possession may sell property "free and clear of any interest in such property of an entity other than the estate," if any one of the following conditions is satisfied:

(1)  applicable nonbankruptcy law permits the sale of such property free and clear of such interests;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Courts have interpreted the requirements of section 363(f) to be disjunctive. See, In re Wolverine Radio Co., 930 F.2d 1132 (6th Cir. 1991); In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002). As such, the sale is permissible if any one of the five conditions are met. See In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988); In re Whittemore, 37 B.R. 93, 94 (Bankr. D. Or. 1984).

34.  As applied in the case at hand, the sale free and clear is authorized because RD VII consents to the sale pursuant to section 363(f)(2) of the Bankruptcy Code.

35.  As to the junior secured claim of MCDF VII, the value of the Debtor's assets as established by the sale process and the resulting APA with the Buyer is substantially less than the allowed claims of RD VII, and thus MCDF VII would have no credit bid rights pursuant to sections 363(k) and 506(a) and (d) of the Bankruptcy Code because MCDF VII is entirely undersecured. As a result, the sale can be approved free and clear of MCDF's (or any other alleged junior secured creditors' interests in the assets) pursuant to section 363(f)(5) of the

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Bankruptcy Code, because such creditors whose interest will be affected could be compelled in a legal or equitable proceeding to accept a money satisfaction of the interest. To establish that a party could be compelled to accept a money satisfaction of its interest, the debtor must show that a proceeding exists or could be brought in which the lienholder could be compelled to accept a money satisfaction for its interest. Undersecured lienholders can be (and frequently are) forced to accept less than the full amount of their claims in state law foreclosure proceedings. See In re Jolan, Inc., 403 B.R. 866, 868-870 (Bankr. W.D. Wash. 2009) (holding that under Washington law, junior lienholders can be forced to take less than full "money satisfaction" in foreclosure sales, probate estate liquidations, personal property tax sales and receivership sales; distinguishing Clear Channel Outdoor, Inc., v. Knupfer (In re PW, LLC), 391 B.R. 25 (B.A.P. 9th Cir. 2008), as not involving section 363(f)(5)); see also In re Boston Generating, LLC, 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010) (citing Jolan and holding that "the existence of judicial and nonjudicial foreclosure and enforcement actions under state law can satisfy section 363(f)(5)").

36.    Further, a creditor's consent pursuant to section 363(f)(2) of the Bankruptcy Code may be implied when the creditor fails to make a timely objection after receiving proper notice of the sale. See In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988); Matter of Tabone, Inc., 175 B.R. 855, 858 (Bankr. D.N.J. 1994); In re James, 203 B.R. 449, 453-454 (Bankr. W.D. Mo. 1997).

37.    A debtor may also sell its property free and clear of lease interests in its property as well in the absence of objection, if the matter is in bona fide dispute, or otherwise. See Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp. & Qualitech Steel Holdings Corp.), 327 F.3d 537, 547-48 (7th Cir. 2003); Cheslock-Bakker & Assoc. v. Kremer (In re Downtown Athletic Club of New York City, Inc.), No. M-47, 2000 WL 744126 (S.D.N.Y. June 9, 2000); Hill v. MKBS Holdings, LLC (In re Hill), 307 B.R. 821 (Bankr. W.D. Pa. 2004); In re Bedford Square Assoc., 247 B.R. 140 (Bankr. E.D. Pa. 2000).

38.    A debtor may also sell designation rights in its contracts and leases, as the current APA contemplates, pursuant to section 363 of the Bankruptcy Code. See In re Chrysler LLC, 405 B.R. 84, 110 (Bankr. S.D.N.Y. 2009); In re Ames Dept. Stores, Inc., 287 B.R. 112, 116-17

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

(Bankr. S.D.N.Y. 2002); In re Ernst Home Ctr., Inc., 209 B.R. 974, 979-80 (Bankr. W.D. Wash. 1997).

39.    Finally, the Debtor is proposing the sale be a "private" sale without going through an auction process due to the significant timing constraints on consummating the sale and because the Debtor asserts that it has already more adequately canvassed the market of potential purchasers as previously described herein, and no party other than the Buyer has shown any substantial and continuing interest in purchasing the assets, and contracts and related property.

**B.    Assumption and Assignment of the Contracts and Leases.**

40.    In connection with the sale of the Assets, the Debtor seeks assumption and assignment of a certain limited number of executory contracts and unexpired leases as set forth in the APA.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

41.    Courts apply a business judgment standard in determining whether to approve a debtor's request to assume or reject executory contracts and unexpired leases.    See Grp. of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523 (1943); Argawal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med. Grp., Inc.), 476 F.3d 665, 670 (9th Cir. 2007); Diatom, LLC v. Comm. of Creditors Holding Unsecured Claims (In re Gentile Family Indus.), No. BAP CC-13-1563-KiTaD, 2014 WL 4091001, at *3 (B.A.P. 9th Cir. Aug. 19, 2014) (citing Official Creditors Comm. v. X10 Wireless Tech., Inc. (In re X10 Wireless Tech., Inc.), BAP No. WW-04-1328-PST, 2005 WL 6960205, at *3 (B.A.P. 9th Cir. Apr. 5, 2005).    While a debtor or trustee, in exercising business judgment, must demonstrate that assumption will benefit the estate, "[a]s long as assumption of a lease appears to enhance a debtor's estate, a bankruptcy court should normally grant its approval, unless the debtor in possession's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." X10 Wireless Tech., Inc., 2005 WL 6960205, at *3 (internal quotation marks and citations omitted).    In deciding whether to approve an assumption of an executory contract or unexpired lease, the Court should presume that the debtor acted prudently, on an informed basis,

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate. See In re Yellowstone Mountain Club, LLC, Nos. 08-61570-11, 2010 WL 5071354, at *2 (D. Mont. Dec. 7, 2010), aff'd, 486 F. App'x. 720 (9th Cir. 2012). The Court should approve the decision to assume the leases unless it finds that the debtor's conclusion that acceptance would be advantageous is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim or caprice." Id.

42.    In connection with the proposed Sale, the Debtor will assume and assign only those Contracts and Leases that the Buyer has designated it wants to assume pursuant to the APA. Debtor's assumption and assignment of the Contracts and Leases will be contingent upon payment of the required cure amounts consistent with the APA, and effective only upon the closing of the Sale.

43.    Furthermore, section 363(k) of the Bankruptcy Code states that a debtor's assignment of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 363(k). As a result, following assumption and assignment of the Contracts and Leases to the Buyer, the Debtor and its estate will be relieved of any and all liability for such Contracts and Leases. As such, the assumption and assignment of the Contracts and Leases will be a valid exercise of Debtor's sound business judgment.

44.    Section 365(b)(1) of the Bankruptcy Code provides as follows:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

45.    Debtor has given specific and targeted notice to all counterparties exactly how each Contract and Lease will be cured.  Importantly, these procedures afford all Contract and Lease counterparties time and an opportunity to object to both the proposed assumption and assignment of the Contract and Lease to the Buyer, as well as the proposed Cure Payment.

46.    Pursuant to section 365(b)(1) of the Bankruptcy Code, the Debtor may either cure any defaults or provide "adequate assurance" that existing defaults will promptly be cured within a reasonable time.  "Adequate assurance of a prompt cure requires that there be a firm commitment to make all payments and at least a reasonably demonstrable capability to do so."  In re Embers 86th Street, Inc., 184 B.R. at 900-01 (Bankr. S.D.N.Y. 1995) (quoting In re R.H. Neil, Inc., 58 B.R. 969, 971 (Bankr. S.D.N.Y. 1986)).

47.    Since the Bankruptcy Code does not define "adequate assurance," the nature of the requisite "adequate assurance of future performance" is left to the court's discretion, and to be determined under the facts and circumstances of each case.  See In re Berkshire Chem. Haulers, Inc., 20 B.R. 454, 457-459 (Bankr. D. Mass. 1982); Matter of Bronx-Westchester Mack Corp. 20 B.R. 139, 142 (Bankr. S.D.N.Y. 1982) (collecting cases).  The "adequate assurance" requirement should be given a "practical, pragmatic construction" based on the circumstances of each case.  See In re PRK Enterprises, Inc., 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999); In re Martin Paint Stores, 199 B.R. 258, 263 (Bankr. S.D.N.Y. 1996).

48.    The assurance of future performance pursuant to section 365(b)(1) of the Bankruptcy Code need not rise to the level of an absolute guarantee.  "Adequate" assurance can be demonstrated by showing that the debtor's performance is "likely"--i.e., more probable than not.  See In re PRK Enterps., Inc., 235 B.R. at 603; In re X10 Wireless Tech., Inc., 2005 WL 6960205, at *3 n.8 (in analyzing the requirement in section 365(b)(1)(C), noting that "[t]he necessary degree of assurance "'falls considerably short of an absolute guaranty.'") (quoting In re Tex. Health Enters., Inc., 246 B.R. 832, 835 (Bankr. E.D. Tex. 2000).  Nor does adequate assurance require a guarantee that the debtor will thrive or make a profit.  See In re Natco Indus., Inc., 54 B.R. 436, 440-441 (Bankr. S.D.N.Y. 1985).

49.    The term "promptly" in section 365(b)(1) of the Bankruptcy Code is not defined,

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

and whether a cure is prompt must be determined on the facts and circumstances of each case. See Matter of DiCamillo, 206 B.R. 64, 72 (Bankr. D.N.J. 1997). Not only must a debtor's cure of existing defaults be "prompt" in order to support an assumption under section 365(b) of the Bankruptcy Code, such debtor must also provide, as a prerequisite to assumption, adequate assurance that it can make the proposed cure payments within the specified period. "Adequate assurance of a prompt cure requires that there be a firm commitment to make all payments and at least a reasonably demonstrable capability to do so." Embers 86th Street, Inc., 184 B.R. at 900-01 (quoting In re R.H. Neil, Inc., 58 B.R. 969, 971 (Bankr. S.D.N.Y. 1986). Such adequate assurance can be demonstrated by establishing a "foundation that is nonspeculative and sufficiently substantive to assure the landlord that it will receive the amount of the default." Matter of World Skating Ctr., Inc., 100 B.R. 147, 148-49 (Bankr. D. Conn. 1989).

50.    As applied in the case at hand, the Buyer has made available and will continue to make available relevant financial information, subject to any relevant party's request for such information and the execution of an appropriate form of confidentiality agreement prior to the sharing of such information. In the absence of any objection to the Buyer's offer of adequate assurances of future performance, the Court should approve the proposed assumption and assignment of the Contracts and Leases.

**C.    Local Rule 6004 Disclosures.**

| Local Rule | Disclosure |
|---|---|
| 6004(b)(1) | *"[A] copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale."* A copy of the proposed APA is attached to the Motion as Exhibit 1. |
| 6004(b)(2) | *"[A] list of all lien holders with an interest in the property to be sold under the sale motion."* RD VII Investments, LLC and Midwest Community Development Fund VII, L.L.C. are the only known secured lienholders in the assets being sold, although arguably the City also may also claim a lien to the extent any property is a fixture pursuant to its Notice of Lien as well. |
| 6004(b)(3) | *"[A] copy of a proposed form of sale order."* The proposed form of Sale Order is attached to the Motion as Exhibit 2. |

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

| 6004(b)(4) | *"[A] request, if necessary, for the appointment of a consumer privacy ombudsman under 11 U.S.C. § 332"* The purchased Assets do not include any "personally identifiable information" within the meaning of section 101(41A) of the Bankruptcy Code, and thus there is no need for any consumer privacy ombudsman to be appointed pursuant to section 332 of the Bankruptcy Code. |
|---|---|
| 6004(b)(5) | *"The sale motion must highlight material terms, and shall indicate the location of any such provision in the proposed form of order or purchase agreement."* The Sale Motion references the key terms of the proposed APA, which are contained in APA, Article I. |
| 6004(b)(6)(A) | *"If the proposed sale is to an insider, as defined in 11 U.S.C. § 101, the sale motion must (i) identify the insider; and (ii) describe the insider's relationship to the debtor."* The proposed sale is not to an "insider" as defined in section 101(31) of the Bankruptcy Code. |
| 6004(b)(6)(B) | *"If a proposed buyer has discussed or entered into any agreements with management or key employees regarding compensation or future employment, the sale motion must disclose the material terms of any such agreements."* As of the date of filing of the Motion, the proposed Buyer has raised the possibility of retaining the Debtor's current Chief Financial Officer and Designated Responsible Person, Robert Smith, on a short-term and part time basis for a period of no greater than 90 days to assist with an orderly handover and transition to their management team. No specific compensation, timeframe or other material terms have been finalized or documented between the proposed Purchase and Mr. Smith. |
| 6004(b)(6)(C) | *"The sale motion must highlight any provisions pursuant to which an entity is being released or claims against any entity are being waived or otherwise satisfied."* Contemporaneous with the Sale Motion, the Debtor is also seeking approval of the North Las Vegas Settlement Agreement with the City and the Landlord as is necessary to allow for an assumption and assignment of the Lease, which comprises the Debtor's main operating location. This matter is discussed in the Motion. |
| 6004(b)(6)(D) | *"The sale motion must disclose whether an auction is contemplated, and highlight any provision in which the debtor has agreed not to solicit competing offers for the property subject to the sale motion or to otherwise limit the marketing of the property."* The Sale Motion does not contemplate an auction because the Debtor asserts that it has appropriately canvassed the market for potential purchasers through substantial efforts both pre and post-petition. |
| 6004(b)(6)(E) | *"The sale motion must highlight any deadlines for the closing of the proposed sale or deadlines that are conditions to closing the proposed transaction."* The Motion sets forth the deadlines for the closing and the conditions to close. See APA, Articles II and VI. |

| 6004(b)(6)(F) | *"The sale motion must highlight whether the proposed purchaser has submitted or will be required to submit a good faith deposit and, if so, the conditions under which the deposit may be forfeited."* The APA does not contemplate a good faith deposit by the proposed Buyer, but does contemplate a deposit of $45,000 of the proceeds of the Cash Purchase Price for the benefit of a litigation trust to be established by the Debtor. See APA § 5.12. |
| --- | --- |
| 6004(b)(6)(G) | *"The sale motion must highlight any provision pursuant to which a debtor is entering into any interim agreements or arrangements with the proposed purchaser, such as interim management arrangements (which, if out of the ordinary course, also must be subject to notice and a hearing under 11 U.S.C. §363(b)), and the terms of the agreements."* The Debtor has not entered into any interim agreements or arrangements with the proposed Buyer, including but not limited to any interim agreements or interim management agreements. |
| 6004(b)(6)(H) | *"The sale motion must highlight any provision pursuant to which a debtor proposes to release sale proceeds on or after the closing without further court order, or to provide for a definitive allocation of sale proceeds."* The Sale Motion does not propose any immediate release of sale proceeds except for certain cure costs, which principally includes the City pursuant to the North Las Vegas Settlement Agreement. APA § 1.07 provides for a Purchase Price Allocation within 30 days after the Closing Date. |
| 6004(b)(6)(I) | *"The sale motion must highlight any provision seeking to have the sale declared exempt from taxes under 11 U.S.C. § 1146(a), and the type of tax (e.g., recording tax, stamp tax, use tax, or capital gains tax) for which the exemption is sought. It is not sufficient to refer simply to "transfer" taxes and the state or states in which the affected property is located."* The Debtor does not seek to have the Sale declared exempt under section 1146 of the Bankruptcy Code as this is not a sale by and through a plan of reorganization. |
| 6004(b)(6)(J) | *"If the debtor proposes to sell substantially all of its assets, the sale motion must highlight whether the debtor will retain, or have reasonable access to, its books and records to enable it to administer its bankruptcy case."* The Debtor does propose to sell substantially all of its assets, however, pursuant to APA § 9.13, the Debtor and the estate will retain a post-closing office, and pursuant to APA § 9.14, the Debtor and the estate will retain, through the second anniversary of the Closing Date, reasonable access to its books and records. |
| 6004(b)(6)(K) | *"The sale motion must highlight any provision pursuant to which the debtor seeks to sell or otherwise limit any rights to pursue avoidance claims under Chapter 5 of Title 11 of the United States Code."* The Debtor is not selling any of its Avoidance Actions or Insider Claims; rather, those are defined as Excluded Assets pursuant to APA § 1.02(d) and the associated Disclosure Schedule. |

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

| 6004(b)(6)(L) | *"The sale motion must highlight any provision limiting the proposed purchaser's successor liability."* APA § 1.04(b) includes successor liability as an Excluded Liability that the Buyer is not assuming and is not responsible for, and thus is confirmed by language in the Sale Order that absolutely and unequivocally prohibits any successor liability claims against the proposed Buyer arising prior to the Closing. |
|---|---|
| 6004(b)(6)(M) | *"The sale motion must highlight any provision by which the debtor seeks to sell property free and clear of a possessory leasehold interest, license or other right."* The Sale Motion and APA propose to sell all of the Debtor's property, wherever situated, including but not limited to any property to the extent owned by the Debtor and situated at the 13th Street Property, and thus free and clear of any alleged sublease of such personal property. |
| 6004(b)(6)(N) | *"The sale motion must highlight any terms with respect to credit bidding pursuant to 11 U.S.C. § 363(k)."* The proposed Buyer is not an existing secured creditor exercising any credit bid right pursuant to section 363(k) of the Bankruptcy Code. |
| 6004(b)(6)(O) | *"The sale motion must highlight any provision whereby the debtor seeks relief from the fourteen (14) day stay imposed by Fed. R. Bankr. P. 6004(h)."* As set forth in this Motion and the Sale Order, the Debtor seeks a waiver of any and all stays, including any stay of the effectiveness of the Sale Order pursuant to Fed. R. Bankr. P. 6004(h), so as to allow the sale to close and be consummated as soon as possible, which is necessary in order to avoid immediate and irreparable harm. |

## D.   The Court Should Find that the Buyer is a Good Faith Buyer for Value.

51.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in the event a sale authorized under section 363(b) is later reversed or otherwise modified on appeal. See 11 U.S.C. § 363(m); see also Paulman v. Gateway Venture Partners III, L.P., 163 F.3d 570, 576 (9th Cir. 1998) ("When a sale of assets is made to a good faith purchaser, it may not be modified or set aside unless the sale was stayed pending appeal."). Although "good faith" purchase is not defined in the Bankruptcy Code, the Ninth Circuit "has defined a good faith purchaser as 'one who buys 'in good faith' and 'for value.'''" In re Fearing, 2005 WL 1663143, *1 (9th Cir. July 18, 2005) (citing Ewell v. Diebert, 958 F.2d 276, 281 (9th Cir. 1992) (further citations omitted). Specifically "lack of 'good faith' is shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" Fearing, at *1 (further citations omitted).

52.    The selection of the Buyer is a result of good faith, arm's length negotiations

26

among the parties, and after a thorough and competitive marketing process. Further, the negotiations with respect to the APA and related transaction documents were substantial, lengthy and involved over the course of more than a month. Additionally, the Buyer is not an insider of the Debtor, and did not induce the bankruptcy filing, and indeed has been a significant competitor of the Debtor's for years. As a result, the Debtor requests a finding that the Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**E.    The Proposed Timing of the Sale Hearing and Notice is Necessary and Appropriate.**

53.    The proposed timing of the Sale is expedited, however, the applicable Bankruptcy Rules support the proposed timeframe within which the Debtor seeks approval of the Sale. Bankruptcy Rule 6004 provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in accordance with § 363(b)(2) of the [Bankruptcy Code]." Fed. R. Bankr. P. 6004(a). Subsections (a)(2), (c)(1) (i) and (k) of Bankruptcy Rule 2002, read together, require the Debtor to give all creditors and certain other parties "at least 21 days' notice by mail" of a sale of assets. See Fed. R. Bankr. P. 2002(a)(2), (c)(1), (i) and (k). Further, the Bankruptcy Rules provide that sales free and clear of liens and other interests shall include notices that specify the relevant objection deadlines. See Fed. R. Bankr. P 6004(b).

54.    Notwithstanding the foregoing, Bankruptcy Rule 9006(c) allows for reduction of the foregoing applicable timeframes for good cause shown. Significantly, however, the proposed timeframe for the Sale is designed to obtain the maximum recovery for creditors, and is necessitated in light of Debtor's cash position and the pressures put on it by its customers and other parties in interest as previously detailed herein. Further, as previously noted, the Debtor will provide separate and specific targeted notice to the holders of Contracts and Leases. Finally, the Debtor's service of the proposed Order Shortening Time with respect to the setting of the Motion, which shortened time has been universally approved of by all of the major parties in interest, will communicate the objection deadline to the Motion.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

**F.**     **Request for Relief Pursuant to Bankruptcy Rules 6004 and 6006.**

55.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  Debtor requests a waiver of these stays given the reality of Debtor's financial situation and its need to quickly maximize and realize the value of its assets, as well as to avoid the incurrence of additional administrative expenses for continued post-petition operations.

**G.**     **Approval of the North Las Vegas Settlement Agreement.**

56.     Bankruptcy Rule 9019 provides in relevant part that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019.  Compromise and settlement agreements have long been an inherent component of the bankruptcy process.  See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson, 390 U.S. 414, 424 (1958) (citing Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939)).  In TMT Trailer, the Supreme Court held that a bankruptcy settlement must be "fair and equitable." Id.

57.     A bankruptcy court may approve a settlement pursuant to Bankruptcy Rule 9019 where, based on its own independent judgment, the court determines that the settlement is "fair and equitable when comparing the claims being compromised against the likely rewards of litigation." In re Endoscopy Ctr. of S. Nevada, LLC, 451 B.R. 527, 535-36 (Bankr. D. Nev. 2011) (citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 425 (1968); In re Churchfield, 277 B.R. 769, 773 (Bankr. E.D. Cal. 2002)).

58.     In order to determine whether a proposed settlement is fair and equitable, the bankruptcy court should consider the following factors:

      (a)     the probability of success in the litigation;

      (b)     the difficulties, if any, to be encountered in the matter of

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

1  collection;

2  (c)    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

3

4  (d)    the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

5  Robinson v. Kane (In re A&C Props.), 784 F.2d 1377, 1381 (9th Cir. 1986); In re Endoscopy Ctr.

6  of S. Nev., LLC, 451 B.R. 527 (Bankr. D. Nev. 2011); In re Hyloft, Inc., 451 B.R. 104 (Bankr. D.

7  Nev. 2011). "The law favors compromise and not litigation for its own sake. . . ." A & C Props.,

8  784 F.2d at 1381.

9  59.    The debtor is not necessarily required to satisfy each of these factors as long as the

10  factors as a whole favor approval of the settlement. See In re Pacific Gas and Elec. Co., 304 B.R.

11  395, 416 (Bankr. N.D. Cal. 2004). The settlement does not have to be the best the debtor could

12  have possibly obtained; rather, the settlement must only fall "within the reasonable range of

13  litigation possibilities." In re Adelphia Comm'ns Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y.

14  2005). In considering the factors, "a precise determination of likely outcomes is not required,

15  since an exact judicial determination of the values at issue would defeat the purpose of

16  compromising the claim." In re Telesphere Comm'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill.

17  1994) (internal quotations omitted). Thus, rather than determining various issues of fact and law,

18  the Court should "canvass the issues and see whether the settlement fall[s] below the lowest

19  point in the range of reasonableness." In re Lion Capital Group, 49 B.R. 163, 175 (Bankr.

20  S.D.N.Y. 1985) (internal quotations omitted); see also Suter v. Goedert, 396 B.R. 535, 548 (D.

21  Nev. 2008) (quoting Burton v. Ulrich (In re Schmitt), 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997)).

22  To require a more extensive analysis would defeat the purpose of Bankruptcy Rule 9019 because

23  if courts were required to do more than canvass the issue, there would be no point compromising;

24  the parties might as well go ahead and try the case.

25  60.    As applied in the case at hand, the North Las Vegas Settlement Agreement meets

26  the A&C Properties standards and thus should be approved. The Agreement is fair, reasonable

27  and in the best interests of the Debtor's estate. The Agreement is also product of extensive,

28  good-faith discussions and arms' length bargaining among the parties thereto, and is an essential

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

component to allow the Sale transaction to proceed because the Buyer requires the Premises subject to the Lease Agreement in order to operate the facility therein, which is also where most of the assets are located.

61.    As to the first <u>A&C Properties</u> factor, the probability of success of the City and/or the Landlord's claims against the Debtor as asserted in their filed proofs of claim is substantial. The amounts owing to the City were largely agreed to in a pre-petition settlement agreement that the Debtor breached due to nonpayment, and as a consequence thereof, the City accelerated the entire balance owing and recorded its Notice of Lien against the Premises for those amounts. Although the City's recordation of its Notice of Lien was within the 90-day preference window pursuant to section 547 of the Bankruptcy Code, the City enjoys special superpriority for its claim under the City of North Las Vegas Municipal Code on par with real property taxes, subject only to any post-petition superpriority liens provided in favor of RDVII under its existing DIP Financings.  Moreover, there is at least an argument that certain of the heavier equipment in the Premises is arguably a fixture and thus part of the realty and thus also subject to the Notice of Lien as well given the substantial difficulties and tremendous expense and/or damage that would undoubtedly be encountered if the equipment were attempted to be removed and sold.

62.    The recordation of the Notice of Lien on the Landlord's Premises is, in turn, a breach by the Debtor of its Lease Agreement with the Landlord as well, and thus the Debtor was in default under its Lease Agreement pre-petition as a result.  The Debtor's Lease for the Premises is its sole operating facility and the Buyer requires the use of the Premises as one of the principal assets it is purchasing.  The Debtor may seek to assume and assign the Lease to the Buyer pursuant to section 365 of the Bankruptcy Code, but as a matter of law, must also provide a prompt cure of any defaults as part of that transaction to the Landlord, which necessarily thus involves dealing with the City's lien recorded on the Premises.

63.    As part of its proposed offer to purchase, and so as to reduce the amount of money it must come "out of pocket" immediately at the close of its purchase, the Buyer has offered to assume up to $750,000 of the obligation to the City as part of its total consideration offered, with the balance of the obligation to the City being paid by the Debtor from the sale proceeds so as to

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

provide the necessary full and prompt cure required. As such, the North Las Vegas Settlement Agreement effectuates the assumption and assignment transaction for the Lease, and also memorializes the terms of the repayment over time of the prompt cure that is statutorily required under section 365 of the Bankruptcy Code as a necessary part of the overall sale transaction. Indeed, the length of repayment as provided for under the Agreement is arguably substantially longer than could reasonably be expected were the Debtor to contest how quickly the Lease must be cured under applicable law. For example, generally the applicable caselaw defines a "prompt" cure as one occurring within one year or less, and, although there is some caselaw allowing for longer cure periods stretching as long as two or three years, those cases are limited and generally involve special circumstances. In comparison, the North Las Vegas Settlement Agreement provides for a lengthier cure period over a few years, and which can be extended if payments are made on time, which is in recognition of the size of the amount of the obligation, and undoubtedly as a result of the substantial number of jobs that would be preserved by keeping the facility open, as well as the tax base generated from the associated job preservation.

64.     As to the second <u>A&C Properties</u> factor, the difficulties of collection, the City does not have any substantial difficulties in collection because it enjoys a special superpriority under its Municipal Code against the Premises per the Notice of Lien. Without the North Las Vegas Settlement Agreement, and if the Lease were instead rejected, the City would incur some additional costs and expenses in seeking to enforce its remedies pursuant to the Notice of Lien recorded against the Premises, including foreclosing and seeking to sell the Premises in satisfaction of the amounts owing, but ultimately given the value of the Premises, and the likelihood that the Landlord would presumably "step up" in such occasion to pay the amount owing to prevent the foreclosure given that the value of the Premises is substantially more than the amount of the City's claim, the City has a high probability of being made whole.

65.     As to the third <u>A&C Properties</u> factor, the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, a fight over how prompt of a cure the Landlord (and in effect the City) should be paid under the Lease could prove somewhat complex and at a very critical and precipitous time for the Debtor. Indeed, the delay attendant to

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

a protracted fight over the promptness of any cure of the Lease could cause the Buyer to abandon the transaction or substantially reduce the total consideration paid in light of the uncertainties or potential results that could be gained even if such litigation were undertaken by the Debtor.

66.    Finally, as to the fourth A&C Properties factor, being the interest of creditors, the interests of various of the Debtor's creditors are well served by allowing the sale transaction to take place, of which the North Las Vegas Settlement Agreement, and the assumption, assignment and cure of the Lease therein, is a necessary and indeed critical part.  First, the sale transaction allows for a return to RDVII as the first tier secured creditor on its DIP Financing.  RDVII has continually financed the Chapter 11 Case to allow for an orderly sale process, including through providing three rounds of DIP Financing, as well as substantial carveouts to the bankruptcy estate's professionals, including the Committee, as well as an additional amounts as part of this sale transaction for the benefit of a litigation trustee.  Second, approval of the North Las Vegas Settlement Agreement allows for the payment and satisfaction of the City and the Landlord, which are two of the most significant creditor groups in the case.  Third, approval of the North Las Vegas Settlement Agreement allows for an orderly transaction to the Buyer, who will undertake servicing of many of the Debtor's existing customers and other normal business contracts, most of whom are also creditors and/or executory contract holders, our of the existing facility, as opposed to a disjointed and value-compromising liquidation or removal of equipment from the existing facility.  Finally, approval of the North Las Vegas Settlement Agreement also is in the interests of unsecured creditors because it is part of the sale transaction that also leaves $45,000 for a litigation trust that can investigate and bring claims for their benefit.

67.    For all of the reasons set forth herein, the Agreement is fair, equitable, and in the best interests of the Debtor's estate and creditors, and thus the Debtor respectfully requests that the Court approve the Agreement as a reasonable compromise of the parties' disputes, and allow for its assumption and assignment to the Buyer as is necessary and appropriate.

. . .

. . .

. . .

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

32

1

## IV.  <u>CONCLUSION</u>

WHEREFORE, Debtor respectfully request that this Court grant this Motion, thereby entering the Sale Order, and granting such other and further relief as is just and proper.

DATED:  May 23, 2017.

By:   /s/ Matthew C. Zirzow
LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
850 E. Bonneville Ave.
Las Vegas, Nevada 89101

Attorneys for Debtor

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

# EXHIBIT "1"



1

2

3

4

5

6

7   LARSON & ZIRZOW, LLC
    ZACHARIAH LARSON, ESQ.
8   Nevada Bar No. 7787
    E-mail: zlarson@lzlawnv.com
9   MATTHEW C. ZIRZOW, ESQ.
    Nevada Bar No. 7222
10  E-mail: mzirzow@lzlawnv.com
    850 E. Bonneville Ave.
11  Las Vegas, Nevada 8 9101
    Tel: (702) 382-1170
12  Fax: (702) 382-1169

13
    Attorneys for Debtor
14

15              UNITED STATES BANKRUPTCY COURT
16                   DISTRICT OF NEVADA

17  In re:                          Case No.: BK-S-16-15388-mkn
                                     Chapter 11
18  SUPERIOR LINEN, LLC,

19              Debtor.
                                     Date:
20                                   Time:

21      ORDER APPROVING DEBTOR'S MOTION FOR APPROVAL PURSUANT TO
22  11 U.S.C. §§ 105(a), 363, AND 365 AND FED. R. BANKR. P. 2002, 6004, 6006, 9007 AND 9014
    AUTHORIZING (A) SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
23      AND INTERESTS; (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
    CONTRACTS AND UNEXPIRED LEASES, AND DESIGNATION RIGHTS; (C) APPROVAL
24  OF SETTLEMENT AND RELEASE AGREEMENT PURSUANT TO FED. R. BANKR. P. 9019
    WITH THE CITY OF NORTH LAS VEGAS AND ICON PAC NEVADA OWNER POOL 3,
25      NEVADA LLC, AND ASSUMPTION AND ASSIGNMENT OF AGREEMENT

26

27

28

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

Superior Linen, LLC, a Nevada corporation, as debtor and debtor in possession (the "Debtor") having filed its *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, 9007 and 9014 Authorizing (A) Sale Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and Designation Rights; (C) Approval of Settlement and Release Agreement Pursuant to Fed. R. Bankr. P. 9019 With the City of North Las Vegas and Icon Pac Nevada Owner Pool 3, Nevada LLC, and Assumption and Assignment of Agreement* (the "Sale Motion") [ECF No. ___] of the above-captioned debtor and debtor in possession (the "Debtor") for the entry of an order pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), and Rules 6004 and 9019 of the Local Rules of Bankruptcy Practice for the United States District Court for the District of Nevada (the "Local Rules"); and the Court having reviewed and considered the Motion and all objections thereto (such filed objections being referred to as the "Filed Objections"), and the arguments of counsel made, and the evidence adduced at the hearing before the Court on May ___, 2017 (the "Sale Hearing"); and upon the record of the Sale Hearing and this chapter 11 case and proceedings, and after due deliberation thereon, and good cause appearing therefor and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; the Court having made certain findings of fact and conclusions of law on the record at the hearing, which are incorporated herein by reference pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable pursuant to Bankruptcy Rules 7052 and 9014; and after due deliberation thereon,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

**I.    JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES**

A.    The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and Local Rule 1001(b)(1). This is a core proceeding pursuant to 28

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

1    U.S.C. §§ 157(b)(2)(A), (N) and (O). Venue is proper in this District and in the Court pursuant to

2    28 U.S.C. §§ 1408(1) and 1409(a).

3        B.      This Order constitutes a final and appealable Order within the meaning of 28

4    U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent

5    necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure,

6    as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just

7    reason for delay in the implementation of this Order, and expressly directs entry of judgment as

8    set forth herein.

9        C.      The statutory predicates for the relief requested in the Motion are sections 105(a),

10   363(b), (f), and (m), and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002(a)(2),

11   6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007, 9014, and 9019.

12       D.      The findings of fact and conclusions of law set forth herein constitute the Court's

13   findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil

14   Procedures, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.

15       E.      To the extent any of the following findings of fact constitute conclusions of law,

16   they are hereby adopted as such.   To the extent any of the following conclusions of law

17   constitute findings of fact, they are hereby adopted as such. Any findings of fact or conclusions

18   of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent

19   they are not inconsistent herewith.

20       F.      Las Vegas Linen, LLC (the "Purchaser") will be acting in good faith pursuant to

21   section 363(m) of the Bankruptcy Code in closing the transaction contemplated by the Final

22   APA (defined below) to purchase the assets as set forth therein (the "Purchased Assets") at any

23   time on or after entry of this Order, and cause has been shown as to why this Order should not be

24   subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

25   II.    **NOTICE OF THE SALE, AUCTION AND THE CURE AMOUNTS**

26       G.      As evidenced by the affidavits of service on file with the Court, (i) due, proper,

27   timely, adequate, and sufficient notice of the Sale Motion,  the Sale Hearing, and the APA, and a

28   reasonable opportunity to object or be heard with respect to the foregoing, has been provided in

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (ii) such notice was good, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Sale Motion, the Sale Hearing, and the APA is or shall be required.

H.      Actual written notice of the Sale Hearing, the APA, and the Sale Motion, and a reasonable opportunity to object or be heard with respect to same, has been afforded to all known interested entities including to the following parties: (i) U.S. Trustee; (ii) counsel to any known secured creditors of record, (iii) all creditors of the Debtor, (iv) counsel to Purchaser, (v) counsel to the Official Committee of Unsecured Creditors (the "Committee"); (vi) any known party asserting a lien or Adverse Interest against any of the Debtor's assets; (vii) all taxing authorities having jurisdiction over the Purchased Assets and the Debtor, including the Internal Revenue Service and the Maryland state taxing authorities; (viii) all governmental agencies that are an interested party with respect to the Sale; (ix) any other applicable state and local taxing and other regulatory authorities; (x) all parties that have filed a notice of appearance and demand for service of papers in this bankruptcy case as of the date of service.

I.      The disclosures made by the Debtor concerning the Sale Motion, the APA and the Sale Hearing were good, complete and adequate.

J.      As part of the Sale Motion, the Debtor served notices (the "Cure Notice") [ECF No. ___] upon the parties to certain Executory Contracts:  (i) that the Debtor intends to seek to assume and assign certain Executory Contracts; and (ii) of the relevant cure amounts.  Pursuant to Bankruptcy Rule 6006(c), the Court finds that the service of such Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a cure amount for the Executory Contracts.  The Purchaser and the Contract Counterparties have had an opportunity to object to the cure amounts set forth in the Cure Notice.

K.      The Debtor has articulated good and sufficient reasons for the Court to grant the relief requested in the Sale Motion regarding the sales, including, without limitation: (i) approval of the Final APA as the highest and best offer, and (ii) determination of final cure amounts.

L.      The Cure Notice provided the Purchaser and the Contract Counterparties with

4

proper notice of the potential assumption and assignment of the Executory Contracts and Leases and any cure amount relating thereto, and the procedures set forth therein with regard to any such cure amount satisfy the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

### III.    GOOD FAITH OF THE PURCHASER

M.    The Purchaser is not an "insider" of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.

N.    The APA was negotiated, proposed, and entered into by the Debtor and the Purchaser without collusion, in good faith, and from arm's length bargaining positions. Neither Purchaser, nor any of its affiliates, members, officers, directors, partners or shareholders (each such entity, including Purchaser, individually and when taken together, the "Purchaser Group") is an "insider" of the Debtor, as that term is defined in Section 101(31) of the Bankruptcy Code.

O.    The sale price in respect of the Purchased Assets was not controlled by any agreement among potential acquirers of the Purchaser's Assets, and neither the Debtor nor Purchaser engaged in collusion or any other conduct that would cause or permit the APA or Sale Transactions to be avoided under section 363(n) of the Bankruptcy Code. Accordingly, the APA may not be avoided and no party shall be entitled to any damages or other recovery pursuant to section 363(n).

P.    The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Purchaser Group is acting in good faith within the meaning of section 363(m) in consummating the Sale Transactions.

### IV.    HIGHEST OR BEST OFFER

Q.    As demonstrated by evidence adduced at and prior to the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, (a) the Debtor conducted an adequate marketing process and (b) the APA represents the highest and best offer for the Purchased Assets and no other or further marketing or sales process with respect to the Purchased Assets is in the best interests of the Debtor's estate or creditors or is likely to lead to an offer that provides consideration in excess of the consideration provided in the APA; (c) the consideration

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

to be provided by Purchaser under the APA provides fair and reasonable consideration to the Debtor for the sale of all Purchased Assets and the assumption of all Assumed Liabilities, and the performance of the other covenants set forth in the APA, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative; (d) the Debtor's determination that the APA constitutes the highest and best offer for the Purchased Assets is a valid and sound exercise of the Debtor's business judgment.

R.    Upon entry of this Sale Order, the Debtor shall have full authority to and shall be required to consummate the APA.

S.    The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

**V.    NO FRAUDULENT TRANSFER**

T.    The consideration provided by the Purchaser pursuant to the Final APA is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

**VI.    VALIDITY OF TRANSFER**

U.    The Debtor has full corporate power and authority to execute and deliver the Final APA and all other documents contemplated thereby, and no further consents or approvals are required for the Debtor to consummate the transactions contemplated by the Final APA.

V.    The transfer of each of the Purchased Assets to the Purchaser will be as of the Closing Date a legal, valid and effective transfer of such assets, and vests or will vest the Purchaser with all right, title and interest of the Debtor to the Purchased Assets free and clear of all Liens (defined below) and Claims (defined below) accruing, arising or relating to any time prior to the Closing Date, except for any assumed liabilities solely relating to the Assumed Liabilities (as that term is defined in the Final APA).

W.    Other than the Assumed Liabilities and the limited Holdback (as defined in the APA), the Purchaser Group shall have no obligations with respect to any Liabilities of the Debtor

6

or any Adverse Interests against the Debtor or its property, including but not limited to (a) under any Contract that is not an Assumed Contract or (b) the liabilities of the Debtor specifically excluded under the APA (the "Excluded Liabilities"); *provided*, *however*, that this finding does not modify any obligation of the Purchaser pursuant to or contemplated by the APA and this Order, which shall be and remain fully enforceable against the Purchaser.

X. The Purchased Assets constitute property of the Debtor's estate and title thereto is presently vested in the Debtor's estate within the meaning of Section 541(a) of the Bankruptcy Code.

Y. The consummation of the Sale Transactions is legal, valid, properly authorized and complies with all applicable state and federal law. The APA is a valid and binding contract between the Debtor and Purchaser, which is and shall be enforceable according to its respective terms.

## VII. SECTION 363(F) IS SATISFIED

Z. The Purchaser would not have entered into the Final APA and would not consummate the transactions contemplated thereby (by paying the Purchase Price (as defined in the Final APA) and assuming the Assumed Liabilities) if the sale of the Purchased Assets to the Purchaser, and the assumption, assignment and sale of the Assumed Contracts to the Purchaser, were not, except as otherwise provided in the Final APA with respect to the Assumed Liabilities, free and clear of all Liens, Claims and/or encumbrances of any kind or nature whatsoever, or if the Purchaser would, or in the future could (except and only to the extent expressly provided in the Final APA and with respect to the Assumed Liabilities), be liable for any of such Liens, Claims, and/or encumbrances including, but not limited to, Liens or Claims in respect of the following: (1) all mortgages, deeds of trust and security interests; (2) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (3) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state labor laws; (k) state discrimination laws, (1) state unemployment compensation laws or any other similar state laws, or (m) any other state or federal benefits or claims relating to any employment with any of the Debtor or any of its predecessors; (4) any bulk sales or similar law; (5) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (6) any Environmental Law(s) (as defined in the Final APA); and (7) any theories of successor liability.

AA.    The Debtor shall sell the Purchased Assets free and clear of all Liens and Claims against the Debtor, its estate or any of the Purchased Assets (except for any Assumed Liabilities under the Final APA) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Liens or Claims against the Debtor, its estate or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of such Liens or Claims who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Liens and/or Claims, if any, in each instance against the Debtor, its estate or any of the Purchased Assets, attach to the cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

BB.    The transfer of the Purchased Assets to the Purchaser or its designee(s), including the assumption by the Debtor and assignment and sale to the Purchaser or its designee(s) of the Assumed Contracts, will not subject the Purchaser or its designee(s) to any liability whatsoever (including any successor liability) with respect to the operation of the Business prior to the Closing or by reason of such transfer, except that the Purchaser or its

8

designee(s), as applicable, shall remain liable for the Assumed Liabilities.

CC.    By virtue of the Sale Transactions, (i) Purchaser is not a continuation of the Debtor or its estate, there is no continuity between Purchaser and the Debtor, there is not substantial continuity between Purchaser and the Debtor, there is no common identity between the Debtor and Purchaser, there is no continuity of enterprise between the Debtor and Purchaser, Purchaser is not a mere continuation of the Debtor or its estate, and Purchaser does not constitute a successor to the Debtor or its estate; Purchaser is not holding itself out to the public as a continuation of the Debtor or its estate; and the Sale Transactions do not amount to a consolidation, merger or de facto merger of Purchaser and the Debtor and/or the Debtor's estate.

DD.    The transfer of the Purchased Assets to Purchaser shall not subject the Purchaser Group to any liability by reason of such transfer (other than for Assumed Liabilities), including, without limitation, under (a) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based in whole or part on, directly or indirectly, including without limitation, any theory of antitrust, environmental, products liability, successor or transferee liability, labor law, de facto merger or substantial continuity; or (b) any employment contract, understanding or agreement, including, without limitation, collective bargaining agreements, employee pension plans or employee welfare or benefit plans.

VIII.    **ASSUMPTION AND ASSIGNMENT OF THE EXECUTORY CONTRACTS**

EE.    The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order are integral to the Final APA and is in the best interests of the Debtor and its estate, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.

FF.    Except as provided in this Order or as may be subsequently determined by the parties or this Court in accordance with this Order, the amounts set forth on **Exhibit 2** annexed hereto are the amounts necessary to cure all monetary defaults and pay all actual pecuniary losses under the Assumed Contracts as of the Closing Date under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code (the "Cure Amounts").

GG.    Pursuant to the terms of the Final APA, the Purchaser will: (i) cure and/or provide

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

adequate assurance of cure of any Cure Amounts (if any) existing prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; (ii) provide compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code; and (iii) provide adequate assurance of its future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(c)(2)(B) of the Bankruptcy Code.

## IX.    COMPELLING CIRCUMSTANCES FOR AN IMMEDIATE SALE

HH.    To enhance the Debtor's level of liquidity, to reduce the amount of postpetition obligations borne by the Debtor, and to maximize the amount of proceeds available to the Debtor's bankruptcy estates, it is essential that the Sale of the Purchased Assets occur within the time constraints set forth in the Final APA.  Time is of the essence in consummating the Sale.

II.    Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the purchase price under the Final APA, the proposed Sale of the Purchased Assets to the Purchaser constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

JJ.    The consummation of the transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

KK.    Approval of the Settlement and Release Agreement among the Debtor, the City of North Las Vegas, and Icon Pac Nevada Owner Pool 3, Nevada, LLC (the "North Las Vegas Settlement Agreement") is fair and equitable, and was a reasonable exercise of the Debtor's business judgment and should be authorized and approved.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

**GENERAL PROVISIONS**

1.      The relief requested in the Motion is granted and approved, and the Sale contemplated thereby is approved as set forth in this Order.

2.      This Court's findings of fact and conclusions of law, set forth in the Bid Procedures Order, are incorporated herein by reference.

3.      The Filed Objections have been withdrawn, and any other objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived or settled, or not otherwise resolved pursuant to the terms hereof, if any, are hereby denied and overruled on the merits with prejudice.

**APPROVAL OF THE FINAL APA**

4.      The Final APA and all other ancillary documents, including, without limitation, the Building license agreement (defined herein), and all of the terms and conditions thereof, are hereby approved, subject to certain amendments and modifications provided by the terms of this Order.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to take any and all actions necessary or appropriate to (i) consummate the Sale of each of the Purchased Assets (as defined in the Final APA) to the Purchaser pursuant to and in accordance with the terms and conditions of the Final APA, (ii) close the Sale as contemplated in the Final APA and this Order, and (iii) execute and deliver, perform under, consummate, implement and close fully the Final APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Final APA and the Sale, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Final APA and such other ancillary documents.

6.      This Order shall be binding in all respects upon the Debtor, including the Debtor, its estate, all holders of equity interests in the Debtor, all holders of any Claim(s) (whether known or unknown) against the Debtor, any holders of Liens or Claims against or on all or any portion of the Purchased Assets, all Contract Counterparties, the Purchaser and all successors and assigns of the Purchaser, the Purchased Assets and any trustees, if any, subsequently

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

11

1  appointed in any of the Debtor's chapter 11 cases or upon a conversion to chapter 7 under the

2  Bankruptcy Code of any of the Debtor's cases. This Order and the Final APA shall inure to the

3  benefit of the Debtor, its estate, its creditors, the Purchaser and their respective successors and

4  assigns.

5        7.    Nothing contained in any chapter 11 plan confirmed in the Bankruptcy Case or

6  any order confirming any such chapter 11 plan, any order converting the Debtor's bankruptcy

7  case to chapter 7 of the Bankruptcy Code, or any order dismissing the Debtor's bankruptcy case

8  shall conflict with or derogate from the provisions of the Final APA

9        8.    To the greatest extent available under applicable law, Purchaser shall be

10  authorized, as of the Closing Date, to operate under any license, permit, registration and any

11  other governmental authorization or approval of the Debtor with respect to the Purchased Assets

12  and the Assumed Contracts, and all such licenses, permits, registrations and governmental

13  authorizations and approvals are deemed to have been, and hereby are, directed to be transferred

14  to Purchaser as of the Closing Date, to the extent provided in the APA. The Debtor shall

15  cooperate with Purchaser and shall use commercially reasonable efforts to cause its

16  representatives to cooperate with Purchaser's representatives, to provide an orderly transition of

17  the Business and the Purchased Assets and to minimize the disruption to the Business resulting

18  from the Sale Transactions, including, but not limited to, with respect to the transfer of all

19  licenses, permits and registrations, to the extent provided in the APA, and to facilitate obtaining

20  all necessary governmental authorizations and approvals, all, however, to the extent included in

21  the Purchased Assets.

22        9.    Nether Purchaser nor the Purchaser Group shall be deemed or considered, as a

23  result of any action taken in connection with the APA, the consummation of the Sale Transactions

24  or the transfer, operation or use of the Purchase Assets (or otherwise), (a) a successor to the

25  Debtor or the Debtor's estate by reason of any theory of law or equity, (b) to have merged with or

26  into the Debtor (*de facto* or otherwise), or (c) to be an alter ego or a mere continuation or

27  substantial continuation of the Debtor, in each case including within the meaning of any foreign,

28  federal, state or local revenue, pension, ERISA (defined below), tax, labor, employment,

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine.

10.     Except as expressly provided in the APA with respect to Assumed Liabilities, the Purchaser Group shall have no liability whatsoever with respect to the Debtor's (or its predecessors' or affiliates') businesses or operations or any of the Debtor's (or its predecessors' or affiliates') obligations (as described below, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets or the Business prior to the Closing. Except to the extent expressly included in the Assumed Liabilities or otherwise provided for in the APA, the Purchaser Group shall have no liability or obligation under the Worker Adjustment and Retraining Notification Act (29 U.S.C. §§ 2101 *et seq.*) and its state law equivalents; the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. §§ 9601 *et. seq.*); the Employment Retirement Income Security Act of 1974, as amended (29 U.S.C. §§ 2101 *et seq.*) ("ERISA") or any foreign, federal, state or local labor, employment or environmental law whether of similar import or otherwise by virtue of Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities by Purchaser.

11.     Nothing in this Order or the APA shall require the Purchaser Group to (a) continue or maintain in effect, or assume any liability in respect of any employee, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtor is a party or have any responsibility therefor including medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

13

respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

12.     Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser Group, or its assets (including the Purchased Assets), with respect to any (a) Adverse Interest or (b) Successor or Transferee Liability including the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Adverse Interest; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the business operated with such assets.

## TRANSFER OF THE PURCHASED ASSETS

13.     Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtor is authorized and directed to transfer the Purchased Assets on the Closing Date (as defined in the Final APA). Such Purchased Assets shall be transferred to the Purchaser upon and as of the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such Purchased Assets and, upon the Debtor's receipt of the Purchase Price, shall be free and clear of all charges, liens (statutory or otherwise), interests, security interests, claims, mortgages, leases, subleases, hypothecations, deeds of trust, pledges, options, rights of ruse or possession, rights of first offer or first refusal, easements, servitudes, restrictive covenants, encroachments, encumbrances, rights of way, transfer restrictions or other similar restrictions of any kind, including any restrictions on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, however arising or existing (including all "Liens" as defined in the

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

Final APA, "Liens") and claims, including, without limitation, all "claims" within the meaning of sections 101(5), 102(2) and 105 of the Bankruptcy Code, and all interests, encumbrances, rights of setoff, recoupment, netting and deductions ("Claims"), except Assumed Liabilities under the Final APA. Upon the Closing, the Purchaser shall take title to and possession of the Purchased Assets subject only to the Assumed Liabilities. Pursuant to section 363(c) of the Bankruptcy Code, other than with respect to the Assumed Liabilities, the transfer of title to the Purchased Assets and the Assumed Contracts shall be free and clear of (a) any and all Liens, (b) any and all liabilities, and (c) any and all Claims including, without limitation, any and all claims pursuant to any successor or successor in interest liability theory; *provided*, *however*, that the Purchaser shall not be relieved of liability with respect to the Assumed Liabilities, consisting solely of obligations accruing under the Assumed Contracts from and after the Closing.

14.    All Liens and/or Claims shall attach solely to the proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Purchased Assets, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

15.    Except as expressly provided by the Final APA with respect to Assumed Liabilities, all persons and entities holding Liens, Claims or interests in all or any portion of the Purchased Assets arising under or out of, in connection with, or in any way relating to the Debtor, the Purchased Assets, the operation of the Debtor's business prior to the Closing Date or the transfer of the Purchased Assets to the Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against the Purchaser or its successors or assigns, their property or the Purchased Assets, such persons' or entities' Liens or Claims in and to the Purchased Assets. On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be deemed by the Purchaser to be necessary or desirable to release Liens or Claims on the Purchased Assets, if any, as provided for herein, as such Liens or Claims may have been recorded or may otherwise exist.

16.    Notwithstanding anything to the contrary contained herein, to the fullest extent permitted by applicable law, neither the Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transactions set forth in the Final APA: (i) be a successor

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

15

to the Debtor or the Debtor's estate; (ii) have, *de facto* or otherwise, merged or consolidated with or into the Debtor or the Debtor's estate; or (iii) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor. Except for the Assumed Liabilities arising solely from the Assumed Contracts, the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtor and/or its estate including, but not limited to, any bulk sales law.

17.    All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Purchaser or its assignee on the Closing Date, including without limitation, all assets currently held or otherwise located at [13th Street Location].

18.    A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the Liens, Claims and other encumbrances of record.

19.    If any person or entity which has filed statements or other documents or agreements evidencing Liens on, Claims or interests in, all or any portion of the Purchased Assets shall not have delivered to the Debtor prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Purchaser for the purpose of documenting the release of all Liens or Claims, which the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Debtor is hereby authorized and directed, and the Purchaser is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

20.    On the Closing Date, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Debtor's interests in the Purchased Assets consisting of the Debtor's interests in, to and under licenses and permits issued by any federal, state and local governmental agency, department, authority or jurisdiction. Each and every federal, state and local governmental agency,

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

16

department, authority or jurisdiction is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Final APA, including any modification or amendment to any public records or documents to acknowledge the Purchaser as the new owner, operator, licensee or permittee of any applicable license, permit or similar asset.

21.    With respect to the transactions consummated pursuant to this Order, this Order is and shall be sole and sufficient evidence of the transfer of title to the Purchaser, and the sale transaction consummated pursuant to this Order shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the transactions contemplated hereby.

22.    The provisions of this Order authorizing the sale of the Purchased Assets free and clear of Liens, other than Assumed Liabilities, shall be self-executing, and neither the Debtor nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents or other instruments to effectuate, consummate and implement the provisions of this Order; *provided*, *however*, that the Debtor and the Purchaser, and each of their respective officers, employees and agents are authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtor or the Purchaser deems necessary or appropriate to implement and effectuate the terms of the Final APA and this Order.

23.    Notwithstanding anything to the contrary in this Order, in the Motion or the Final APA, the Purchaser shall receive the benefits and burdens of, and be solely responsible for payment in full of all accrued charges, payments, and the like arising under or pursuant to the

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

1  Assumed Liabilities as of the Closing Date or as otherwise provided in the Final APA.  If the

2  Purchaser disputes any alleged charge or payment under any of the Assumed Liabilities and the

3  parties are unable to come to an agreement regarding the amount actually owed, the dispute may

4  be adjudicated by the Bankruptcy Court or any other court of competent jurisdiction.

5  **EXECUTORY CONTRACTS AND LEASES**

6      24.    Upon the Designation Date (defined herein), the Debtor is authorized and directed

7  to assume and assign the Assumed Contracts (as defined in the Final APA) to the Purchaser free

8  and clear of all Liens and Claims, as described herein.  The payment of the applicable Cure

9  Amounts (if any) by the Purchaser shall (a) effect a cure of all defaults existing thereunder as of

10  the Closing Date; (b) compensate for any actual pecuniary loss to such non-Debtor party

11  resulting from such default, and (c) together with the assumption of the Assumed Contracts by

12  the Purchaser, constitute adequate assurance of future performance thereof.  The Purchaser shall

13  then have assumed the Assumed Contracts and, pursuant to section 365(f) of the Bankruptcy

14  Code, the assignment by the Debtor of such Assumed Contracts shall not be a default thereunder.

15  After the payment of the relevant Cure Amounts by the Purchaser, neither the Debtor nor the

16  Purchaser shall have any further liabilities to the Contract Counterparties other than the unpaid

17  obligations under the Assumed Contracts that become due and payable on or after the date of the

18  Cure Notice.

19      25.    Within forty five (45) days after the Closing Date (hereinafter, the "Designation

20  Date"), the Purchaser may, by written notice to the Debtor, designate additional Executory

21  Contracts as Assumed Contracts to be assigned to Purchaser in addition to those Executory

22  Contracts designated as Assumed Contracts in the Final APA, or choose to exclude certain

23  Executory Contracts, including those contracts and leases previously designated to be Assumed

24  Contracts in the Final APA.  The assumption and assignment of an Assumed Contract shall be

25  deemed effective upon the Closing Date, irrespective of the date such contract or lease was

26  designated as an Assumed Contract.  Any Executory Contract not designated as an Assumed

27  Contract shall not be assumed by the Debtor.

28      26.    Any provisions in any Assumed Contract that prohibits or conditions the

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

18

assignment of such Assumed Contract or allows the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Purchaser of the Assumed Contract have been satisfied. Upon closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtor under the Assumed Contract.

27. Upon closing and the payment of the relevant Cure Amounts, if any, the Purchaser shall be deemed to be substituted for the Debtor as a party to the applicable Assumed Contract and the Debtor shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contract, except to the extent of claims covered by the Debtor's existing insurance policies.

28. Upon the payment of the applicable Cure Amount, if any, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

29. There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to the Purchaser or the Debtor solely as a result of the assumption and assignment of the Assumed Contracts.

30. Other than as provided in this Order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against the Purchaser any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

31. The Final APA, and any related agreements, documents or other instruments may be modified, amended or supplemented by the Debtor and the Purchaser, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court;

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

1    *provided*, *however*, that any (a) such modification, amendment or supplement does not have a

2    material adverse effect on the Debtor's estates and has been agreed to between the Debtor and

3    the Purchaser and (b) such modification, amendment or supplement is filed with the Bankruptcy

4    Court and provided on twenty-four (24) hours prior notice to its effectiveness to counsel for the

5    Official Committee of Unsecured Creditors and counsel for RD VII Investments, LLC, unless

6    such timing requirement is waived by the respective party.    Any material modification,

7    amendment or supplement to the Final APA must be approved by Order of the Bankruptcy Court

8    following a motion on notice to all interested parties.

9          32.    The North Las Vegas Settlement Agreement is approved pursuant to Bankruptcy

10    Rule 9019 as fair and equitable, and to the extent it is being assumed by the Debtor and assigned

11    to the Purchaser, that is also approved.

12    **TRANSITION PROVISIONS**

13          33.    Prior to the Closing Date, the Debtor shall employ all reasonable efforts to ensure

14    the security and safeguard of all Purchased Assets.    Effective immediately upon the conclusion

15    of the Sale Hearing, the Purchaser and its employees, agents and professionals shall be permitted

16    to access and enter upon any other location occupied by the Debtor and where the Purchased

17    Assets may be located in order to ensure the security and safeguard of the Purchased Assets and

18    to facilitate an orderly transition of the transactions contemplated under the Final APA and this

19    Order (the "Transition Matters").    The Debtor and the Purchaser may enter into arrangements, in

20    writing, with respect to the use of equipment, assets and other resources of the Debtor that are

21    not Purchased Assets, without further notice or court order, with respect to Transition Matters, so

22    long that such arrangements have no adverse economic consequences to the Debtor's estate.    The

23    Debtor, and its employees, agents and professionals shall cooperate with the Purchaser, its

24    employees, agents and professionals with respect to Transition Matters.

25    **OTHER PROVISIONS**

26          34.    Effective upon the Closing Date and except as otherwise provided by stipulations

27    filed with or announced to the Court with respect to a specific matter, all persons and entities are

28    forever prohibited and permanently enjoined from commencing or continuing in any manner any

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser, its successors and assigns, or the Purchased Assets, with respect to any (a) Lien or Claim arising under, out of, in connection with or in any way relating to the Debtor, the Purchaser, the Purchased Assets, or the operation of the Purchased Assets prior to the Closing of the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Purchaser, its successors or assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Purchaser, its successors, assets or properties; (iii) creating, perfecting or enforcing any Lien or Claim against the Purchaser, its successors or assigns, assets or properties; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.

35.    Except for the Assumed Liabilities or as otherwise expressly set forth in the Final APA, the Purchaser shall not have any liability or other obligation of the Debtor arising under or related to any of the Purchased Assets. Without limiting the generality of the foregoing, and except for the Assumed Liabilities provided in the Final APA, the Purchaser shall not be liable for any Claims against the Debtor or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing Date.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

The Purchaser has given substantial consideration under the Final APA for the benefit of the holders of any Liens or Claims. The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens or Claims against or interests in the Debtor or any of the Purchased Assets.

36.    The transactions contemplated by the Final APA are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and such Sale are duly stayed pending such appeal.  The Purchaser is a good faith Purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

37.    If requested by the Purchaser, the Debtor is authorized and directed to change its corporate name in which it is registered or authorized to do business under the names "Superior Linen" to "SL Debtor," and to provide the Purchaser with evidence of such name change.  Upon such event, the caption of all pleadings to be filed in this case shall be changed to the new names, and all pleadings shall be filed under the new caption.

38.    Notwithstanding the provisions of Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in such rules is hereby expressly waived and shall not apply.  Time is of the essence in approving the Sale, and the Debtor and the Purchaser intend to, and are authorized to, close the Sale as soon as practicable, but in no event later than January 8, 2014.

39.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

40.    The failure specifically to include any particular provision of the Final APA in

22

1   this Order shall not diminish or impair the effectiveness of such provision, it being the intent of

2   the Court that the Final APA be authorized and approved in its entirety except as otherwise

3   expressly provided by in this Order.

4       41.    The Court shall retain jurisdiction to, among other things, interpret, implement,

5   and enforce the terms and provisions of this Order and the Final APA, all amendments thereto

6   and any waivers and consents thereunder and each of the agreements executed in connection

7   therewith to which the Debtor is a party or which has been assigned by the Debtor to the

8   Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way

9   to the Sale.

10      42.    All time periods set forth in this Order shall be calculated in accordance with

11  Bankruptcy Rule 9006(a).

12      43.    To the extent that this Order is inconsistent with any prior Order, the Final APA,

13  any other document or pleading with respect to the Motion in these chapter 11 cases, the terms of

14  this Order shall govern, provided however, the failure to include specifically any particular

15  provision of the Final APA in this Sale Order shall not diminish or impair the effectiveness of

16  such provision, it being the intent of the Court that the APA be authorized and approved in its

17  entirety.

18      44.    The terms and provisions of the APA, the other ancillary agreements, and this

19  Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, the

20  Purchaser, and their respective affiliates, successors and assigns, and any affected third parties,

21  notwithstanding the dismissal of any of the Debtor's case or any subsequent appointment of any

22  trustee(s) under any chapter of the Bankruptcy Code or conversion of the Debtor's case to a

23  case under chapter 7, as to which trustee(s) such terms and provisions likewise shall be binding

24  and not subject to rejection or avoidance. The APA, the Sale Transactions and this Sale Order

25  shall be binding upon, and shall not be subject to rejection or avoidance by, any chapter 7 or

26  chapter 11 trustee appointed in the Bankruptcy Case.

27      **IT IS SO ORDERED.**

28

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

23

PREPARED AND SUBMITTED:

By: /s/
LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
850 E. Bonneville Ave.
Las Vegas, Nevada 89101

Attorneys for Debtor


APPROVED / DISAPPROVED:

By: /s/
SCHWARTZ FLANSBURG PLLC
SAMUEL A. SCHWARTZ, ESQ.
Nevada Bar No. 10985
BRYAN A. LINDSEY, ESQ.
Nevada Bar No. 10662
6623 Las Vegas Blvd. Ste. 300
Las Vegas, Nevada  89119

Attorneys for RD VII Investments, LLC


APPROVED / DISAPPROVED:

By: /s/
MORRIS POLICH & PURDY, LLP
CANDACE CARLYON, ESQ.
Nevada Bar No. 2666
MATTHEW CARLYON, ESQ.
Nevada Bar No. 12712
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169

Attorneys for the Official Committee of
Unsecured Creditors


APPROVED / DISAPPROVED:

By: /s/
FOX ROTHSCHILD, LLP
BRETT AXELROD, ESQ.
Nevada Bar No. 5859
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas NV 89135

Attorneys for Las Vegas Linen, LLC


APPROVED / DISAPPROVED:

By: /s/
McDONALD CARANO WILSON LLP
RYAN J. WORKS, ESQ.
Nevada Bar No. 9224
2300 W. Sahara Avenue, Suite 1200
Las Vegas, Nevada  89102

OKIN ADAMS LLP
MATTHEW S. OKIN, ESQ.
(Admitted Pro Hac Vice)
DAVID CURRY JR.
(Admitted Pro Hac Vice)
1113 Vine St., Suite 201
Houston, Texas 77002

Attorneys for Midwest Community
Development Fund VII, L.L.C.

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

1   APPROVED / DISAPPROVED:                    APPROVED / DISAPPROVED:

2   By:  /s/                                   BY:    /s/
    SYLVESTER & POLEDNAK, LTD.                 SNELL & WILMER L.L.P.
3   JEFFREY SYLVESTER, ESQ.                    ROBERT R. KINAS, ESQ.
    Nevada Bar No. 4396                        Nevada Bar No. 6019
4   ALLYSON R. NOTO, ESQ.                      BLAKELEY GRIFFITH, ESQ.
    Nevada Bar No. 8286                        Nevada Bar No. 12386
5   1731 Village Center Circle                 3883 Howard Hughes Parkway, Ste. 1100
    Las Vegas, NV 89134                        Las Vegas, NV 89169
6
7   Attorneys for Icon Pac Nevada              Attorneys for City of North Las Vegas
8   Owner Pool 3, Nevada, LLC

9

10                       **LR 9021 CERTIFICATION**

11          In accordance with LR 9021, counsel submitting this document certifies that the order
    accurately reflects the court's ruling and that (check one):

12          ☐    The court has waived the requirement of approval under LR 9021(b)(1).
13
14          ☐    No party appeared at the hearing or filed an objection to the motion.

15          ☒    I have delivered a copy of this proposed order to all counsel who appeared at the
    hearing, any unrepresented parties who appeared at the hearing, and each has approved or
16  disapproved the order, or failed to respond, as indicated above.

17          ☐    I certify that this is a case under Chapter 7 or 13, that I have served a copy of this
    order with the motion pursuant to LR 9014(g), and that no party has objected to the form or
18  content of the order.

19                                      # # #

20

21

22

23

24

25

26

27

28

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

# EXHIBIT "2"

*DRAFT 5/21/17*

# ASSET PURCHASE AGREEMENT

by and between

**SUPERIOR LINEN, LLC,**
a Nevada limited liability company,
as Seller

and

**LAS VEGAS LINEN LLC,**
a Nevada limited liability company,
as Buyer

dated as of

May __, 2017

# TABLE OF CONTENTS

Page

**ARTICLE I** PURCHASE AND SALE ................................................................................... 2

**SECTION 1.01** PURCHASE AND SALE OF ASSETS .......................................... 2
**SECTION 1.02** EXCLUDED ASSETS .................................................................. 3
**SECTION 1.03** ASSUMPTION OF LIABILITIES ................................................. 3
**SECTION 1.04** EXCLUDED LIABILITIES ............................................................ 4
**SECTION 1.05** TOTAL CONSIDERATION .......................................................... 5
**SECTION 1.06** CLOSING RECEIVABLES AND PAYABLES ................................. 6
**SECTION 1.07** ALLOCATION OF TOTAL CONSIDERATION ............................... 6
**SECTION 1.08** DESIGNATED CONTRACTS ........................................................ 6
**SECTION 1.09** PURCHASE PRICE ADJUSTMENT. ........................................... 6

**ARTICLE II** CLOSING ..................................................................................................... 9

**SECTION 2.01** CLOSING ................................................................................... 9
**SECTION 2.02** CLOSING DELIVERABLES .......................................................... 9

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF SELLER .................................... 10

**SECTION 3.01** ORGANIZATION AND AUTHORITY OF SELLER; ENFORCEABILITY ...................... 10
**SECTION 3.02** NO CONFLICTS; CONSENTS ..................................................... 10
**SECTION 3.03** SUBSIDIARIES; INDEBTEDNESS ............................................... 10
**SECTION 3.04** FINANCIAL STATEMENTS ......................................................... 11
**SECTION 3.05** UNDISCLOSED LIABILITIES ....................................................... 11
**SECTION 3.06** ABSENCE OF CERTAIN CHANGES, EVENTS AND CONDITIONS ........... 11
**SECTION 3.07** MATERIAL CONTRACTS. ........................................................... 13
**SECTION 3.08** TITLE TO PURCHASED ASSETS .................................................. 14
**SECTION 3.09** CONDITION OF ASSETS ............................................................ 14
**SECTION 3.10** REAL PROPERTY. ..................................................................... 14
**SECTION 3.11** INVENTORY .............................................................................. 15
**SECTION 3.12** ACCOUNTS RECEIVABLE .......................................................... 15
**SECTION 3.13** CUSTOMERS AND SUPPLIERS .................................................. 16
**SECTION 3.14** ASSUMED CONTRACTS ............................................................ 16
**SECTION 3.15** INTELLECTUAL PROPERTY ........................................................ 16
**SECTION 3.16** NON-FOREIGN STATUS ............................................................ 16
**SECTION 3.17** COMPLIANCE WITH LAWS ......................................................... 17
**SECTION 3.18** LEGAL PROCEEDINGS ............................................................. 17
**SECTION 3.19** ENVIRONMENTAL MATTERS. ..................................................... 17
**SECTION 3.20** EMPLOYEE BENEFIT MATTERS ................................................. 19
**SECTION 3.21** EMPLOYMENT MATTERS ........................................................... 21
**SECTION 3.22** TAXES ...................................................................................... 22
**SECTION 3.23** BROKERS .................................................................................. 22
**SECTION 3.24** FULL DISCLOSURE ................................................................... 22

i

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF BUYER ..................................................... 23

SECTION 4.01    ORGANIZATION AND AUTHORITY OF BUYER; ENFORCEABILITY ...................... 23
SECTION 4.02    NO CONFLICTS; CONSENTS .................................................................... 23
SECTION 4.03    LEGAL PROCEEDINGS ........................................................................... 23
SECTION 4.04    BROKERS ........................................................................................... 23
SECTION 4.05    FINANCING. ....................................................................................... 23
SECTION 4.06    ASSUMED CONTRACTS ......................................................................... 23

**ARTICLE V** COVENANTS ....................................................................................... 24

SECTION 5.01    CONDUCT OF BUSINESS PRIOR TO THE CLOSING .................................... 24
SECTION 5.02    ACCESS TO INFORMATION .................................................................... 24
SECTION 5.03    NOTICE OF CERTAIN EVENTS. ............................................................... 25
SECTION 5.04    EMPLOYEES AND EMPLOYEE BENEFITS .................................................. 25
SECTION 5.05    CONFIDENTIALITY ............................................................................... 26
SECTION 5.06    NON-COMPETITION; NON-SOLICITATION .............................................. 26
SECTION 5.07    BANKRUPTCY ORDER .......................................................................... 27
SECTION 5.08    CONSENTS AND APPROVALS ................................................................ 27
SECTION 5.09    PUBLIC ANNOUNCEMENTS .................................................................. 27
SECTION 5.10    TRANSFER TAXES ............................................................................... 28
SECTION 5.11    RECEIVABLES ..................................................................................... 28
SECTION 5.12    PAYMENT OF EXCLUDED LIABILITIES; LITIGATION TRUST ....................... 28
SECTION 5.13    BULK SALES LAWS ............................................................................. 28
SECTION 5.14    PRORATIONS ..................................................................................... 28
SECTION 5.15    NAME CHANGE .................................................................................. 28
SECTION 5.16    FURTHER ASSURANCES ....................................................................... 28

**ARTICLE VI** CONDITIONS TO CLOSING .................................................................... 29

SECTION 6.01    CONDITIONS TO OBLIGATIONS OF BUYER .............................................. 29
SECTION 6.02    CONDITIONS TO OBLIGATIONS OF SELLER .............................................. 30

**ARTICLE VII** INDEMNIFICATION .............................................................................. 31

SECTION 7.01    SURVIVAL .......................................................................................... 31
SECTION 7.02    INDEMNIFICATION BY SELLER ............................................................... 31
SECTION 7.03    INDEMNIFICATION BY BUYER ............................................................... 31
SECTION 7.04    INDEMNIFICATION PROCEDURES .......................................................... 31
SECTION 7.05    TAX TREATMENT OF INDEMNIFICATION PAYMENTS .............................. 32
SECTION 7.06    EFFECT OF INVESTIGATION .................................................................. 32
SECTION 7.07    CUMULATIVE REMEDIES ..................................................................... 32
SECTION 7.08    LIMITATIONS ..................................................................................... 32

**ARTICLE VIII** TERMINATION .................................................................................. 32

SECTION 8.01    TERMINATION .................................................................................... 32
SECTION 8.02    EFFECT OF TERMINATION .................................................................... 34

ii

**ARTICLE IX** MISCELLANEOUS ............................................................................ 34

**SECTION 9.01**  AS-IS CONVEYANCE. .......................................................... 34
**SECTION 9.02**  EXPENSES .......................................................................... 34
**SECTION 9.03**  NOTICES............................................................................. 34
**SECTION 9.04**  INTERPRETATION ................................................................ 35
**SECTION 9.05**  HEADINGS.......................................................................... 35
**SECTION 9.06**  SEVERABILITY .................................................................... 35
**SECTION 9.07**  ENTIRE AGREEMENT ........................................................... 35
**SECTION 9.08**  SUCCESSORS AND ASSIGNS ................................................. 36
**SECTION 9.09**  NO THIRD-PARTY BENEFICIARIES ........................................ 36
**SECTION 9.10**  AMENDMENT AND MODIFICATION; WAIVER............................ 36
**SECTION 9.11**  GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL...... 36
**SECTION 9.12**  SPECIFIC PERFORMANCE ..................................................... 37
**SECTION 9.13**  POST-CLOSING OFFICE. ...................................................... 37
**SECTION 9.14**  DOCUMENT RETENTION/SHARING. ....................................... 37
**SECTION 9.15**  COUNTERPARTS .................................................................. 38

Appendix A – Definitions

**Exhibits:**
Exhibit A – Form of Bill of Sale
Exhibit B – Form of Assignment and Assumption Agreement

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**"), is entered into as of May __, 2017, by and between **SUPERIOR LINEN, LLC**, a Nevada limited liability company ("**Seller**"); and **LAS VEGAS LINEN LLC**, a Nevada limited liability company ("**Buyer**"). Seller and Buyer are referred to collectively herein as the "**Parties**" and each a "**Party**." Following the Petition Date (as defined below), the term Seller shall refer to Seller as a debtor-in-possession and include the Seller's estate.

## RECITALS

A.     Seller is engaged in the business of providing linen rental and laundry services to the hospitality and retail markets in Las Vegas, Nevada and the surrounding areas (the "**Business**").

B.     On September 30, 2016 (the "**Petition Date**") Seller filed its voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"), which is pending as case number 16-15388-mkn (the "**Bankruptcy Case**");

C.     Seller desires to sell and assign to Buyer and Buyer desires to purchase and assume from Seller all right, title and interest of the Seller in substantially all of its assets, properties and rights as the same shall exist as of the Closing, of every kind, type or designation, whether tangible or intangible, known or unknown, real, personal or mixed, wherever located other than the Excluded Assets (as defined herein) in accordance with the terms and subject to the conditions set forth herein;

D.     The Purchased Assets (as defined below) will be sold pursuant to an Order of the Bankruptcy Court (the "**Sale Order**"), authorizing the sale of the Purchased Assets free and clear of liens, claims, encumbrances and other interests pursuant to Section 363 of the Bankruptcy Code, the assumption and assignment of the Contracts included in the Purchased Assets pursuant to Section 365 of the Bankruptcy Code, and a finding of good faith pursuant to Section 363(m) of the Bankruptcy Code, as more fully set forth in the Sale Order and in accordance with the terms and conditions of this Agreement; and

E.     For purposes of this Agreement, capitalized terms shall have the meanings ascribed thereto in **Appendix A** hereto.

## AGREEMENT

NOW, THEREFORE, in consideration of the above Recitals, incorporated herein by this reference, mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

# ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale of Assets**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and subject to the terms and conditions set forth herein and the Sale Order, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in the assets that relate to, or are used or held for the use in connection with the Business (the "**Purchased Assets**"), free and clear of all Encumbrances, but excluding the Excluded Assets, as set forth in **Section 1.02**, below.  The Purchased Assets shall include the following assets of the Business, as of the date of Closing (defined below):

(a)    (i) All accounts receivable, notes receivable, and employee receivables, and any security, claim, remedy or other right related to any of the foregoing, whether accruing before or after the Closing Date (the "**Accounts Receivable**");

(b)    All fixed assets and tangible personal property, including, equipment, furniture, fixtures, machinery, tools, vehicles, data processing and office equipment, supplies, computers, and telephones, including all tangible personal property listed in **Section 1.01(b)** of the Disclosure Schedules;

(c)    Subject to Section 1.08 below, all customer contracts generating or contributing to Seller's revenues, as listed on **Section 1.01(c)** of the Disclosure Schedules ("**Customer Contracts**"), and as otherwise agreed to by the Buyer and Seller;

(d)    All inventory, packaging, supplies, parts and other inventories, including new and used linens, and including all inventory listed in **Section 1.01(d)** of the Disclosure Schedules ("**Inventory**");

(e)    Originals, or where not available, copies, of machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, invoices, quality control records and procedures, customer complaints and inquiry files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), and marketing and promotional surveys ("**Books and Records**");

(f)    The Lease Agreement dated July 26, 2011, and all amendments thereto (the "**Lease Agreement**"), with respect to the premises leased by the Seller located at 4501 Mitchell Street, North Las Vegas, Nevada 89081 (the "**Leased Property**");

(g)    The agreement by and among the Seller and the City of North Las Vegas regarding the repayment of sewer and water charges, as set forth on the schedule set forth therein, as it may be amended with the consent of the Buyer prior to Closing (the "**North Las Vegas Settlement Agreement**");

(h)    All going concern value and goodwill of the Business;

2

44921005.v11

(i)      All know-how, confidential or proprietary information, technical information, data, process technology, plans and drawings of Seller relating to the operations of the Business and all employee manuals relating to the Business;

(j)      Any rights Seller may have in the name "Superior Linen" and similar derivations thereof, all rights in internet websites presently used by Seller for the Business, including www.superiorlinenlv.com, and all Intellectual Property owned by Seller;

(k)      All prepaid expenses, advance payments, security, refunds, and deposits to the extent related to the Business, the Purchased Assets or the Assumed Liabilities;

(l)      All Permits, including Environmental Permits, which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets, to the extent such Permits are transferable;

(m)      Except as set forth in **Section 1.02** of the Disclosure Schedules, all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities;

(n)      All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to the Business or any Purchased Assets or the Assumed Liabilities;

(o)      Except as set forth in Section **1.02** of the Disclosure Schedules, all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise; and

(p)      All other assets used in the operation of the Business, unless an Excluded Asset specifically excluded in **Section 1.02** below, including those set forth in **Section 1.01(p)** of the Disclosure Schedules.

Section 1.02   Excluded Assets.  Notwithstanding the foregoing, the Purchased Assets shall not include any of the following assets (the "**Excluded Assets**"):

(a)      Seller's company minute book and ownership ledger;

(b)      All Contracts, other than the Assumed Contracts (the "**Excluded Contracts**");

(c)      Any and all cash in Seller's bank accounts set forth in **Section 1.02** of the Disclosure Schedules and as of the close of business on the day immediately preceding the Closing; and

(d)      All of Seller's assets listed in **Section 1.02** of the Disclosure Schedules.

Section 1.03   Assumption of Liabilities.  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge the liabilities and obligations set forth below, but, other than with respect to the North Las Vegas Settlement Agreement, only

3

to the extent that such liabilities and obligations do not relate to any breach, default or violation by Seller on or prior to the Closing (collectively, the "**Assumed Liabilities**"):

(a)  Seven Hundred Fifty Thousand Dollars ($750,000.00) of Seller's Liabilities under the North Las Vegas Settlement Agreement, including $60,000 to be paid by Buyer at Closing in accordance with the North Las Vegas Settlement Agreement;

(b)  All trade accounts payable (including supporting invoices) to third parties in connection with the Business accruing or invoiced after the Closing Date for work, services, materials, or products performed or provided to or purchased by Buyer by third parties;

(c)  All Liabilities under the Lease Agreement accruing after the Closing; and

(d)  All Liabilities in respect of the Assumed Contracts listed on **Section 1.03(d)** of the Disclosure Schedules that are properly assigned to Buyer, but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller on or prior to the Closing.

Other than the Assumed Liabilities, Buyer shall not assume any liabilities or obligations of Seller or the Business of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created, and all other liabilities shall be retained, paid, performed, and discharged solely by Seller.

**Section 1.04  Excluded Liabilities**.  Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). Seller shall, and shall cause each of their Affiliates to, pay and satisfy in due course all Excluded Liabilities that they are obligated to pay and satisfy. Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)  any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other documents delivered herewith and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)  any Liability for (i) Taxes of Seller (or any member or Affiliate of Seller) or relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller pursuant to **Section 5.10**; or (iii) other Taxes of Seller (or any member or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any member or Affiliate of Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(c)  any Liabilities relating to or arising out of the Excluded Assets;

4

(d)  any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(e)  any Liabilities of Seller arising under or in connection with any Benefit Plan providing benefits to any present or former employee of Seller;

(f)  any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(g)  any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing Date or otherwise to the extent arising out of any actions or omissions of Seller, including those, if any, referred to on any Schedule to this Agreement;

(h)  except as set forth **Section 1.03(d)**, any trade accounts payable (including supporting invoices) to third parties in connection with the Business accruing or invoiced before the Closing Date including for work, services, materials, or products performed or provided to or purchased by Seller or the Business ("**Excluded Payables**");

(i)  any Liabilities or other obligations which constitute intercompany payables owing to Affiliates of Seller;

(j)  any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same);

(k)  any Liabilities under the Excluded Contracts or any other Contracts (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing;

(l)  any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions;

(m)  any other Liabilities of Seller listed in **Section 1.04** of the Disclosure Schedules; and

(n)  any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order.

**Section 1.05  Total Consideration**.  The aggregate consideration for the Purchased Assets shall be (a) One Million Eight Hundred Fifty Thousand Dollars ($1,850,000) in cash; (b) up to Two Hundred Thousand Dollars ($200,000) in cash for specified equipment not identified in **Section 1.01(b)** of the Disclosure Schedules which shall be agreed to by Buyer and Seller at or

5

prior to Closing (the sum of (a) inclusive with (b) being the "**Cash Purchase Price**" which shall be subject to adjustment pursuant to **Section 1.09** below); plus (c) the assumption of the Assumed Liabilities (the "**Total Consideration**").

Section 1.06   **Closing Receivables and Payables.**   On the day prior to the Closing, Seller shall deliver to Buyer, for Buyer's approval, a statement setting forth the total amount of Seller's estimated Accounts Receivable and Excluded Payables as of 11:59 p.m. on the day of the Closing (the "**Closing Certificate**"), certified by the Seller.  The Closing Certificate shall attach thereto copies of all supporting invoices.

Section 1.07   **Allocation of Total Consideration**.  Buyer shall, no more than thirty (30) days after the Closing Date, prepare and deliver to Seller for its review a schedule allocating the Total Consideration for all purposes (including Tax and financial accounting purposes) (the "**Purchase Price Allocation**").  Seller shall review the Purchase Price Allocation and provide any objections to Buyer within thirty (30) days after the receipt thereof.  If Seller raises any objection to the Purchase Price Allocation, the Parties will negotiate in good faith to resolve such objection.  In the event that Seller and Buyer are unable to resolve any dispute with respect to the Purchase Price Allocation, such dispute shall be resolved by an independent accountant, jointly selected by Buyer and Seller, in a final and binding manner. The fees and expenses of the independent accountant in connection with resolving a dispute regarding the Purchase Price Allocation shall be borne equally by Buyer and Seller.  Upon reaching an agreement on the Purchase Price Allocation, or upon receipt of the independent accountant's resolution regarding the Purchase Price Allocation, as the case may be, none of the parties hereto will take a position on any Tax Return, before any Governmental Authority charged with the collection of any Tax, or in any judicial proceeding, that is in any way inconsistent with the such Purchase Price Allocation.

Section 1.08   **Designated Contracts**.  At or prior to Closing, the Buyer shall designate in writing to Seller those Customer Contracts (the "**Designated Contracts**") that it elects not to assume at Closing but will instead operate under during the 60-day period following the Closing (the "**Negotiation Period**").  During the Negotiation Period (i) Seller, to the maximum extent permitted by law shall act as Buyer's agent in order to obtain for Buyer the benefits under the Designated Contracts and shall cooperate with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer, and (ii) the Buyer will negotiate with the counterparties to the Designated Contracts amendments thereto or new contracts that will supersede such Designated Contracts, providing for terms and conditions satisfactory to Buyer in its sole discretion.  At the conclusion of the Designation Period, Buyer shall notify Seller of the Designated Contracts that it has not renegotiated to its satisfaction, and Seller shall reject such Designated Contracts.

Section 1.09   **Purchase Price Adjustment**.

(a)   <u>Closing Adjustment</u>.

(i)   No later than one (1) Business Day prior to the Closing Date, Seller shall deliver to the Buyer a statement (the "**Estimated Closing AR Statement**") setting forth its good faith estimate of Closing Net AR Amount (the "**Estimated Closing Net AR**

Amount") with supporting calculations in reasonable detail. "**Closing Net AR Amount**" shall mean the Accounts Receivable of the Seller included in the Purchased Assets, net of reserves in accordance with GAAP; provided, however, that for purposes of this Section 1.09, the Closing Net AR Amount shall not be greater than $800,000 (so that the maximum positive adjustment to the Purchase Price under this Section 1.09 will not exceed $300,000).

(ii)     The "**Closing Adjustment**" shall be an amount equal to the excess, if any, of $500,000 (the "**Target Net AR Amount**") over the Estimated Closing Net AR Amount.  The Cash Purchase Price shall be reduced by the amount of the Closing Adjustment (if any). If the Estimated Closing Net AR Amount exceeds the Target Net AR Amount, the Cash Purchase Price shall not be adjusted at the Closing but shall be subject to adjustment following the Closing as provided in **Section 1.09 (b)** and **(c)** below.

(b)     Post-Closing Adjustment.

(i)     Within sixty (60) days after the Closing Date, Buyer shall prepare and deliver to Seller a statement setting forth its calculation of the Closing Net AR Amount with supporting calculations in reasonable detail (the "**Closing AR Amount Statement**").

(ii)     The post-closing adjustment shall be an amount equal to (A) the Closing Net AR Amount, as finally determined pursuant to this **Section 1.09**, minus (B) Target Net AR Amount, minus (C) (if applicable) the Closing Adjustment (the "**Post-Closing Adjustment**").  If the Post-Closing Adjustment is a positive number, then the Cash Purchase Price shall be increased by the Post-Closing Adjustment and Buyer shall pay to Seller an amount equal to the Post-Closing Adjustment.  If the Post-Closing Adjustment is a negative number, then the Cash Purchase Price shall be reduced by an amount equal to the Post-Closing Adjustment, which shall be immediately paid to Buyer by the Seller.

(iii)     During the 60-days following the Closing ("**Post-Closing Period**"), Buyer (i) shall use commercially reasonable efforts to collect all Accounts Receivable included in the Purchased Assets in good faith in a manner consistent with current practices, policies and procedures of Buyer and Buyer's Affiliates (collectively, "**Buyer's Collection Practices**"), and shall only discount, extend, modify, cancel, terminate or settle any of such Accounts Receivable consistent with such practices, policies and procedures, and (ii) shall not provide or accept payments, or amend the terms of any contracts with Customers having Accounts Receivable included in the Closing Net AR Amount (the "**Post-Closing AR Customers**"), or take any other action or inaction, in each case, to the extent any such action or inaction would reasonably be expected to reduce the Closing Net AR Amount (as finally determined pursuant to this **Section 1.09**).  In the event Buyer discounts, extends, modifies, cancels, terminates or settles any Accounts Receivable in deviation or inconsistent with Buyer's Collection Practices during the Post-Closing Period (each a "**Discounted Account**"), Buyer shall give Seller full credit to the Account Receivable for such Discounted Account and ledger such account as paid in full in the Closing AR Amount Statement (each a "**Discounted AR Credit**").  Provided however, any Discounted AR Credit shall be applied to the Closing AR Amount Statement so that the maximum positive adjustment to the Purchase Price under this Section 1.09 will not exceed $300,000.  Within five (5) Business Days after the final determination of the Closing Net AR Amount pursuant to this **Section 1.09**, Buyer shall transfer and assign to Seller

7

all of Buyer's all right, title and interest in and to the uncollected Accounts Receivable that were included in the Estimated Closing Net AR Amount but excluded from the final Closing AR Amount Statement (the "**Reserved Collections**"). Seller shall thereafter have the right to pursue such collection action with respect to the Reserved Collections as is determined to be reasonable by Seller in its sole and absolute discretion.

(c)    Examination and Review.

(i)    Examination. After receipt of the Closing AR Amount Statement, Seller shall have twenty (20) days (the "**Review Period**") to review the Closing AR Amount Statement. During the Review Period, Seller shall have access to the books and records of Buyer relating to the Closing AR Amount Statement.

(ii)    Objection. On or prior to the last day of the Review Period, Seller may object to the Closing AR Amount Statement by delivering to Buyer a written statement setting forth Seller's objections in reasonable detail, indicating each disputed item or amount and the basis for its disagreement (the "**Statement of Objections**"). If Seller fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing AR Amount Statement and the Post-Closing Adjustment reflected in the Closing AR Amount Statement shall be deemed to have been accepted by Seller. If Seller delivers the Statement of Objections before the expiration of the Review Period, Buyer and Seller shall negotiate in good faith to resolve such objections within thirty (30) days after the delivery of the Statement of Objections (the "**Resolution Period**"), and, if the same are so resolved within the Resolution Period, the Post-Closing Adjustment and the Closing AR Amount Statement with such changes as may have been previously agreed in writing by Buyer and Seller, shall be final and binding.

(iii)    Resolution of Disputes. If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**" and any amounts not so disputed, the "**Undisputed Amounts**") shall be submitted for resolution to an impartial nationally recognized firm of independent certified public accountants (the "**Independent Accountant**") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing AR Amount Statement. The Independent Accountant shall only decide the specific items under dispute by the parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing AR Amount Statement, the Estimated Closing AR Amount Statement and the Statement of Objections, respectively.

(iv)    Fees of the Independent Accountant. The fees and expenses of the Independent Accountant shall be paid by Seller, on the one hand, and by Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to Seller or Buyer, respectively, bears to the aggregate amount actually contested by Sellers and Buyer.

(v)    Determination by Independent Accountant. The Independent Accountant shall make a determination as soon as practicable within thirty (30) days (or such other time as the parties hereto shall agree in writing) after their engagement, and their resolution

8

of the Disputed Amounts and their adjustment, if any, to the Closing AR Amount Statement and/or the Post-Closing Adjustment shall be conclusive and binding upon the parties hereto.

(vi)    Payments of Post-Closing Adjustment. Except as otherwise provided herein, any payment of the Post-Closing Adjustment, shall (A) be due (x) within five (5) Business Days of acceptance of the applicable Closing AR Amount Statement if there are no Disputed Amounts or (y) if there are Disputed Amounts, then within five (5) Business Days of the resolution described in clause (v) above; and (B) be paid by wire transfer of immediately available funds to such account as is directed by Buyer or Seller, as the case may be.

# ARTICLE II
## CLOSING

**Section 2.01    Closing**.  Subject to the terms and conditions hereof, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Barnett & Associates, located at 3883 Howard Hughes Parkway, Suite 790, Las Vegas, Nevada 89169, at 10:00 a.m., local time, on May ___, 2017 or within three (3) Business Days after satisfaction or waiver of the conditions set forth in **Article VI** (other than those which by their nature may only be satisfied on the Closing Date), whichever date is first to occur, or at such other time and place as the Buyer and the Seller may agree in writing.  The date on which the Closing actually occurs is referred to in this Agreement as the "**Closing Date**". The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the day immediately after the Closing Date.

**Section 2.02    Closing Deliverables**

(a)    At the Closing, Seller shall deliver or shall cause to be delivered to Buyer the following:

(i)    a bill of sale in the form of **Exhibit A** hereto (the "**Bill of Sale**"), duly executed by Seller, transferring the Purchased Assets to Buyer;

(ii)    an assignment and assumption agreement in the form of **Exhibit B** hereto (the "**Assignment and Assumption Agreement**"), duly executed by Seller, effecting the assignment to and assumption by Buyer of the Contracts (including, without limitation, the Customer Contracts), the North Las Vegas Settlement Agreement and the Assumed Liabilities;

(iii)    the Closing Certificate duly executed by Seller's president or another responsible person acceptable to Buyer;

(iv)    a certificate dated the Closing Date and signed by the Designated Responsible Person, that (A) each of the Closing deliverables set forth in **Section 2.02(a)** have been delivered as of Closing; and (B) the representations and warranties of Seller contained in this Agreement and the documents to be delivered hereunder are true and correct in all respects on and as of the Closing Date;

(v)    a copy of the Sale Order as entered by the Bankruptcy Court; and

9

(vi)    possession of the Purchased Assets, including keys and security codes to the Leased Property.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Cash Purchase Price in the form of a cashier's check, wire transfer or other immediately available funds; and

(ii)    the Assignment and Assumption Agreement duly executed by Buyer.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that to Seller's Knowledge the statements contained in this **Article III** are true and correct as of the date hereof and as of the Closing Date.

**Section 3.01    Organization and Authority of Seller; Enforceability**.    Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Nevada.    Seller has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.    The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Seller.    This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

**Section 3.02    No Conflicts; Consents**.    The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the articles of organization, operating agreement or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller or the Purchased Assets; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any Contract or other instrument to which Seller is a party or to which any of the Purchased Assets are subject; or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets.    Except for the Sale Order or as listed on **Section 3.02** of the Disclosure Schedules, no consent, approval, waiver or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby.

**Section 3.03    Subsidiaries; Indebtedness**.    Seller has no subsidiaries. Seller does not own or hold the right to acquire any shares of stock or any other security or interest in any other person or entity nor does Seller have any obligation to make any investments in any person or

10

entity. Seller does not have any outstanding indebtedness that will continue post-Closing and is not a party to any contract providing for the creation, incurrence or assumption thereof.

**Section 3.04    Financial Statements**.  Seller has delivered to Buyer complete copies of (i) audited financial statements of the Seller as at and for the year ended December 31, 2014, including the audited balance sheet as at such date and the unaudited related statements of income, stockholders' equity and cash flows for the year then ended (the "**Audited Financial Statements**"), (ii) unaudited balance sheets of Debtor ("**Balance Sheets**") as of December 31, 2015 and 2016, and as of March 31, 2017 (the "**Balance Sheet Date**"), and (iii) the related statements of income, members' equity and cash flows for the periods then ended (collectively, the "**Interim Financial Statements**", and together with the Balance Sheets and Audited Financial Statements, the "**Financial Statements**"). The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes.  The Financial Statements are based on the books and records of the Business, and fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

**Section 3.05    Undisclosed Liabilities**. Seller has no liabilities, except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

**Section 3.06    Absence of Certain Changes, Events and Conditions**.    Since the Balance Sheet Date, except as listed on **Section 3.06** of the Disclosure Schedules, there has not been any:

(a)    event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    material change in any method of accounting or accounting practice for the Business;

(c)    material change in cash management policies, practices and procedures with respect to collection of Accounts Receivable, establishment of reserves for uncollectible Accounts Receivable, accrual of Accounts Receivable, Inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

(d)    entry into any contract in excess of Five Thousand Dollars ($5,000) that would extend beyond the Closing or encumber the Purchased Assets;

(e)    incurrence, assumption or guarantee of any indebtedness for borrowed money in connection with the Business except unsecured current obligations and liabilities incurred in the ordinary course of business consistent with past practice;

11

44921005.v11

(f)     transfer, assignment, sale or other disposition of any of the Purchased Assets shown or reflected in the Balance Sheet, except for the sale of Inventory in the ordinary course of business;

(g)     cancellation of any debts or claims or amendment, termination, or waiver of any rights constituting Purchased Assets;

(h)     material damage, destruction or loss, or any material interruption in use, of any Purchased Assets, whether or not covered by insurance;

(i)     acceleration, termination, material modification to or cancellation of any Assumed Contract or Permit;

(j)     material capital expenditures which would constitute an Assumed Liability;

(k)     imposition of any Encumbrance upon any of the Purchased Assets;

(l)     adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(m)     purchase, lease or other acquisition of the right to own, use or lease any property or assets in connection with the Business for an amount in excess of Five Thousand Dollars ($5,000), except for purchases of Inventory or supplies in the ordinary course of business consistent with past practice;

(n)     (i) grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any current or former employees, managers, officers, directors, independent contractors or consultants of the Business, other than as provided for in any written agreements disclosed in writing to Buyer, or required by applicable Law, (ii) change in the terms of employment for any employee of the Business or any termination of any employees, or (iii) action to accelerate the vesting or payment of any compensation or benefit for any current or former employee, manager, officer, director, consultant or independent contractor of the Business;

(o)     any loan to (or forgiveness of any loan to), or entry into any other transaction with, any current or former managers, officers, directors, or employees of the Business; or

(p)     any contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**Section 3.07    Material Contracts.**

(a)    **Section 3.07** of the Disclosure Schedules lists each of the following Contracts (i) by which any of the Purchased Assets are bound or affected or (ii) to which Seller is a party or by which it is bound in connection with the Business or the Purchased Assets (such Contracts, together with all leases concerning the occupancy, management or operation of any Real Property listed or otherwise disclosed in **Section 3.10** of the Disclosure Schedules, being "**Material Contracts**"):

(i)    all Contracts involving aggregate consideration in excess of Five Thousand Dollars ($5,000);

(ii)    all Contracts that provide for the indemnification of any Person or the assumption of any Tax, environmental or other Liability of any Person;

(iii)    all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person or any Real Property (whether by merger, sale of stock, sale of assets or otherwise);

(iv)    all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts;

(v)    all employment agreements and Contracts with, employees, independent contractors or consultants (or similar arrangements);

(vi)    except for Contracts relating to trade receivables, all Contracts relating to indebtedness (including, without limitation, guarantees);

(vii)    all Contracts with any Governmental Authority;

(viii)    all Contracts that limit or purport to limit the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

(ix)    all joint venture, partnership or similar Contracts;

(x)    all Contracts for the sale of any of the Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

(xi)    all powers of attorney with respect to the Business or any Purchased Asset;

(xii)    all collective bargaining agreements or Contracts with any Union;

(xiii)    all Contracts which cannot be cancelled without penalty or without more than ninety (90) days' notice; and

(xiv)   all other Contracts that are material to the Purchased Assets or the operation of the Business.

(b)     To the Knowledge of Seller, each Material Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Except as set forth on **Section 3.07** of the Disclosure Schedules, none of Seller or, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract. Except as set forth on **Section 3.07** of the Disclosure Schedules, to the Knowledge of Seller, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer. Except as set forth on **Section 3.07** of the Disclosure Schedules, to the Knowledge of Seller, there are no material disputes pending or threatened under any Contract included in the Purchased Assets. **Section 3.07** of the Disclosure Schedules sets forth the amounts required to cure Buyer's default under each applicable Material Contract.

**Section 3.08   Title to Purchased Assets**.  Except as set forth on **Section 1.01(b)** of the Disclosure Schedules, Seller owns and has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets, free and clear of Encumbrances.

**Section 3.09   Condition of Assets**. To the Knowledge of Seller, the Purchased Assets are in good condition and are adequate for the uses to which they are being put, and none of such Purchased Assets are in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.  To the Knowledge of Seller, the Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted. To the Knowledge of Seller, none of the Excluded Assets are material to the Business.

**Section 3.10   Real Property.**

(a)     **Section 3.10** of the Disclosure Schedules sets forth each parcel of real property leased by Seller and used in or necessary for the conduct of the Business as currently conducted (together with all rights, title and interest of Seller in and to leasehold improvements relating thereto, including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "**Leased Real Property**"), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property (collectively, the "**Leases**"). Seller has delivered to Buyer a true and complete copy of each Lease. With respect to each Lease to the Knowledge of Seller:

(i)     such Leases are valid, binding, enforceable and in full force and effect, and Seller enjoys peaceful and undisturbed possession of the Leased Real Property;

14

(ii)     except as set forth in **Section 3.10** of the Disclosure Schedules, Seller is not in breach or default under such Leases, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default, and Seller has paid all rent due and payable under such Lease;

(iii)     except as set forth in **Section 3.10** of the Disclosure Schedules, Seller has not received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by Seller under any of the Leases and, to the Knowledge of Seller, no other party is in default thereof, and no party to any Lease has exercised any termination rights with respect thereto;

(iv)     except as set for in **Section 3.10** of the Disclosure Schedules, Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(v)     Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Leased Real Property.

(b)     Except as set forth in **Section 3.10** of the Disclosure Schedules, Seller has not received any written notice of (i) violations of building codes or zoning ordinances or other governmental or regulatory Laws affecting the Leased Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Leased Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to adversely affect the ability to operate the Leased Real Property as currently operated. Except as set forth in **Section 3.10** of the Disclosure Schedules, neither the whole nor any material portion of any Leased Real Property has been damaged or destroyed by fire or other casualty.

(c)     The Leased Real Property is sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the Real Property necessary to conduct the Business as currently conducted.

**Section 3.11  Inventory**.  To the Knowledge of Seller, all Inventory, whether or not reflected in the Balance Sheet, consists of a quality and quantity usable and salable in the ordinary course of business consistent with past practice, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established. To the Knowledge of Seller, all Inventory is owned by Seller free and clear of all Encumbrances. To the Knowledge of Seller, the quantities of each item of Inventory are not excessive, but are reasonable in the present circumstances of Seller.

**Section 3.12  Accounts Receivable**. To the Knowledge of Seller, the Accounts Receivable reflected on the Balance Sheet and the Accounts Receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by Seller involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course

15

of business consistent with past practice; and (c) are collectible in full within one 120 days after billing.

**Section 3.13    Customers and Suppliers**. Section 3.13 of the Disclosure Schedules sets forth a complete and accurate list of (a) the laundry customers of the Business ("**Customers**") during 2015 and 2016, and (b) the suppliers of materials, products or services to the Business who had net purchases from the Business during 2015 and 2016 in excess of Five Thousand Dollars ($5,000) ("**Suppliers**"). The relationships of the Seller with Customers and Suppliers are good commercial working relationships and no Customers or Suppliers have canceled, terminated or otherwise materially altered its relationship with the Business, and Seller has not received any notice, and has no reason to believe, that any of the Customers or Suppliers intend to terminate or materially reduce its relationship with the Business.  The Business has adequate sources of supply in order to conduct the Business as currently conducted as of the date hereof.

**Section 3.14    Assumed Contracts**.  Each of the Assumed Contracts is valid and binding on Seller in accordance with its terms and is in full force and effect.  Except as set forth on **Section 3.14** of the Disclosure Schedules, none of Seller or, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assumed Contract.  Except as set forth on **Section 3.14** of the Disclosure Schedules, no event or circumstance has occurred that, with or without notice or lapse of time or both, would constitute an event of default under any Assumed Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of benefit thereunder.  Complete and correct copies of each Assumed Contract have been made available to Buyer.  Except as set forth on **Section 3.14** of the Disclosure Schedules, there are no disputes pending or threatened under any Assumed Contract.  The amount required to cure Buyer's defaults under the Assumed Contracts does not exceed $7,500 in the aggregate. Seller's aggregate revenues during 2016 under the Customer Contracts with respect to which Seller has not furnished true copies to Buyer did not exceed $50,000 in the aggregate.

**Section 3.15    Intellectual Property**.  Section 3.15 of the Disclosure Schedules contains a complete and accurate list of all Intellectual Property owned or used by Seller and all material licenses and other rights granted by (a) any third party to Seller or (b) Seller to any third party with respect to any Intellectual Property.  Seller owns and possesses all right, title and interest to, or has the right to use pursuant to a valid and enforceable license, all of the purchased Intellectual Property, and such purchased Intellectual Property constitutes all of the Intellectual Property used in, related to or necessary for the operation of the Business as presently conducted and as presently proposed to be conducted, free and clear of all Encumbrances.  There have been no claims made against Seller asserting the invalidity, misuse or unenforceability of any of the Intellectual Property owned or used by Seller and, to Seller's Knowledge, there is no basis for any such claim and Seller has not received any notices of, and has no Knowledge of any facts which indicate a likelihood of, any infringement or misappropriation by, or conflict with, any third party with respect to any Intellectual Property (including any offer, demand or request that Seller license any rights from a third party).

**Section 3.16    Non-Foreign Status**.  Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

**Section 3.17    Compliance With Laws.**

(a)    Seller has complied, and is now complying, with all applicable federal, state and local Laws and regulations applicable to the Business or the ownership and use of the Purchased Assets.

(b)    All Permits required for Seller to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Seller, are valid and in full force and effect, and are listed on **Section 3.17(b)** of the Disclosure Schedules. All fees and charges with respect to such Permits as of the date hereof have been paid in full. **Section 3.17(b)** of the Disclosure Schedules lists all current Permits issued to Seller which are related to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets, including the names of the Permits and their expiration dates. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in **Section 3.17(b)** of the Disclosure Schedules. The Seller's discharge of waste waters within the 30-days preceding the date hereof is consistent with past practice and will not result in any additional liability under the North Las Vegas Settlement Agreement or a breach of any term thereof.

**Section 3.18    Legal Proceedings.**  Except as set forth in **Section 3.18** of the Disclosure Schedules, there is no Action of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Purchased Assets or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 3.19    Environmental Matters.**

(a)    The operations of Seller with respect to the Business conducted at the Leased Real Property, and the Purchased Assets are currently and have been in compliance with all applicable Environmental Laws. Seller has not received from any Person, with respect to the Business, the Purchased Assets or any other property currently or previously owned, leased or operated by the Seller, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to applicable Environmental Law.

(b)    Seller has obtained and is in material compliance with all Environmental Permits necessary for the ownership, lease, operation or use of the Business or assets of the Seller as currently operated, and there is no reason to believe, that any such Environmental Permits will be revoked, adversely modified, or not renewed in the ordinary course.

(c)    No Real Property currently owned, operated or leased by Seller is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d)    (i) Seller has not Released any Hazardous Materials at any location in contravention of any applicable Environmental Laws or in a manner or under circumstances that could reasonably be expected to result in material liability to Seller, the Business, or the

17

Purchased Assets or materially interfere with the operations of Seller; (ii) Hazardous Materials are not otherwise present at or affecting any property currently or formerly owned, leased or operated by Seller or any other location (including any facility at which Hazardous Materials have been stored, treated or disposed of or otherwise Released) for which Seller may be responsible, in any case in contravention of any applicable Environmental Laws or in a manner or under circumstances that could reasonably be expected to result in material liability to Seller or materially interfere with the operations of Seller; and (iii) Seller has not received an Environmental Notice that any property has been contaminated with or otherwise affected by any Hazardous Material which could reasonably be expected to result in an Environmental Claim against, or a violation of any Environmental Laws or any Environmental Permit by, Seller.

(e)     Seller has made available to Buyer any and all written information, in its possession or control, including Environmental Notices, Environmental Permits, environmental reports, studies, audits, records, sampling data, site assessments and other similar documents with respect to the Business or Purchased Assets or any location currently or formerly owned, leased or operated by Seller or for which Seller may have liability under any Environmental Laws or for the Release of, or exposure of any Person to, any Hazardous Materials.

(f)     No current or proposed events, conditions, circumstances, practices, plans or legal requirements exist that could reasonably be expected to prevent Seller from, or materially increase the cost to Seller of: (i) complying in all material respects with applicable Environmental Laws, or (i) obtaining, renewing, or complying with any Environmental Permits.

(g)     The Business: (i) has access through its water service provider to a water supply sufficient to support its business as currently operated, (ii) has not had limitations imposed upon its water supply which would render its water supply insufficient to support its business as currently operated, and (iii) has not received notice that access to its current water supply will be reduced or limited, or that costs associated with its water supply will be increased.

### Section 3.20    Employee Benefit Matters.

(a)    **Section 3.20** of the Disclosure Schedules contains a true and complete list of each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off, welfare, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by Seller or any Affiliate of any of them for the benefit of any current or former employee, manager, officer, director, retiree, independent contractor or consultant of the Business or any spouse or dependent of such individual, or under which Seller or any of its ERISA affiliates has or may have any Liability, or with respect to which Buyer or any of its Affiliates would reasonably be expected to have any Liability, contingent or otherwise (each, a "**Benefit Plan**").

(b)    With respect to each Benefit Plan, Seller has made available to Buyer accurate, current and complete copies of each of the following: (i) where the Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements or other funding arrangements, custodial agreements, insurance policies and contracts, administration agreements and similar agreements, and investment management or investment advisory agreements, now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise; (iv) copies of any summary plan descriptions, summaries of material modifications, employee handbooks and any other written communications (or a description of any oral communications) relating to any Benefit Plan; (v) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination, opinion or advisory letter from the Internal Revenue Service; (vi) in the case of any Benefit Plan for which a Form 5500 is required to be filed, a copy of the two most recently filed Form 5500, with schedules and financial statements attached; (vii) actuarial valuations and reports related to any Benefit Plans with respect to the most recently completed plan years; (viii) the most recent nondiscrimination tests performed under the Code; and (ix) copies of material notices, letters or other correspondence from the Internal Revenue Service, Department of Labor, Pension Benefit Guaranty Corporation or other Governmental Authority relating to the Benefit Plan.

(c)    Except as set forth on **Section 3.20** of the Disclosure Schedules, each Benefit Plan and related trust has been established, administered and maintained in accordance with its terms and in compliance with all applicable Laws (including ERISA and the Code). Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "**Qualified Benefit Plan**") is so qualified, and nothing has occurred that could reasonably be expected to adversely affect the qualified status of any Qualified Benefit Plan. Nothing has occurred with respect to any Benefit Plan that has subjected or could reasonably be expected to subject Seller or any of its ERISA Affiliates or, with respect to any period after the Closing Date, Buyer or any of its Affiliates, to a penalty under Section 502 of ERISA or to tax or penalty under Section 4975 of the Code. All benefits, contributions and premiums relating to each Benefit Plan have been timely paid in

19

accordance with the terms of such Benefit Plan and all applicable Laws, and all benefits accrued under any unfunded Benefit Plan have been paid, accrued or otherwise adequately reserved to the extent required by, and in accordance with GAAP. No condition exists with respect to any Benefit Plan which can reasonably be expected to result in any liability of any kind or nature to the Buyer.

(d)     Neither Seller nor any of its ERISA affiliates has within the seven (7) year period immediately preceding the Closing Date maintained, contributed to or has been required to contribute to any: (i) a "multiple employer plan" within the meaning of Section 413(c) of the Code; (ii) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA); (iii) a "multi-employer plan" within the meaning of Section 3(37) of ERISA; or (iv) a defined benefit plan within the meaning for Section 3(35) of ERISA.

(e)     Except as set forth in **Section 3.20** of the Disclosure Schedules, no Benefit Plan that is a group health plan is subject to the continuation of coverage requirements of Section 601 et. seq. of ERISA ("**COBRA**") and no Seller employee is on COBRA or in a COBRA election period.

(f)     Other than as may be required under COBRA or other applicable Law, no Benefit Plan or other arrangement provides post-termination or retiree welfare benefits to any individual for any reason.

(g)     Except as set forth on **Section 3.20** of the Disclosure Schedules, there is no pending or, to Seller's Knowledge, threatened Action relating to a Benefit Plan (other than routine claims for benefits), and no Benefit Plan has within the five (5) years prior to the date hereof been the subject of an examination or audit by a Governmental Authority or the subject of an application or filing under, or is a participant in, an amnesty, voluntary compliance, self-correction or similar program sponsored by any Governmental Authority.

(h)     Except as set forth in **Section 3.20** of the Disclosure Schedules, there has been no amendment to, announcement by Seller or any of its Affiliates relating to, or change in employee participation or coverage under, any Benefit Plan or collective bargaining agreement that would increase the annual expense of maintaining such plan above the level of the expense incurred for the most recently completed fiscal year with respect to any manager, officer, director, employee, consultant or independent contractor of the Business, as applicable. Neither Seller nor any of its Affiliates has any commitment or obligation or has made any representations to any manager, officer, director, employee, consultant or independent contractor of the Business, whether or not legally binding, to adopt, amend, modify or terminate any Benefit Plan or any collective bargaining agreement.

(i)     Each Benefit Plan that is subject to Section 409A of the Code has been administered in compliance with its terms and the operational and documentary requirements of Section 409A of the Code and all applicable regulatory guidance (including, notices, rulings and proposed and final regulations) thereunder. Seller does not have any obligation to gross up, indemnify or otherwise reimburse any individual for any excise taxes, interest or penalties incurred pursuant to Section 409A of the Code.

(j)      Neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former manager, officer, director, member, employee, independent contractor or consultant of the Business to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation due to any such individual; (iii) increase the amount payable under or result in any other material obligation pursuant to any Benefit Plan; (iv) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (v) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code.

### Section 3.21   Employment Matters.

(a)      **Section 3.21** of the Disclosure Schedules contains a list of all persons who are employees, independent contractors or consultants of the Business as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized.   As of the date hereof, all compensation, including wages, commissions and bonuses payable to all employees, independent contractors or consultants of the Business for services performed on or prior to the date hereof have been paid in full and there are no outstanding agreements, understandings or commitments of Seller with respect to any compensation, commissions or bonuses.

(b)      To Seller's Knowledge, Seller is not, and has not been for the past five (5) years, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), and there is not, and has not been for the past five (5) years, any Union representing or purporting to represent any employee of Seller, and, to Seller's Knowledge, no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. To Seller's Knowledge, there has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting Seller or any employees of the Business. Seller has no duty to bargain with any Union.

(c)      To Seller's Knowledge, Seller is and has been in compliance with all applicable Laws pertaining to employment and employment practices to the extent they relate to employees of the Business, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence and unemployment insurance. To Seller's Knowledge, all individuals characterized and treated by Seller as consultants or independent contractors of the Business are properly treated as independent contractors under all applicable Laws. To Seller's Knowledge, all employees of the Business classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified. To Seller's Knowledge, there are no Actions against Seller pending, or to the Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern or independent contractor of the Business, including, without limitation, any Action relating to unfair labor practices,

21

employment discrimination, harassment, retaliation, equal pay, wages and hours or any other employment related matter arising under applicable Laws.

**Section 3.22  Taxes.**  Except as set forth on **Section 3.22** of the Disclosure Schedules,

(a)  To Seller's Knowledge, all Tax Returns with respect to the Business required to be filed by Seller for any Pre-Closing Tax Period have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all respects. All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)  To Seller's Knowledge, each of Seller has withheld and paid each Tax for any Pre-Closing Tax Period required to have been withheld and paid in connection with amounts paid or owing to any Employee, independent contractor, creditor, customer, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law.

(c)  To Seller's Knowledge, no extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller.

(d)  To Seller's Knowledge, all deficiencies asserted, or assessments made, against Seller as a result of any examinations by any Governmental Authority with respect to Taxes for any Pre-Closing Tax Period have been fully paid.

(e)  To Seller's Knowledge, Seller is not a party to any Action with respect to Taxes by any Governmental Authority for any Pre-Closing Tax Period. There are no pending or threatened Actions with respect to Taxes by any Governmental Authority.  No Claim has ever been made by a Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction.

(f)  To Seller's Knowledge, there are no Encumbrances for Taxes upon any of the Purchased Assets nor, to Seller's Knowledge, is any Governmental Authority in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable).

(g)  To Seller's Knowledge, Seller has not been classified as a disregarded entity for U.S. federal income Tax and other relevant Tax purposes.

**Section 3.23  Brokers**.  Except for Province, Inc., whose fee shall be paid by Seller, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 3.24  Full Disclosure**.  To Seller's Knowledge, no representation or warranty by Seller in this Agreement and no statement contained in any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this **Article IV** are true and correct as of the date hereof and as of the Closing Date.

**Section 4.01    Organization and Authority of Buyer; Enforceability.**    Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Nevada.  Buyer has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Buyer.  This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 4.02    No Conflicts; Consents.**    The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the articles of organization, operating agreement or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer.  No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 4.03    Legal Proceedings.**    There is no Action of any nature pending or, to Buyer's knowledge, threatened against or by Buyer that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 4.04    Brokers.**    No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 4.05    Financing.**    Buyer has sufficient cash, committed and available lines of credit or other sources of committed and available funds to enable Buyer to perform all of its obligations under this Agreement and the other Transaction Documents to which Buyer is or will be a party, including to pay the Purchase Price.

**Section 4.06    Assumed Contracts.**    Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2) of the Bankruptcy Code with respect to the Assumed Contracts.

23

# ARTICLE V
## COVENANTS

**Section 5.01    Conduct of Business Prior to the Closing**.  From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer, Seller shall (x) conduct the Business in the ordinary course of business consistent with past practice; and (y) maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, suppliers and others having relationships with the Business. Without limiting the foregoing, from the date hereof until the Closing Date, Seller shall:

(a)    preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

(b)    pay the debts, Taxes and other obligations of the Business when due;

(c)    continue to collect Accounts Receivable in a commercially reasonable manner;

(d)    maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(e)    continue in full force and effect without modification all Insurance Policies, except as required by applicable Law;

(f)    perform all of its obligations under all Contracts;

(g)    maintain the Books and Records in accordance with past practice;

(h)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets; and

(i)    not take or permit any action that would cause any of the changes, events or conditions described in **Section 3.06** to occur.

**Section 5.02    Access to Information**.  From the date hereof until the Closing, Seller shall (a) afford Buyer and its representatives full and free access to and the right to inspect the Purchased Assets, the Leased Real Property, and all other properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Buyer and its representatives with such financial, operating and other data and information related to the Business as Buyer or any of its representatives may reasonably request; and (c) instruct its representatives to cooperate with Buyer in its investigation of the Business. Without limiting the foregoing, Seller shall permit Buyer and its representatives to conduct environmental due diligence of the Leased Property, including the collecting and analysis of samples of indoor or outdoor air, surface water, groundwater or surface or subsurface land on, at, in, under or from the Leased Property. For a period of six (6) months after the Closing, Seller shall allow Buyer reasonable access during normal business hours to the books and records of Seller solely to the extent relevant to any pre-Closing matter, including pre-Closing financial information germane to the Buyer's use of the Purchased Assets. No investigation by Buyer or other information

24

received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

**Section 5.03    Notice of Certain Events.**

(a)    From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)    any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in **Section 6.01** to be satisfied;

(ii)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)    any Actions commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to **Section 3.18** or that relates to the consummation of the transactions contemplated by this Agreement.

(b)    Buyer's receipt of information pursuant to this **Section 5.03** shall not operate as an amendment, supplementation and modification of any representation, warranty or agreement given or made by Seller in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 5.04    Employees and Employee Benefits**

(a)    Buyer may offer employment with Buyer beginning on the Closing Date to substantially all of Seller's employees, as determined by Buyer in Buyer's sole discretion. Except as otherwise provided herein, Buyer shall not be required to offer employment to any of Seller's employees. Seller's employees hired by Buyer may be subject to Buyer's standard non-compete agreement, as determined by Buyer in Buyer's sole discretion.

(b)    Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or any other benefits payable under any Benefit Plan (including any COBRA continuation coverage), or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons

25

on or prior to the Closing Date. The Seller and Buyer shall make available to the employees of Seller hired by Buyer, for a period of 65 days following the Closing, Seller's benefit plans set forth on **Schedule 1.03(d)**, at Buyer's expense.

(c)    Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, retirement, health accident or disability benefits brought by or in respect of current or former employees, managers, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Seller also shall remain solely responsible for all worker's compensation claims of any current or former employees, managers, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Closing Date. Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

(d)    Each employee of the Business who becomes employed by Buyer in connection with the transactions contemplated by this Agreement may be given service credit for the purpose of eligibility and vesting under Buyer's 401(k) plan, as applicable, for his or her period of service with Seller prior to the Closing Date; provided, however, that (i) such credit shall be given pursuant to payroll or plan records, at the election of Buyer, in Buyer's sole and absolute discretion; and (ii) such service credit shall be permitted and consistent with Buyer's 401(k) plan, as applicable. In all other respects, employees of Seller hired by Buyer shall be treated as new employees for all purposes, including with respect to seniority, entitlement to vacation, accrual of "participation" credit in 401(k) plans and other fringe benefits.

**Section 5.05   Confidentiality**. From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use their reasonable best efforts to cause its or their respective representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of their Affiliates or their respective representatives; or (b) is lawfully acquired by Seller, any of their Affiliates or their respective representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any of its Affiliates or their respective representatives are compelled to disclose any information by judicial or administrative process or by other requirements of law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller are advised by their counsel in writing is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.06   Non-competition; Non-solicitation.**

(a)    For a period of five (5) years commencing on the Closing Date (the "**Restricted Period**"), except as permitted by this **Section 5.06**, neither Seller nor any of the Required Members shall engage, directly or indirectly, in any Competitive Activities (i) within the Restricted Area, or (ii) in any geographical or market area in which Buyer or any of its Affiliates engage in business or provide products or services or derive a material portion of their revenues or have demonstrable plans to commence business activities, or own the equity securities of,

26

manage, operate or control, any Person that engages, directly or indirectly, in any Competitive Activities; provided, however, that with respect to the equity of any Competitive Activity that is publicly traded, ownership as a passive investor of less than 1% of the outstanding publicly traded stock shall not be deemed a violation of this **Section 5.06(a)**.

(b)    From the date hereof for a period of three (3) years from and after the Closing Date, Seller and the Required Members shall not, directly or indirectly on their own account or for the account of any other individual or entity, engage in Interfering Activities.

(c)    Seller acknowledges and agrees that its obligations set forth in this **Section 5.06** are an essential element of this Agreement and that, but for the agreement of Seller in this **Section 5.06**, Buyer would not have entered into this Agreement.  Seller acknowledges and agrees that the undertakings of Seller in this **Section 5.06** constitute an independent covenant of Seller. Seller acknowledges that it has consulted with its own counsel with regard to this **Section 5.06** and, after such consultation, agrees that its obligations set forth in this **Section 5.06** are reasonable and proper, have been negotiated fully and fairly and represent an agreement based on the totality of the transactions contemplated hereby.

(d)    In the event that any covenant contained in this **Section 5.06** should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law.  The covenants contained in this **Section 5.06** and each provision hereof are severable and distinct covenants and provisions.  The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 5.07    Bankruptcy Order**.  Seller and Buyer shall use their best efforts to secure the entry of the Sale Order, including, without limitation, by making its officers and other principals and Affiliates available for testimony before the Bankruptcy Court.

**Section 5.08    Consents and Approvals**.  Seller shall use reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in **Section 3.02** of the Disclosure Schedules. Each party hereto shall, as promptly as possible, (i) make, or cause or be made, all filings and submissions required under any Law applicable to such party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The Parties shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

**Section 5.09    Public Announcements**. Unless otherwise required by applicable law, no party hereto shall make any public announcements regarding this Agreement or the transactions

44921005.v11

contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed).

**Section 5.10  Transfer Taxes**.    All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder shall be borne and paid by Seller when due.  Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 5.11  Receivables**. From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any Purchased Asset, Seller or such Affiliates shall remit such funds to Buyer within five (5) business days after its receipt thereof.

**Section 5.12  Payment of Excluded Liabilities; Litigation Trust.** Seller shall pay, or make adequate provisions for the payment, in full of all Excluded Liabilities and other Liabilities of Seller that are not Assumed Liabilities promptly when due, and immediately following the Closing shall (i) deposit $45,000 of the proceeds of the Cash Purchase Price into a litigation trust established by Seller in accordance with the Sale Order, and (ii) pay all Liabilities owing to any Governmental Authority with respect to Taxes, including, without limitation, all Liabilities referred to in **Section 3.22** of the Disclosure Schedules.

**Section 5.13  Bulk Sales Laws**.    The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

**Section 5.14  Prorations**.    In the event that Buyer elects, in Buyer's sole discretion to continue any of the Business's utility services under existing accounts with the applicable utility providers or any of the Business's insurance policies with the applicable insurer, any related bills or premiums shall be prorated between Seller and Buyer as of the Closing Date, with the Seller responsible for the portion prior to the Closing Date, and Buyer responsible for the portion after and including the Closing Date.

**Section 5.15  Name Change.**  Within ten (10) business days following the Closing Date, Seller shall change its name to a name that has no reference to "Superior Linen" or any derivative or variation thereof, and shall make all filings necessary to effect such name change.

**Section 5.16  Further Assurances and Permit Transfer**.  Following the Closing, each of the Parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder. With respect to Seller's rights under the Permits set forth on **Section 3.17(b)** of the Disclosure Schedules that are not transferable to Buyer, Seller, to the maximum extent permitted by law, shall allow Buyer to use the Permits after the Closing until such Permits can be transferred and/or replaced with Permits in Buyer's name and further agrees to cooperate by providing assignments and assistance to Buyer as permitted by Law in connection with Buyer's efforts to obtain new Permits or transfer (to the extent transferable)

28

existing Permits to Buyer (each, a "**Permit Transition**").   Seller shall deliver to Buyer an invoice setting forth in reasonable detail the actual cost to Seller to transfer a Permit in connection with the Permit Transition (the "**Transition Costs**"), which shall include without limitation the actual costs, fees and expenses incurred by Seller in connection with a Permit Transition.  By way of illustration and not limitation, Transition Costs shall include those costs, fees and expenses that are required to be paid by or on behalf of Seller in connection with the Transition Costs to any third-party ("**Payable Party**").   Within three (3) days after receiving such invoice for any Transition Costs actually incurred by Seller, Buyer shall pay all such Transition Costs associated with the Permit Transition. In the event Seller is required to pay any Transition Costs, within three (3) days after receiving such invoice any Transition Costs, Buyer shall pay the Seller any such Transition Costs.  Buyer shall defend, indemnify and hold harmless Seller, its Affiliates and their respective stockholders, directors, officers and employees from and against all claims, liabilities, costs and expenses, including attorneys' fees and disbursements, arising from any action taken by Seller at Buyer's request relating to any Permit Transition, unless resulting from Seller's gross negligence or willful misconduct.   The terms, obligations, conditions and provisions of this **Section 5.16** shall survive the Closing for a period of four (4) months.

## ARTICLE VI
### CONDITIONS TO CLOSING

**Section 6.01   Conditions to Obligations of Buyer**.   The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)      The representations and warranties of Seller contained in this Agreement and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)      Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)      No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)      All approvals, consents and waivers that are listed on **Section 3.02** of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(e)      All Permits set forth on **Section 3.17(b)** of the Disclosure Schedules necessary for the operation of the Business by Buyer shall to the extent assignable at Closing have been

assigned to Buyer or Buyer shall have obtained similar Permits to the extent Seller's Permits are non-transferrable prior to Closing and in the event such transfers cannot be made prior to Closing the Parties shall cooperate in the Permit Transition as set forth in **Section 5.16** above.

(f)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(g)     Buyer shall have completed its due diligence investigation of the Business (including the Leased Real Property and the Purchased Assets) and the results thereof shall be satisfactory to Buyer in its sole discretion, including, without limitation, with respect to Buyer's environmental review.

(h)     Seller shall have delivered to Buyer the documents set forth in **Section 2.02(a)**.

(i)     All Encumbrances relating to the Purchased Assets shall have been released in full, other than Permitted Encumbrances, and Seller shall have delivered to Buyer written evidence, in form satisfactory to Buyer in its sole discretion, of the release of such Encumbrances.

(j)     The Sale Order authorizing the sale of the Purchased Assets to the Buyer pursuant to this Agreement shall have been entered, shall not be stayed, and shall be in form and substance satisfactory to Buyer in its sole discretion.

(k)     Seller shall have delivered to Buyer such other agreements, documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(l)     The North Las Vegas Settlement Agreement shall have been amended on terms and conditions satisfactory to Buyer in its sole discretion.

(m)     The Bankruptcy Court shall not have entered an order (i) appointing a trustee or examiner with expanded powers or (ii) dismissing the Bankruptcy Case or converting the chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.

(n)     All environmental certificates are obtained in Buyer's sole discretion.

**Section 6.02   Conditions to Obligations of Seller**.   The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Buyer contained in this Agreement shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

44921005.v11

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)     No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)     The Sale Order authorizing the sale of the Purchased Assets to the Buyer pursuant to this Agreement shall have been entered, and shall not be stayed.

(e)     Buyer shall have delivered to Seller the documents set forth in **Section 2.02(b)**.

## ARTICLE VII
### INDEMNIFICATION

**Section 7.01   Survival.** All representations, warranties, covenants and agreements contained herein and all related rights to indemnification shall survive the Closing for a period of two (2) years.

**Section 7.02   Indemnification By Seller.** Seller shall defend, indemnify and hold harmless Buyer, its affiliates and their respective stockholders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements, arising from or relating to (collectively, "**Damages**"):

(a)     any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or any document to be delivered hereunder;

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement or any document to be delivered hereunder; or

(c)     any liability of Seller relating to the Purchased Assets.

**Section 7.03   Indemnification By Buyer.** Buyer shall defend, indemnify and hold harmless Seller, its affiliates and their respective stockholders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements, arising from or relating to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or any document to be delivered hereunder; or

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement or any document to be delivered hereunder.

**Section 7.04   Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In

31

44921005.v11

connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any Damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

Section 7.05    **Tax Treatment of Indemnification Payments.** All indemnification payments made by Seller under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

Section 7.06    **Effect of Investigation.** Buyer's right to indemnification or other remedy based on the representations, warranties, covenants and agreements of Seller contained herein will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

Section 7.07    **Cumulative Remedies.** The rights and remedies provided in this **Article VII** are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

Section 7.08    **Limitations.**  Seller shall have no liability with respect to claims under **Section 7.02(a)** until the total Damages with respect to such indemnified matters exceeds Twenty Five Thousand Dollars ($25,000.00)(the "**Threshold**"), in which event Seller will be liable for all Damages without regard to the Threshold, and Seller's aggregate liabilities under this **Article VII** with respect to claims under **Section 7.02(a)** shall be limited to Damages of One Million Dollars ($1,000,000.00); provided, however, that such limitations under this Section 7.08 will not apply to claims (i) for breaches of Seller's representations under **Sections 3.01, 3.02, 3.05, 3.08, 3.19, 3.22** or **3.23**, or (ii) arising out of Seller's fraud or willful misconduct.

## ARTICLE VIII
### TERMINATION

Section 8.01    **Termination**.  This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Seller and Buyer;

(b)      by Buyer by written notice to Seller if:

44921005.v11

(i)      Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VI** and such breach, inaccuracy or failure has not been cured by Seller within ten days of Seller's receipt of written notice of such breach from Buyer;

(ii)      any of the conditions set forth in **Section 6.01** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by May 2, 2017, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)      if (A) Seller seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) Seller seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, the entry of an order by the Bankruptcy Court appointing a trustee in the Bankruptcy Case or an examiner with enlarged powers relating to the operation of the Seller's Business, (C) the Bankruptcy Court orders, for any reason, an order of a type identified in clause (A) or (B) above or (D) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any material Purchased Assets; or

(iv)      the Sale Order is not entered by the Bankruptcy Court within twenty five (25) days of the entry of this Agreement.

(c)      by Seller by written notice to Buyer if:

(i)      Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VI** and such breach, inaccuracy or failure has not been cured by Buyer within ten days of Buyer's receipt of written notice of such breach from Seller;

(ii)      any of the conditions set forth in **Section 6.02** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by May 2, 2017, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(iii)      a transaction with respect to a superior bid is consummated with another purchaser other than Buyer with the approval of the Bankruptcy Court.

(d)      by Buyer or Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order

33

restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 8.02   Effect of Termination**.  In the event of the termination of this Agreement in accordance with this **Article VIII**, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)      as set forth in this **Article VIII**, **Section 5.05** and **Article IX** hereof; and

(b)      that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

**ARTICLE IX**
**MISCELLANEOUS**

**Section 9.01   As-Is Conveyance**.   Buyer agrees that, upon the Closing, Buyer shall conclusively be deemed to have accepted the Purchased Assets and Assumed Liabilities, in their then existing condition, "AS IS, WHERE IS AND WITH ALL FAULTS" without representation or warranty of any kind or nature whatsoever except as expressly set forth in this Agreement.

**Section 9.02   Expenses**.   All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

**Section 9.03   Notices**.   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this **Section 9.03**):

If to Seller:                                        Superior Linen, LLC
                                                         Attn: Mr. Robert E. Smith
                                                         4501 Mitchell Street
                                                         North Las Vegas, Nevada 89081
                                                         E-mail: robert.smith@superiorlinen.com

with a copy to:                                Larson & Zirzow
                                                         Attn. Mathew C. Zirzow, Esq.
                                                         850 E. Bonneville Ave.
                                                         Las Vegas, Nevada 89101
                                                         E-mail: mzirzow@lzlawnv.com

34

If to Buyer:                          Las Vegas Linen LLC
                                      c/o Pure Star Group
                                      1 West Mayflower Ave.
                                      N. Las Vegas, Nevada 89030
                                      Attn. Dave Barron
                                      Email: dbarron@purestargroup.com

with a copy to:                       Zev Bomrind
                                      Fox Rothschild LLP
                                      101 Park Avenue, 17th Floor
                                      New York, NY 10178
                                      E-mail: zbomrind@foxrothschild.com

**Section 9.04   Interpretation.** For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole; (d) "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase will not mean simply "if"; and (e) "in the ordinary course of business" shall be deemed to be followed by the words "consistent with past practice". Unless the context otherwise requires, references herein: (x) to Articles, Sections, Appendixes, Schedules, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Appendixes, Schedules, Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute and any regulations promulgated thereunder as of the date hereof. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted. The Appendixes, Schedules, Disclosure Schedules, and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 9.05   Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.06   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.07   Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the

35

event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Appendixes, Schedules, and the Exhibits, the statements in the body of this Agreement will control.

**Section 9.08    Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns. No Party may assign its rights or obligations hereunder without the prior written consent of the Seller and Buyer, which consent shall not be unreasonably withheld or delayed; provided that, Buyer may assign any of its rights, interests or obligations hereunder, in whole or in part, to one or more of its Affiliates and Buyer may assign any of its rights as collateral security to a lender to Buyer or any of its Affiliates (and, if requested by such lender, Seller agrees to execute and acknowledge, in form and substance reasonably acceptable to Seller, any such assignment). In any event, no assignment shall relieve the assigning Party of any of its obligations hereunder.

**Section 9.09    No Third-Party Beneficiaries**.  Except as provided in **Article VII**, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.10    Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.11    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)    Except to the extend Bankruptcy law applies, this Agreement shall be governed by and construed in accordance with the internal laws of the State of Nevada without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Nevada.

(b)    Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, any other Transaction Document or any of the Transactions, exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Case remain open and (b) after the close of the Bankruptcy Case or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the District of Nevada or any Nevada State court sitting in Las Vegas (together with the Bankruptcy Court, the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement and any other related transactions, (i) irrevocably submits to the exclusive jurisdiction of the Chosen

36

Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if notice is given in accordance with Section 9.02.

(c)      EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE DOCUMENTS DELIVERED HEREWITH IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE DOCUMENTS DELIVERED HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **SECTION 9.10(c)**.

**Section 9.12    Specific Performance**.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.13    Post-Closing Office**.  From and after the Closing Date and for a period of up to Ninety (90) days thereafter, Buyer may provide Seller's Designated Responsible Person with a furnished office (desk, chair, computer and telephone) at 4501 Mitchell Street, North Las Vegas, Nevada 89081 which shall include: (i) a computer and network access to Seller's pre-Closing books and records; (ii) telephone line and internet access; and (iii) access to the office from 9:00 am to 5:00 pm, Business Days.  In the event Buyer does not provide an office as contemplated above, Buyer shall from and after the Closing Date and for a period of up to Ninety (90) days thereafter, provide Seller's Designated Responsible Person with remote electronic access to Seller's data, files, books and records stored in an electronic format on the network and servers of Seller as of the Closing Date.  All access provided by Buyer under this Section 9.13 to Seller's Designated Responsible Person shall be for the sole purposes, and limited to the extent necessary, to allow Seller's Designated Responsible Person to administer the estate of Seller in the Bankruptcy Case or to cause Seller to comply with its obligations under this Agreement or applicable Law.

**Section 9.14    Document Retention/Sharing**.  From the Closing Date through the second anniversary of the Closing Date, Buyer shall, at Seller's reasonable request, provide Seller and its representatives, upon reasonable notice and during normal business hours, with access to, and the right to make copies of, any records and documents related to the Business included in the Purchased Assets as may be necessary or useful in connection with Seller's

37

Chapter 11 Case (or any adversary proceedings or contested matters arising therein or related thereto) or for the preparation of any filings with any Governmental Authority to be made by Seller.

**Section 9.15   Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

44921005.v11

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**Seller:**                                          **Buyer:**

**SUPERIOR LINEN, LLC,**                              **LAS VEGAS LINEN LLC,**
a Nevada limited liability company:                  a Nevada limited liability company:


                                                     By: _____
By: _____                   Name:
Name:  Robert E. Smith                               Its:
Its:      Designated Responsible Person

44921005.v11

# APPENDIX A

## TO

## ASSET PURCHASE AGREEMENT
### Dated May __, 2017

The following terms have the meanings specified or referred to in this **Appendix A**:

"**Accounts Receivable**" has the meaning set forth in **Section 1.01(a)(i)**.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly of twenty percent (20%) or more of all outstanding and issued membership interests, shares, stocks or ownership interests of a Person, or the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Assumed Contracts**" means the Contracts listed on **Section 1.03(d)** of the Disclosure Schedules, each as assigned to Buyer, with consent, where required, subject to the rights of Buyer to designate such Contracts under **Section 1.08**.

"**Assumed Liabilities**" has the meaning set forth in **Section 1.03**.

"**Avoidance Actions**" means any and all actual or potential claims or causes of action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including §§ 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a), other than against any counterparty to an Assumed Contract or any other Contract assumed by Buyer.

"**Balance Sheet**" has the meaning set forth in **Section 3.04**.

"**Balance Sheet Date**" has the meaning set forth in **Section 3.04**.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Benefit Plan**" has the meaning set forth in **Section 3.20(a)**.

"**Books and Records**" has the meaning set forth in **Section 1.01(e)**.

"**Business**" has the meaning set forth in **Recital A**.

A-1

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York or Las Vegas, Nevada are authorized or required by Law to be closed for business.

"**Business Relation**" means any current or prospective client, customer, licensee, supplier, or other business relation of Buyer or the Business, or any such relation that was a client, customer, licensee or other business relation in the prior six (6) month period, in each case, with whom any Seller transacted business or whose identity became known to any Seller in connection with its relationship with, or employment by, Buyer or the Business.

"**Cash Purchase Price**" has the meaning set forth in **Section 1.05**.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**Claim**" means a claim against Debtor as defined in the Bankruptcy Code and including, but not limited to, administrative claims or expenses as defined by 11 U.S.C. § 503.

"**Closing**" has the meaning set forth in **Section 2.01**.

"**Closing Date**" has the meaning set forth in **Section 2.01**.

"**Closing Certificate**" has the meaning set forth in **Section 1.06**.

"**COBRA**" has the meaning set forth in **Section 3.20(e)**.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competitive Activities**" means any business activities that are directly or indirectly related to (a) laundry and dry-cleaning services (including, without limitation, the washing of linens and dry cleaning of uniforms for commercial establishments), (b) linen supply or rental, (c) the provision of retail and wholesale goods to commercial establishments in respect of laundry services or linen supply, or (d) any other business activity that is competitive with the then current or demonstrably planned business activities of the Buyer or the Business.

"**Contract**" or "**Contracts**" means with respect to any Person, all legally binding agreements, undertakings, contracts, obligations, understandings and commitments, whether written or oral and together with all amendments, modifications or supplements thereof, (i) to which such Person is a party, (ii) under which such Person has any rights, (iii) under which such Person has any liability or (iv) by which such Person, or any of the assets or properties owned or used by such Person, is bound, including without limitation any agreement, contract, lease, sublease, purchase order, arrangement, commitment, license, franchise, indenture, note, bond, obligation, undertaking or other legally binding arrangement.

"**Customer Contracts**" has the meaning set forth in **Section 1.01(c)**.

"**Customers**" has the meaning set forth in **Section 3.13**.

A-2

"**Designated Responsible Person**" means Mr. Robert E. Smith.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, lease, option, title defect, adverse interest, encroachment or other similar encumbrance that is not a Permitted Post-Closing Lien.

"**Environmental Claims**" means any action, suit, claim, investigation or other legal proceeding by any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) any actual or alleged Release of, threatened Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Laws**" means any Law, and any Governmental Order or binding agreement with any Governmental Authority regulating, relating to or imposing standards of conduct concerning protection of the environment or of human health (as affected by exposure to hazardous substances), including any such Laws, Governmental Orders, or agreements: (a) relating to emissions, discharges, Releases or threatened Releases of hazardous substances, Hazardous Materials, pollutants, contaminants, chemicals, wastes or other substances into the environment or (b) relating to the identification, generation, manufacture, processing, distribution, use, treatment, storage, disposal, recovery, transport or other handling of hazardous substances, Hazardous Materials, pollutants, contaminants, chemicals, or wastes. The term "Environmental Law" includes, without limitation, the following (including all amendments thereof, all their implementing regulations and any state analogs): CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq. (as it applies to human exposure to hazardous substances).

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim (a) relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit; or (b) regarding any Hazardous Materials.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Excluded Assets**" has the meaning set forth in **Section 1.02**.

"**Excluded Contracts**" has the meaning set forth in **Section 1.02(d)**.

"**Excluded Liabilities**" has the meaning set forth in **Section 1.04**.

"**Excluded Payables**" has the meaning set forth in **Section 1.04(h)**.

"**Financial Statements**" has the meaning set forth in **Section 3.04**.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: all pollutants, contaminants, hazardous substances, hazardous wastes, toxic wastes, and any other carcinogenic, ignitable, corrosive, reactive, toxic or otherwise hazardous substances or materials as defined in or subject to regulation, control, or remediation under the Environmental Laws. "Hazardous Materials" shall include: (a) any "hazardous waste" as defined by the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., as amended; (b) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq., as amended; (c) asbestos-containing materials, polychlorinated biphenyls, radioactive materials, or urea-formaldehyde; and (d) spilled or leaked petroleum products, distillates, or fractions.

"**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (a) trademarks, trade names, corporate names, service marks, and all other source indicators including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights and copyrighted works, including all applications and registrations related to the foregoing; (c) trade secrets; (d) patents and patent applications; (e) internet domain name registrations; and (f) all other intellectual property and related proprietary rights, interests and protections.

"**Intellectual Property Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used in or

A-4

necessary for the conduct of the Business as currently conducted to which Seller is a party, beneficiary or otherwise bound.

"**Interfering Activities**" shall mean (a) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, Buyer or the Business to terminate such Person's employment or services (or in the case of a consultant, materially reducing such services) with Buyer or the Business; (b) hiring any individual who was employed by Buyer or the Business within the twelve (12) month period prior to the date of such hiring; or (c) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Business Relation to cease doing business with or reduce the amount of business conducted with Buyer or the Business, or in any way interfering with the relationship between any such Business Relation and Buyer or the Business.

"**Insider Claims**" means all claims or causes of action against any and all current or former officers, directors, members, managers, required members, shareholders or other equity security holders of the Seller, including without limitation, RD VII Investments, LLC.

"**Inventory**" has the meaning set forth in **Section 1.01(d)**.

"**Law**" means any statute, law (including common law), ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Lease Agreement**" has the meaning set forth in **Section 1.01(f)**.

"**Leased Property**" has the meaning set forth in **Section 1.01(f)**.

"**Leased Real Property**" has the meaning set forth in **Section 3.10**.

"**Leases**" has the meaning set forth in **Section 3.10(a)**.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Losses**" means any claims, actions, suits, demands, disbursements, assessments, judgments, losses, liabilities, Taxes, damages, settlements, losses, costs and expenses, including, without limitation, interest, penalties, reasonable attorneys' and accounting fees and investigation costs.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, prospects, condition (financial or otherwise) or assets of the Business, taken as a whole (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; provided, however, that none of the following will constitute a Material Adverse Effect: any event, change, circumstance, effect or other matter resulting from or related to (i) any outbreak or escalation of

A-5

war or major hostilities or any act of terrorism, (ii) changes in Laws, GAAP or enforcement or interpretation thereof, (iii) changes that generally affect the industries and markets in which the Seller operates, (iv) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs) or political conditions, (v) any action taken or failed to be taken pursuant to or in accordance with this Agreement or at the request of, or consented to by, the Buyer, or (vi) the execution or delivery of this Agreement or the public announcement or other publicity with respect to any of the foregoing.

"**Material Contracts**" has the meaning set forth in **Section 3.07(a)**.

"**Officer's Certificate**" has the meaning set forth in **Section 2.02(a)(vi)**.

"**Permit**" means, with respect to any Person, any license, franchise, permit, consent, approval, right, privilege, exemption, certificate or other similar authorization issued by, or otherwise granted by, any Governmental Authority or any other Person, to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"**Permitted Post-Closing Liens**" means (i) statutory liens for Taxes not yet due and payable; or (ii) mechanics, carriers', workmen's, repairmen's or other similar liens arising or incurred in the ordinary course of business for payment of amounts that are not delinquent and which are not, individually or in the aggregate, material in amount.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Purchased Assets**" has the meaning set forth in **Section 1.01**.

"**Qualified Benefit Plan**" has the meaning set forth in **Section 3.20(c)**.

"**Real Property**" means the real property owned, leased or subleased by the Seller, together with all buildings, structures and facilities located thereon.

"**Release**" means the releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandoning, or disposing (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Material).

"**Required Members**" means: (i) Fortuna Partners One, LLC; (ii) Little Current, LLC; (iii) BrightLight Holdings, LLC; and (iv) Rex Runzheimer Living Trust.

"**Restricted Area**" means the State Nevada.

A-6

44921005.v11

"**Seller's Knowledge**" or "**Knowledge of Seller**" means the actual or constructive knowledge of Robert E. Smith, including the knowledge that would be expected to be obtained after reasonable inquiry.

"**Suppliers**" has the meaning set forth in **Section 3.13**.

"**Tax**" or "**Taxes**" means all U.S. federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, capital gains, capital stock, value added, alternative or add-on minimum, escheat, unclaimed property, windfall profits, customs, duties or other taxes, levies, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document filed or required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Total Consideration**" has the meaning set forth in **Section 1.05**.

"**Union**" has the meaning set forth in **Section 3.21(b)**.

A-7

**EXHIBIT A**

**FORM OF BILL OF SALE**

[SELLER Draft 05/15/2017]

## Bill of Sale and Assignment Agreement

### (Superior Linen LLC)

**1.    Identification and Parties**.  This Bill of Sale and Assignment Agreement (this "**Bill of Sale**") is made and entered into effective as of May ___, 2017, by and between **SUPERIOR LINEN, LLC**, a Nevada limited liability company ("**Seller**"), in favor of **LAS VEGAS LINEN LLC**, a Delaware limited liability company ("**Buyer**").

**2.    Recitals.**

2.1    Seller and Buyer entered into that certain Asset Purchase Agreement dated May ___, 2017 for the acquisition of the Business upon the terms, conditions and obligations set forth therein (the "**Agreement**").  All capitalized terms used but not defined in this Bill of Sale shall have the meanings ascribed to such terms in the Agreement.

2.2    Under the Agreement, among other things, Seller agreed to sell to Buyer, and Buyer agreed to purchase from Seller, the Business, including the Purchased Assets.

2.3    The Agreement requires the execution and delivery of this Bill of Sale.

In order to consummate the transaction contemplated by the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller desires to execute this Bill of Sale in favor of Buyer.

**3.    Bill of Sale and Assignment Agreement**.

3.1    Seller assigns, sells, transfers, conveys and delivers to Buyer, except as provided in Section 3.08 of the Agreement free and clear of liens and encumbrances and, to the extent transferable, all of Seller's right, title and interest in the Purchased Assets including, without limitation, the Purchased Assets described on **Exhibit A** attached hereto and incorporated herein by this reference.

3.2    By acceptance of this Bill of Sale, Buyer hereby accepts the assignment, sale, transfer, conveyance and delivery set forth in Section 3.1 above.

3.3    Notwithstanding any provision of Section 3.1 to the contrary, the Purchased Assets shall not include any Excluded Assets listed on **Exhibit B** attached hereto and incorporated herein by this reference.

3.4    Except as otherwise expressly set forth in Article III of the Agreement, the Purchased Assets are assigned, sold, transferred, conveyed and delivered hereunder without representation or warranty of any kind or nature whatsoever, whether statutory, express or implied, including, without limitation, any warranty of fitness or merchantability.  Without in

1

any way limiting the generality of the preceding sentence, Section 3.08 and Section 9.01 of the Agreement are hereby incorporated herein by these references as though they were set forth in full herein.

**4.**    **Miscellaneous**.

4.1    Entire Agreement.  This Bill of Sale and the Agreement are the entire agreement between the parties hereto with respect to the subject matter hereof, and incorporate all prior agreements and understandings of the parties hereto.

4.2    Amendments in Writing.  No amendment or modification of this Bill of Sale shall be valid unless the amendment or modification is in writing and signed by Seller and Buyer.

4.3    Counterparts.  This Bill of Sale may be executed in one or more duplicate counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Seller has executed this Bill of Sale to be effective as of the date first set forth above.

**Seller:**

**SUPERIOR LINEN, LLC,**
a Nevada limited liability company:


By: _____
Name:   Robert E. Smith
Its:        Designated Responsible Person

3

**Exhibit A to Bill of Sale**

**<u>Purchased Assets</u>**

**Exhibit B to Bill of Sale**

**Excluded Assets**

(a)      Any property identified as an Excluded Assets in Section 1.02 of the Disclosure Schedules for the Agreement.

# EXHIBIT B

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

[**SELLER Draft 05/15/2017**]

## Assignment and Assumption of Contracts

### (Superior Linen LLC)

1.   **Identification and Parties**.   This Assignment and Assumption of Contracts (this "**Assignment**") is made and entered into effective as of May \_\_\_, 2017, by and between **SUPERIOR LINEN, LLC**, a Nevada limited liability company ("**Assignor**"), and **LAS VEGAS LINEN LLC**, a Delaware limited liability company ("**Assignee**").

2.   **Recitals**.

   2.1   Seller and Buyer entered into that certain Asset Purchase Agreement dated May \_\_\_, 2017 for the acquisition of the Business upon the terms, conditions and obligations set forth therein (the "**Agreement**").  All capitalized terms used but not defined in this Bill of Sale shall have the meanings ascribed to such terms in the Agreement.

   2.2   The Agreement requires the execution and delivery of this Assignment in order to convey to Assignee all of Assignor's right, title and interest in and to the Contracts (including without limitation the Customer Contracts), the North Las Vegas Settlement Agreement and Assumed Liabilities, as listed on **Exhibit A** attached hereto (collectively, the "**Contracts**").

   In order to consummate the transaction contemplated by the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee desire to execute this Assignment.

3.   **Assignment and Assumption**.

   3.1   Assignor hereby assigns to Assignee all of Assignor's right, title and interest in, to and under the Contracts.

   3.2   Assignee hereby accepts the assignment set forth in Section 3.1, and assumes and agrees to perform all obligations, duties, undertakings and liabilities of Assignor under the Contracts.

   3.3   Except as otherwise expressly set forth in Article III of the Agreement, Assignor's right, title and interest under the Contracts are assigned hereunder without representation or warranty of any kind or nature whatsoever, whether statutory, express or implied.  Without in any way limiting the generality of the preceding sentence, Section 3.08 and Section 9.01 of the Agreement are hereby incorporated herein by these references as though they were set forth in full herein.

1

4.  **Miscellaneous**.

4.1    <u>Entire Agreement</u>.  This Assignment and the Agreement are the entire agreement between the parties hereto with respect to the subject matter hereof, and incorporate all prior agreements and understandings of the parties hereto.

4.2    <u>Amendments in Writing</u>.  No amendment or modification of this Assignment shall be valid unless the amendment or modification is in writing and signed by Assignor and Assignee.

4.3    <u>Counterparts</u>.  This Assignment may be executed in one or more duplicate counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Assignor and Assignee have entered into this Assignment to be effective as of the date first set forth above.

**Assignor:**

**SUPERIOR LINEN, LLC,**
a Nevada limited liability company:


By: _____
Name:   Robert E. Smith
Its:      Designated Responsible Person

**Assignee:**

**LAS VEGAS LINEN LLC**, a Delaware limited liability company:


By: _____
Name:
Its:

3

**Exhibit A to Assignment of Contracts**

[*To be attached*]

# EXHIBIT "3"

## SETTLEMENT AND RELEASE AGREEMENT

This SETTLEMENT AND RELEASE AGREEMENT (the "Agreement") is entered into as of May___, 2017 (the "Execution Date") by and among SUPERIOR LINEN, LLC, a Nevada limited liability company, as debtor and debtor in possession (the "Debtor" or "Superior Linen" as applicable); the CITY OF NORTH LAS VEGAS, a Nevada municipal corporation (the "City"); and ICON PAC NEVADA OWNER POOL 3, NEVADA, LLC, a Delaware limited liability company, as successor landlord (the "Landlord" and together with the Debtor and the City, the "Parties" or each as a "Party."

## RECITALS

A.    Superior Linen is a full service commercial laundry company providing the entire spectrum of laundry services to hotels and food and beverage managed restaurants and clubs.

B.    On or about July 26, 2011, Superior Linen, as tenant, entered into a Lease Agreement (as amended, the "Lease Agreement") with Prologis NA3, LLC, a Delaware limited liability company ("Prologis"), as original landlord, for a building located in the Nellis Industrial Park with an address of 4501 Mitchell Street, North Las Vegas, Nevada 89081 (as amended, the "Premises").  The Lease Agreement was later amended pursuant to that certain First Amendment to Lease dated as of June 22, 2012, and then again pursuant to that certain Second Amendment to Lease Agreement dated as of May 16, 2014.  In or about 2015, the Landlord became the successor landlord of the Premises and assumed all rights, liabilities and remedies under the Lease Agreement in its then current form as amended.

C.    Superior Linen is also obligated to pay certain sums to the City over time as and for "wastewater/sewerage connection fees for industrial laundries as well as normal monthly utility charges.  On or about July 30, 2014, the City and Superior Linen entered into a Confession of Judgment, which included certain repayment schedules and a settlement agreement with the City.  On or about February 1, 2015, the City and Superior Linen entered into a Settlement Agreement and Release, which included an additional Confession of Judgment.

D.    Prior to the Petition Date, Superior Linen defaulted on its payment arrangement(s) with the City, and thus the City recorded a Notice of Lien for Unpaid Utilities Charges against the Premises in the Official Records of the County Recorder, Clark County, Nevada on September 22, 2016 at Instrument 20160922-0000141 (the "Notice of Lien") in the amount of $893,667.33.  The recordation of the Notice of Lien on the Premises is a breach of the Lease Agreement.

E.    On September 30, 2016 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), thereby commencing its bankruptcy case, Case No. 16-15388-mkn (the "Chapter 11 Case").  Debtor is authorized to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

F.    On January 24, 2017, the Bankruptcy Court entered an order granting an adequate assurance utility deposit to the City pursuant to section 366 of the Bankruptcy Code in the amount of $85,000.00 (the "Deposit"), which the Debtor has posted with the City and which deposit

remains unapplied as of the Execution Date.

G.    On February 1, 2017, the City filed a Proof of Claim, being Claim No. 33 in the amount of $905,387.08, and on that same date the Landlord filed its Proof of Claim, being Claim No. 34, in the amount of $902,179.93.

H.    As of the Execution Date of this Agreement, the Debtor is indebted to the City for utility services, and wastewater/sewerage connection fees, among other items, in the total amount of $875,341.15, plus current utility services bills due May 1, 2017 in the total amount of $55,942.10, plus additional monthly utility service amounts thereafter through the time the Transaction closes (the "Debtor Allocated Portion of the Final Utility Bills"). As of the Execution Date of this Agreement, the Landlord asserts a total cure claim under the Lease pursuant to section 365 of the Bankruptcy Code in the amount of $931,283.24, plus the Debtor Allocated Portion of the Final Utility Bills (collectively, the "Cure Obligation").

I.    Debtor is proposing to sell substantially all of its assets to Las Vegas Linen, LLC, a Nevada limited liability company (the "Buyer"), pursuant to section 363 of the Bankruptcy Code, which transaction also contemplates the assumption and assignment of the Lease by the Debtor to the Buyer pursuant to section 365 of the Bankruptcy Code (collectively, the "Transaction"). Pursuant to the terms and conditions of this proposed Transaction, which is subject to approval by the Bankruptcy Court, the Buyer has agreed to pay as an assumed liability the sum of $750,000.00 of the Cure Obligation owing to the City over time as set forth herein; *provided*, *however*, that, among other matters:  (1) the Transaction is approved by the Bankruptcy Court as presented on or before May _, 2017; (2) this Agreement is approved by the Debtor, the City, the Landlord, and the Bankruptcy Court on or before the approval of the Transaction; and (3) the Transaction Closes.

J.    Except as expressly set forth herein, and subject to the terms and conditions herein, the Parties, without conceding or admitting liability, have concluded that it serves their respective interests to avoid the expenditure of additional time, effort and resources in litigating their disputes and in continuing their various proceedings and litigation against or involving each other, and that they now wish to fully, finally and forever settle and compromise their claims and disputes against each other, including but not limited to any and all claims to attorney's fees, costs, and other expenses, and to release, discharge and terminate all claims, demands, controversies, suits, causes of action, damages, rights, warranties, liabilities and obligations, and which either have been asserted or which could be asserted against each other.

**NOW, THEREFORE,** in consideration of the promises, undertakings, payments, and releases stated in this Agreement, which the Parties acknowledge to be sufficient consideration, the Parties agree as follows:

**1.    Bankruptcy Court Approval.** The effectiveness of this Agreement is contingent upon the entry of an order authorizing and approving the Transaction and this Agreement and the Closing of the Transaction as contemplated by the Sale Motion.  Within one (1) business day of the receipt of signatures on this Agreement and the Asset Purchase Agreement for the Transaction, the Debtor shall file a motion with the Bankruptcy Court seeking to authorize and to approve this Agreement (the "Settlement Motion"), and shall use their commercially reasonable best efforts to obtain such approval of the same.  The proposed form of Settlement Motion and Settlement Order

must be in a form and substance reasonably acceptable to the Parties as well as the Buyer prior to it being filed with the Bankruptcy Court.

2.     **The Assumed Payment by the Buyer**.  Subject to the terms and conditions herein, the Debtor shall assume the obligation to repay the principal sum of up to $750,000 of the Cure Obligation to the City (the "Assumed Payment"), which shall thereafter be assumed by the Buyer pursuant to the terms and conditions of the Asset Purchase Agreement. The Assumed Payment shall be made on the payment schedule as attached hereto as **Exhibit 1**.  The Assumed Payment shall be made as follows:

- Within five days of the Closing of the Transaction, , the Buyer will make a payment of $60,000 to the City;

- The remaining amount of $690,000 shall accrue interest at the rate of 2.03% and shall be paid in full in thirty-six (36) equal monthly payments, with payments beginning as set forth in Exhibit 1.

- However, if the Buyer has failed to make the first twenty-four (24) month payments on time, or otherwise defaulted on its obligations to the City, the City will be entitled to full repayment on the remainder of the amount owing at the end of the twenty-four (24) month period.

3.     **The Remaining Payment by the Debtor**.  Subject to the terms and conditions herein, the Debtor shall immediately pay to the City the balance of the Cure Obligation in excess of the $750,000 Assumed Payment, being the sum of $181,283.25, plus the Debtor Allocated Portion of the Final Utility Bills, shall be paid by the Debtor directly from escrow from the Transaction and thus directly from the proceeds of sale received by the Debtor from the Buyer.

4.     **Confession of Judgment by Buyer**.  The Buyer and the City shall execute a Confession of Judgment in favor of the City containing the terms and conditions of this Agreement, and that Confession of Judgment is for security purposes only and shall not be filed or executed upon unless an Event of Default occurs that is not cured or not given an extended period of time to cure.  Further, AMCP Clean Acquisition Company and AMCP Clean Acquisition Holdco will execute a guaranty, guarantying the Buyer's obligation to the City (the "Guaranty").  The signed Confession of Judgment and Guaranty are attached hereto as **Exhibit 3**  for reference.

5.     **Landlord's Consent**.  In consideration of the payments and assumed liabilities in this Agreement, the Landlord approves of, and waives any objection to the approval of the Transaction, the assumption of the Lease by the Debtor, the assignment of the Lease to the Buyer. Nothing herein is intended or should be construed as a waiver or release of any obligations that may arise under the Lease from and after the Execution Date of this Agreement, which shall be the sole and exclusive responsibility of the Buyer.

6.     **City's Consent and Release of Current Lien(s)**.  In consideration of the payments and the assumption of liabilities in this Agreement, the City approves of, and waives any objection to the approval of the Transaction, the assumption of the Lease by the Debtor, the assignment of the Lease to the Buyer.  The City also agrees to release any and all existing liens on the Premises,

which shall be effectuated by the City through the recordation of the Extinguishment and Release (the "Extinguishment & Release") attached hereto as **Exhibit 2** in the Official Records. After the Transaction closes, the City shall have thirty (30) days to record the Extinguishment and Release. The City's release of lien shall be without prejudice to the default remedies provided under the City's municipal code, state law or elsewhere in this Agreement. Nothing herein is intended or should be construed as a waiver or release of any obligations that may arise under the Lease from and after the Transaction Closing, which shall be the sole and exclusive responsibility of the Buyer.

7.    **Events of Default for the Assumed Payment.**  Superior Linen or Buyer after assumption and assignment as applicable, shall be in default under this Agreement upon the occurrence and continuation of any one or more of the following events (the "Events of Default"):

a.    Superior Linen, or Buyer after the assumption and assignment of this Agreement, fails to timely make the payments contemplated in Section 2, above, or any other payment that comes due, and does not cure that failure within fifteen (15) days of being provided with written notice of such default,

b.    Buyer becomes insolvent or is the subject of any bankruptcy or other voluntary or involuntary proceeding in our out of court, for the adjustment of debtor-creditor relationships;

c.    Buyer dissolves or liquidates or is administratively suspended or dissolved. For the avoidance of doubt, any withdrawal, removal, transfer, or change in membership interests of the Buyer shall not be an Event of Default.

d.    Any governmental, judicial, or legal authority having jurisdiction over the Buyer or its business withdraws, suspends, or revokes any required approval, license, certificate, or permit and the withdrawal, suspension, or revocation remains in effect for a period of sixty (60) days (the "Initial Cure Period"). So long as Buyer begins within the Initial Cure Period and diligently takes steps to remove the cause of the withdrawal, suspension, or revocation, and the City, after meeting and consulting with the Buyer, and the City determines that the Buyer is reasonably likely to prevail, the Initial Cure period may be extended by a period not to exceed ninety (90) days.

8.    **Default Remedies.**  If an Event of Default occurs and remains uncured, and Buyer fails to comply with the conditions of this Agreement, any or all of the following may occur:

a.    All amounts of principal and interest under this Agreement shall be accelerated and immediately due and payable within five (5) Business Days of transmission of a written notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor or other notices or demands of any kind or character;

b.    Any outstanding amounts due and owing, at the option of the City, shall bear additional interest at an annual rate of 2.03% (the "default rate");

c.    The City may record the Confession of Judgment and seek to enforce the Guaranties or otherwise execute the Confession of Judgment to satisfy any outstanding amounts due and owing, including amounts due for any default rate of interest; and

    **d.**    The City may pursue any of its other rights and remedies under the City's municipal code and/or state law, including recordation of a lien on the Premises for the amount that remains unpaid and any future or additional amounts owing to the City.

**9.**    **Audit.**    The City may audit, no less than quarterly, then-current wastewater/sewerage flows, and after such audit, the City reserve the right to bill Buyer additional amounts for wastewater/sewerage connection fees for such percentage of additional wastewater/sewerage as may be discovered in any audit., However, if an audit is conducted prior to May 1, 2018, the City agrees to initially pay for any additional fees and the Buyer shall not be responsible for reimbursing the City for these additional wastewater/sewage fees until May 31, 2018. **Deposit.** The City will maintain the $85,000 Deposit as security for water service pursuant to the City's municipal code.

**10.**    **No Prepayment Penalty.**  There shall be no pre-payment penalty if all or any part of the Assumed Payment is made in advance of the applicable due date.

**11.**    **Attorneys' Fees and Costs for Agreement.**  Each of the Parties shall bear their own attorneys' fees and costs for the negotiation and preparation of this Agreement, and the related attachments.

**12.**    **Effects of Non-Approval.**  If the Bankruptcy Court declines to approve either this Agreement or the Transaction or the Transaction does not Close, then (i) this Agreement will be null and void and of no force or effect; (ii) no Party shall have any obligations to any other Party arising out of this Agreement; and (iii) the Parties' respective rights and remedies with respect to all matters addressed by this Agreement will be fully reserved as they exist as of just prior to the Execution Date.

**13.**    **Releases.**

    **a.**    **Debtor.**  Except for the obligations set forth in this Agreement, the City and the Landlord hereby fully release, acquit and forever discharge the Debtor and its bankruptcy estate, and their respective employees, officers, directors, managers, members, agents, representatives, attorneys, predecessors, successors, insiders, affiliates, assigns, partnerships, corporations, and limited liability companies of and from any and all claims, demands, causes of action, damages, costs, interest, expenses, attorneys' fees, liabilities, indemnities, duties and obligations of any kind or nature whatsoever, whether at law or in equity or statutory, whether known or unknown, suspected or unsuspected, fixed or contingent, arising out of any cause whatsoever occurring prior to the Execution Date of this Agreement. For the avoidance of doubt, this Agreement shall also result in the immediate full and final satisfaction and expungement of both the Landlord's and the City's Proofs of Claim in the Chapter 11 Case.

    **b.**    **Landlord.**  Except for the obligations set forth in this Agreement, the City and the Debtor hereby fully release, acquit and forever discharge the landlord, and its respective employees, officers, directors, managers, members, agents, representatives, attorneys, predecessors, successors, insiders, affiliates, assigns, partnerships, corporations, and limited liability companies of and from any and all claims, demands, causes of action,

damages, costs, interest, expenses, attorneys' fees, liabilities, indemnities, duties and obligations of any kind or nature whatsoever, whether at law or in equity or statutory, whether known or unknown, suspected or unsuspected, fixed or contingent, arising out of any cause whatsoever occurring prior to the Execution Date of this Agreement.  For the avoidance of doubt, this does not in any way limit the ability of the City to renew its lien or record a new lien on the Premises upon default by the Buyer.

       **c.**      **City.**  Except for the obligations set forth in this Agreement, the Debtor and the Landlord hereby fully release, acquit and forever discharge the City, and its respective employees, officials, officers, directors, managers, members, agents, representatives, attorneys, predecessors, successors, insiders, affiliates, assigns, partnerships, corporations, limited liability companies, divisions, political subdivisions and legal entities of and from any and all claims, demands, causes of action, damages, costs, interest, expenses, attorneys' fees, liabilities, indemnities, duties and obligations of any kind or nature whatsoever, whether at law or in equity or statutory, whether known or unknown, suspected or unsuspected, fixed or contingent, arising out of any cause whatsoever occurring prior to the Execution Date of this Agreement.

       **d.**      Buyer release from Debtor, City, and Landlord.  For the avoidance of doubt, the City does not release the Buyer from its obligations as set forth in this Agreement and its future payment obligations to the City.

**14.**      **Representations and Warranties.**  The Parties represent and warrant to each other the following:

       **a.**      **Due Authority.**  Subject to approval by the Bankruptcy Court, each person signing this Agreement on behalf of a Party represents and warrants that he or she is duly authorized and lawfully empowered to execute this Agreement on behalf of the Party for whom or which he or she purports to act and to bind such Party to the terms of this Agreement.  Subject only to approval by the Bankruptcy Court, the Parties hereby represent and warrant to each other that the execution, delivery and performance by each of them of this Agreement and the other filings and transactions referenced herein and made a part hereof are within the legal power of such Parties and have been duly authorized by all necessary action by the Parties.  Subject to the entry of the Settlement Order, this Agreement constitutes a legal, valid and binding obligation of each of the Parties hereto, enforceable against each of the Parties in accordance with its terms.  Subject to the entry of the Settlement Order, all other filings and documents executed and delivered by any of the Parties to the Agreement shall, when executed by each such Party, constitute legal, valid and binding obligations of each Party thereto, enforceable against each such Party in accordance with their terms.

       **b.**      **No Prior Assignments.**  Each Party releasing any right or claim under this Agreement represents and warrants that such Party has not previously assigned, sold, or transferred any interest in such right or claim, is the sole owner thereof, and has the sole right to release the same as of the date of execution of this Agreement.

**15.**      **Notices.**  If any Party is required to give notice to another Party under this

Agreement, notice shall be mailed to the addresses listed below as well as sent by email.  The addresses for notices to a Party are:

        <u>For Notice to the Debtor</u>:
                Larson & Zirzow
                Attn.  Mathew C. Zirzow, Esq.
                850 E. Bonneville Ave.
                Las Vegas, NV 89101
                Email: mzirzow@lzlawnv.com

                -and-

                Superior Linen, LLC
                Attn.  Robert Smith
                4501 Mitchell Street
                Las Vegas, NV 89030
                E-mail:  robert.smith@superlinen.com

        <u>For Notice to the City</u>:
                Snell & Wilmer, L.L.P.
                Attn.  Robert Kinas, Esq.
                3883 Howard Hughes Parkway, Suite 1100
                Las Vegas, Nevada  89169
                Email: rkinas@swlaw.com

                -and-

                City of North Las Vegas
                Attn. City Attorney
                2250 Las Vegas Blvd., N. Suite 810
                North Las Vegas, NV 89030
                E-mail:  moorem@cityofnorthlasvegas.com

        <u>For Notice to the Landlord</u>:
                Sylvester & Polednak
                Attn.  Allyson Noto, Esq.
                1731 Village Center Circle
                Las Vegas, NV 89134
                E-mail: allyson@sylvesterpolednak.com

                -and-


                _____
                E-mail:  _____

      **16.**    **Cooperative Drafting**.  The Parties to this Agreement have participated jointly in the negotiation and preparation of this Agreement.  Accordingly, each Party agrees not to assert

that any other Party is the sole or principal drafter of the Agreement. Each Party also agrees not to assert that any canon of construction applicable to sole or principal drafters should be applied against the other Party.

17. **Counterparts.** This Agreement may be executed in counterparts by one or more of the Parties to this Agreement, and all counterparts, when executed, shall together constitute the final Agreement, as if one document had been signed by all the Parties. Each counterpart, upon execution and delivery, shall be deemed a complete original, binding the Party or Parties that signed the counterpart upon the execution by all Parties to this Agreement.

18. **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the undersigned Parties and their respective predecessors, successors, assigns, agents, representatives, attorneys, heirs, executors, and administrators.

19. **No Confidentiality**. The Parties acknowledge and agree that this Agreement is required to be publically disclosed under applicable federal laws and regulations.

20. **Construction**. The descriptive headings of this Agreement are for convenience only and shall not affect the construction or interpretation of this Agreement.

21. **Choice of Law/Forum**. This Agreement shall be interpreted, construed, and enforced according to applicable federal law, or, in its absence, the laws of the State of Nevada. The Parties agree that any legal actions between them regarding this Agreement shall be brought in the Bankruptcy Court, or to the extent the Bankruptcy Court lacks or refuses jurisdiction over such dispute, courts in and for the State of Nevada. The Parties hereby consent to the jurisdiction of said court(s) in connection with any action or proceeding initiated concerning this Agreement and agrees that service by mail to the address specified herein shall be sufficient to confer jurisdiction in such courts.

22. **Entire Agreement and Amendments**. This Agreement constitutes the entire agreement and understanding between and among the undersigned Parties concerning the matters set forth herein. This Agreement may not be amended or modified except by another written instrument signed by the Party or Parties to be bound by the amendment or modification, or by their respective authorized attorney(s) or other representative(s). This Agreement is a novation of and supersedes and replaces any prior claims, rights, remedies and/or obligations of the Parties.

23. **Reasonable Cooperation**. The Parties agree to cooperate in good faith and in a commercially reasonable manner to effectuate all the terms and conditions of the Agreement, including doing or causing their agents and attorneys to do whatever is reasonably necessary to effectuate the signing, delivery, execution, filing, recording, and entry of any documents necessary to perform the terms of this Agreement.

24. **Advice of Counsel.** Each Party acknowledges that it has consulted with and obtained the advice of counsel before executing this Agreement, and that this Agreement has been explained to that Party by its counsel.

25. **Severability**. If any provision of this Agreement or the application of any provision of this Agreement to any person or circumstance is held invalid or unenforceable, only that

provision shall be affected, and the remainder of this Agreement (or the application of that provision to other persons and circumstances) shall remain in full force and effect.

**26.    Time is of the Essence.**  Time is of the essence with respect to all obligations, deliveries, and payments under this Agreement.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives on the dates indicated below.

**[Signature Pages Follow]**

DEBTOR:

SUPERIOR LINEN, LLC,
a Nevada limited liability company,
as debtor and debtor-in-possession:


By: _____

Its: _____


LANDLORD:

ICON PAC NEVADA OWNER POOL 3,
NEVADA, LLC,
a Delaware limited liability company:


By: _____

Its: _____


BUYER:

LAS VEGAS LINEN, LLC:


By: _____

Its: _____


GUARANTOR:

AMCP Clean Acquisition Company, LLC,
a Delaware limited liability company:

By: _____

Its: _____

CITY:

CITY OF NORTH LAS VEGAS,
a Nevada municipal corporation:


By: _____
    Dr. Qiong X. Liu, City Manager

Attest:


_____
    Catherine A. Raynor, MMC, City Clerk


Approved as to Form:


By: _____
    Micaela Rustia Moore, City Attorney


GUARANTOR:

AMCP Clean Subsidiary Holdco LLC:

By: _____

Its: _____


**EXHIBITS**

Exhibit 1 - Monthly Payment Schedule

Exhibit 2 - Extinguishment & Release

Exhibit 3 - Confession of Judgment and Guaranties