Honorable Mike K. Nakagawa
United States Bankruptcy Judge

Entered on Docket
June 01, 2017

LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 8 9101
Tel: (702) 382-1170
Fax: (702) 382-1169

Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>SUPERIOR LINEN, LLC,<br><br>                Debtor. | Case No.: BK-S-16-15388-mkn<br>Chapter 11<br><br><br>Date:  May 30, 2017<br>Time:  2:00 p.m. |

***AMENDED* ORDER APPROVING DEBTOR'S MOTION FOR APPROVAL PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 365 AND FED. R. BANKR. P. 2002, 6004, 6006, 9007 AND 9014 AUTHORIZING (A) SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND DESIGNATION RIGHTS; (C) APPROVAL OF SETTLEMENT AND RELEASE AGREEMENT PURSUANT TO FED. R. BANKR. P. 9019 WITH THE CITY OF NORTH LAS VEGAS, AND ASSUMPTION AND ASSIGNMENT OF AGREEMENT***

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Superior Linen, LLC, a Nevada corporation, as debtor and debtor in possession (the "Debtor") having filed its *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, 9007 and 9014 Authorizing (A) Sale Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and Designation Rights; (C) Approval of Settlement and Release Agreement Pursuant to Fed. R. Bankr. P. 9019 With the City of North Las Vegas, and Assumption and Assignment of Agreement* (the "Sale Motion") [ECF No. 437] of the above-captioned debtor and debtor in possession (the "Debtor") for the entry of an order pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), and Rules 6004 and 9019 of the Local Rules of Bankruptcy Practice for the United States District Court for the District of Nevada (the "Local Rules"); and the Court having reviewed and considered the Motion and all objections thereto (such filed objections being referred to as the "Filed Objections"), and the arguments of counsel made, and the evidence adduced at the hearing before the Court on May 30, 2017 (the "Sale Hearing"); and upon the record of the Sale Hearing and this chapter 11 case and proceedings, and after due deliberation thereon, and good cause appearing therefor and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; the Court having made certain findings of fact and conclusions of law on the record at the hearing, which are incorporated herein by reference pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable pursuant to Bankruptcy Rules 7052 and 9014; and after due deliberation thereon,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

**I.    JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES**

A.    The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and Local Rule 1001(b)(1). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O). Venue is proper in this District and in the Court pursuant to

1   28 U.S.C. §§ 1408(1) and 1409(a).

2   　　　　B.　　This Order constitutes a final and appealable Order within the meaning of 28 U.S.C.

3   § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary

4   under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made

5   applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay

6   in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

7   　　　　C.　　The statutory predicates for the relief requested in the Motion are sections 105(a),

8   363(b), (f), and (m), and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002(a)(2), 6004(a),

9   (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007, 9014, and 9019.

10   　　　　D.　　The findings of fact and conclusions of law set forth herein constitute the Court's

11   findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil

12   Procedures, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.

13   　　　　E.　　To the extent any of the following findings of fact constitute conclusions of law,

14   they are hereby adopted as such. To the extent any of the following conclusions of law constitute

15   findings of fact, they are hereby adopted as such. Any findings of fact or conclusions of law stated

16   by the Court on the record at the Sale Hearing are hereby incorporated, to the extent they are not

17   inconsistent herewith.

18   　　　　F.　　Las Vegas Linen, LLC (the "Purchaser") will be acting in good faith pursuant to

19   section 363(m) of the Bankruptcy Code in closing the transaction contemplated by the Asset

20   Purchase Agreement and the First Amendment to Asset Purchase Agreement, in the forms as

21   attached hereto as **Exhibit 1** and **Exhibit 2** (collectively, the "Final APA") to purchase the assets

22   as set forth therein (the "Purchased Assets") at any time on or after entry of this Order, and cause

23   has been shown as to why this Order should not be subject to the stay provided by Bankruptcy

24   Rules 6004(h) and 6006(d).

25   **II.　　NOTICE OF THE SALE, AUCTION AND THE CURE AMOUNTS**

26   　　　　G.　　As evidenced by the affidavits of service on file with the Court, (i) due, proper,

27   timely, adequate, and sufficient notice of the Sale Motion, the Sale Hearing, and the Final APA,

28   and a reasonable opportunity to object or be heard with respect to the foregoing, has been provided

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

1  in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (ii) such

2  notice was good, sufficient, and appropriate under the circumstances; and (iii) no other or further

3  notice of the Sale Motion, the Sale Hearing, and the Final APA is or shall be required.

4        H.     Actual written notice of the Sale Hearing, the Final APA, and the Sale Motion, and

5  a reasonable opportunity to object or be heard with respect to same, has been afforded to all known

6  interested entities including to the following parties: (i) U.S. Trustee; (ii) counsel to any known

7  secured creditors of record, (iii) all creditors of the Debtor, (iv) counsel to Purchaser, (v) counsel

8  to the Official Committee of Unsecured Creditors (the "Committee"); (vi) any known party

9  asserting a lien or Adverse Interest against any of the Debtor's assets; (vii) all taxing authorities

10  having jurisdiction over the Purchased Assets and the Debtor, including the Internal Revenue

11  Service and the Maryland state taxing authorities; (viii) all governmental agencies that are an

12  interested party with respect to the Sale; (ix) any other applicable state and local taxing and other

13  regulatory authorities; (x) all parties that have filed a notice of appearance and demand for service

14  of papers in this bankruptcy case as of the date of service.

15        I.     The disclosures made by the Debtor concerning the Sale Motion, the Supplement

16  thereto [ECF No. 459], the Final APA and the Sale Hearing were good, complete and adequate.

17        J.     The Debtor has articulated good and sufficient reasons for the Court to grant the

18  relief requested in the Sale Motion regarding the sales, including, without limitation: (i) approval

19  of the Final APA as the highest and best offer, and (ii) determination of final cure amounts.

20  **III.   GOOD FAITH OF THE PURCHASER**

21        K.     The Purchaser is not an "insider" of the Debtor as that term is defined in section

22  101(31) of the Bankruptcy Code.

23        L.     The Final APA was negotiated, proposed, and entered into by the Debtor and the

24  Purchaser without collusion, in good faith, and from arm's length bargaining positions.  Neither

25  Purchaser, nor any of its affiliates, members, officers, directors, partners or shareholders (each

26  such entity, including Purchaser, individually and when taken together, the "Purchaser Group") is

27  an "insider" of the Debtor, as that term is defined in Section 101(31) of the Bankruptcy Code.

28        M.     The sale price in respect of the Purchased Assets was not controlled by any

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

agreement among potential acquirers of the Purchaser's Assets, and neither the Debtor nor Purchaser engaged in collusion or any other conduct that would cause or permit the Final APA or Sale Transactions to be avoided under section 363(n) of the Bankruptcy Code. Accordingly, the Final APA may not be avoided and no party shall be entitled to any damages or other recovery pursuant to section 363(n).

N.    The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Purchaser Group is acting in good faith within the meaning of section 363(m) in consummating the Sale Transactions.

## IV.    HIGHEST OR BEST OFFER

O.    As demonstrated by evidence adduced at and prior to the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, (a) the Debtor conducted an adequate marketing process and (b) the Final APA represents the highest and best offer for the Purchased Assets and no other or further marketing or sales process with respect to the Purchased Assets is in the best interests of the Debtor's estate or creditors or is likely to lead to an offer that provides consideration in excess of the consideration provided in the Final APA; (c) the consideration to be provided by Purchaser under the Final APA provides fair and reasonable consideration to the Debtor for the sale of all Purchased Assets and the assumption of all Assumed Liabilities, and the performance of the other covenants set forth in the Final APA, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative; (d) the Debtor's determination that the Final APA constitutes the highest and best offer for the Purchased Assets is a valid and sound exercise of the Debtor's business judgment.

P.    Upon entry of this Sale Order, the Debtor shall have full authority to and shall be required to consummate the Final APA.

Q.    The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

## V.    NO FRAUDULENT TRANSFER

R.    The consideration provided by the Purchaser pursuant to the Final APA is fair and

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

## VI.    VALIDITY OF TRANSFER

S.      The Debtor has full corporate power and authority to execute and deliver the Final APA and all other documents contemplated thereby, and no further consents or approvals are required for the Debtor to consummate the transactions contemplated by the Final APA.

T.      The transfer of each of the Purchased Assets to the Purchaser will be as of the Closing Date a legal, valid and effective transfer of such assets, and vests or will vest the Purchaser with all right, title and interest of the Debtor to the Purchased Assets free and clear of all Liens (defined below) and Claims (defined below) accruing, arising or relating to any time prior to the Closing Date, except for any assumed liabilities solely relating to the Assumed Liabilities (as that term is defined in the Final APA).

U.      Other than the Assumed Liabilities (as defined in the Final APA), the Purchaser Group shall have no obligations with respect to any Liabilities of the Debtor or any Adverse Interests against the Debtor or its property, including but not limited to (a) under any Contract that is not an Assumed Contract or (b) the liabilities of the Debtor specifically excluded under the Final APA (the "Excluded Liabilities"); *provided*, *however*, that this finding does not modify any obligation of the Purchaser pursuant to or contemplated by the Final APA and this Order, which shall be and remain fully enforceable against the Purchaser.

V.      The Purchased Assets constitute property of the Debtor's estate and title thereto is presently vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.

W.      The consummation of the Sale Transactions is legal, valid, properly authorized and complies with all applicable state and federal law. The Final APA is a valid and binding contract between the Debtor and Purchaser, which is and shall be enforceable according to its respective terms.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

**VII.    SECTION 363(F) IS SATISFIED**

X.    The Purchaser would not have entered into the Final APA and would not consummate the transactions contemplated thereby (by paying the Purchase Price (as defined in the Final APA) and assuming the Assumed Liabilities) if the sale of the Purchased Assets to the Purchaser, and the assumption, assignment and sale of the Assumed Contracts to the Purchaser, were not, except as otherwise provided in the Final APA with respect to the Assumed Liabilities, free and clear of all Liens, Claims and/or encumbrances of any kind or nature whatsoever, or if the Purchaser would, or in the future could (except and only to the extent expressly provided in the Final APA and with respect to the Assumed Liabilities), be liable for any of such Liens, Claims, and/or encumbrances including, but not limited to, Liens or Claims in respect of the following: (1) all mortgages, deeds of trust and security interests; (2) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (3) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state labor laws; (k) state discrimination laws, (1) state unemployment compensation laws or any other similar state laws, or (m) any other state or federal benefits or claims relating to any employment with any of the Debtor or any of its predecessors; (4) any bulk sales or similar law; (5) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (6) any Environmental Law(s) (as defined in the Final APA); and (7) any theories of successor liability.

Y.    The Debtor shall sell the Purchased Assets free and clear of all Liens and Claims against the Debtor, its estate or any of the Purchased Assets (except for any Assumed Liabilities under the Final APA) because, in each case, one or more of the standards set forth in section

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens or Claims against the Debtor, its estate or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of such Liens or Claims who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Liens and/or Claims, if any, in each instance against the Debtor, its estate or any of the Purchased Assets, attach to the cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

Z.    The transfer of the Purchased Assets to the Purchaser or its designee(s), including the assumption by the Debtor and assignment and sale to the Purchaser or its designee(s) of the Assumed Contracts, will not subject the Purchaser or its designee(s) to any liability whatsoever (including any successor liability) with respect to the operation of the Business prior to the Closing or by reason of such transfer, except that the Purchaser or its designee(s), as applicable, shall remain liable for the Assumed Liabilities.

AA.    By virtue of the Sale Transactions, (i) Purchaser is not a continuation of the Debtor or its estate, there is no continuity between Purchaser and the Debtor, there is not substantial continuity between Purchaser and the Debtor, there is no common identity between the Debtor and Purchaser, there is no continuity of enterprise between the Debtor and Purchaser, Purchaser is not a mere continuation of the Debtor or its estate, and Purchaser does not constitute a successor to the Debtor or its estate; Purchaser is not holding itself out to the public as a continuation of the Debtor or its estate; and the Sale Transactions do not amount to a consolidation, merger or de facto merger of Purchaser and the Debtor and/or the Debtor's estate.

BB.    The transfer of the Purchased Assets to Purchaser shall not subject the Purchaser Group to any liability by reason of such transfer (other than for Assumed Liabilities), including, without limitation, under (a) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based in whole or part on, directly or indirectly, including without

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

limitation, any theory of antitrust, environmental, products liability, successor or transferee liability, labor law, de facto merger or substantial continuity; or (b) any employment contract, understanding or agreement, including, without limitation, collective bargaining agreements, employee pension plans or employee welfare or benefit plans.

## VIII.   ASSUMPTION AND ASSIGNMENT OF THE EXECUTORY CONTRACTS

CC.   The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order are integral to the Final APA and is in the best interests of the Debtor and its estate, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.

DD.   Pursuant to the terms of the Final APA, the Purchaser will: (i) cure and/or provide adequate assurance of cure of any Cure Amounts (if any) existing prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; (ii) provide compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code; and (iii) provide adequate assurance of its future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(c)(2)(B) of the Bankruptcy Code.

## IX.   COMPELLING CIRCUMSTANCES FOR AN IMMEDIATE SALE

EE.   To enhance the Debtor's level of liquidity, to reduce the amount of postpetition obligations borne by the Debtor, and to maximize the amount of proceeds available to the Debtor's bankruptcy estates, it is essential that the Sale of the Purchased Assets occur within the time constraints set forth in the Final APA.  Time is of the essence in consummating the Sale.

FF.   Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the purchase price under the Final APA, the proposed Sale of the Purchased Assets to the Purchaser constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

GG.   The consummation of the transaction is legal, valid and properly authorized under

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

HH.    Approval of the Settlement and Release Agreement among the Debtor, the Purchaser and the City of North Las Vegas (the "North Las Vegas Settlement Agreement") in the form as attached hereto as **Exhibit 3**, is fair and equitable, and was a reasonable exercise of the Debtor's business judgment and should be authorized and approved.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**GENERAL PROVISIONS**

1.    The relief requested in the Motion is granted and approved, and the Sale contemplated thereby is approved as set forth in this Order.

2.    In the event of any conflicts between the APA, the North Las Vegas Settlement Agreement, or any other documents effectuating the transaction, the terms of this Order shall control.

3.    The Filed Objections have been withdrawn, and any other objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived or settled, or not otherwise resolved pursuant to the terms hereof, if any, are hereby denied and overruled on the merits with prejudice.

**APPROVAL OF THE FINAL APA**

4.    The Final APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved, subject to certain amendments and modifications provided by the terms of this Order.

5.    Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to take any and all actions necessary or appropriate to (i) consummate the Sale of each of the Purchased Assets (as defined in the Final APA) to the Purchaser pursuant to and in accordance with the terms and conditions of the Final APA, (ii) close the Sale as contemplated in the Final APA and this Order, and (iii) execute and deliver, perform under, consummate, implement and

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

close fully the Final APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Final APA and the Sale, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Final APA and such other ancillary documents.

6.      This Order shall be binding in all respects upon the Debtor, including the Debtor, its estate, all holders of equity interests in the Debtor, all holders of any Claim(s) (whether known or unknown) against the Debtor, any holders of Liens or Claims against or on all or any portion of the Purchased Assets, all Contract Counterparties, the Purchaser and all successors and assigns of the Purchaser, the Purchased Assets and any trustees, if any, subsequently appointed in any of the Debtor's chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtor's cases. This Order and the Final APA shall inure to the benefit of the Debtor, its estate, its creditors, the Purchaser and their respective successors and assigns.

7.      Nothing contained in any chapter 11 plan confirmed in the Bankruptcy Case or any order confirming any such chapter 11 plan, any order converting the Debtor's bankruptcy case to chapter 7 of the Bankruptcy Code, or any order dismissing the Debtor's bankruptcy case shall conflict with or derogate from the provisions of the Final APA.

8.      To the greatest extent available under applicable law, Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and any other governmental authorization or approval of the Debtor with respect to the Purchased Assets and the Assumed Contracts, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to Purchaser as of the Closing Date, to the extent provided in the Final APA. The Debtor shall cooperate with Purchaser and shall use commercially reasonable efforts to cause its representatives to cooperate with Purchaser's representatives, to provide an orderly transition of the Business and the Purchased Assets and to minimize the disruption to the Business resulting from the Sale Transactions, including, but not limited to, with respect to the transfer of all licenses, permits and registrations, to the extent provided in the Final APA, and to facilitate obtaining all necessary governmental authorizations and approvals, all, however, to the extent included in the Purchased Assets.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

11

9.     Nether Purchaser nor the Purchaser Group shall be deemed or considered, as a result of any action taken in connection with the Final APA, the consummation of the Sale Transactions or the transfer, operation or use of the Purchase Assets (or otherwise), (a) a successor to the Debtor or the Debtor's estate by reason of any theory of law or equity, (b) to have merged with or into the Debtor (*de facto* or otherwise), or (c) to be an alter ego or a mere continuation or substantial continuation of the Debtor, in each case including within the meaning of any foreign, federal, state or local revenue, pension, ERISA (defined below), tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine.

10.     Except as expressly provided in the Final APA with respect to Assumed Liabilities, the Purchaser Group shall have no liability whatsoever with respect to the Debtor's (or its predecessors' or affiliates') businesses or operations or any of the Debtor's (or its predecessors' or affiliates') obligations (as described below, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets or the Business prior to the Closing. Except to the extent expressly included in the Assumed Liabilities or otherwise provided for in the Final APA, the Purchaser Group shall have no liability or obligation under the Worker Adjustment and Retraining Notification Act (29 U.S.C. §§ 2101 *et seq.*) and its state law equivalents; the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. §§ 9601 *et. seq.*); the Employment Retirement Income Security Act of 1974, as amended (29 U.S.C. §§ 2101 *et seq.*) ("ERISA") or any foreign, federal, state or local labor, employment or environmental law whether of similar import or otherwise by virtue of Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

by Purchaser.

11.    Nothing in this Order or the Final APA shall require the Purchaser Group to (a) continue or maintain in effect, or assume any liability in respect of any employee, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtor is a party or have any responsibility therefor including medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

12.    Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser Group, or its assets (including the Purchased Assets), with respect to any (a) Adverse Interest or (b) Successor or Transferee Liability including the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Adverse Interest; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the business operated with such assets.

**TRANSFER OF THE PURCHASED ASSETS**

13.    Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtor is authorized and directed to transfer the Purchased Assets on the Closing Date (as defined in the Final APA). Such Purchased Assets shall be transferred to the Purchaser upon and as of the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such Purchased Assets and, upon the Debtor's receipt of the Purchase Price, shall be

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

free and clear of all charges, liens (statutory or otherwise), interests, security interests, claims, mortgages, leases, subleases, hypothecations, deeds of trust, pledges, options, rights of ruse or possession, rights of first offer or first refusal, easements, servitudes, restrictive covenants, encroachments, encumbrances, rights of way, transfer restrictions or other similar restrictions of any kind, including any restrictions on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, however arising or existing (including all "Liens" as defined in the Final APA, "Liens") and claims, including, without limitation, all "claims" within the meaning of sections 101(5), 102(2) and 105 of the Bankruptcy Code, and all interests, encumbrances, rights of setoff, recoupment, netting and deductions ("Claims"), except Assumed Liabilities under the Final APA. Upon the Closing, the Purchaser shall take title to and possession of the Purchased Assets subject only to the Assumed Liabilities. Pursuant to section 363(c) of the Bankruptcy Code, other than with respect to the Assumed Liabilities, the transfer of title to the Purchased Assets and the Assumed Contracts shall be free and clear of (a) any and all Liens, (b) any and all liabilities, and (c) any and all Claims including, without limitation, any and all claims pursuant to any successor or successor in interest liability theory; *provided*, *however*, that the Purchaser shall not be relieved of liability with respect to the Assumed Liabilities, consisting solely of obligations accruing under the Assumed Contracts from and after the Closing.

14.    All Liens and/or Claims shall attach solely to the proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Purchased Assets, subject to any claims and defenses the Debtor and its estate may possess with respect thereto, the Court having ordered that all parties' liens, claims, rights and defenses are reserved without prejudice

15.    Except as expressly provided by the Final APA with respect to Assumed Liabilities, all persons and entities holding Liens, Claims or interests in all or any portion of the Purchased Assets arising under or out of, in connection with, or in any way relating to the Debtor, the Purchased Assets, the operation of the Debtor's business prior to the Closing Date or the transfer of the Purchased Assets to the Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against the Purchaser or its successors or assigns, their property or the Purchased Assets, such persons' or entities' Liens or Claims in and to the Purchased Assets. On

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be deemed by the Purchaser to be necessary or desirable to release Liens or Claims on the Purchased Assets, if any, as provided for herein, as such Liens or Claims may have been recorded or may otherwise exist.

16.     Notwithstanding anything to the contrary contained herein, to the fullest extent permitted by applicable law, neither the Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transactions set forth in the Final APA: (i) be a successor to the Debtor or the Debtor's estate; (ii) have, *de facto* or otherwise, merged or consolidated with or into the Debtor or the Debtor's estate; or (iii) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor.  Except for the Assumed Liabilities arising solely from the Assumed Contracts, the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtor and/or its estate including, but not limited to, any bulk sales law.

17.     All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Purchaser or its assignee on the Closing Date, including without limitation, all assets (a) currently held or otherwise located at 125 S. 13th Street, Las Vegas, Nevada 89101, and (b) acquired by the Debtor pursuant to that certain 13th Street Laundry Triple Net Tenant Lease Agreement, as amended (the "13th Street Master Lease") between 13th Street Property LLC and 13th Street Properties North LLC, as landlord (the "13th Street Master Landlord"), and the Debtor, as tenant.  For the avoidance of doubt, the Debtor is not assuming and assigning to Purchaser either the 13th Street Master Lease or any alleged sublease of those same premises.

18.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the Liens, Claims and other encumbrances of record.

19.     If any person or entity which has filed statements or other documents or agreements evidencing Liens on, Claims or interests in, all or any portion of the Purchased Assets shall not have delivered to the Debtor prior to the Closing Date, in proper form for filing and executed by

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Purchaser for the purpose of documenting the release of all Liens or Claims, which the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Debtor is hereby authorized and directed, and the Purchaser is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

20.     On the Closing Date, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Debtor's interests in the Purchased Assets consisting of the Debtor's interests in, to and under licenses and permits issued by any federal, state and local governmental agency, department, authority or jurisdiction.  Each and every federal, state and local governmental agency, department, authority or jurisdiction is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Final APA, including any modification or amendment to any public records or documents to acknowledge the Purchaser as the new owner, operator, licensee or permittee of any applicable license, permit or similar asset.

21.     With respect to the transactions consummated pursuant to this Order, this Order is and shall be sole and sufficient evidence of the transfer of title to the Purchaser, and the sale transaction consummated pursuant to this Order shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the transactions contemplated hereby.

22.     The provisions of this Order authorizing the sale of the Purchased Assets free and

16

clear of Liens, other than Assumed Liabilities, shall be self-executing, and neither the Debtor nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents or other instruments to effectuate, consummate and implement the provisions of this Order; *provided*, *however*, that the Debtor and the Purchaser, and each of their respective officers, employees and agents are authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtor or the Purchaser deems necessary or appropriate to implement and effectuate the terms of the Final APA and this Order.

23.    Notwithstanding anything to the contrary in this Order, in the Motion or the Final APA, the Purchaser shall receive the benefits and burdens of, and be solely responsible for payment in full of all accrued charges, payments, and the like arising under or pursuant to the Assumed Liabilities as of the Closing Date or as otherwise provided in the Final APA.  If the Purchaser disputes any alleged charge or payment under any of the Assumed Liabilities and the parties are unable to come to an agreement regarding the amount actually owed, the dispute may be adjudicated by the Bankruptcy Court or any other court of competent jurisdiction.

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

24.    The Debtor is authorized and directed to assume and assign the Assumed Contracts (as defined in the Final APA) to the Purchaser free and clear of all Liens and Claims, as described herein.  The payment of the applicable Cure Amounts (if any) by the Purchaser shall (a) effect a cure of all defaults existing thereunder as of the Closing Date; (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default, and (c) together with the assumption of the Assumed Contracts by the Purchaser, constitute adequate assurance of future performance thereof.  The Purchaser shall then have assumed the Assumed Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtor of such Assumed Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amounts by the Purchaser, neither the Debtor nor the Purchaser shall have any further liabilities to the Contract Counterparties other than the unpaid obligations under the Assumed Contracts that become due and payable on or after the date of the Cure Notice.

25.    Within sixty (60) days after the Closing Date (hereinafter, the "Designation Date"),

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

the Purchaser may, by written notice to the Debtor, designate additional Executory Contracts as Assumed Contracts to be assigned to Purchaser in addition to those Executory Contracts designated as Assumed Contracts in the Final APA, or choose to exclude certain Executory Contracts, including those contracts and leases previously designated to be Assumed Contracts in the Final APA. The assumption and assignment of an Assumed Contract shall be deemed effective upon the Closing Date, irrespective of the date such contract or lease was designated as an Assumed Contract. Any Executory Contract not designated as an Assumed Contract shall not be assumed by the Debtor.

26.    Any provisions in any Assumed Contract that prohibits or conditions the assignment of such Assumed Contract or allows the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Purchaser of the Assumed Contract have been satisfied. Upon closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtor under the Assumed Contract.

27.    Upon closing and the payment of the relevant Cure Amounts, if any, the Purchaser shall be deemed to be substituted for the Debtor as a party to the applicable Assumed Contract and the Debtor shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contract, except to the extent of claims covered by the Debtor's existing insurance policies.

28.    Upon the payment of the applicable Cure Amount, if any, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

29.    There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to the Purchaser or the Debtor solely as a result of the

18

assumption and assignment of the Assumed Contracts.

30.    Other than as provided in this Order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against the Purchaser any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

31.    The Final APA, and any related agreements, documents or other instruments may be modified, amended or supplemented by the Debtor and the Purchaser, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court; _provided_, _however_, that any (a) such modification, amendment or supplement does not have a material adverse effect on the Debtor's estates and has been agreed to between the Debtor and the Purchaser and (b) such modification, amendment or supplement is filed with the Bankruptcy Court and provided on twenty-four (24) hours prior notice to its effectiveness to counsel for the Official Committee of Unsecured Creditors and counsel for RD VII Investments, LLC, unless such timing requirement is waived by the respective party.   Any material modification, amendment or supplement to the Final APA must be approved by Order of the Bankruptcy Court following a motion on notice to all interested parties.

32.    The North Las Vegas Settlement Agreement is approved in the form as pursuant to Bankruptcy Rule 9019 as fair and equitable, and to the extent it is being assumed by the Debtor and assigned to the Purchaser, that is also approved.

**TRANSITION PROVISIONS**

33.    Prior to the Closing Date, the Debtor shall employ all reasonable efforts to ensure the security and safeguard of all Purchased Assets.  Effective immediately upon the conclusion of the Sale Hearing, the Purchaser and its employees, agents and professionals shall be permitted to access and enter upon any other location occupied by the Debtor and where the Purchased Assets may be located in order to ensure the security and safeguard of the Purchased Assets and to facilitate an orderly transition of the transactions contemplated under the Final APA and this Order (the "Transition Matters").  The Debtor and the Purchaser may enter into arrangements, in writing,

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

with respect to the use of equipment, assets and other resources of the Debtor that are not Purchased Assets, without further notice or court order, with respect to Transition Matters, so long that such arrangements have no adverse economic consequences to the Debtor's estate. The Debtor, and its employees, agents and professionals shall cooperate with the Purchaser, its employees, agents and professionals with respect to Transition Matters.

**OTHER PROVISIONS**

34.     Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser, its successors and assigns, or the Purchased Assets, with respect to any (a) Lien or Claim arising under, out of, in connection with or in any way relating to the Debtor, the Purchaser, the Purchased Assets, or the operation of the Purchased Assets prior to the Closing of the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Purchaser, its successors or assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Purchaser, its successors, assets or properties; (iii) creating, perfecting or enforcing any Lien or Claim against the Purchaser, its successors or assigns, assets or properties; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.

35.     Except for the Assumed Liabilities or as otherwise expressly set forth in the Final APA, the Purchaser shall not have any liability or other obligation of the Debtor arising under or related to any of the Purchased Assets. Without limiting the generality of the foregoing, and except

**LARSON & ZIRZOW, LLC**
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

for the Assumed Liabilities provided in the Final APA, the Purchaser shall not be liable for any Claims against the Debtor or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing Date. The Purchaser has given substantial consideration under the Final APA for the benefit of the holders of any Liens or Claims. The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens or Claims against or interests in the Debtor or any of the Purchased Assets.

36.    The transactions contemplated by the Final APA are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and such Sale are duly stayed pending such appeal. The Purchaser is a good faith Purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

37.    If requested by the Purchaser, the Debtor is authorized and directed to change its corporate name in which it is registered or authorized to do business under the names "Superior Linen" to "SL Debtor," and to provide the Purchaser with evidence of such name change. Upon such event, the caption of all pleadings to be filed in this case shall be changed to the new names, and all pleadings shall be filed under the new caption.

38.    Notwithstanding the provisions of Bankruptcy Rule 6004 and Bankruptcy Rule

6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in such rules is hereby expressly waived and shall not apply. Time is of the essence in approving the Sale, and the Debtor and the Purchaser intend to, and are authorized to, close the Sale as soon as practicable.

39.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

40.    The failure specifically to include any particular provision of the Final APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Final APA be authorized and approved in its entirety except as otherwise expressly provided by in this Order.

41.    The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Final APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

42.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

43.    To the extent that this Order is inconsistent with any prior Order, the Final APA, any other document or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern, provided however, the failure to include specifically any particular provision of the Final APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Final APA be authorized and approved in its entirety.

44.    The terms and provisions of the Final APA, the other ancillary agreements, and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, the Purchaser, and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding the dismissal of any of the Debtor's case or any subsequent appointment of any

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

1    trustee(s) under any chapter of the Bankruptcy Code or conversion of the Debtor's case to a case

2    under chapter 7, as to which trustee(s) such terms and provisions likewise shall be binding and not

3    subject to rejection or avoidance. The Final APA, the Sale Transactions and this Sale Order shall

4    be binding upon, and shall not be subject to rejection or avoidance by, any chapter 7 or chapter 11

5    trustee appointed in the Bankruptcy Case.

6          45.    Notwithstanding anything to the contrary elsewhere in this Order or in the Final

7    APA with the Purchaser, Ecolab Inc. ("Ecolab") owns the unused chemicals and chemical

8    dispensing and related equipment, including intellectual property (collectively, the "Ecolab

9    Property") provided to the Debtor pursuant to the April 1, 2014 agreement with Debtor, (as

10   amended, the "Ecolab Agreement"). The Ecolab Property shall not be included within the

11   definition of the Purchased Assets or the Tangible Personal Property sold to the Purchaser and

12   Ecolab's rights in and ownership of the Ecolab Property are preserved. In the event the Ecolab

13   Agreement is not assumed and assigned to Purchaser pursuant to the Final APA, the Ecolab

14   Property shall be made available for pickup by Ecolab upon reasonable advanced notice to

15   Purchaser. For the avoidance of doubt, the EcoLab Agreement is a Designated Contract that is

16   subject to assumption and assignment consistent with the terms and conditions of the APA,

17   including but not limited to the provision of a full and prompt cure thereof.

18         46.    Notwithstanding anything to the contrary elsewhere in this Order or in the Final

19   APA, pending assumption or rejection of the Ecolab Agreement, Debtor shall remain liable and

20   shall pay as an administrative expense all post-petition charges for goods supplied and use of the

21   Ecolab Property from the Petition Date through the date of Closing. After Closing, pending

22   assumption or rejection of the Ecolab Agreement, to the extent that Purchaser uses the Ecolab

23   Property or any additional goods and chemicals supplied by Ecolab, Purchaser shall be liable for

24   and shall pay Ecolab for such amounts.

25         47.    The City may audit, no less than quarterly, then-current wastewater/sewerage

26   flows, and after such audit, the City reserve the right to bill Purchaser additional amounts for

27   wastewater/sewerage connection fees for such percentage of additional wastewater/sewerage as

28   may be discovered in any audit. The Clark County Water Reclamation District ("District")

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

23

informed the City and Purchaser that it would not conduct an audit of the premises located at 4501 Mitchell Street, North Las Vegas, Nevada, until the earlier of (I) June 2018 for the prior twelve (12) month period or (II) improvements, equipment or fixtures, are made at the Premises property. The District's statement in this regard is a material part of the Settlement Agreement but for which the Purchaser would not have entered into either the Settlement Agreement or the Final APA. For the avoidance of doubt, the Purchaser maintains that it is not assuming any obligation other than what is set forth in the Settlement Agreement.

48.    Notwithstanding anything to the contrary in this Order, the Purchaser shall pay the sum of $1,000,000.00 of the sale proceeds directly to RD VII Investments, LLC ("RDVII"), in care of its counsel, Schwartz Flansburg, PLLC, per wire instructions to be provided by counsel, in partial credit for the Purchase Price under the Final APA, with the balance of the balance of the Purchase Price to be paid to the Debtor and deposited directly into the Debtor's DIP account per wire instructions to be provided by the Debtor. Except as otherwise set forth in this Order, the remaining portion of the Purchase Price sent to the Debtor pursuant to the Final APA shall be reserved in the estate subject to further orders of the Court. Subject to the foregoing, the estate shall continue to hold the balance of any remaining funds from the Purchase Price without prejudice to the rights and remedies of all creditors of the estate, and nothing herein is intended or should be construed as a waiver or release of the rights and remedies of any creditors to such funds, or to modify any prior orders of the Court.

49.    The Debtor is authorized and directed to use the remaining sale proceeds in the estate immediately to pay the following: (a) all allowed cure costs for any Executory Contracts and Unexpired Leases assumed and assigned under the Final APA; (b) the payments the Debtor is required to make pursuant to the City of North Las Vegas Settlement Agreement; (c) any allowed fees and costs up to the amount any carveouts as set forth in the debtor-in-possession financing orders of the Court, with the remaining balance to be reserved in the estate, subject to the following additional holdbacks: (x) the sum of $70,000 to be reserved for the potential benefit of the counsel for Icon Pac Nevada Owner Pool 3, Nevada LLC (the "Landlord"), pending an adjudication or resolution of the Landlord's entitlement to the attorney's fees and costs component of its alleged

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

cure claim under its Lease Agreement with the Debtor as asserted in ECF No. 457]; (y) the sum of $45,000 to be reserved for the potential benefit of a liquidating trust as may be arranged pursuant to a confirmed chapter 11 plan, with the additional sum of $50,000 to be reserved should the Purchaser consummate its purchase of the estate's claims (except for Avoidance Actions) against Nevada Property 1, LLC d/b/a The Cosmopolitan, pursuant to the First Amendment to the Final APA; (z) a sum as is necessary to pay all fees owing to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6). To the extent any portion of the foregoing holdbacks are not used for the purposes intended or otherwise allowed by the Court, such sums shall be reserved in the estate, subject to the liens, claims, encumbrances or other charges of any kind, which may be asserted by RD VII under its prepetition or postpetition loans.

50.     As per stated on the record at the Sale Hearing: the Purchaser shall execute a confession of judgment in favor of the Landlord for all obligations under the Lease from and after the Closing, through the expiration of the Lease term; AMCP Clean Acquisition Company LLC and AMCP Clean Subsidiary Holdco, LLC shall execute guarantys unconditionally guarantying the full and faithful performance of the Purchaser under the Lease; Purchaser, AMCP Clean Acquisition Company LLC, and AMCP Clean Subsidiary Holdco, LLC shall guaranty in favor of the Landlord all sums as may be due and owing and unpaid to the City.

**IT IS SO ORDERED.**

. . .

. . .

. . .

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

PREPARED AND SUBMITTED:

By: /s/ Matthew C. Zirzow
LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
850 E. Bonneville Ave.
Las Vegas, Nevada 89101

Attorneys for Debtor


APPROVED / ~~DISAPPROVED~~:

By: /s/ Samuel A. Schwartz
SCHWARTZ FLANSBURG PLLC
SAMUEL A. SCHWARTZ, ESQ.
Nevada Bar No. 10985
BRYAN A. LINDSEY, ESQ.
Nevada Bar No. 10662
6623 Las Vegas Blvd. Ste. 300
Las Vegas, Nevada 89119

Attorneys for RD VII Investments, LLC


APPROVED / ~~DISAPPROVED~~:

By: /s/ Matthew Carlyon
MORRIS POLICH & PURDY, LLP
CANDACE CARLYON, ESQ.
Nevada Bar No. 2666
MATTHEW CARLYON, ESQ.
Nevada Bar No. 12712
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169

Attorneys for the Official Committee of
Unsecured Creditors


APPROVED / ~~DISAPPROVED~~:

By: /s/ Brett Axelrod
FOX ROTHSCHILD, LLP
BRETT AXELROD, ESQ.
Nevada Bar No. 5859
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas NV 89135

Attorneys for Las Vegas Linen, LLC


APPROVED / DISAPPROVED:

By: No response
McDONALD CARANO WILSON LLP
RYAN J. WORKS, ESQ.
Nevada Bar No. 9224
2300 W. Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102

OKIN ADAMS LLP
MATTHEW S. OKIN, ESQ.
(Admitted Pro Hac Vice)
DAVID CURRY JR.
(Admitted Pro Hac Vice)
1113 Vine St., Suite 201
Houston, Texas 77002

Attorneys for Midwest Community
Development Fund VII, L.L.C.

APPROVED / ~~DISAPPROVED~~:

By: ___/s/ Jeffrey Sylvester_____
SYLVESTER & POLEDNAK, LTD.
JEFFREY SYLVESTER, ESQ.
Nevada Bar No. 4396
ALLYSON R. NOTO, ESQ.
Nevada Bar No. 8286
1731 Village Center Circle
Las Vegas, NV 89134

Attorneys for Icon Pac Nevada
Owner Pool 3, Nevada, LLC

APPROVED / ~~DISAPPROVED~~:

BY: ___/s/ Blakeley Griffith_____
SNELL & WILMER L.L.P.
ROBERT R. KINAS, ESQ.
Nevada Bar No. 6019
BLAKELEY GRIFFITH, ESQ.
Nevada Bar No. 12386
3883 Howard Hughes Parkway, Ste. 1100
Las Vegas, NV 89169

Attorneys for City of North Las Vegas

APPROVED / ~~DISAPPROVED~~:

By: ___/s/ Samuel C. Wisotzkey_____
SAMUEL C. WISOTZKEY, ESQ.
KOHNER, MANN & KAILAS, S.C.
4650 North Port Washington Road
Milwaukee, WI 53212

Attorneys for EcoLab, Inc.

APPROVED / ~~DISAPPROVED~~:

By: ___/s/ Terri Didion_____
OFFICE OF THE UNITED STATES TRUSTEE
TERRI DIDION, ESQ.
300 Las Vegas Blvd S., 4th Floor
Las Vegas, NV 89101

## LR 9021 CERTIFICATION

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

☐ The court has waived the requirement of approval under LR 9021(b)(1).

☐ No party appeared at the hearing or filed an objection to the motion.

☒ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated above.

☐ I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order.

# # #

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
(702) 382-1170 FAX: (702) 382-1169

# EXHIBIT "1"

# ASSET PURCHASE AGREEMENT

by and between

**SUPERIOR LINEN, LLC,**
a Nevada limited liability company,
as Seller

and

**LAS VEGAS LINEN LLC,**
a Nevada limited liability company,
as Buyer

dated as of

May 31, 2017

# TABLE OF CONTENTS

Page

**ARTICLE I** PURCHASE AND SALE .................................................................................... 2

**SECTION 1.01** PURCHASE AND SALE OF ASSETS ............................................... 2
**SECTION 1.02** EXCLUDED ASSETS ...................................................................... 3
**SECTION 1.03** ASSUMPTION OF LIABILITIES .................................................. 3
**SECTION 1.04** EXCLUDED LIABILITIES ............................................................. 4
**SECTION 1.05** TOTAL CONSIDERATION ............................................................. 5
**SECTION 1.06** CLOSING RECEIVABLES AND PAYABLES ................................ 6
**SECTION 1.07** ALLOCATION OF TOTAL CONSIDERATION ............................. 6
**SECTION 1.08** DESIGNATED CONTRACTS ......................................................... 6
**SECTION 1.09** PURCHASE PRICE ADJUSTMENT. ............................................. 6

**ARTICLE II** CLOSING ...................................................................................................... 9

**SECTION 2.01** CLOSING ......................................................................................... 9
**SECTION 2.02** CLOSING DELIVERABLES ........................................................... 9

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF SELLER ................................. 10

**SECTION 3.01** ORGANIZATION AND AUTHORITY OF SELLER; ENFORCEABILITY ...................... 10
**SECTION 3.02** NO CONFLICTS; CONSENTS ....................................................... 10
**SECTION 3.03** SUBSIDIARIES; INDEBTEDNESS ............................................... 10
**SECTION 3.04** FINANCIAL STATEMENTS .......................................................... 11
**SECTION 3.05** UNDISCLOSED LIABILITIES ........................................................ 11
**SECTION 3.06** ABSENCE OF CERTAIN CHANGES, EVENTS AND CONDITIONS ........................ 11
**SECTION 3.07** MATERIAL CONTRACTS ............................................................. 12
**SECTION 3.08** TITLE TO PURCHASED ASSETS .................................................. 14
**SECTION 3.09** CONDITION OF ASSETS .............................................................. 14
**SECTION 3.10** REAL PROPERTY. ....................................................................... 14
**SECTION 3.11** INVENTORY ................................................................................. 15
**SECTION 3.12** ACCOUNTS RECEIVABLE .......................................................... 15
**SECTION 3.13** CUSTOMERS AND SUPPLIERS .................................................. 15
**SECTION 3.14** ASSUMED CONTRACTS .............................................................. 16
**SECTION 3.15** INTELLECTUAL PROPERTY ....................................................... 16
**SECTION 3.16** NON-FOREIGN STATUS .............................................................. 16
**SECTION 3.17** COMPLIANCE WITH LAWS ........................................................ 16
**SECTION 3.18** LEGAL PROCEEDINGS ............................................................... 17
**SECTION 3.19** ENVIRONMENTAL MATTERS. .................................................. 17
**SECTION 3.20** EMPLOYEE BENEFIT MATTERS ............................................... 18
**SECTION 3.21** EMPLOYMENT MATTERS ........................................................... 20
**SECTION 3.22** TAXES ........................................................................................... 21
**SECTION 3.23** BROKERS ..................................................................................... 22
**SECTION 3.24** FULL DISCLOSURE .................................................................... 22

i

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF BUYER ............................................ 22

SECTION 4.01  ORGANIZATION AND AUTHORITY OF BUYER; ENFORCEABILITY ..................... 22
SECTION 4.02  NO CONFLICTS; CONSENTS ............................................................................ 22
SECTION 4.03  LEGAL PROCEEDINGS .................................................................................... 23
SECTION 4.04  BROKERS ....................................................................................................... 23
SECTION 4.05  FINANCING. ................................................................................................... 23
SECTION 4.06  ASSUMED CONTRACTS ................................................................................... 23

**ARTICLE V** COVENANTS ................................................................................................... 23

SECTION 5.01  CONDUCT OF BUSINESS PRIOR TO THE CLOSING ............................................ 23
SECTION 5.02  ACCESS TO INFORMATION .............................................................................. 24
SECTION 5.03  NOTICE OF CERTAIN EVENTS. ........................................................................ 24
SECTION 5.04  EMPLOYEES AND EMPLOYEE BENEFITS ......................................................... 25
SECTION 5.05  CONFIDENTIALITY ......................................................................................... 26
SECTION 5.06  NON-COMPETITION; NON-SOLICITATION ........................................................ 26
SECTION 5.07  BANKRUPTCY ORDER .................................................................................... 27
SECTION 5.08  CONSENTS AND APPROVALS .......................................................................... 27
SECTION 5.09  PUBLIC ANNOUNCEMENTS ............................................................................ 27
SECTION 5.10  TRANSFER TAXES .......................................................................................... 27
SECTION 5.11  RECEIVABLES ................................................................................................ 27
SECTION 5.12  PAYMENT OF EXCLUDED LIABILITIES; LITIGATION TRUST ............................ 27
SECTION 5.13  BULK SALES LAWS ........................................................................................ 27
SECTION 5.14  PRORATIONS .................................................................................................. 28
SECTION 5.15  NAME CHANGE .............................................................................................. 28
SECTION 5.16  FURTHER ASSURANCES .................................................................................. 28

**ARTICLE VI** CONDITIONS TO CLOSING .............................................................................. 28

SECTION 6.01  CONDITIONS TO OBLIGATIONS OF BUYER ...................................................... 28
SECTION 6.02  CONDITIONS TO OBLIGATIONS OF SELLER ..................................................... 30

**ARTICLE VII** INDEMNIFICATION ....................................................................................... 30

SECTION 7.01  SURVIVAL ..................................................................................................... 30
SECTION 7.02  INDEMNIFICATION BY SELLER ....................................................................... 30
SECTION 7.03  INDEMNIFICATION BY BUYER ........................................................................ 31
SECTION 7.04  INDEMNIFICATION PROCEDURES .................................................................... 31
SECTION 7.05  TAX TREATMENT OF INDEMNIFICATION PAYMENTS ....................................... 31
SECTION 7.06  EFFECT OF INVESTIGATION ........................................................................... 31
SECTION 7.07  CUMULATIVE REMEDIES ............................................................................... 32
SECTION 7.08  LIMITATIONS ................................................................................................. 32

**ARTICLE VIII** TERMINATION ............................................................................................. 32

SECTION 8.01  TERMINATION ................................................................................................ 32
SECTION 8.02  EFFECT OF TERMINATION .............................................................................. 33

ii

**ARTICLE IX** MISCELLANEOUS ......................................................................... 33

| | | |
|---|---|---|
| **SECTION 9.01** | AS-IS CONVEYANCE. .......................................................... | 33 |
| **SECTION 9.02** | EXPENSES ......................................................................... | 34 |
| **SECTION 9.03** | NOTICES............................................................................ | 34 |
| **SECTION 9.04** | INTERPRETATION ................................................................ | 35 |
| **SECTION 9.05** | HEADINGS ......................................................................... | 35 |
| **SECTION 9.06** | SEVERABILITY .................................................................. | 35 |
| **SECTION 9.07** | ENTIRE AGREEMENT ......................................................... | 35 |
| **SECTION 9.08** | SUCCESSORS AND ASSIGNS.............................................. | 35 |
| **SECTION 9.09** | NO THIRD-PARTY BENEFICIARIES ..................................... | 36 |
| **SECTION 9.10** | AMENDMENT AND MODIFICATION; WAIVER........................ | 36 |
| **SECTION 9.11** | GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL ...... | 36 |
| **SECTION 9.12** | SPECIFIC PERFORMANCE .................................................. | 37 |
| **SECTION 9.13** | POST-CLOSING OFFICE. ..................................................... | 37 |
| **SECTION 9.14** | DOCUMENT RETENTION/SHARING. ...................................... | 37 |
| **SECTION 9.15** | COUNTERPARTS ................................................................ | 37 |

Appendix A – Definitions

**Exhibits:**
Exhibit A – Form of Bill of Sale
Exhibit B – Form of Assignment and Assumption Agreement

iii

44921005.v12

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**"), is entered into as of May 31, 2017, by and between **SUPERIOR LINEN, LLC**, a Nevada limited liability company ("**Seller**"); and **LAS VEGAS LINEN LLC**, a Nevada limited liability company ("**Buyer**"). Seller and Buyer are referred to collectively herein as the "**Parties**" and each a "**Party**." Following the Petition Date (as defined below), the term Seller shall refer to Seller as a debtor-in-possession and include the Seller's estate.

## RECITALS

A.    Seller is engaged in the business of providing linen rental and laundry services to the hospitality and retail markets in Las Vegas, Nevada and the surrounding areas (the "**Business**").

B.    On September 30, 2016 (the "**Petition Date**") Seller filed its voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"), which is pending as case number 16-15388-mkn (the "**Bankruptcy Case**");

C.    Seller desires to sell and assign to Buyer and Buyer desires to purchase and assume from Seller all right, title and interest of the Seller in substantially all of its assets, properties and rights as the same shall exist as of the Closing, of every kind, type or designation, whether tangible or intangible, known or unknown, real, personal or mixed, wherever located other than the Excluded Assets (as defined herein) in accordance with the terms and subject to the conditions set forth herein;

D.    The Purchased Assets (as defined below) will be sold pursuant to an Order of the Bankruptcy Court (the "**Sale Order**"), authorizing the sale of the Purchased Assets free and clear of liens, claims, encumbrances and other interests pursuant to Section 363 of the Bankruptcy Code, the assumption and assignment of the Contracts included in the Purchased Assets pursuant to Section 365 of the Bankruptcy Code, and a finding of good faith pursuant to Section 363(m) of the Bankruptcy Code, as more fully set forth in the Sale Order and in accordance with the terms and conditions of this Agreement; and

E.    For purposes of this Agreement, capitalized terms shall have the meanings ascribed thereto in **Appendix A** hereto.

## AGREEMENT

NOW, THEREFORE, in consideration of the above Recitals, incorporated herein by this reference, mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

# ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale of Assets**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and subject to the terms and conditions set forth herein and the Sale Order, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in the assets that relate to, or are used or held for the use in connection with the Business (the "**Purchased Assets**"), free and clear of all Encumbrances, but excluding the Excluded Assets, as set forth in **Section 1.02**, below.  The Purchased Assets shall include the following assets of the Business, as of the date of Closing (defined below):

(a)     (i) All accounts receivable, notes receivable, and employee receivables, and any security, claim, remedy or other right related to any of the foregoing, whether accruing before or after the Closing Date (the "**Accounts Receivable**");

(b)     All fixed assets and tangible personal property, including, equipment, furniture, fixtures, machinery, tools, vehicles, data processing and office equipment, supplies, computers, and telephones, including all tangible personal property listed in **Section 1.01(b)** of the Disclosure Schedules;

(c)     Subject to Section 1.08 below, all customer contracts generating or contributing to Seller's revenues, as listed on **Section 1.01(c)** of the Disclosure Schedules ("**Customer Contracts**"), and as otherwise agreed to by the Buyer and Seller;

(d)     All inventory, packaging, supplies, parts and other inventories, including new and used linens, and including all inventory listed in **Section 1.01(d)** of the Disclosure Schedules ("**Inventory**");

(e)     Originals, or where not available, copies, of machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, invoices, quality control records and procedures, customer complaints and inquiry files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), and marketing and promotional surveys ("**Books and Records**");

(f)     The Lease Agreement dated July 26, 2011, and all amendments thereto (the "**Lease Agreement**"), with respect to the premises leased by the Seller located at 4501 Mitchell Street, North Las Vegas, Nevada 89081 (the "**Leased Property**");

(g)     The agreement by and among the Seller and the City of North Las Vegas regarding the repayment of sewer and water charges, as set forth on the schedule set forth therein, as it may be amended with the consent of the Buyer prior to Closing (the "**North Las Vegas Settlement Agreement**");

(h)     All going concern value and goodwill of the Business;

44921005.v12

(i)    All know-how, confidential or proprietary information, technical information, data, process technology, plans and drawings of Seller relating to the operations of the Business and all employee manuals relating to the Business;

(j)    Any rights Seller may have in the name "Superior Linen" and similar derivations thereof, all rights in internet websites presently used by Seller for the Business, including www.superiorlinenlv.com, and all Intellectual Property owned by Seller;

(k)    All prepaid expenses, advance payments, security, refunds, and deposits to the extent related to the Business, the Purchased Assets or the Assumed Liabilities;

(l)    All Permits, including Environmental Permits, which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets, to the extent such Permits are transferable;

(m)    Except as set forth in **Section 1.02** of the Disclosure Schedules, all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities;

(n)    All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to the Business or any Purchased Assets or the Assumed Liabilities;

(o)    Except as set forth in Section **1.02** of the Disclosure Schedules, all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise; and

(p)    All other assets used in the operation of the Business, unless an Excluded Asset specifically excluded in **Section 1.02** below, including those set forth in **Section 1.01(p)** of the Disclosure Schedules.

**Section 1.02    Excluded Assets**. Notwithstanding the foregoing, the Purchased Assets shall not include any of the following assets (the "**Excluded Assets**"):

(a)    Seller's company minute book and ownership ledger;

(b)    All Contracts, other than the Assumed Contracts (the "**Excluded Contracts**");

(c)    Any and all cash in Seller's bank accounts set forth in **Section 1.02** of the Disclosure Schedules and as of the close of business on the day immediately preceding the Closing; and

(d)    All of Seller's assets listed in **Section 1.02** of the Disclosure Schedules.

**Section 1.03    Assumption of Liabilities**. Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge the liabilities and obligations set forth below, but, other than with respect to the North Las Vegas Settlement Agreement, only

to the extent that such liabilities and obligations do not relate to any breach, default or violation by Seller on or prior to the Closing (collectively, the "**Assumed Liabilities**"):

(a)    Seven Hundred Fifty Thousand Dollars ($750,000.00) of Seller's Liabilities under the North Las Vegas Settlement Agreement, including $60,000 to be paid by Buyer at Closing in accordance with the North Las Vegas Settlement Agreement;

(b)    All trade accounts payable (including supporting invoices) to third parties in connection with the Business accruing or invoiced after the Closing Date for work, services, materials, or products performed or provided to or purchased by Buyer by third parties;

(c)    All Liabilities under the Lease Agreement accruing after the Closing; and

(d)    All Liabilities in respect of the Assumed Contracts listed on **Section 1.03(d)** of the Disclosure Schedules that are properly assigned to Buyer, but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller on or prior to the Closing.

Other than the Assumed Liabilities, Buyer shall not assume any liabilities or obligations of Seller or the Business of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created, and all other liabilities shall be retained, paid, performed, and discharged solely by Seller.

**Section 1.04    Excluded Liabilities**.  Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)    any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other documents delivered herewith and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)    any Liability for (i) Taxes of Seller (or any member or Affiliate of Seller) or relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller pursuant to **Section 5.10**; or (iii) other Taxes of Seller (or any member or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any member or Affiliate of Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(c)    any Liabilities relating to or arising out of the Excluded Assets;

4

(d)　　any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(e)　　any Liabilities of Seller arising under or in connection with any Benefit Plan providing benefits to any present or former employee of Seller;

(f)　　any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(g)　　any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing Date or otherwise to the extent arising out of any actions or omissions of Seller, including those, if any, referred to on any Schedule to this Agreement;

(h)　　except as set forth **Section 1.03(d)**, any trade accounts payable (including supporting invoices) to third parties in connection with the Business accruing or invoiced before the Closing Date including for work, services, materials, or products performed or provided to or purchased by Seller or the Business ("**Excluded Payables**");

(i)　　any Liabilities or other obligations which constitute intercompany payables owing to Affiliates of Seller;

(j)　　any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same);

(k)　　any Liabilities under the Excluded Contracts or any other Contracts (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing;

(l)　　any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions;

(m)　　any other Liabilities of Seller listed in **Section 1.04** of the Disclosure Schedules; and

(n)　　any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order.

**Section 1.05  Total Consideration**.  The aggregate consideration for the Purchased Assets shall be (a) One Million Eight Hundred Thousand Dollars ($1,800,000) in cash; (b) up to Two Hundred Thousand Dollars ($200,000) in cash for specified equipment not identified in **Section 1.01(b)** of the Disclosure Schedules which shall be agreed to by Buyer and Seller at or

5

prior to Closing (the sum of (a) inclusive with (b) being the "**Cash Purchase Price**" which shall be subject to adjustment pursuant to **Section 1.09** below); plus (c) the assumption of the Assumed Liabilities (the "**Total Consideration**").

**Section 1.06   Closing Receivables and Payables.**   On the day prior to the Closing, Seller shall deliver to Buyer, for Buyer's approval, a statement setting forth the total amount of Seller's estimated Accounts Receivable and Excluded Payables as of 11:59 p.m. on the day of the Closing (the "**Closing Certificate**"), certified by the Seller.  The Closing Certificate shall attach thereto copies of all supporting invoices.

**Section 1.07   Allocation of Total Consideration**.  Buyer shall, no more than thirty (30) days after the Closing Date, prepare and deliver to Seller for its review a schedule allocating the Total Consideration for all purposes (including Tax and financial accounting purposes) (the "**Purchase Price Allocation**").  Seller shall review the Purchase Price Allocation and provide any objections to Buyer within thirty (30) days after the receipt thereof.  If Seller raises any objection to the Purchase Price Allocation, the Parties will negotiate in good faith to resolve such objection.  In the event that Seller and Buyer are unable to resolve any dispute with respect to the Purchase Price Allocation, such dispute shall be resolved by an independent accountant, jointly selected by Buyer and Seller, in a final and binding manner. The fees and expenses of the independent accountant in connection with resolving a dispute regarding the Purchase Price Allocation shall be borne equally by Buyer and Seller.  Upon reaching an agreement on the Purchase Price Allocation, or upon receipt of the independent accountant's resolution regarding the Purchase Price Allocation, as the case may be, none of the parties hereto will take a position on any Tax Return, before any Governmental Authority charged with the collection of any Tax, or in any judicial proceeding, that is in any way inconsistent with the such Purchase Price Allocation.

**Section 1.08   Designated Contracts**.  The Buyer hereby designates to Seller those Customer Contracts and any other Contracts set forth in **Section 1.08** of the Disclosure Schedules (the "**Designated Contracts**") that it elects not to assume at Closing but will instead operate under during the 60-day period following the Closing (the "**Negotiation Period**"). During the Negotiation Period (i) Seller, to the maximum extent permitted by law shall act as Buyer's agent in order to obtain for Buyer the benefits under the Designated Contracts and shall cooperate with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer, and (ii) the Buyer will negotiate with the counterparties to the Designated Contracts amendments thereto or new contracts that will supersede such Designated Contracts, providing for terms and conditions satisfactory to Buyer in its sole discretion.  At the conclusion of the Designation Period, Buyer shall notify Seller of the Designated Contracts that it has not renegotiated to its satisfaction, and Seller shall reject such Designated Contracts.

**Section 1.09   Purchase Price Adjustment**.

(a)   Closing Adjustment.

(i)   No later than one (1) Business Day prior to the Closing Date, Seller shall deliver to the Buyer a statement (the "**Estimated Closing AR Statement**") setting forth its good faith estimate of Closing Net AR Amount (the "**Estimated Closing Net AR**

Amount") with supporting calculations in reasonable detail. "**Closing Net AR Amount**" shall mean the Accounts Receivable of the Seller included in the Purchased Assets, net of reserves in accordance with GAAP; provided, however, that for purposes of this Section 1.09, the Closing Net AR Amount shall not be greater than $800,000 (so that the maximum positive adjustment to the Purchase Price under this Section 1.09 will not exceed $300,000).

(ii)    The "**Closing Adjustment**" shall be an amount equal to the excess, if any, of $500,000 (the "**Target Net AR Amount**") over the Estimated Closing Net AR Amount. The Cash Purchase Price shall be reduced by the amount of the Closing Adjustment (if any). If the Estimated Closing Net AR Amount exceeds the Target Net AR Amount, the Cash Purchase Price shall not be adjusted at the Closing but shall be subject to adjustment following the Closing as provided in **Section 1.09 (b)** and **(c)** below.

(b)    Post-Closing Adjustment.

(i)    Within sixty (60) days after the Closing Date, Buyer shall prepare and deliver to Seller a statement setting forth its calculation of the Closing Net AR Amount with supporting calculations in reasonable detail (the "**Closing AR Amount Statement**").

(ii)    The post-closing adjustment shall be an amount equal to (A) the Closing Net AR Amount, as finally determined pursuant to this **Section 1.09**, minus (B) Target Net AR Amount, minus (C) (if applicable) the Closing Adjustment (the "**Post-Closing Adjustment**"). If the Post-Closing Adjustment is a positive number, then the Cash Purchase Price shall be increased by the Post-Closing Adjustment and Buyer shall pay to Seller an amount equal to the Post-Closing Adjustment. If the Post-Closing Adjustment is a negative number, then the Cash Purchase Price shall be reduced by an amount equal to the Post-Closing Adjustment, which shall be immediately paid to Buyer by the Seller.

(iii)    During the 60-days following the Closing ("**Post-Closing Period**"), Buyer (i) shall use commercially reasonable efforts to collect all Accounts Receivable included in the Purchased Assets in good faith in a manner consistent with current practices, policies and procedures of Buyer and Buyer's Affiliates (collectively, "**Buyer's Collection Practices**"), and shall only discount, extend, modify, cancel, terminate or settle any of such Accounts Receivable consistent with such practices, policies and procedures, and (ii) shall not provide or accept payments, or amend the terms of any contracts with Customers having Accounts Receivable included in the Closing Net AR Amount (the "**Post-Closing AR Customers**"), or take any other action or inaction, in each case, to the extent any such action or inaction would reasonably be expected to reduce the Closing Net AR Amount (as finally determined pursuant to this **Section 1.09**). In the event Buyer discounts, extends, modifies, cancels, terminates or settles any Accounts Receivable in deviation or inconsistent with Buyer's Collection Practices during the Post-Closing Period (each a "**Discounted Account**"), Buyer shall give Seller full credit to the Account Receivable for such Discounted Account and ledger such account as paid in full in the Closing Net AR Amount Statement. Within five (5) Business Days after the final determination of the Closing Net AR Amount pursuant to this **Section 1.09**, Buyer shall transfer and assign to Seller all of Buyer's all right, title and interest in and to the uncollected Accounts Receivable that were included in the Estimated Closing Net AR Amount but excluded from the final Closing AR Amount Statement (the "**Reserved Collections**"),

7

44921005.v12

provided, however, that Buyer shall not be required to transfer and assign any Reserved Collections to Seller if the Closing Net AR Amount, as finally determined pursuant to this **Section 1.09,** equals or exceeds the Estimated Closing Net AR Amount. Seller shall thereafter have the right to pursue such collection action with respect to the Reserved Collections as is determined to be reasonable by Seller in its sole and absolute discretion.

      (c)     <u>Examination and Review</u>.

      (i)     <u>Examination</u>. After receipt of the Closing AR Amount Statement, Seller shall have twenty (20) days (the "**Review Period**") to review the Closing AR Amount Statement. During the Review Period, Seller shall have access to the books and records of Buyer relating to the Closing AR Amount Statement.

      (ii)     <u>Objection</u>. On or prior to the last day of the Review Period, Seller may object to the Closing AR Amount Statement by delivering to Buyer a written statement setting forth Seller's objections in reasonable detail, indicating each disputed item or amount and the basis for its disagreement (the "**Statement of Objections**"). If Seller fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing AR Amount Statement and the Post-Closing Adjustment reflected in the Closing AR Amount Statement shall be deemed to have been accepted by Seller. If Seller delivers the Statement of Objections before the expiration of the Review Period, Buyer and Seller shall negotiate in good faith to resolve such objections within thirty (30) days after the delivery of the Statement of Objections (the "**Resolution Period**"), and, if the same are so resolved within the Resolution Period, the Post-Closing Adjustment and the Closing AR Amount Statement with such changes as may have been previously agreed in writing by Buyer and Seller, shall be final and binding.

      (iii)     <u>Resolution of Disputes</u>. If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**" and any amounts not so disputed, the "**Undisputed Amounts**") shall be submitted for resolution to an impartial nationally recognized firm of independent certified public accountants (the "**Independent Accountant**") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing AR Amount Statement. The Independent Accountant shall only decide the specific items under dispute by the parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing AR Amount Statement, the Estimated Closing AR Amount Statement and the Statement of Objections, respectively.

      (iv)     <u>Fees of the Independent Accountant</u>. The fees and expenses of the Independent Accountant shall be paid by Seller, on the one hand, and by Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to Seller or Buyer, respectively, bears to the aggregate amount actually contested by Sellers and Buyer.

      (v)     <u>Determination by Independent Accountant</u>. The Independent Accountant shall make a determination as soon as practicable within thirty (30) days (or such other time as the parties hereto shall agree in writing) after their engagement, and their resolution

of the Disputed Amounts and their adjustment, if any, to the Closing AR Amount Statement and/or the Post-Closing Adjustment shall be conclusive and binding upon the parties hereto.

(vi)    <u>Payments of Post-Closing Adjustment</u>. Except as otherwise provided herein, any payment of the Post-Closing Adjustment, shall (A) be due (x) within five (5) Business Days of acceptance of the applicable Closing AR Amount Statement if there are no Disputed Amounts or (y) if there are Disputed Amounts, then within five (5) Business Days of the resolution described in clause (v) above; and (B) be paid by wire transfer of immediately available funds to such account as is directed by Buyer or Seller, as the case may be.

## ARTICLE II
### CLOSING

**Section 2.01    Closing**. Subject to the terms and conditions hereof, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Barnett & Associates, located at 3883 Howard Hughes Parkway, Suite 790, Las Vegas, Nevada 89169, at 10:00 a.m., local time, on May 31, 2017 or within three (3) Business Days after satisfaction or waiver of the conditions set forth in **Article VI** (other than those which by their nature may only be satisfied on the Closing Date), whichever date is first to occur, or at such other time and place as the Buyer and the Seller may agree in writing. The date on which the Closing actually occurs is referred to in this Agreement as the "**Closing Date**". The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the day immediately after the Closing Date.

**Section 2.02    Closing Deliverables**

(a)    At the Closing, Seller shall deliver or shall cause to be delivered to Buyer the following:

(i)    a bill of sale in the form of **Exhibit A** hereto (the "**Bill of Sale**"), duly executed by Seller, transferring the Purchased Assets to Buyer;

(ii)    an assignment and assumption agreement in the form of **Exhibit B** hereto (the "**Assignment and Assumption Agreement**"), duly executed by Seller, effecting the assignment to and assumption by Buyer of the Contracts (including, without limitation, the Customer Contracts), the North Las Vegas Settlement Agreement and the Assumed Liabilities;

(iii)    the Closing Certificate duly executed by Seller's president or another responsible person acceptable to Buyer;

(iv)    a certificate dated the Closing Date and signed by the Designated Responsible Person, that (A) each of the Closing deliverables set forth in **Section 2.02(a)** have been delivered as of Closing; and (B) the representations and warranties of Seller contained in this Agreement and the documents to be delivered hereunder are true and correct in all respects on and as of the Closing Date;

(v)    a copy of the Sale Order as entered by the Bankruptcy Court; and

9

(vi)    possession of the Purchased Assets, including keys and security codes to the Leased Property.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Cash Purchase Price in the form of a cashier's check, wire transfer or other immediately available funds; and

(ii)    the Assignment and Assumption Agreement duly executed by Buyer.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that to Seller's Knowledge the statements contained in this **Article III** are true and correct as of the date hereof and as of the Closing Date.

**Section 3.01    Organization and Authority of Seller; Enforceability**.    Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Nevada.    Seller has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.    The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Seller.    This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

**Section 3.02    No Conflicts; Consents**.    The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the articles of organization, operating agreement or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller or the Purchased Assets; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any Contract or other instrument to which Seller is a party or to which any of the Purchased Assets are subject; or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets.    Except for the Sale Order or as listed on **Section 3.02** of the Disclosure Schedules, no consent, approval, waiver or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby.

**Section 3.03    Subsidiaries; Indebtedness**.    Seller has no subsidiaries. Seller does not own or hold the right to acquire any shares of stock or any other security or interest in any other

10

person or entity nor does Seller have any obligation to make any investments in any person or entity.

**Section 3.04    Financial Statements.**  Seller has delivered to Buyer complete copies of (i) audited financial statements of the Seller as at and for the year ended December 31, 2014, including the audited balance sheet as at such date and the unaudited related statements of income, stockholders' equity and cash flows for the year then ended (the "**Audited Financial Statements**"), (ii) unaudited balance sheets of Debtor ("**Balance Sheets**") as of December 31, 2015 and 2016, and as of March 31, 2017 (the "**Balance Sheet Date**"), and (iii) the related statements of income, members' equity and cash flows for the periods then ended (collectively, the "**Interim Financial Statements**", and together with the Balance Sheets and Audited Financial Statements, the "**Financial Statements**"). The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes.  The Financial Statements are based on the books and records of the Business, and fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

**Section 3.05    Undisclosed Liabilities.**  Seller has no liabilities, except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

**Section 3.06    Absence of Certain Changes, Events and Conditions.**  Since the Balance Sheet Date, except as listed on **Section 3.06** of the Disclosure Schedules, there has not been any:

(a)    event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    material change in any method of accounting or accounting practice for the Business;

(c)    material change in cash management policies, practices and procedures with respect to Inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

(d)    entry into any contract in excess of Five Thousand Dollars ($5,000) that would extend beyond the Closing or encumber the Purchased Assets;

(e)    incurrence, assumption or guarantee of any indebtedness for borrowed money in connection with the Business except unsecured current obligations and liabilities incurred in the ordinary course of business consistent with past practice;

(f)     transfer, assignment, sale or other disposition of any of the Purchased Assets shown or reflected in the Balance Sheet, except for the sale of Inventory in the ordinary course of business;

(g)     cancellation of any debts or claims or amendment, termination, or waiver of any rights constituting Purchased Assets;

(h)     material damage, destruction or loss, or any material interruption in use, of any Purchased Assets, whether or not covered by insurance;

(i)     acceleration, termination, material modification to or cancellation of any Assumed Contract or Permit;

(j)     material capital expenditures which would constitute an Assumed Liability;

(k)     imposition of any Encumbrance upon any of the Purchased Assets;

(l)     adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(m)     purchase, lease or other acquisition of the right to own, use or lease any property or assets in connection with the Business for an amount in excess of Five Thousand Dollars ($5,000), except for purchases of Inventory or supplies in the ordinary course of business consistent with past practice;

(n)     (i) grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any current or former employees, managers, officers, directors, independent contractors or consultants of the Business, other than as provided for in any written agreements disclosed in writing to Buyer, or required by applicable Law, (ii) change in the terms of employment for any employee of the Business or any termination of any employees, or (iii) action to accelerate the vesting or payment of any compensation or benefit for any current or former employee, manager, officer, director, consultant or independent contractor of the Business;

(o)     any loan to (or forgiveness of any loan to), or entry into any other transaction with, any current or former managers, officers, directors, or employees of the Business; or

(p)     any contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

### Section 3.07  Material Contracts.

(a)     **Section 3.07** of the Disclosure Schedules lists each of the following Contracts (i) by which any of the Purchased Assets are bound or affected or (ii) to which Seller is a party or by which it is bound in connection with the Business or the Purchased Assets (such Contracts, together with all leases concerning the occupancy, management or operation of any Real

44921005.v12

Property listed or otherwise disclosed in **Section 3.10** of the Disclosure Schedules, being "**Material Contracts**"):

      (i)    all Contracts involving aggregate consideration in excess of Five Thousand Dollars ($5,000);

      (ii)    all Contracts that provide for the indemnification of any Person or the assumption of any Tax, environmental or other Liability of any Person;

      (iii)    all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person or any Real Property (whether by merger, sale of stock, sale of assets or otherwise);

      (iv)    all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts;

      (v)    all employment agreements and Contracts with, employees, independent contractors or consultants (or similar arrangements);

      (vi)    except for Contracts relating to trade receivables, all Contracts relating to indebtedness (including, without limitation, guarantees);

      (vii)    all Contracts with any Governmental Authority;

      (viii)    all Contracts that limit or purport to limit the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

      (ix)    all joint venture, partnership or similar Contracts;

      (x)    all Contracts for the sale of any of the Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

      (xi)    all powers of attorney with respect to the Business or any Purchased Asset;

      (xii)    all collective bargaining agreements or Contracts with any Union;

      (xiii)    all Contracts which cannot be cancelled without penalty or without more than ninety (90) days' notice; and

      (xiv)    all other Contracts that are material to the Purchased Assets or the operation of the Business.

    (b)    To the Knowledge of Seller, each Material Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Except as set forth on **Section 3.07** of the Disclosure Schedules, none of Seller or, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or

13

received any notice of any intention to terminate, any Material Contract. Except as set forth on **Section 3.07** of the Disclosure Schedules, to the Knowledge of Seller, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer. Except as set forth on **Section 3.07** of the Disclosure Schedules, to the Knowledge of Seller, there are no material disputes pending or threatened under any Contract included in the Purchased Assets. **Section 3.07** of the Disclosure Schedules sets forth the amounts required to cure Seller's default under each applicable Material Contract.

Section 3.08   Title to Purchased Assets.   Except as set forth on **Section 1.01(b)** of the Disclosure Schedules, Seller owns and has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets.

Section 3.09   Condition of Assets.   To the Knowledge of Seller and subject to any unforeseen acts, events, mechanical failures of the equipment and repair delays or disruptions prior to Closing, the Purchased Assets are in their "as-is" "where-is" condition as existed during Buyer's May 29, 2017 inspection of the Business and are in a condition sufficient for the operation of the Business in the ordinary course consistent with past practice. To the Knowledge of Seller, none of the Excluded Assets are material to the Business.

Section 3.10   Real Property.

(a)     **Section 3.10** of the Disclosure Schedules sets forth each parcel of real property leased by Seller and used in or necessary for the conduct of the Business as currently conducted (together with all rights, title and interest of Seller in and to leasehold improvements relating thereto, including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "**Leased Real Property**"), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property (collectively, the "**Leases**"). Seller has delivered to Buyer a true and complete copy of each Lease. With respect to each Lease to the Knowledge of Seller:

(i)     such Leases are valid, binding, enforceable and in full force and effect, and Seller enjoys peaceful and undisturbed possession of the Leased Real Property;

(ii)     except as set forth in **Section 3.10** of the Disclosure Schedules, Seller is not in breach or default under such Leases, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default, and Seller has paid all rent due and payable under such Lease;

(iii)     except as set forth in **Section 3.10** of the Disclosure Schedules, Seller has not received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by Seller under any of the Leases and, to the Knowledge of

14

Seller, no other party is in default thereof, and no party to any Lease has exercised any termination rights with respect thereto;

(iv)    except as set for in **Section 3.10** of the Disclosure Schedules, Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(v)    Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Leased Real Property.

(b)    Except as set forth in **Section 3.10** of the Disclosure Schedules, Seller has not received any written notice of (i) violations of building codes or zoning ordinances or other governmental or regulatory Laws affecting the Leased Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Leased Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to adversely affect the ability to operate the Leased Real Property as currently operated. Except as set forth in **Section 3.10** of the Disclosure Schedules, neither the whole nor any material portion of any Leased Real Property has been damaged or destroyed by fire or other casualty.

(c)    The Leased Real Property is sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the Real Property necessary to conduct the Business as currently conducted.

**Section 3.11    Inventory.**  To the Knowledge of Seller, all Inventory, whether or not reflected in the Balance Sheet, consists of that Inventory as set forth in **Section 1.01(d)** of the Disclosure Schedules and the a quantities of Inventory set forth therein are not exact counts as may exist on the Closing Date, but do represent the result of Seller's last count of Inventory prior to the Closing Date.  To the Knowledge of Seller and subject to any unforeseen acts, events, loss or destruction of the Inventory prior to Closing, the quantities of each item of Inventory are not excessive, but are reasonable in the present circumstances of Seller and are of a quality and in a sufficient quantity for the operation of the Business in the ordinary course consistent with past practice.

**Section 3.12    Accounts Receivable.**  To the Knowledge of Seller, the Accounts Receivable reflected on the Balance Sheet and the Accounts Receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by Seller involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; and (c) are collectible in full within one 120 days after billing.

**Section 3.13    Customers and Suppliers.  Section 3.13** of the Disclosure Schedules sets forth a complete and accurate list of (a) the laundry customers of the Business ("**Customers**") during 2015 and 2016, and (b) the suppliers of materials, products or services to the Business who had net purchases from the Business during 2015 and 2016 in excess of Five Thousand

15

Dollars ($5,000) ("**Suppliers**"). Except as set forth on Section 3.13 of the Disclosure Schedules, the relationships of the Seller with Customers and Suppliers are good commercial working relationships and no Customers or Suppliers have canceled, terminated or otherwise materially altered its relationship with the Business, and Seller has not received any notice, and has no reason to believe, that any of the Customers or Suppliers intend to terminate or materially reduce its relationship with the Business. The Business has adequate sources of supply in order to conduct the Business as currently conducted as of the date hereof.

Section 3.14    **Assumed Contracts.**  Each of the Assumed Contracts is valid and binding on Seller in accordance with its terms and is in full force and effect. Except as set forth on **Section 3.14** of the Disclosure Schedules, none of Seller or, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assumed Contract. Except as set forth on **Section 3.14** of the Disclosure Schedules, no event or circumstance has occurred that, with or without notice or lapse of time or both, would constitute an event of default under any Assumed Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of benefit thereunder. Complete and correct copies of each Assumed Contract have been made available to Buyer. Except as set forth on **Section 3.14** of the Disclosure Schedules, there are no disputes pending or threatened under any Assumed Contract. The amount required to cure Buyer's defaults under the Assumed Contracts does not exceed $7,500 in the aggregate. Seller's aggregate revenues during 2016 under the Customer Contracts with respect to which Seller has not furnished true copies to Buyer did not exceed $50,000 in the aggregate.

Section 3.15    **Intellectual Property.**  Section 3.15 of the Disclosure Schedules contains a complete and accurate list of all Intellectual Property owned or used by Seller and all material licenses and other rights granted by (a) any third party to Seller or (b) Seller to any third party with respect to any Intellectual Property. Seller owns and possesses all right, title and interest to, or has the right to use pursuant to a valid and enforceable license, all of the purchased Intellectual Property, and such purchased Intellectual Property constitutes all of the Intellectual Property used in, related to or necessary for the operation of the Business as presently conducted and as presently proposed to be conducted, free and clear of all Encumbrances. There have been no claims made against Seller asserting the invalidity, misuse or unenforceability of any of the Intellectual Property owned or used by Seller and, to Seller's Knowledge, there is no basis for any such claim and Seller has not received any notices of, and has no Knowledge of any facts which indicate a likelihood of, any infringement or misappropriation by, or conflict with, any third party with respect to any Intellectual Property (including any offer, demand or request that Seller license any rights from a third party).

Section 3.16    **Non-Foreign Status.**  Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

Section 3.17    **Compliance With Laws.**

(a)    Seller has complied, and is now complying, with all applicable federal, state and local Laws and regulations applicable to the Business or the ownership and use of the Purchased Assets.

44921005.v12

(b)    All Permits required for Seller to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Seller, are valid and in full force and effect, and are listed on **Section 3.17(b)** of the Disclosure Schedules. All fees and charges with respect to such Permits as of the date hereof have been paid in full. **Section 3.17(b)** of the Disclosure Schedules lists all current Permits issued to Seller which are related to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets, including the names of the Permits and their expiration dates. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in **Section 3.17(b)** of the Disclosure Schedules.  The Seller's discharge of waste waters within the 30-days preceding the date hereof is consistent with past practice and will not result in any additional liability under the North Las Vegas Settlement Agreement or a breach of any term thereof.

**Section 3.18    Legal Proceedings**.  Except as set forth in **Section 3.18** of the Disclosure Schedules, there is no Action of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Purchased Assets or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 3.19    Environmental Matters.**

(a)    The operations of Seller with respect to the Business conducted at the Leased Real Property, and the Purchased Assets are currently and have been in compliance with all applicable Environmental Laws. Seller has not received from any Person, with respect to the Business, the Purchased Assets or any other property currently or previously owned, leased or operated by the Seller, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to applicable Environmental Law.

(b)    Seller has obtained and is in material compliance with all Environmental Permits necessary for the ownership, lease, operation or use of the Business or assets of the Seller as currently operated, and there is no reason to believe, that any such Environmental Permits will be revoked, adversely modified, or not renewed in the ordinary course.

(c)    No Real Property currently owned, operated or leased by Seller is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d)    (i) Seller has not Released any Hazardous Materials at any location in contravention of any applicable Environmental Laws or in a manner or under circumstances that could reasonably be expected to result in material liability to Seller, the Business, or the Purchased Assets or materially interfere with the operations of Seller; (ii) Hazardous Materials are not otherwise present at or affecting any property currently or formerly owned, leased or operated by Seller or any other location (including any facility at which Hazardous Materials have been stored, treated or disposed of or otherwise Released) for which Seller may be responsible, in any case in contravention of any applicable Environmental Laws or in a manner or under circumstances that could reasonably be expected to result in material liability to Seller

17

or materially interfere with the operations of Seller; and (iii) Seller has not received an Environmental Notice that any property has been contaminated with or otherwise affected by any Hazardous Material which could reasonably be expected to result in an Environmental Claim against, or a violation of any Environmental Laws or any Environmental Permit by, Seller.

(e)     Seller has made available to Buyer any and all written information, in its possession or control, including Environmental Notices, Environmental Permits, environmental reports, studies, audits, records, sampling data, site assessments and other similar documents with respect to the Business or Purchased Assets or any location currently or formerly owned, leased or operated by Seller or for which Seller may have liability under any Environmental Laws or for the Release of, or exposure of any Person to, any Hazardous Materials.

(f)     No current or proposed events, conditions, circumstances, practices, plans or legal requirements exist that could reasonably be expected to prevent Seller from, or materially increase the cost to Seller of: (i) complying in all material respects with applicable Environmental Laws, or (i) obtaining, renewing, or complying with any Environmental Permits.

(g)     The Business: (i) has access through its water service provider to a water supply sufficient to support its business as currently operated, (ii) has not had limitations imposed upon its water supply which would render its water supply insufficient to support its business as currently operated, and (iii) has not received notice that access to its current water supply will be reduced or limited, or that costs associated with its water supply will be increased.

**Section 3.20     Employee Benefit Matters.**

(a)     **Section 3.20** of the Disclosure Schedules contains a true and complete list of each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off, welfare, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by Seller or any Affiliate of any of them for the benefit of any current or former employee, manager, officer, director, retiree, independent contractor or consultant of the Business or any spouse or dependent of such individual, or under which Seller or any of its ERISA affiliates has or may have any Liability, or with respect to which Buyer or any of its Affiliates would reasonably be expected to have any Liability, contingent or otherwise (each, a "**Benefit Plan**").

(b)     With respect to each Benefit Plan, Seller has made available to Buyer accurate, current and complete copies of each of the following: (i) where the Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements or other funding arrangements, custodial agreements, insurance policies and contracts, administration agreements and similar agreements, and investment management or investment advisory agreements, now in effect or required in the

18

future as a result of the transactions contemplated by this Agreement or otherwise; (iv) copies of any summary plan descriptions, summaries of material modifications, employee handbooks and any other written communications (or a description of any oral communications) relating to any Benefit Plan; (v) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination, opinion or advisory letter from the Internal Revenue Service; (vi) in the case of any Benefit Plan for which a Form 5500 is required to be filed, a copy of the two most recently filed Form 5500, with schedules and financial statements attached; (vii) actuarial valuations and reports related to any Benefit Plans with respect to the most recently completed plan years; (viii) the most recent nondiscrimination tests performed under the Code; and (ix) copies of material notices, letters or other correspondence from the Internal Revenue Service, Department of Labor, Pension Benefit Guaranty Corporation or other Governmental Authority relating to the Benefit Plan.

(c)     Except as set forth on **Section 3.20** of the Disclosure Schedules, each Benefit Plan and related trust has been established, administered and maintained in accordance with its terms and in compliance with all applicable Laws (including ERISA and the Code). Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "**Qualified Benefit Plan**") is so qualified, and nothing has occurred that could reasonably be expected to adversely affect the qualified status of any Qualified Benefit Plan. Nothing has occurred with respect to any Benefit Plan that has subjected or could reasonably be expected to subject Seller or any of its ERISA Affiliates or, with respect to any period after the Closing Date, Buyer or any of its Affiliates, to a penalty under Section 502 of ERISA or to tax or penalty under Section 4975 of the Code.  All benefits, contributions and premiums relating to each Benefit Plan have been timely paid in accordance with the terms of such Benefit Plan and all applicable Laws, and all benefits accrued under any unfunded Benefit Plan have been paid, accrued or otherwise adequately reserved to the extent required by, and in accordance with GAAP. No condition exists with respect to any Benefit Plan which can reasonably be expected to result in any liability of any kind or nature to the Buyer.

(d)     Neither Seller nor any of its ERISA affiliates has within the seven (7) year period immediately preceding the Closing Date maintained, contributed to or has been required to contribute to any: (i) a "multiple employer plan" within the meaning of Section 413(c) of the Code; (ii) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA); (iii) a "multi-employer plan" within the meaning of Section 3(37) of ERISA; or (iv) a defined benefit plan within the meaning for Section 3(35) of ERISA.

(e)     Except as set forth in **Section 3.20** of the Disclosure Schedules, no Benefit Plan that is a group health plan is subject to the continuation of coverage requirements of Section 601 et. seq. of ERISA ("**COBRA**") and no Seller employee is on COBRA or in a COBRA election period.

(f)     Other than as may be required under COBRA or other applicable Law, no Benefit Plan or other arrangement provides post-termination or retiree welfare benefits to any individual for any reason.

(g)     Except as set forth on **Section 3.20** of the Disclosure Schedules, there is no pending or, to Seller's Knowledge, threatened Action relating to a Benefit Plan (other than

19

routine claims for benefits), and no Benefit Plan has within the five (5) years prior to the date hereof been the subject of an examination or audit by a Governmental Authority or the subject of an application or filing under, or is a participant in, an amnesty, voluntary compliance, self-correction or similar program sponsored by any Governmental Authority.

(h)      Except as set forth in **Section 3.20** of the Disclosure Schedules, there has been no amendment to, announcement by Seller or any of its Affiliates relating to, or change in employee participation or coverage under, any Benefit Plan or collective bargaining agreement that would increase the annual expense of maintaining such plan above the level of the expense incurred for the most recently completed fiscal year with respect to any manager, officer, director, employee, consultant or independent contractor of the Business, as applicable. Neither Seller nor any of its Affiliates has any commitment or obligation or has made any representations to any manager, officer, director, employee, consultant or independent contractor of the Business, whether or not legally binding, to adopt, amend, modify or terminate any Benefit Plan or any collective bargaining agreement.

(i)      Each Benefit Plan that is subject to Section 409A of the Code has been administered in compliance with its terms and the operational and documentary requirements of Section 409A of the Code and all applicable regulatory guidance (including, notices, rulings and proposed and final regulations) thereunder. Seller does not have any obligation to gross up, indemnify or otherwise reimburse any individual for any excise taxes, interest or penalties incurred pursuant to Section 409A of the Code.

(j)      Neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former manager, officer, director, member, employee, independent contractor or consultant of the Business to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation due to any such individual; (iii) increase the amount payable under or result in any other material obligation pursuant to any Benefit Plan; (iv) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (v) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code.

### Section 3.21  Employment Matters.

(a)      **Section 3.21** of the Disclosure Schedules contains a list of all persons who are employees, independent contractors or consultants of the Business as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized.  As of the date hereof, all compensation, including wages, commissions and bonuses payable to all employees, independent contractors or consultants of the Business for services performed on or prior to the date hereof have been paid in full and there are no outstanding agreements, understandings or commitments of Seller with respect to any compensation, commissions or bonuses.

(b)      To Seller's Knowledge, Seller is not, and has not been for the past five (5) years, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), and there is not, and has not

44921005.v12

been for the past five (5) years, any Union representing or purporting to represent any employee of Seller, and, to Seller's Knowledge, no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. To Seller's Knowledge, there has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting Seller or any employees of the Business. Seller has no duty to bargain with any Union.

(c)     To Seller's Knowledge, Seller is and has been in compliance with all applicable Laws pertaining to employment and employment practices to the extent they relate to employees of the Business, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence and unemployment insurance. To Seller's Knowledge, all individuals characterized and treated by Seller as consultants or independent contractors of the Business are properly treated as independent contractors under all applicable Laws. To Seller's Knowledge, all employees of the Business classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified. To Seller's Knowledge, there are no Actions against Seller pending, or to the Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern or independent contractor of the Business, including, without limitation, any Action relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wages and hours or any other employment related matter arising under applicable Laws.

**Section 3.22    Taxes.**  Except as set forth on **Section 3.22** of the Disclosure Schedules,

(a)     To Seller's Knowledge, all Tax Returns with respect to the Business required to be filed by Seller for any Pre-Closing Tax Period have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all respects. All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)     To Seller's Knowledge, each of Seller has withheld and paid each Tax for any Pre-Closing Tax Period required to have been withheld and paid in connection with amounts paid or owing to any Employee, independent contractor, creditor, customer, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law.

(c)     To Seller's Knowledge, no extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller.

(d)     To Seller's Knowledge, all deficiencies asserted, or assessments made, against Seller as a result of any examinations by any Governmental Authority with respect to Taxes for any Pre-Closing Tax Period have been fully paid.

(e)     To Seller's Knowledge, Seller is not a party to any Action with respect to Taxes by any Governmental Authority for any Pre-Closing Tax Period. There are no pending or threatened Actions with respect to Taxes by any Governmental Authority. No Claim has ever been made by a Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction.

(f)     To Seller's Knowledge, there are no Encumbrances for Taxes upon any of the Purchased Assets nor, to Seller's Knowledge, is any Governmental Authority in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable).

(g)     To Seller's Knowledge, Seller has not been classified as a disregarded entity for U.S. federal income Tax and other relevant Tax purposes.

**Section 3.23   Brokers**.  Except for Province, Inc., whose fee shall be paid by Seller, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 3.24   Full Disclosure**.  To Seller's Knowledge, no representation or warranty by Seller in this Agreement and no statement contained in any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this **Article IV** are true and correct as of the date hereof and as of the Closing Date.

**Section 4.01   Organization and Authority of Buyer; Enforceability**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Nevada.  Buyer has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Buyer.  This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 4.02   No Conflicts; Consents**.  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the articles

44921005.v12

of organization, operating agreement or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 4.03    Legal Proceedings**.    There is no Action of any nature pending or, to Buyer's knowledge, threatened against or by Buyer that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.    No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 4.04    Brokers**.    No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 4.05    Financing**.    Buyer has sufficient cash, committed and available lines of credit or other sources of committed and available funds to enable Buyer to perform all of its obligations under this Agreement and the other Transaction Documents to which Buyer is or will be a party, including to pay the Purchase Price.

**Section 4.06    Assumed Contracts**.    Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2) of the Bankruptcy Code with respect to the Assumed Contracts.

## ARTICLE V
### COVENANTS

**Section 5.01    Conduct of Business Prior to the Closing**.    From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer, Seller shall (x) conduct the Business in the ordinary course of business consistent with past practice; and (y) maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, suppliers and others having relationships with the Business. Without limiting the foregoing, from the date hereof until the Closing Date, Seller shall:

(a)    preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

(b)    pay the debts, Taxes and other obligations of the Business when due;

(c)    continue to collect Accounts Receivable in a commercially reasonable manner;

(d)    maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(e)    continue in full force and effect without modification all Insurance Policies, except as required by applicable Law;

23

44921005.v12

(f)    perform all of its obligations under all Contracts;

(g)    maintain the Books and Records in accordance with past practice;

(h)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets; and

(i)    not take or permit any action that would cause any of the changes, events or conditions described in **Section 3.06** to occur.

**Section 5.02    Access to Information**.  From the date hereof until the Closing, Seller shall (a) afford Buyer and its representatives full and free access to and the right to inspect the Purchased Assets, the Leased Real Property, and all other properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Buyer and its representatives with such financial, operating and other data and information related to the Business as Buyer or any of its representatives may reasonably request; and (c) instruct its representatives to cooperate with Buyer in its investigation of the Business. Without limiting the foregoing, Seller shall permit Buyer and its representatives to conduct environmental due diligence of the Leased Property, including the collecting and analysis of samples of indoor or outdoor air, surface water, groundwater or surface or subsurface land on, at, in, under or from the Leased Property. For a period of six (6) months after the Closing, Seller shall allow Buyer reasonable access during normal business hours to the books and records of Seller solely to the extent relevant to any pre-Closing matter, including pre-Closing financial information germane to the Buyer's use of the Purchased Assets. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

**Section 5.03    Notice of Certain Events.**

(a)    From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)    any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in **Section 6.01** to be satisfied;

(ii)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)    any Actions commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the

24

44921005.v12

Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to **Section 3.18** or that relates to the consummation of the transactions contemplated by this Agreement.

(b)    Buyer's receipt of information pursuant to this **Section 5.03** shall not operate as an amendment, supplementation and modification of any representation, warranty or agreement given or made by Seller in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules.

### Section 5.04    Employees and Employee Benefits

(a)    Buyer may offer employment with Buyer beginning on the Closing Date to substantially all of Seller's employees, as determined by Buyer in Buyer's sole discretion. Except as otherwise provided herein, Buyer shall not be required to offer employment to any of Seller's employees.  Seller's employees hired by Buyer may be subject to Buyer's standard non-compete agreement, as determined by Buyer in Buyer's sole discretion.

(b)    Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or any other benefits payable under any Benefit Plan (including any COBRA continuation coverage), or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date.  The Seller and Buyer shall make available to the employees of Seller hired by Buyer, for a period of 65 days following the Closing, Seller's benefit plans set forth on **Schedule 1.03(d)**, at Buyer's expense.

(c)    Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, retirement, health accident or disability benefits brought by or in respect of current or former employees, managers, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Seller also shall remain solely responsible for all worker's compensation claims of any current or former employees, managers, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Closing Date.

(d)    Each employee of the Business who becomes employed by Buyer in connection with the transactions contemplated by this Agreement may be given service credit for the purpose of eligibility and vesting under Buyer's 401(k) plan, as applicable, for his or her period of service with Seller prior to the Closing Date; provided, however, that (i) such credit shall be given pursuant to payroll or plan records, at the election of Buyer, in Buyer's sole and absolute discretion; and (ii) such service credit shall be permitted and consistent with Buyer's 401(k) plan, as applicable.  In all other respects, employees of Seller hired by Buyer shall be treated as new employees for all purposes, including with respect to seniority, entitlement to vacation, accrual of "participation" credit in 401(k) plans and other fringe benefits.

25

**Section 5.05   Confidentiality**. From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use their reasonable best efforts to cause its or their respective representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of their Affiliates or their respective representatives; or (b) is lawfully acquired by Seller, any of their Affiliates or their respective representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any of its Affiliates or their respective representatives are compelled to disclose any information by judicial or administrative process or by other requirements of law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller are advised by their counsel in writing is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.06   Non-competition; Non-solicitation.**

(a)   For a period of five (5) years commencing on the Closing Date (the "**Restricted Period**"), except as permitted by this **Section 5.06**, neither Seller nor any of the Required Members shall engage, directly or indirectly, in any Competitive Activities (i) within the Restricted Area, or (ii) in any geographical or market area in which Buyer or any of its Affiliates engage in business or provide products or services or derive a material portion of their revenues or have demonstrable plans to commence business activities, or own the equity securities of, manage, operate or control, any Person that engages, directly or indirectly, in any Competitive Activities; provided, however, that with respect to the equity of any Competitive Activity that is publicly traded, ownership as a passive investor of less than 1% of the outstanding publicly traded stock shall not be deemed a violation of this **Section 5.06(a)**.

(b)   From the date hereof for a period of three (3) years from and after the Closing Date, Seller and the Required Members shall not, directly or indirectly on their own account or for the account of any other individual or entity, engage in Interfering Activities.

(c)   Seller acknowledges and agrees that its obligations set forth in this **Section 5.06** are an essential element of this Agreement and that, but for the agreement of Seller in this **Section 5.06**, Buyer would not have entered into this Agreement.   Seller acknowledges and agrees that the undertakings of Seller in this **Section 5.06** constitute an independent covenant of Seller. Seller acknowledges that it has consulted with its own counsel with regard to this **Section 5.06** and, after such consultation, agrees that its obligations set forth in this **Section 5.06** are reasonable and proper, have been negotiated fully and fairly and represent an agreement based on the totality of the transactions contemplated hereby.

(d)   In the event that any covenant contained in this **Section 5.06** should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law.   The covenants contained in this **Section 5.06** and each provision hereof are severable and distinct

26

covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

Section 5.07    **Bankruptcy Order**.  Seller and Buyer shall use their best efforts to secure the entry of the Sale Order, including, without limitation, by making its officers and other principals and Affiliates available for testimony before the Bankruptcy Court.

Section 5.08    **Consents and Approvals**.  Seller shall use reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in **Section 3.02** of the Disclosure Schedules. Each party hereto shall, as promptly as possible, (i) make, or cause to be made, all filings and submissions required under any Law applicable to such party or any of its Affiliates; and (ii) use reasonable best efforts to obtain all consents, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The Parties shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

Section 5.09    **Public Announcements**.  Unless otherwise required by applicable law, no party hereto shall make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed).

Section 5.10    **Transfer Taxes**.    All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder shall be borne and paid by Seller when due.  Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

Section 5.11    **Receivables**. From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any Purchased Asset, Seller or such Affiliates shall remit such funds to Buyer within five (5) business days after its receipt thereof.

Section 5.12    **Payment of Excluded Liabilities; Litigation Trust.** Seller shall pay, or make adequate provisions for the payment, in full of all Excluded Liabilities and other Liabilities of Seller that are not Assumed Liabilities promptly when due, and immediately following the Closing shall (i) deposit $45,000 of the proceeds of the Cash Purchase Price into a litigation trust established by Seller in accordance with the Sale Order.

Section 5.13    **Bulk Sales Laws**.    The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

27

**Section 5.14    Prorations.**  In the event that Buyer elects, in Buyer's sole discretion to continue any of the Business's utility services under existing accounts with the applicable utility providers or any of the Business's insurance policies with the applicable insurer, any related bills or premiums shall be prorated between Seller and Buyer as of the Closing Date, with the Seller responsible for the portion prior to the Closing Date, and Buyer responsible for the portion after and including the Closing Date.

**Section 5.15    Name Change.**  Within ten (10) business days following the Closing Date, Seller shall change its name to a name that has no reference to "Superior Linen" or any derivative or variation thereof, and shall make all filings necessary to effect such name change.

**Section 5.16    Further Assurances and Permit Transfer.**  Following the Closing, each of the Parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder. With respect to Seller's rights under the Permits set forth on **Section 3.17(b)** of the Disclosure Schedules that are not transferable to Buyer, Seller, to the maximum extent permitted by law, shall allow Buyer to use the Permits after the Closing until such Permits can be transferred and/or replaced with Permits in Buyer's name and further agrees to cooperate by providing assignments and assistance to Buyer as permitted by Law in connection with Buyer's efforts to obtain new Permits or transfer (to the extent transferable) existing Permits to Buyer (each, a "**Permit Transition**").  Seller shall deliver to Buyer an invoice setting forth in reasonable detail the actual cost to Seller to transfer a Permit in connection with the Permit Transition (the "**Transition Costs**"), which shall include without limitation the actual costs, fees and expenses incurred by Seller in connection with a Permit Transition. By way of illustration and not limitation, Transition Costs shall include those costs, fees and expenses that are required to be paid by or on behalf of Seller in connection with the Transition Costs to any third-party ("**Payable Party**").  Within three (3) days after receiving such invoice for any Transition Costs actually incurred by Seller, Buyer shall pay all such Transition Costs associated with the Permit Transition. In the event Seller is required to pay any Transition Costs, within three (3) days after receiving such invoice any Transition Costs, Buyer shall pay the Seller any such Transition Costs. Buyer shall defend, indemnify and hold harmless Seller, its Affiliates and their respective stockholders, directors, officers and employees from and against all claims, liabilities, costs and expenses, including attorneys' fees and disbursements, arising from any action taken by Seller at Buyer's request relating to any Permit Transition, unless resulting from Seller's gross negligence or willful misconduct.   The terms, obligations, conditions and provisions of this **Section 5.16** shall survive the Closing for a period of four (4) months.

## ARTICLE VI
### CONDITIONS TO CLOSING

**Section 6.01    Conditions to Obligations of Buyer.**  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Seller contained in this Agreement and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)     No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)     All approvals, consents and waivers that are listed on **Section 3.02** of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(e)     All Permits set forth on **Section 3.17(b)** of the Disclosure Schedules necessary for the operation of the Business by Buyer shall to the extent assignable at Closing have been assigned to Buyer or Buyer shall have obtained similar Permits to the extent Seller's Permits are non-transferrable prior to Closing and in the event such transfers cannot be made prior to Closing the Parties shall cooperate in the Permit Transition as set forth in **Section 5.16** above.

(f)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(g)     Buyer shall have completed its due diligence investigation of the Business (including the Leased Real Property and the Purchased Assets) and the results thereof shall be satisfactory to Buyer in its sole discretion, including, without limitation, with respect to Buyer's environmental review.

(h)     Seller shall have delivered to Buyer the documents set forth in **Section 2.02(a)**.

(i)     All Encumbrances relating to the Purchased Assets shall have been released in full, other than Permitted Encumbrances, and Seller shall have delivered to Buyer written evidence, in form satisfactory to Buyer in its sole discretion, of the release of such Encumbrances.

(j)     The Sale Order authorizing the sale of the Purchased Assets to the Buyer pursuant to this Agreement shall have been entered, shall not be stayed, and shall be in form and substance satisfactory to Buyer in its sole discretion.

(k)     Seller shall have delivered to Buyer such other agreements, documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(l)     The North Las Vegas Settlement Agreement shall have been amended on terms and conditions satisfactory to Buyer in its sole discretion.

(m)     The Bankruptcy Court shall not have entered an order (i) appointing a trustee or examiner with expanded powers or (ii) dismissing the Bankruptcy Case or converting the chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.

(n)     All environmental certificates are obtained in Buyer's sole discretion.

**Section 6.02  Conditions to Obligations of Seller.**  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Buyer contained in this Agreement shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)     No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)     The Sale Order authorizing the sale of the Purchased Assets to the Buyer pursuant to this Agreement shall have been entered, and shall not be stayed.

(e)     Buyer shall have delivered to Seller the documents set forth in **Section 2.02(b)**.

## ARTICLE VII
### INDEMNIFICATION

**Section 7.01  Survival.**  All representations, warranties, covenants and agreements contained herein and all related rights to indemnification shall survive the Closing for a period of two (2) years.

**Section 7.02  Indemnification By Seller.** Seller shall defend, indemnify and hold harmless Buyer, its affiliates and their respective stockholders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements, arising from or relating to (collectively, "**Damages**"):

(a)     any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or any document to be delivered hereunder;

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement or any document to be delivered hereunder; or

(c)     any liability of Seller relating to the Purchased Assets.

**Section 7.03    Indemnification By Buyer.** Buyer shall defend, indemnify and hold harmless Seller, its affiliates and their respective stockholders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements, arising from or relating to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or any document to be delivered hereunder; or

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement or any document to be delivered hereunder.

**Section 7.04    Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any Damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

**Section 7.05    Tax Treatment of Indemnification Payments.** All indemnification payments made by Seller under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

**Section 7.06    Effect of Investigation.** Buyer's right to indemnification or other remedy based on the representations, warranties, covenants and agreements of Seller contained herein will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

31

**Section 7.07    Cumulative Remedies.** The rights and remedies provided in this **Article VII** are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**Section 7.08    Limitations.**  Seller shall have no liability with respect to claims under **Section 7.02(a)** until the total Damages with respect to such indemnified matters exceeds Twenty Five Thousand Dollars ($25,000.00)(the "**Threshold**"), in which event Seller will be liable for all Damages without regard to the Threshold, and Seller's aggregate liabilities under this **Article VII** with respect to claims under **Section 7.02(a)** shall be limited to Damages of One Million Dollars ($1,000,000.00); provided, however, that such limitations under this Section 7.08 will not apply to claims (i) for breaches of Seller's representations under **Sections 3.01, 3.02, 3.05, 3.08, 3.19, 3.22** or **3.23**, or (ii) arising out of Seller's fraud or willful misconduct.

## ARTICLE VIII
### TERMINATION

**Section 8.01    Termination.**  This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer by written notice to Seller if:

(i)    Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VI** and such breach, inaccuracy or failure has not been cured by Seller within ten days of Seller's receipt of written notice of such breach from Buyer;

(ii)    any of the conditions set forth in **Section 6.01** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by May 2, 2017, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)    if (A) Seller seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) Seller seeks or otherwise takes material steps in furtherance of, or does not use commercially reasonable efforts to oppose any other Person in seeking, the entry of an order by the Bankruptcy Court appointing a trustee in the Bankruptcy Case or an examiner with enlarged powers relating to the operation of the Seller's Business, (C) the Bankruptcy Court orders, for any reason, an order of a type identified in clause (A) or (B) above or (D) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any material Purchased Assets; or

44921005.v12

(iv)    the Sale Order is not entered by the Bankruptcy Court within twenty five (25) days of the entry of this Agreement.

(c)    by Seller by written notice to Buyer if:

(i)    Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VI** and such breach, inaccuracy or failure has not been cured by Buyer within ten days of Buyer's receipt of written notice of such breach from Seller;

(ii)    any of the conditions set forth in **Section 6.02** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by May 2, 2017, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(iii)    a transaction with respect to a superior bid is consummated with another purchaser other than Buyer with the approval of the Bankruptcy Court.

(d)    by Buyer or Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 8.02   Effect of Termination**.  In the event of the termination of this Agreement in accordance with this **Article VIII**, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)    as set forth in this **Article VIII**, **Section 5.05** and **Article IX** hereof; and

(b)    that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

## ARTICLE IX
### MISCELLANEOUS

**Section 9.01   As-Is Conveyance**.  Buyer agrees that, upon the Closing, Buyer shall conclusively be deemed to have accepted the Purchased Assets and Assumed Liabilities, in their then existing condition, "AS IS, WHERE IS AND WITH ALL FAULTS" without representation or warranty of any kind or nature whatsoever except as expressly set forth in this Agreement.

33

**Section 9.02    Expenses**.    All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

**Section 9.03    Notices**.    All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.    Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this **Section 9.03**):

| | |
|---|---|
| If to Seller: | Superior Linen, LLC<br>Attn: Mr. Robert E. Smith<br>4501 Mitchell Street<br>North Las Vegas, Nevada 89081<br>E-mail: robert.smith@superiorlinen.com |
| with a copy to: | Larson & Zirzow<br>Attn. Mathew C. Zirzow, Esq.<br>850 E. Bonneville Ave.<br>Las Vegas, Nevada 89101<br>E-mail: mzirzow@lzlawnv.com |
| If to Buyer: | Las Vegas Linen LLC<br>c/o Pure Star Group<br>1 West Mayflower Ave.<br>N. Las Vegas, Nevada 89030<br>Attn. Dave Barron<br>Email: dbarron@purestargroup.com |
| with a copy to: | Zev Bomrind<br>Fox Rothschild LLP<br>101 Park Avenue, 17th Floor<br>New York, NY 10178<br>E-mail: zbomrind@foxrothschild.com |
| If to Unsecured Creditor's Committee: | Morris Polich & Purdy LLP<br>Attn: Candace C. Carlyon, Esq.<br>3800 Howard Hughes Parkway<br>Suite 500<br>Las Vegas, Nevada 89169<br>Email: CCarlyon@MPPLAW.com |

34

**Section 9.04    Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole; (d) "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase will not mean simply "if"; and (e) "in the ordinary course of business" shall be deemed to be followed by the words "consistent with past practice". Unless the context otherwise requires, references herein: (x) to Articles, Sections, Appendixes, Schedules, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Appendixes, Schedules, Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute and any regulations promulgated thereunder as of the date hereof. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted. The Appendixes, Schedules, Disclosure Schedules, and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 9.05    Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.06    Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.07    Entire Agreement**.  This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Appendixes, Schedules, and the Exhibits, the statements in the body of this Agreement will control.

**Section 9.08    Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns. No Party may assign its rights or obligations hereunder without the prior written consent of the Seller and Buyer, which consent shall not be unreasonably withheld or delayed; provided that, Buyer may assign any of its rights, interests or obligations hereunder, in whole or in part, to one or more of its Affiliates and Buyer may assign any of its rights as collateral security to a lender to Buyer or any of its Affiliates (and, if requested by such lender, Seller agrees to execute and

acknowledge, in form and substance reasonably acceptable to Seller, any such assignment). In any event, no assignment shall relieve the assigning Party of any of its obligations hereunder.

**Section 9.09   No Third-Party Beneficiaries**.  Except as provided in **Article VII**, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.10   Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.11   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)    Except to the extent Bankruptcy law applies, this Agreement shall be governed by and construed in accordance with the internal laws of the State of Nevada without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Nevada.

(b)    Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, any other Transaction Document or any of the Transactions, exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Case remain open and (b) after the close of the Bankruptcy Case or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the District of Nevada or any Nevada State court sitting in Las Vegas (together with the Bankruptcy Court, the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement and any other related transactions, (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if notice is given in accordance with Section 9.02.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE DOCUMENTS DELIVERED HEREWITH IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS

AGREEMENT, THE DOCUMENTS DELIVERED HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **SECTION 9.10(c)**.

**Section 9.12    Specific Performance**.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.13    Post-Closing Office**.  From and after the Closing Date and for a period of up to Ninety (90) days thereafter, Buyer may provide Seller's Designated Responsible Person with a furnished office (desk, chair, computer and telephone) at 4501 Mitchell Street, North Las Vegas, Nevada 89081 which shall include: (i) a computer and network access to Seller's pre-Closing books and records; (ii) telephone line and internet access; and (iii) access to the office from 9:00 am to 5:00 pm, Business Days.  In the event Buyer does not provide an office as contemplated above, Buyer shall from and after the Closing Date and for a period of up to Ninety (90) days thereafter, provide Seller's Designated Responsible Person with remote electronic access to Seller's data, files, books and records stored in an electronic format on the network and servers of Seller as of the Closing Date.  All access provided by Buyer under this Section 9.13 to Seller's Designated Responsible Person shall be for the sole purposes, and limited to the extent necessary, to allow Seller's Designated Responsible Person to administer the estate of Seller in the Bankruptcy Case or to cause Seller to comply with its obligations under this Agreement or applicable Law.

**Section 9.14    Document Retention/Sharing**.  From the Closing Date through the second anniversary of the Closing Date, Buyer shall, at Seller's reasonable request, provide Seller and its representatives, upon reasonable notice and during normal business hours, with access to, and the right to make copies of, any records and documents related to the Business included in the Purchased Assets as may be necessary or useful in connection with Seller's Chapter 11 Case (or any adversary proceedings or contested matters arising therein or related thereto) or for the preparation of any filings with any Governmental Authority to be made by Seller.

**Section 9.15    Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

37

44921005.v12

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**Seller:**                                    **Buyer:**

**SUPERIOR LINEN, LLC,**                        **LAS VEGAS LINEN LLC,**
a Nevada limited liability company:            a Nevada limited liability company:


                                               By: _____
By: _____                  Name:
Name:  Robert E. Smith                         Its:
Its:      Designated Responsible Person

**APPENDIX A**

**TO**

**ASSET PURCHASE AGREEMENT**
**Dated May 31, 2017**

The following terms have the meanings specified or referred to in this **Appendix A**:

"**Accounts Receivable**" has the meaning set forth in **Section 1.01(a)(i)**.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly of twenty percent (20%) or more of all outstanding and issued membership interests, shares, stocks or ownership interests of a Person, or the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Assumed Contracts**" means the Contracts listed on **Section 1.03(d)** of the Disclosure Schedules, each as assigned to Buyer, with consent, where required, subject to the rights of Buyer to designate such Contracts under **Section 1.08**.

"**Assumed Liabilities**" has the meaning set forth in **Section 1.03**.

"**Avoidance Actions**" means any and all actual or potential claims or causes of action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including §§ 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a), other than against any counterparty to an Assumed Contract or any other Contract assumed by Buyer.

"**Balance Sheet**" has the meaning set forth in **Section 3.04**.

"**Balance Sheet Date**" has the meaning set forth in **Section 3.04**.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Benefit Plan**" has the meaning set forth in **Section 3.20(a)**.

"**Books and Records**" has the meaning set forth in **Section 1.01(e)**.

"**Business**" has the meaning set forth in **Recital A**.

A-1

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York or Las Vegas, Nevada are authorized or required by Law to be closed for business.

"**Business Relation**" means any current or prospective client, customer, licensee, supplier, or other business relation of Buyer or the Business, or any such relation that was a client, customer, licensee or other business relation within the prior six (6) month period, in each case, with whom any Seller transacted business or whose identity became known to any Seller in connection with its relationship with, or employment by, Buyer or the Business.

"**Cash Purchase Price**" has the meaning set forth in **Section 1.05**.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**Claim**" means a claim against Debtor as defined in the Bankruptcy Code and including, but not limited to, administrative claims or expenses as defined by 11 U.S.C. § 503.

"**Closing**" has the meaning set forth in **Section 2.01**.

"**Closing Date**" has the meaning set forth in **Section 2.01**.

"**Closing Certificate**" has the meaning set forth in **Section 1.06**.

"**COBRA**" has the meaning set forth in **Section 3.20(e)**.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Competitive Activities**" means any business activities that are directly or indirectly related to (a) laundry and dry-cleaning services (including, without limitation, the washing of linens and dry cleaning of uniforms for commercial establishments), (b) linen supply or rental, (c) the provision of retail and wholesale goods to commercial establishments in respect of laundry services or linen supply, or (d) any other business activity that is competitive with the then current or demonstrably planned business activities of the Buyer or the Business.

"**Contract**" or "**Contracts**" means with respect to any Person, all legally binding agreements, undertakings, contracts, obligations, understandings and commitments, whether written or oral and together with all amendments, modifications or supplements thereof, (i) to which such Person is a party, (ii) under which such Person has any rights, (iii) under which such Person has any liability or (iv) by which such Person, or any of the assets or properties owned or used by such Person, is bound, including without limitation any agreement, contract, lease, sublease, purchase order, arrangement, commitment, license, franchise, indenture, note, bond, obligation, undertaking or other legally binding arrangement.

"**Customer Contracts**" has the meaning set forth in **Section 1.01(c)**.

"**Customers**" has the meaning set forth in **Section 3.13**.

A-2

"**Designated Responsible Person**" means Mr. Robert E. Smith.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, lease, option, title defect, adverse interest, encroachment or other similar encumbrance that is not a Permitted Post-Closing Lien.

"**Environmental Claims**" means any action, suit, claim, investigation or other legal proceeding by any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) any actual or alleged Release of, threatened Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Laws**" means any Law, and any Governmental Order or binding agreement with any Governmental Authority regulating, relating to or imposing standards of conduct concerning protection of the environment or of human health (as affected by exposure to hazardous substances), including any such Laws, Governmental Orders, or agreements: (a) relating to emissions, discharges, Releases or threatened Releases of hazardous substances, Hazardous Materials, pollutants, contaminants, chemicals, wastes or other substances into the environment or (b) relating to the identification, generation, manufacture, processing, distribution, use, treatment, storage, disposal, recovery, transport or other handling of hazardous substances, Hazardous Materials, pollutants, contaminants, chemicals, or wastes. The term "Environmental Law" includes, without limitation, the following (including all amendments thereof, all their implementing regulations and any state analogs): CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq. (as it applies to human exposure to hazardous substances).

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim (a) relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit; or (b) regarding any Hazardous Materials.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Excluded Assets**" has the meaning set forth in **Section 1.02**.

"**Excluded Contracts**" has the meaning set forth in **Section 1.02(d)**.

"**Excluded Liabilities**" has the meaning set forth in **Section 1.04**.

"**Excluded Payables**" has the meaning set forth in **Section 1.04(h)**.

"**Financial Statements**" has the meaning set forth in **Section 3.04**.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: all pollutants, contaminants, hazardous substances, hazardous wastes, toxic wastes, and any other carcinogenic, ignitable, corrosive, reactive, toxic or otherwise hazardous substances or materials as defined in or subject to regulation, control, or remediation under the Environmental Laws. "Hazardous Materials" shall include: (a) any "hazardous waste" as defined by the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., as amended; (b) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq., as amended; (c) asbestos-containing materials, polychlorinated biphenyls, radioactive materials, or urea-formaldehyde; and (d) spilled or leaked petroleum products, distillates, or fractions.

"**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (a) trademarks, trade names, corporate names, service marks, and all other source indicators including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights and copyrighted works, including all applications and registrations related to the foregoing; (c) trade secrets; (d) patents and patent applications; (e) internet domain name registrations; and (f) all other intellectual property and related proprietary rights, interests and protections.

"**Intellectual Property Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used in or

A-4

necessary for the conduct of the Business as currently conducted to which Seller is a party, beneficiary or otherwise bound.

"**Interfering Activities**" shall mean (a) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, Buyer or the Business to terminate such Person's employment or services (or in the case of a consultant, materially reducing such services) with Buyer or the Business; (b) hiring any individual who was employed by Buyer or the Business within the twelve (12) month period prior to the date of such hiring; or (c) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Business Relation to cease doing business with or reduce the amount of business conducted with Buyer or the Business, or in any way interfering with the relationship between any such Business Relation and Buyer or the Business.

"**Insider Claims**" means all claims or causes of action against any and all current or former officers, directors, members, managers, required members, shareholders or other equity security holders of the Seller, including without limitation, RD VII Investments, LLC.

"**Inventory**" has the meaning set forth in **Section 1.01(d)**.

"**Law**" means any statute, law (including common law), ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Lease Agreement**" has the meaning set forth in **Section 1.01(f)**.

"**Leased Property**" has the meaning set forth in **Section 1.01(f)**.

"**Leased Real Property**" has the meaning set forth in **Section 3.10**.

"**Leases**" has the meaning set forth in **Section 3.10(a)**.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Losses**" means any claims, actions, suits, demands, disbursements, assessments, judgments, losses, liabilities, Taxes, damages, settlements, losses, costs and expenses, including, without limitation, interest, penalties, reasonable attorneys' and accounting fees and investigation costs.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, prospects, condition (financial or otherwise) or assets of the Business, taken as a whole (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; provided, however, that none of the following will constitute a Material Adverse Effect: any event, change, circumstance, effect or other matter resulting from or related to (i) any outbreak or escalation of

A-5

war or major hostilities or any act of terrorism, (ii) changes in Laws, GAAP or enforcement or interpretation thereof, (iii) changes that generally affect the industries and markets in which the Seller operates, (iv) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs) or political conditions, (v) any action taken or failed to be taken pursuant to or in accordance with this Agreement or at the request of, or consented to by, the Buyer, or (vi) the execution or delivery of this Agreement or the public announcement or other publicity with respect to any of the foregoing.

"**Material Contracts**" has the meaning set forth in **Section 3.07(a)**.

"**Officer's Certificate**" has the meaning set forth in **Section 2.02(a)(vi)**.

"**Permit**" means, with respect to any Person, any license, franchise, permit, consent, approval, right, privilege, exemption, certificate or other similar authorization issued by, or otherwise granted by, any Governmental Authority or any other Person, to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"**Permitted Post-Closing Liens**" means (i) statutory liens for Taxes not yet due and payable; or (ii) mechanics, carriers', workmen's, repairmen's or other similar liens arising or incurred in the ordinary course of business for payment of amounts that are not delinquent and which are not, individually or in the aggregate, material in amount.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Purchased Assets**" has the meaning set forth in **Section 1.01**.

"**Qualified Benefit Plan**" has the meaning set forth in **Section 3.20(c)**.

"**Real Property**" means the real property owned, leased or subleased by the Seller, together with all buildings, structures and facilities located thereon.

"**Release**" means the releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandoning, or disposing (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Material).

"**Required Members**" means: (i) Fortuna Partners One, LLC; (ii) Little Current, LLC; (iii) BrightLight Holdings, LLC; and (iv) Rex Runzheimer Living Trust.

"**Restricted Area**" means the State Nevada.

"**Seller's Knowledge**" or "**Knowledge of Seller**" means the actual or constructive knowledge of Robert E. Smith, including the knowledge that would be expected to be obtained after reasonable inquiry.

"**Suppliers**" has the meaning set forth in **Section 3.13**.

"**Tax**" or "**Taxes**" means all U.S. federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, capital gains, capital stock, value added, alternative or add-on minimum, escheat, unclaimed property, windfall profits, customs, duties or other taxes, levies, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document filed or required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Total Consideration**" has the meaning set forth in **Section 1.05**.

"**Union**" has the meaning set forth in **Section 3.21(b)**.

A-7

**EXHIBIT A**

**FORM OF BILL OF SALE**

# Bill of Sale and Assignment Agreement

## (Superior Linen LLC)

**1.**    **Identification and Parties**.  This Bill of Sale and Assignment Agreement (this "**Bill of Sale**") is made and entered into effective as of May 31, 2017, by and between **SUPERIOR LINEN, LLC**, a Nevada limited liability company ("**Seller**"), in favor of **LAS VEGAS LINEN LLC**, a Nevada limited liability company ("**Buyer**").

**2.**    **Recitals.**

2.1    Seller and Buyer entered into that certain Asset Purchase Agreement dated May 31, 2017 for the acquisition of the Business upon the terms, conditions and obligations set forth therein (the "**Agreement**").  All capitalized terms used but not defined in this Bill of Sale shall have the meanings ascribed to such terms in the Agreement.

2.2    Under the Agreement, among other things, Seller agreed to sell to Buyer, and Buyer agreed to purchase from Seller, the Business, including the Purchased Assets.

2.3    The Agreement requires the execution and delivery of this Bill of Sale.

In order to consummate the transaction contemplated by the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller desires to execute this Bill of Sale in favor of Buyer.

**3.**    **Bill of Sale and Assignment Agreement**.

3.1    Seller assigns, sells, transfers, conveys and delivers to Buyer all of Seller's right, title and interest in the Purchased Assets including, without limitation, the Purchased Assets described on **Exhibit A** attached hereto and incorporated herein by this reference.

3.2    By acceptance of this Bill of Sale, Buyer hereby accepts the assignment, sale, transfer, conveyance and delivery set forth in Section 3.1 above.

3.3    Notwithstanding any provision of Section 3.1 to the contrary, the Purchased Assets shall not include any Excluded Assets listed on **Exhibit B** attached hereto and incorporated herein by this reference.

3.4    Except as otherwise expressly set forth in Article III of the Agreement, the Purchased Assets are assigned, sold, transferred, conveyed and delivered hereunder without representation or warranty of any kind or nature whatsoever, whether statutory, express or implied, including, without limitation, any warranty of fitness or merchantability.  Without in any way limiting the generality of the preceding sentence, Section 3.08, Section 3.09 and Section

44921005.v12

9.01 of the Agreement are hereby incorporated herein by these references as though they were set forth in full herein.

**4.** **Miscellaneous**.

4.1    Entire Agreement.  This Bill of Sale and the Agreement are the entire agreement between the parties hereto with respect to the subject matter hereof, and incorporate all prior agreements and understandings of the parties hereto. The scope, nature and extent of the Purchased Assets are set forth in the Agreement.  Nothing herein contained shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Agreement in any manner whatsoever.  This instrument does not create or establish liabilities or obligations not otherwise created or existing under or pursuant to the Agreement.   In the event of any conflict or other difference between the Agreement and this Assignment, the provisions of the Agreement shall control.

4.2    Amendments in Writing.  No amendment or modification of this Bill of Sale shall be valid unless the amendment or modification is in writing and signed by Seller and Buyer.

4.3    Counterparts.  This Bill of Sale may be executed in one or more duplicate counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Seller has executed this Bill of Sale to be effective as of the date first set forth above.

**Seller:**

**SUPERIOR LINEN, LLC,**
a Nevada limited liability company:


By: _____
Name:   Robert E. Smith
Its:     Designated Responsible Person

# EXHIBIT B

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

## Assignment and Assumption of Contracts

### (Superior Linen LLC)

1. **Identification and Parties**. This Assignment and Assumption of Contracts (this "**Assignment**") is made and entered into effective as of May 31, 2017, by and between **SUPERIOR LINEN, LLC**, a Nevada limited liability company ("**Assignor**"), and **LAS VEGAS LINEN LLC**, a Nevada limited liability company ("**Assignee**").

2. **Recitals**.

2.1    Seller and Buyer entered into that certain Asset Purchase Agreement dated May 31, 2017 for the acquisition of the Business upon the terms, conditions and obligations set forth therein (the "**Agreement**"). All capitalized terms used but not defined in this **Assignment** shall have the meanings ascribed to such terms in the Agreement.

2.2    The Agreement requires the execution and delivery of this Assignment in order to convey to Assignee all of Assignor's right, title and interest in and to the Assumed Contracts (including without limitation, subject to Section 1.08 of the Agreement, the Customer Contracts), the North Las Vegas Settlement Agreement and Assumed Liabilities, including those listed on **Exhibit A** attached hereto (collectively, the "**Contracts**").

In order to consummate the transaction contemplated by the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee desire to execute this Assignment.

3. **Assignment and Assumption**.

3.1    Assignor hereby assigns to Assignee all of Assignor's right, title and interest in, to and under the Contracts.

3.2    Assignee hereby accepts the assignment set forth in Section 3.1, and assumes and agrees to perform all obligations, duties, undertakings and liabilities of Assignor under the Contracts.

3.3    Except as otherwise expressly set forth in Article III of the Agreement, Assignor's right, title and interest under the Contracts are assigned hereunder without representation or warranty of any kind or nature whatsoever, whether statutory, express or implied. Without in any way limiting the generality of the preceding sentence, Section 3.08 and Section 9.01 of the Agreement are hereby incorporated herein by these references as though they were set forth in full herein.

44921005.v12

4. **Miscellaneous**.

4.1    Entire Agreement.  This Assignment and the Agreement are the entire agreement between the parties hereto with respect to the subject matter hereof, and incorporate all prior agreements and understandings of the parties hereto.  The scope, nature and extent of the Assumed Contracts and the Assumed Liabilities are set forth in the Agreement.  Nothing herein contained shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Agreement in any manner whatsoever.  This instrument does not create or establish liabilities or obligations not otherwise created or existing under or pursuant to the Agreement.  In the event of any conflict or other difference between the Agreement and this Assignment, the provisions of the Agreement shall control.

4.2    Amendments in Writing.  No amendment or modification of this Assignment shall be valid unless the amendment or modification is in writing and signed by Assignor and Assignee.

4.3    Counterparts.  This Assignment may be executed in one or more duplicate counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

*[Signature Page Follows]*

44921005.v12

IN WITNESS WHEREOF, Assignor and Assignee have entered into this Assignment to be effective as of the date first set forth above.

**Assignor:**

**SUPERIOR LINEN, LLC,**
a Nevada limited liability company:


By: _____
Name:  Robert E. Smith
Its:       Designated Responsible Person

**Assignee:**

**LAS VEGAS LINEN LLC**, a Nevada limited liability company:


By: _____
Name:
Its:

# ASSET PURCHASE AGREEMENT

## DISCLOSURE SCHEDULES

SECTION 1.01(b):
FIXED ASSETS

## Fixed Assets located at Mitchell Property.

| QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL |
|---|---|---|---|---|
| 1 | (1998) 12-Compartment Continuous Tunnel Washer, to Include: Milnor Stainless Steel Incline Conveyor; (3) Milnor 4-Compartment Continuous Batch Washers; Milnor Laundry Press; Milnor Incline Load Conveyor; Milnor Shuttle Conveyor; (5) Milnor Natural Gas Fired Double Batch Dryers; Milnor Reuse Water Tank Assembly; Milnor Flow Lifter Tank; Milnor Splitter Tank; Milnor Controls; Milnor Inverter Drive; Milnor Control Center. | Milnor | (7603954M) w/ Incline Load Conveyor, COINC11; Washers, Model's 76039S4F, 76039S4L & 76039S4M; Laundry Press, MP1603 R; Load Conveyor, CONW306 (H 35.5'W x Approx. 21'L); Shuttle Conveyor, COSH0112; Batch Dryers, 64058TG1; Tank Assembly, ReUseWat; Lifter Tank, FlowLift; Splitter Tank, SPLI Flow; Controls, Mentor; Inverter Box; Control Center, "Belbow"; | (7094002) w/ Incline Load Conveyor, S/N AAG/0201072601, (2002); Washers, S/N's ABK/7094001, ABK/7094002 & ABK/7094004, (1998); Laundry Press, S/N AAB/0201030901, (2002); Load Conveyor, S/N-AAOn094060, (1998); Shuttle Conveyor, S/N AAB/0201071901, (2002); Batch Dryers, S/N's AAB/0200982401, AAB/0200987201, AAB/0200987101, AAB/0200982501 & AAB/0200982301, (2002); Water Tank Assembly, S/N AAJn7094040, (1998); Flow Lifter Tank, S/N AAHn094042, (1998); Splitter Tank, S/N AAHn094041, (1998); Controls, S/N 7094001, (1998); Inverter Drive Box, S/N AADn094076, (1998); Control Center, S/N AAA/0200959201, (2002). |
| 1 | (2001) 15-Compartment Continuous Tunnel Washer, (450-Lbs./Hr.) to Include: Lavatec Stainless Steel Incline Conveyor; Lavatec Water Extraction Press; (5) Lavatec Batch Washers, Lavatec Shuttle Conveyor, (5) Lavatec Steam Type Double Batch Dryers (2,050,000-BTU/Hr.), , Lavatec Controls, Lavatec 36"W x Approx. 60' Off-Load Conveyor, Fiberglass Lint Collection System. | Lavatec | Incline Conveyor 36"W x Approx. 40'L, Model LT 50 X 15 CT 110-Lb; Press, Model LP571 110-Lb; Batch Washer, Model LI150 350-Lb.; Shuttle Conveyor, Model DHF 10.24 2 x 440-Lb.; Dryers, Model TT 756-D 450-Lb.; Controls, Model 150; ULTRAX. | Press, S/N 571.0959, (2006); Batch Washer, S/N 50.466, 50465, 50466, 50467, 50468 & 50469; Shuttle Conveyor, S/N 100.1208, (2001); Dryers, S/N's 756.0483, 756.0484, 756.0485, 756.0486 & 756.0487, (2001); Controls, S/N 150.0426, (2001); |

| Qty | Description | Make/Model | Serial/Other | Serial/Other |
|---|---|---|---|---|
| 1 | (2003) 16-Compartment, 200- Lb. Continuous Tunnel Washer, to include: Stainless Steel Natural Gas Fired Steam Type, 3,915,000-BTU/Hr., Lavatec Incline Conveyor, Lavatec Water Extraction Press, Lavatec Elevator Lift, Lavatec Controls, | Lavatec | (LT-90X16-BT) w/ Incline Conveyor 36"W x Approx. 40'L, 4PALC-90-301; Press Model LP583 200-Lb.; Controls, Model 150-LT90X16-BT; Shuttle Lift typr 150 | (90.007) w/ Incline Conveyor 28-301528; Press, S/N 583.0106, (2003/2010); Controls, S/N 90.007, (2003); Shuttle Lift, S/N 150.0587. |
| 1 | Washer - Type Ex30C | Wascomat #1 | 686252768 | 0012000156930986252768 |
| 1 | Washer - | B&C #2 | HE-60-A2-24ANN-ABA | 006971 |
| 1 | Ridgid Mount Open-Pocket Washer Extractor, (2009), 125-Lb. Capacity, 19.2 Cu. Ft. Cylinder Volume; with 10-Hp Motor & Controls | Unimac #3 | UW125PVQU | 06092593003226   9 |
| 1 | Washer – 135lb | Unimac #4 | UF135PVQU30001 | 3060192413 |
| 1 | Washer – 85lb | Unimac #5 | UW85PVQU20001 | 0995068714 |
| 1 | Ridgid Mount Open-Pocket Washer Extractor, (2005), 140-Lb. Capacity, 42" Cylinder Dia., 26" Cylinder Depth. 20.8 cu. Ft. Cylinder Volume ,33 & 40 RPM Wash Speeds, 10-Hp Motor & Controls | Milnor #6 | 42026V6J | AAQ/0502421101 |
| 2 | Ridgid Mount Open-Pocket Washer Extractors, (2002), 125-Lb. Capacity, 19.2 cu. Ft. Cylinder Volume; with 10-Hp Motor & Controls | Unimac #7 & #8 | UW125PVQU50002 | 090219340 & 090219341 |
| 1 | 450 lb. open pocket washer extractor (1999) | Brim #9 | 4523020030 | 459808100 |
| 1 | 450 lb., Open-Pocket Washer Extractor, (2009), 48" Door Opening, 136.75" Max. Tilting Height, 68" Cylinder Dia., 36" Cylinder Depth,75.6 cu. Ft. Cylinder Volume, 25 -32 RPM Wash Speeds , 40-Hp Motor & Controls | Milnor #10 | 68036F5N | AAB/0903779601 |
| 6 | Spreaders/Feeders | Sager | 08 AC | 40331 |

| | | | | |
|---|---|---|---|---|
| 1 | Natural Gas Industrial Dryer, (2003),310-Lb.Max. Capacity, 62.5" Tumbler Dia., 60" Tumbler Depth, 106.5 cu. Ft. Tumbler Volume,36.75" x 43" Door Opening, 1,125,000 Btu/Hr. Opening, | American Dryer Corporation #7 | 310 | 48 1214 |
| 1 | Dryer<br>Dryer<br>Dryer<br>Dryer<br>Natural Gas Industrial Dryer, (2001), 125-Lb. Max. Capacity, 44" Tumbler Dia., 41" Tumbler Depth, 36.1 cu. Ft. Tumbler Volume,26.875" Door Opening, 300,000 Btu/Hr. | Kenmore #1<br>Cissell #2<br>Cissell #3<br>Cissell #4<br>Cissell #5 | Elite<br>L36CD36G<br>L44CD42G<br>L44AD42G<br>H0125G | 2145-384<br>12508-390<br>246<br>2012014574 |
| 1 | Dryer<br>4501b.Gas Heated Dryer with Stainless Steel Lint Trao | Cissell #6<br>Consolidated #8 | L44CD426<br>194GP | 12507-390 |
| 1 | 800mm Dia.3-Roll Flatwork Ironer,(2001), 3,000mm Working Width; with Jensen Draping Stacker Single Storage Bar Draping Stacker; Jensen Silverline Plus Automatic Folder/Crossfolder, S/N 551240 , (2001); & PLC Controls | Jensen | Jenroll EX8 | 650353 |
| 1 | 1,300mm Dia. 2-Roll Flatwork Ironer, (2004); with Chicago Belt Spreader; Chicago Skyline 2000 S-10-2000 120" 2-Lane Automatic Folder/Crossfolder,S/N 53077 5/05, (2005), 80 to 200 FPM & PLC Controls | Chicago | Century 5200 Cent1152ST | 52000 5/04 |
| 1 | 1,300mm Dia. 2-Roll Flatwork Ironer, (2006); with Chicago Belt Spreader·& PLC Controls | Chicago | Century 5200 Cent1152ST | 53315 1/6 |

| | | | | |
|---|---|---|---|---|
| 3 | Rebuilt, 8 roll Steam Heated Ironers | American | Hypro's | |
| 1 | 42"W x 71"1_ Small Piece Folder, (2004), with Jensen Compact Plus Sin11e Stora11e Bar Stacker·& PLC Controls | Jensen | Butterfly | 37-6148-CP |
| 1 | 36'W x 72"L Small Piece Folder (2005) | Chicago # | Air Chicago | 53098 5/05 |
| 1 | Folder | Chicago #1 | Air Chicago | 56419 5/08 |
| 2 | 36"W x 72"L Small Piece Folder, (2005) | Chicago #2 & #3 | Air Chicago | 53316 7/05 & 53317 7/05 |
| 1 | 36"W x 72"L Small Piece Folder, (2008} | Chicago #4 | Air Chicago | 56281 3/08 |
| 2 | 120" 2-Lane Automatic Folder/Crossfolder, (2008). 80 to 200 FPM; with Chicago King Edge 120" 2-Lane Automatic Spreader/Feeder, S/N 54606 12/06, (2006), 30 to 150 FPM; Chicago Max Stack Stacker; & PLC Controls | Chicago | Skyline 2000 S- 16-2000 | 56280 3/08 |
| 1 | 100" to 140" Blanket Folder/Crossfolder, (2005), Maximum Speed: 200-F PM 878 to 1 285 Blankets/Hr. ·with Larae Piece Stacker blanket folder (1993) | Lavatec | Lavafold | BFORV0501021 |
| 1 | | Lavatec | b200 | b200r109313 |
| 1 | 2000 Automatic Folder / Cross folder w Jensen single storage Bar draping stacker | Jensen | Silverline Plus | 551190 |
| 1 | 2005 Automatic Small piece folder 36 x 72 | Chicago | | 53099 |
| 1 | 5-Lane Stack-n-Store w/ Siemens Controls | Laundry List | invoice M7718 | ST092314 |
| 1 | Hydraulic Dump Hopper with 28"W x Approximately 30'L Power Belt Conveyor | Speed Check Conveyor #2 | | |
| 1 | 30"W x 36'L Soiled Linen Sort Conveyor with Platform | Hvtrol #1 | TL | 137795 |
| 1 | New Vertical Cart Dumper | Speed Check | SCCD | |
| 1 | Slider Bed Model 700SB | Sierra Conveyor | 141386 | |
| 1 | Slider Bed for 42" 65' Conveyor | Sierra Conveyor | 141464 | |

5

| | | | |
|---|---|---|---|
| 1 | Waste Water Treatment System, To Include: T.E.A. 19023 Plate & Frame Heat Exchanger; T.E.A. Custom Designed & Fabricated System 2000 Waste Water Recovery Unit; 48" x 17" Plate Pack with (107) Plates; 375-Gallon Holding Tank; & 7,000-Gallon Cold Water Tank | TEA | |
| 1 | Waste Water Heat Recovery System; with Plate & Frame Heat Exchanger, (1986), with 54-Plates | Thermal Engineering of Arizona (T.E.A .) | TS-5m |
| 1 | 1O" to 18.5'W Taper x 50"L Steam Type Tapered Laundry Presses, (1992) | American Ajax | 554-C | 295402811191 |
| 1 | Double Buck Steam Type Laundry Press, (2000) | Unipress | *CRD* | 311321 |
| 1 | Heat Sealing Machine | Texasomation Products | ES32 | 475 |
| 1 | Steam Type Sleeve Press, (2001) | Unipress | ucs | 156010 |
| 1 | 2000 Steam type dbl buck laundry press | UniPress | CRD | 0031321 |
| 1 | 2000 Steam Type Collar & Cuff Press | UniPress | 3TZP | 0054780 |
| 1 | 1981 Steam Type Dbl Pants Legger Press 24 x 42, w Finishing Iron | American Ajax | 2442 | 260136361181 |
| 1 | 2011 Natural Gas Right Hand Wide Body Steam Tunnel Finisher, 900 garments/hr. | Colmac | CFS-1200 G/S RH | 110896GPF0180 |
| | Sewing Machine - Hercules Clutch | | FS-500H | ???????????? |
| | Sewing Machine - Yamata | | DOL12H | ??????????? |
| | Spotting Board | | VSE-A | 38040684 |
| | Vacuum Pump | | RP-5 | 872552 |
| 1 | Water Softener | Kibler | Dual | |
| 2 | Polishing softeners | Anco | 2atm3672-2par | |
| | Water Softener System - 2 tanks | | | |
| 1 | NEW, 600-Hp Natural Gas Fired Boiler, | Superior | | |
| 1 | Direct Contact Water Heating Stack Economizer, (2011) | Thermal Engineering of Arizona <T.E.A .) | DC-2 Supermizer | |
| 1 | Hot water tank 70.5 x | | | |

6

| | | | | |
|---|---|---|---|---|
| | 96" | | | |
| 1 | Hot water tank 72 x 108" | | | |
| 1 | 2002 Triple pumping hot water system | TEA | PBB150BBA | PCB-02-2558 |
| 1 | 7,000 GALLON FIBERGS TANK | Justin Tanks | | |
| 2 | 1OOhp Air Compressor with 3500oal. Air Receiver and New Air Dryer | Atlas Copco | | |
| 1 | Skid mounted rotary air compressor | Gardner Denver | | |
| 1 | 4,900-Lb. LPG Fork Lift Truck (1973) with 188" Maximum Lift Hight | Clark | C500-55 | 355-2200-2560 |
| 4 | Scales | Avery Weigh-Tronix | | 14080939, 14080942, 14080513 |
| 1 | Scales PO KS3037 | Avery Weigh-Tronix Brim Laundry Machine | DSL 4848-05 | 78349, 78350, 78434 |
| 1 | Main Electrical switch board, 5 sections,3,000 amp, 480/277 | Sylvania | 3000A | |
| 1 | Transformer,500 kva, 3 phase, w 800-amp heavy duty switch | Siemens | 3f3y500ftp1 | |
| 1 | Transformer, 75 kva w/ 200 amp safety switch | Acme | | |
| 5 | Transformer, 30 kva w/ 60-100 amp safety switch | | | |
| 3 | Lift Tables; with (12) Wire Carts (Hand Fold) | Norman | | |
| 1 | Lot of Miscellaneous Office Furniture & Business Machines | | | |
| 1 | Lot of Miscellaneous Factory & Support Equipment | | | |
| 1 | Lot of misc. shop equip | | | |

| | |
|---|---|
| | 40" Sliding Sealing Drawer, (2011) | Felrap | Felrapper Console F-240 |
| 1 | 120" 2-Lane Automatic Cornerless Spreader/Feeder, (2005), 30 to 150 FPM | Chicago | Eddie Maxx |
| 700+ | Miscellaneous Laundry Carts |
| | Polishing Softeners | Anco |
| 1 | 2012 refrigerated Air dryer | Atlas Copco |
| 10 | Large Portable Cooling Fans for production workers | Port-Cool |

| | | | |
|---|---|---|---|
| 2 | Forenta Presses | | |
| 1 | Forenta Puff Iron | | |
| 1 | Taylor Dunn Utility Cart | | |
| 1 | Conveyor (48x60) | Roach | | |
| 1 | Conveyor (48x50) | Hytrol | | |
| *1* | *Steam Tunnel* | *Colmac* | *s/n 40907CFF0214* |
| *1* | *125lb. Conventional Washer* | *Milnor* | *s/n AAJ0201068601* |
| *1* | *300lb. Dryer* | *Milnor* | *s/n 567311* |
| *1* | *Dryer* | *Huebsch* | *s/n MTCK 9306003724* |
| *1* | *Hot Water Storage Tank* | | *72 x 108"* |

*Tenant's List of Equipment (Addendum IV) from "13th Street Laundry Triple Net (NNN) Tenant Lease Agreement 125 S. 13th Street Las Vegas, Nevada 89101", to the extent they are present, including:(items in excess $999)*

| | | |
|---|---|---|
| | *Assorted Carts* | |
| *1* | *1979 Washex 46/110* | *Washex* |
| *1* | *1985 Omega Folder* | *Braun* |
| *1* | *CLM 400GPLT* | |
| *1* | *Super Sylon Ironer* | *American* |
| *2* | *10hp Air Compressors* | |
| *2* | *Dry-cleaning Presses* | *Ajax* |
| *2* | *25hp Boilers* | *Parker* |
| *2* | *125lb. Washer Extractors* | *Unimac* |
| *2* | *85lb. Washer Extractors* | *Unimac* |
| *2* | *Collar & Cuff presses* | *Unipress* |
| *1* | *1994 Sigma RTF Folder* | *Braun* |
| *1* | *Mushroom & Sleever* | *Excelsior* |
| *1* | *70hp. Boiler* | *Parker* |
| *1* | *50hp. Water Heater* | *IEA* |
| *1* | *Double Buck* | *Unipress* |

8

1       1995 GMC Truck

*Miscellaneous other equipment valued less than $1,000*

The equipment set forth in the above table for this Section 1.01(b) of the Disclosure Schedules that appear in "***bold italic font***" are being conveyed "as-is" and "where-is" to Buyer without any representation or warranty from Seller as to Seller's right, title or interest in and to the above designated personal property and equipment and that it is free and clear of Encumbrances.

All of Seller's right, title and interest, if any, for all personal property and equipment purchased from 13th Street Property, LLC and 13th Street Properties North, LLC pursuant to that certain 13th Street Laundry (NNN) Tenant Lease Agreement, dated as of February 2010, including but not limited to those items as listed in Addendum IV therein are being conveyed "as-is" and "where-is" to Buyer without any representation or warranty from Seller as to Seller's right, title or interest in and to the above designated personal property and equipment and that it is free and clear of Encumbrances.

All of Seller's right, title and interest, if any, for all of Seller's right, title and interest, if any, to any and all personal property and equipment set forth in the alleged sublease between Seller and Max Enterprises, LLC allegedly dated as of February 17, 2014, including but not limited to the 5 pieces of equipment listed in section 1 thereof" are being conveyed "as-is" and "where-is" to Buyer without any representation or warranty from Seller as to Seller's right, title or interest in and to the above designated personal property and equipment and that it is free and clear of Encumbrances.

<u>**SECTION 1.01(c) Customer Contracts:**</u>

1.  Avi Resort and Casino, a Fort Mojave Indian Tribe Corporation, agreement dated June 19, 2015.
2.  B B + B, LLC, d/b/a Oscar's Beef Booze Broads*
3.  Bayshore Suites, LLC, Linen Services Agreement dated April 17, 2014.
4.  Cafe Latte*
5.  Golden Gate Casino, LLC, d/b/a Golden Gate Hotel & Casino Laundry Services Agreement dated August 3, 2016.
6.  THI of Nevada II at Desert Lane, LLC d/b/a Horizon Specialty Hospital of Henderson Laundry Services Agreement dated August 8, 2015.
7.  Ike Gaming, Inc., d/b/a El Cortez Hotel and Casino, agreement dated December 18, 2013, as amended.
8.  Jean Development Company, LLC, d/b/a Gold Strike Hotel and Gambling Hall Laundry Services Agreement dated August 1, 2015.
9.  LVGV, LLC, d/b/a M Resort Spa & Casino Laundry Services Agreement dated February 1, 2015.
10. Marnell Gaming, LLC (f/b/o Colorado Belle Gaming, LLC and Edgewater Gaming, LLC) Laundry Services Agreement dated March 24, 2014.
11. Vegas Hospital Care, LLC d/b/a Mountain's Edge Hospital, agreement dated March 26, 2015
12. Pioneer Hotel and Gambling Hall, a Nevada corporation, agreement dated May 20, 2014.
13. Plaza Hotel And Casino, LLC, d/b/a Plaza, a Nevada limited liability company, agreement dated August 13, 2011.
14. R.B. Properties Inc., contracting as Bilbray Industries Inc., Linen Services Agreement dated August 19, 2014.
15. Riverside Resort and Casino, LLC, a Nevada limited liability company, agreement dated July 1, 2016.
16. The Primmadonna Company, LLC, d/b/a Primm Valley Resort & Casino, Buffalo Bill's Resort & Casino, and Whiskey Pete's Hotel & Casino, a Nevada limited liability company, agreement dated February 2013, NO SPECIFIC DATE INCLUDED, as amended.
17. The Service Companies, Inc.*
18. Top Golf USA Las Vegas, LLC Rental Services Agreement dated March 21, 2016.

**All of the foregoing customer contracts constitute Designated Contracts under Section 1.08 of the Agreement.**

**\* Copy has not been provided to Buyer**

### SECTION 1.01(d) INVENTORY AND SUPPLIES:

| Inventory Description | Number of Items | Identifying Number: |
|---|---|---|
| **NEW AND USED LINEN** | See attached schedule on following page. | LOT |

The a quantities of Inventory set forth herein are not exact counts as may exist on the Closing Date, but do represent the result of Seller's last count of Inventory prior to the Closing Date

The following Inventory is owned by Customers:

1. Primmadonna Company, LLC, d/b/a Primm Valley Resort & Casino, Buffalo Bill's Resort & Casino, and Whiskey Pete's Hotel & Casino, a Nevada limited liability company.

2. Sapphires pool towels and wipers

| Quantity (ea.) | BATH TOWEL WHITE 27x50 | BATH TOWEL WHITE 22x44 | HAND TOWEL WHITE 16x30 | WASH CLOTH WHITE 13x13 | KING SHEET 108x120 | KING SHEET 114x120 | KING SHEET WHITE 90x120 | QUEEN SHEET WHITE X-HOME 60x106 | QUEEN SHEET WHITE LTD X-HOME 42x36 | PILLOWCASE WHITE LTD WHITE | BATHMAT WHITE | GLASS TOWEL RED STRIPE | PILLOW SLIP WHITE STRIPE | PILLOW SLIP KING WHITE STRIPE | HAND TOWEL BEIGE | BATH RUG | KING FITTED | QUEEN FITTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avi | 7947 | | 5778 | 6697 | 2241 | | 5936 | | 3983 | | | | | | | | | 20,875 |
| Riverside | | | 12579 | 14885 | 4067 | | 26499 | | 8060 | | | | | | | | | 108,139 |
| Cadillac | 14074 | | 16936 | 27378 | 2099 | | 6697 | 5721 | 8697 | | | | | | | | | 114,323 |
| Frontier | 7906 | | 3573 | 7056 | | | | 1430 | | | | | | | | | | 72,347 |
| Golden Gate | | 993 | 1075 | 1567 | | 1230 | | 181 | | | | | | | | | | 4,156 |
| El Cortez | | 3613 | 4139 | 4075 | | 933 | 2938 | 1577 | | | | | | | | | | 26,116 |
| Plaza | 6457 | | 6627 | 8395 | 454 | 3980 | | 7431 | 3562 | | | | | | | | | 50,534 |
| Gold Strike | 7483 | | 3823 | 4058 | 12005 | 7566 | 8263 | | 3067 | 7568 | 14849 | 7093 | 167 | 567 | 542 | 108 | 729 | 22,694 |
| | 15242 | 4756 | 16964 | 12020 | 1120 | | 27743 | 19603 | 42760 | 27325 | | 63932 | 94615 | 167 | | 567 | 108 | |

| | M Resort | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | BATH TOWEL WHITE HAND KEY | HAND TOWEL WHITE HAND KEY | WASH CLOTH WHITE HAND KEY | BATHMAT WHITE HAND KEY | SHEET QUEEN MICRO CHECK 520 | SHEET QUEEN MICRO CHECK T-500 | SHEET KING MICRO CHECK K-520 | SHEET KING MICRO T-500 | PILLOWCASE KING T-500 | | | | | | |
| | 3821 | 5351 | 3961 | 904 | 2363 | 954 | 4531 | 8270 | | | | | | | 28,247 |

| Hospital Linen Inventory Numbers | Amount |
|---|---|
| 5150 - Pillowcase | 12116 |
| 5201 - Sheet, Hospital | 14865 |
| 5230 - Sheet, Draw | 4263 |
| 5250 - Sheet, Knitted Contour | 4058 |
| 5256 - Blue Gurney Sheets | 2461 |
| 5310 - Blanket, Thermal White | 3895 |
| 5311 - Blanket, Thermal Blue | 2169 |
| 5312 - Blanket, Thermal Green | 204 |
| 5313 - Blanket, Thermal Raspberry | 345 |
| 5350 - Blanket, Bath | 9786 |
| 5401 - Pad, Incontinent | 1457 |
| 5520 - Washcloth | 16433 |
| 5530 - Towel, Bath | 15110 |
| 5710 - Gown, Patient | 641 |
| 5713 - Gown, Patient Oversize | 693 |
| 5720 - Gown, Patient IV/Telemetry | 3792 |
| 5721 - Gown, Patient IV/Telemetry Oversize | 464 |
| 5820 - Towel, Surgery Misty Green | 2675 |
| 6075 - Pant, Pajama Adult XLarge | 346 |
| 6401 - TOWEL, MICROFIBER | 3019 |
| 6407 - Mop, Wet Microfiber Blue String Mop | 422 |
| 6410 - Mop, Flat Microfiber 18" | 3182 |
| 6410 - TOWEL, CLEANING BLUE | 4173 |
| 6412 - Mop, Wet Medium 16 oz | 464 |
| 6550 - Towel, Dish | 1522 |

| Food and Beverage Linen Inventory Numbers | Amount |
|---|---|
| 0900 - BAR TOWEL WIPER | 17207 |
| 0900 - WIPER | 13295 |
| 0901 - BAR TOWEL WHITE | 8390 |
| 0902 - UTILITY TOWEL RED | 7241 |
| 0903 - UTILITY TOWEL BLUE | 8914 |
| 0903 - UTILITY TOWEL BLUE | 5114 |
| 0904 - GLASS TOWEL RED STRIPE | 8763 |
| 0908 - DUST MOP 24" | 29 |
| 0910 - APRON BIB WHITE | 1430 |
| 0911 - APRON  BLACK BIB | 975 |
| 0920 - APRON BISTRO WHITE | 111 |
| 0921 - APRON BISTRO BLACK | 84 |
| 0930 - APRON 4-WAY WHITE | 184 |

13

| | |
|---|---|
| 0931 - APRON 4-WAY BLACK | 37 |
| 1000 - NAPKIN WHITE WAVE (CTN) | 2772 |
| 1000 - NAPKINS WHITE | 8413 |
| 1002 - 52X52 TABLE TOP WHITE | 1696 |
| 1003 - 52X120 TABLE TOP WHITE | 1150 |
| 1004 - 62X62 TABLE TOP WHITE | 805 |
| 1005 - 72X72 TABLE TOP WHITE | 575 |
| 1006 - 90X90 TABLE TOP WHITE | 556 |
| 1006 - TABLE CLOTH 72X72 BLK/WHT CHECK | 312 |
| 1007 - 120" ROUND WHITE | 305 |
| 1008 - 132" ROUND WHITE | 316 |
| 1009 - 90" ROUND WHITE | 115 |
| 1010 - NAPKINS BLACK | 17020 |
| 1012 - 52X52 TABLE TOP BLACK | 225 |
| 1013 - 52X120 TABLE TOP BLACK | 695 |
| 1014 - 62X62 TABLE TOP BLACK | 365 |
| 1015 - 72X72 TABLE TOP BLACK | 995 |
| 1016 - 90X90 TABLE TOP BLACK | 720 |
| 1017 - 120" ROUND BLACK | 355 |
| 1018 - 132" ROUND BLACK | 317 |
| 1019 - 90" ROUND BLACK | 71 |
| 1020 - NAPKINS BROWN | 2481 |
| 1021 - TABLE CLOTH 42X42 BROWN | 312 |
| 1022 - TABLE CLOTH 52X52 BROWN | 225 |
| 1023 - TABLE CLOTH 52X114 BROWN | 451 |
| 1024 - TABLE CLOTH 62X62 BROWN | 285 |
| 1025 - TABLE CLOTH 72X72 BROWN | 270 |
| 1026 - TABLE CLOTH 85X85 BROWN | 296 |
| 1028 - TABLE CLOTH 130" ROUND BROWN | 252 |
| 1029 - TABLE CLOTH 54X72 BROWN | 450 |
| 1029 - TABLE CLOTH 90" ROUND BROWN | 132 |
| 1030 - NAPKINS RED | 4071 |
| 1032 - TABLE CLOTH 52X52 RED | 225 |
| 1033 - TABLE CLOTH 52X114 RED | 80 |
| 1036 - TABLE CLOTH 85X85 RED | 290 |
| 1040 - NAPKINS BURGUNDY | 4639 |
| 1042 - TABLE CLOTH 52X52 BURGUNDY | 527 |
| 1043 - TABLE CLOTH 52X114 BURGUNDY | 670 |
| 1044 - TABLE CLOTH 61X61 BURGUNDY | 612 |
| 1045 - TABLE CLOTH 72X72 BURGUNDY | 0 |
| 1046 - TABLE CLOTH 85X85 BURGUNDY | 1478 |
| 1050 - NAPKINS RUST | 1600 |
| 1052 - TABLE CLOTH 52X52 RUST | 50 |

14

| | |
|---|---|
| 1053 - TABLE CLOTH 52X114 RUST | 15 |
| 1056 - TABLE CLOTH 85X85 RUST | 60 |
| 1060 - NAPKIN FOREST GREEN | 11950 |
| 1062 - TABLE CLOTH 52X52 FOREST GREEN | 50 |
| 1063 - TABLE CLOTH 52X114 FOREST GREEN | 450 |
| 1066 - TABLE CLOTH 85X85 FOREST GREEN | 430 |
| 1070 - NAPKINS PURPLE | 514 |
| 1072 - TABLE CLOTH 52X52 PURPLE | 75 |
| 1072 - TABLE CLOTH 62X62 PURPLE | 35 |
| 1072 - TABLE CLOTH 72X72 PURPLE | 0 |
| 1073 - TABLE CLOTH 52X114 PURPLE | 48 |
| 1076 - TABLE CLOTH 85X85 PURPLE | 93 |
| 1080 - NAPKIN LAVENDER | 618 |
| 1082 - TABLE CLOTH 52X52 LAVENDER | 36 |
| 1083 - TABLE CLOTH 52X114 LAVENDER | 20 |
| 1086 - TABLE CLOTH 85X85 LAVENDER | 160 |
| 1090 - NAPKINS GOLD | 4100 |
| 1092 - TABLE CLOTH 52X52  GOLD | 50 |
| 1092 - TABLE CLOTH 62X62 GOLD | 30 |
| 1093 - TABLE CLOTH 52X114 GOLD | 35 |
| 1094 - TABLE CLOTH 72X72 GOLD | 15 |
| 1096 - TABLE CLOTH 85X85 GOLD | 72 |
| 1100 - NAPKINS IVORY | 412 |
| 1102 - 52X52 TABLE TOP IVORY | 585 |
| 1103 - 52X120 TABLE TOP IVORY | 736 |
| 1104 - 62X62 TABLE TOP IVORY | 553 |
| 1105 - TABLE CLOTH 61X61 IVORY ELM (GT) | 496 |
| 1106 - 90X90 TABLE TOP IVORY | 506 |
| 1106 - TABLE CLOTH 72X72 IVORY ELM (GT) | 384 |
| 1107 - 120" ROUND IVORY | 65 |
| 1108 - 132" ROUND IVORY | 205 |
| 1109 - 90" ROUND IVORY | 120 |
| 1110 - NAPKIN HOT PINK | 317 |
| 1120 - NAPKIN LIGHT PINK | 245 |
| 1122 - TABLE CLOTH 52X52 LIGHT PINK | 43 |
| 1123 - TABLE CLOTH 52X114 LIGHT PINK | 40 |
| 1126 - TABLE CLOTH 85X85 LIGHT PINK | 24 |
| 1130 - NAPKIN NAVY | 900 |
| 1130 - NAPKIN ROYAL BLUE | 3000 |
| 1132 - TABLE CLOTH 52X52 NAVY | 147 |
| 1132 - TABLE CLOTH 52X52 ROYAL BLUE | 125 |
| 1133 - TABLE CLOTH 52X114 NAVY | 29 |
| 1133 - TABLE CLOTH 52X114 ROYAL BLUE | 457 |

| | |
|---|---|
| 1136 - TABLE CLOTH 85X85 NAVY | 36 |
| 1136 - TABLE CLOTH 85X85 ROYAL BLUE | 495 |
| 1140 - NAPKIN LT BLUE | 418 |
| 1142 - TABLE CLOTH 52X52 LIGHT BLUE | 25 |
| 1143 - TABLE CLOTH 52X114 LIGHT BLUE | 16 |
| 1146 - TABLE CLOTH 85X85 LIGHT BLUE | 36 |
| 1150 - NAPKIN CADET BLUE | 118 |
| 1152 - TABLE CLOTH 52X52 CADET BLUE | 0 |
| 1153 - TABLE CLOTH 52X114 CADET BLUE | 30 |
| 1156 - TABLE CLOTH 85X85 CADET BLUE | 90 |
| 1160 - NAPKIN MAZE | 400 |
| 1162 - TABLE CLOTH 52X52 MAZE | 25 |
| 1163 - TABLE CLOTH 52X114 MAZE | 20 |
| 1166 - TABLE CLOTH 85X85 MAZE | 30 |
| 1170 - NAPKIN STONE GREY | 102 |
| 1172 - TABLE CLOTH 52X52 STONE GREY(DARK) | 0 |
| 1173 - TABLE CLOTH 52X114 STONE GREY(DARK) | 10 |
| 1176 - TABLE CLOTH 85X85 STONE GREY(DARK) | 20 |
| 1180 - NAPKIN PEACH | 600 |
| 1183 - TABLE CLOTH 52X114 PEACH | 50 |
| 1190 - NAPKIN SEAFOAM | 427 |
| 1192 - TABLE CLOTH 52X52 SEAFOAM | 125 |
| 1192 - TABLE CLOTH 62X62 SEAFOAM | 60 |
| 1193 - TABLE CLOTH 52X114 SEAFOAM | 30 |
| 1194 - TABLE CLOTH 72X72 SEAFOAM | 0 |
| 1196 - TABLE CLOTH 85X85 SEAFOAM | 107 |
| 1200 - NAPKIN RED WHITE CHECK | 500 |
| 1202 - TABLE CLOTH 52X52 RED WHITE CHECK | 105 |
| 1203 - TABLE CLOTH 52X114 RED WHITE CHECK | 25 |
| 1206 - TABLE CLOTH 85X85 RED WHITE CHECK | 90 |
| 1210 - NAPKIN TURQUOISE | 300 |
| 1220 - NAPKIN YELLOW | 288 |
| 1230 - NAPKIN SANDLEWOOD | 3164 |
| 1230 - NAPKIN SANDLEWOOD DIAMOND WEAVE | 2593 |
| 1231 - NAPKIN BLACK DIAMOND WEAVE | 3201 |
| 1232 - NAPKIN OLIVE DIAMOND WEAVE | 4217 |
| 1232 - TABLE CLOTH 52X52 SANDLEWOOD | 455 |
| 1233 - TABLE CLOTH 52X114 SANDALWOOD | 513 |
| 1234 - TABLE CLOTH 61X61 SANDALWOOD | 270 |
| 1235 - TABLE CLOTH 72X72 SANDLEWOOD | 375 |
| 1236 - TABLE CLOTH 85X85 SANDALWOOD | 302 |
| 1238 - TABLE CLOTH 130" ROUND SANDLEWOOD | 209 |
| 1239 - TABLE CLOTH 90" ROUND SANDLEWOOD | 85 |

| | |
|---|---|
| 1243 - TABLE CLOTH 52X114 ROSETTA | 232 |
| 1250 - NAPKIN DOVE GREY | 195 |
| 1266 - TABLE CLOTH 85X85 RASPBERRY | 42 |
| 1270 - NAPKIN ROSETTA | 300 |
| 1290 - NAPKIN WHITE W/ RED STRIPE | 5545 |
| 1300 - MAT SLATE 3 X 4 | 65 |
| 1301 - MAT SLATE 4 X 6 | 87 |
| 1302 - MAT SLATE 3 X 10 | 101 |
| 1307 - MAT NAVY 4X6 | 13 |
| 1308 - MAT NAVY 3X10 | 9 |
| 1317 - MAT RED 3 X 6 | 3 |
| 1318 - MAT RED 4 X 6 | 8 |
| 1319 - MAT RED 3 X 10 | 9 |
| 6401- TOWEL, MICROFIBER | 685 |

### SECTION 1.01(p) OTHER ASSETS:

Except as limited below, all remaining rights, if any, that may exist after Seller's rejection of that certain Second Amended and Restated Employment Agreement with D.W. "Doc" Wiener to the Non-Competition and Non-Solicit Agreement in Paragraph 14 of that employment agreement ("the **Wiener Contract**"). Provided however, Buyer shall be entitled to exercise only those rights and claims under the Wiener Contract arising from and after the Closing Date, with Seller reserving any and all rights and claims pertaining to and arising from the Weiner Contract prior to the Closing Date.

### SECTION 1.02 EXCLUDED ASSETS:

1.  All Avoidance Actions;

2.  All Insider Claims;

3.  Cash in Seller's bank account as of the date of this Agreement $160,524.77 and such sums contained in the Seller's bank account on the day immediately preceding the Closing;

4.  All insurance benefits, including rights and proceeds, arising from or relating to the Business claims and proceeds under the Liberty Mutual policy of insurance numbers BKS56461008 & EBU066321975.

5.  All, insurance benefits, including rights and proceeds, arising from or relating to the Business claims and proceeds under the landlord's policy of insurance for the Leased Property.

6.  All insurance benefits, including rights and proceeds, arising from or relating to the any claims and proceeds under the AIG (National Union Fire Insurance Company of Pittsburgh, PA) policy of insurance no. 41921410.

7.  All insurance benefits, including rights and proceeds, arising from or relating to the any claims and proceeds under the Insurance Policy Nos. Commercial General Liability (BKS56461008), Automobile Liability (BAS56461008), Umbrella (EBU066321975), Workers Compensation (KWC1075435) and any and all insurance polices for the Seller issued for all periods prior to the Closing Date.

8.  All claims and causes of action and Actions, as well as any defenses or offsets claimed with respect to the following:

    (a)  Nevada Property 1, LLC d/b/a The Cosmopolitan of Las Vegas arising from or relating to the Linen Services Agreement dated as of August 9, 2016 which shall include the Accounts Receivable for this contract (collectively, the "**Cosmopolitan Claims and AR**"); and

    (b)  The Excluded Contracts.

9.  Southwest Gas Bond in the amount of $105,000.

10. Nevada Energy Deposit in the amount of $50,000.

11. Any and all equipment located at the Business and provided in connection with that certain Services Agreement dated April 1, 2014 by and between Seller and ECOLAB INC.

## SECTION 1.03(d) ASSUMED CONTRACTS:

1.      Lease Agreement - 4501 Mitchell (Landlord is 13th Street Property LLC and 13th Street Properties North, LLC).

## SECTION 1.08(d) DESIGNATED CONTRACTS:

1.    Avi Resort and Casino, a Fort Mojave Indian Tribe Corporation, agreement date June 19, 2015.
2.    B B + B, LLC, d/b/a Oscar's Beef Booze Broads*
3.    Bayshore Suites, LLC, Linen Services Agreement dated April 17, 2014.
4.    Cafe Latte*
5.    Golden Gate Casino, LLC, d/b/a Golden Gate Hotel & Casino Laundry Services Agreement dated August 3, 2016.
6.    THI of Nevada II at Desert Lane, LLC d/b/a Horizon Specialty Hospital of Henderson Laundry Services Agreement dated August 8, 2015.
7.    Ike Gaming, Inc., d/b/a El Cortez Hotel and Casino, agreement dated December 18, 2013, as amended.
8.    Jean Development Company, LLC, d/b/a Gold Strike Hotel and Gambling Hall Laundry Services Agreement dated August 1, 2015.
9.    LVGV, LLC, d/b/a M Resort Spa & Casino Laundry Services Agreement dated February 1, 2015.
10.    Marnell Gaming, LLC (f/b/o Colorado Belle Gaming, LLC and Edgewater Gaming, LLC) Laundry Services Agreement dated March 24, 2014.
11.    Vegas Hospital Care, LLC d/b/a Mountain's Edge Hospital, agreement dated March 26, 2015
12.    Pioneer Hotel and Gambling Hall, a Nevada corporation, agreement dated May 20, 2014.
13.    Plaza Hotel And Casino, LLC, d/b/a Plaza, a Nevada limited liability company, agreement dated August 13, 2011.
14.    R.B. Properties Inc., contracting as Bilbray Industries Inc., Linen Services Agreement dated August 19, 2014.
15.    Riverside Resort and Casino, LLC, a Nevada limited liability company, agreement dated July 1, 2016.
16.    The Primmadonna Company, LLC, d/b/a Primm Valley Resort & Casino, Buffalo Bill's Resort & Casino, and Whiskey Pete's Hotel & Casino, a Nevada limited liability company, agreement dated February 2013, NO SPECIFIC DATE INCLUDED, as amended.
17.    The Service Companies, Inc.
18.    Top Golf USA Las Vegas, LLC Rental Services Agreement dated March 21, 2016.
19.    Computer Software Architects LLC - Linen Master Software.
20.    Southwest Gas Corporation Incremental Natural Gas Facilities Agreement
21.    QTS Customer Payroll & HR Solutions
22.    Aflac
23.    Health Partners Network – Health Coverage
24.    Principal – Dental Coverage
25.    United Healthcare – Life Coverage & Vision
26.    Ecolab Inc. – Chemicals.

### SECTION 3.02 CONSENTS:

[None]

### SECTION 3.07 MATERIAL CONTRACTS

1. Lease Agreement -4501 Mitchell (Landlord is Icon Pac Nevada Owner Pool 3 Nevada, LLC) - $8,442
2. Lease Agreement - 13th Street (Landlord is 13th Street Property LLC and 13th Street Properties North, LLC) - $0
3. AT&T - Tablet Computer- $0
4. Balboa Capital – Copier - $0
5. City Of North Las Vegas – Permit - $718,916.74
6. City Of North Las Vegas – Utilities - $154,069.95 pre-petition, $61,573.80 post
7. Computer Software Architects LLC - Linen Master Software - $0
8. De Lage Landen Financial Services, Inc. – Copier - $0
9. *Ecolab – Chemicals - $122,810.25
10. H&E Equipment Services - Forklift / Scissor Lift (Contract Has Buyout Value) - $20,952.63 post-petition
11. Penske Truck Leasing Co., LP – Vehicle / Trailer Leases - $67,694.39
12. New City It – Po System Support - $0
13. Windstream – Internet / Telephone Access - $0
14. Aflac - $0
15. Health Partners Network – Health Coverage - $0
16. Principal – Dental Coverage - $0
17. United Healthcare – Life Coverage & Vision - $0
18. Amtrust North America – Workers Comp 2017 - $0
19. First Insurance – Business Insurance - $0
20. Chem-Aqua, Inc. - Chemical Treatment – 30 Day Out - $3,541.68
21. Intelligent Technical Solutions - Internet / Phone Support - $0
22. Robert Smith - Employment Agreement, CFO - $0
23. Chris McLemore - Employment Agreement, President  - $0
24. Southwest Gas Corporation Incremental Natural Gas Facilities Agreement - $0
25. QTS Customer Payroll & HR Solutions - $0

**The forgoing vendor contracts identified with an \*, constitute Designated Contracts under Section 1.08 of the Agreement.**

### SECTION 3.10  REAL PROPERTY LEASE / SUBLEASE AGREEMENTS:

1) Mitchell Property;

Identify breach and violation notices for the Leases:

1) A claimed breach of non-encumbrance provision of Lease as a result of the City of North Las Vegas's lien on the Mitchell Property.

## SECTION 3.13 CUSTOMERS AND SUPPLIERS:

1)    **Customers: 2015 & 2016**

AVI RESORT AND CASINO
BAYSHORE SUITES
COLORADO BELLE
EDGEWATER
EL CORTEZ HSKP
GOLD STRIKE
GOLDEN GATE HOTEL & CASINO
HORIZON SPECIALTY HOSPITAL OF HENDERSON
M RESORT SPA & CASINO
MOUNTAIN'S EDGE HOSPITAL
OSCARS
PIONEER HOTEL AND GAMBLING HALL
R.B. PROPERTIES
RIVERSIDE RESORT RENTAL
SAPPHIRE
THE SERVICE COMPANIES
TOP GOLF
WHISKEY PETES TRUCKSTOP

2)    **Suppliers: 2015 & 2016**

13TH STREET PROPERTIES, LLC
ADVANTAGE CAPITAL PARTNERS
AFLAC
ALL HOSE, INC
ALLPRO SERVICES, LLC
ALTERNATIVE OFFICE SYSTEM
AMAZON
AMTRUST
ANDREW S BILLIG, PA
ATLAS COPCO COMPRESSORS, LLC
AUTOMOTIVE WORKWEAR, INC
BALBOA CAPITAL
BARNETT & ASSOCIATES
BEARING BELT CHAIN
BEDSPREADS INC
BEST BUY
BRIGHTLIGHT HOLDINGS, LLC
BRIM LAUNDRY MACHINERY CO.,

INC.

C&L REFRIGERATION

CALDERONE INC

CHEF WORKS, INC.

CHEM-AQUA

CHEMTAINER LOS ANGELES

CHEMTREAT, INC

CLARK COUNTY ASSESSOR

CLARK COUNTY BUSINESS
LICENSE

COLMAC

COMPLETELY CLEAN

COMPUTER SOFTWARE
ARCHITECTS LLC

CONSOLIDATED INT'L CORP

CONSOLIDATED LAUNDRY
MACHINERY

CONSUMERS PIPE

CURTIS STEEL

DEPARTMENT OF AIR QUALITY

DESERT BOILERS & CONTROLS,
INC

DESTINATION, L.A. INC

ECOLAB

ELECTRICAL ENGINEERING &
EQUIP CO - 3E

ELLSWORTH & STOUT, LLC

EMI - ENERGY MECHANICAL
INSULATION

F J G EQUIPMENT CO., INC.

FIRST INSURANCE FUNDING CORP.

FLW, INC

GARNIER THIEBAUT INC

GLOBAL INDUSTRIAL

GOLDEN STAR

GRAINGER

GROVE MADSEN INDUSTRIES

H & E EQUIPMENT SERVICES

HEALTH PLAN OF NEVADA

HENDERSON ELECTRIC MOTORS,
INC

ICON PAC NEVADA OWNER POOL 3
NEVADA

26

IMPERIAL TEXTILE
INSURANCE OFFICE OF AMERICA
I-WIRE ELECTRICAL SERVICES
JENSEN USA INC
JIMMERSON HANSEN
JL LINEN RECOVERY, INC,
JMAC PLUMBING & AIR
CONDITIONING
K-1 CONSTRUCTION, INC
KLENKE'S THREAD ART
LANDRY'S INC
LARSON & ZIRZOW, LLC
LAVATEC LAUNDRY
LINCOLN NATIONAL LIFE
LOCKTON
MACHANIX FAB INC. OF NV
MCMASTER-CARR
MEDLINE
MEESE ORBITRON DUNNE CO.
MICHELLI MEASUREMENT GROUP,
LLC
MIP INC
MODROTO
MOTION INDUSTRIES, INC
MOUNT VERNON MILLS, INC/
RIEGEL
MOUNTVILLE MILLS INC
NATIONAL SWAMP COOLER, LLC
NEVADA DEPARTMENT OF
TAXATION
NEVADA HOTEL & LODGING
ASSOCIATION
NEW IMAGE DRY CLEANING
NV ENERGY
PARALLON
PENSKE
PHILIPPE PAGEAU GOYETTE
PREMIER DRY CLEANING &
LAUNDRY
PRINCIPAL FINANCIAL GROUP
PURVIS INDUSTRIES
PYRO
REED MANUFACTURING CO, INC
REGENT APPAREL

REM COMPANY
R. F. MACDONALD CO
SHAMRON MILLS
SHIMMER CLOTHING COMPANY
SOBEL WESTEX
SOFTCONTROL SYSTEMS INC.
SOUTHWEST GAS CORPORATION
SOUTHWEST LAUNDRY
EQUIPMENT LLC
SPRINT
STAHELI LAUNDRY SERVICES, LLC
STEPSAVER, INC
STORMS INDUSTRIES, INC
SURPLUS SALT
SWIFT ELECTRICAL SERVICES, INC
TALLEY MACHINERY
TEMPRITE AIR CONDITIONING
THE COMPHY CO., INC
THE LAUNDRY LIST
THERMAL ENGINEERING OF
ARIZONA
TICKET MEDIA, INC
TIFCO INDUSTRIES
TINGUE BROWN & CO
TMC CORP
TPM SERVICES, LLC
UNIPRESS CORP
UNITED CLEANERS SUPPLY, INC
UNITED MACHINE & TOOLS
VEGAS TICKETS
VELOCITY TRUCK RENTAL &
LEASING
VENUS GROUP
WAXIE SANITARY SUPPLY
WELL EQUIPMENT, INC.
WESTERN STATE DESIGN, INC
WINDSTREAM

Each Customer and Supplier identified in the below table with "*italics*" has canceled, terminated or otherwise been materially altered its relationship with the Business.

**Customers: 2015 & 2016**

*ANDIRON*
*BEAUTY AND ESSEX*
*CHARTHOUSE*
*CHATEAU NIGHT CLUB*
*CHAYO*
*CHLOE & LAUREN ENTERPRISES*
*COSMOPOLITAN OF LAS VEGAS*
*EAT. RESTAURANT*
*FIREROCK STEAKHOUSE*
*GOLDEN NUGGET*
*HONEY SALT*
*HOWARD JOHNSONS*
*FP HOLDING L.P. D/B/A THE PALMS CASINO RESORT*
*LAUGHLIN RIVER LODGE*
*LAVO KITCHEN*
*LVS*

*MARCHE BACCHUS*
*MARQUEE*
*MGM GRAND LAUNDRY*
*MINT INDIAN BISTRO*

*MOUNTAINVIEW HOSPITAL*
*NEW IMAGE DRY CLEANERS*
*PALMS CASINO RESORT*
*PALMS PLACE HOTEL AND SPA*
*PANCHO'S RESTAURANT*
*PIEROS*
*RAILROAD PASS*
*RAILROAD CLEANERS D/B/A RRC COMMERCIAL INC.*
*RIVIERA HOTEL & CASINO*

*SICILIAN RISTORANTE*
*SKINNY FATS*
*SKINNY FATS-DEAN MARTIN*
*SOUTHERN HILLS*
*SPIEDINI RISTORANTE*
*TAHITI VILLAGE*

*TAO*
*THE JADE RESTAURANT*
*WYNDHAM DESERT BLUE*
  *TREASURE ISLAND HOTEL AND CASINO*
  *TROPICANA EXPRESS*
  *TUSCANY SUITES AND CASINO*
  *VIC & ANTHONY'S*
  *YOU GOT IT MAID*

**Suppliers: 2015 & 2016**

*ACR MECHANICAL, INC.*
*BALTIC LINEN*
*BENJAMIN JONES*
*BRADSHAW, SMITH & CO., LLP*
*BRE/ PAC INDUSTRIAL REIT INC*
*CENTURY LINK*
*CITY OF NORTH LAS VEGAS*
*COHEN JOHNSON, LLC*
*INTELLIGENT TECHNICAL SOLUTIONS, INC*
*JAMES BARTON*
*LOVATO LAW FIRM, P.C.*
*M RESORT, LLC*
*PALMS CASINO*
*SCHWARTZ FLANSBURG PLLC*
*SNELL & WILMER*

### <u>Section 3.14 Breach Status of Assumed Contracts</u>

    1)     Lease Agreement - 4501 Mitchell (Landlord is 13th Street Property LLC and 13th Street Properties North, LLC) See description in Section 3.10 of these Disclosure Schedules above.

### SECTION 3. 15 INTELLECTUAL PROPERTY:

The name "Superior Linen, LLC"

## SECTION 3. 17(b) PERMITS:

| License / Permit | Identifying Number and Expiration Date | Transferable / Not Transferrable |
|---|---|---|
| State of Nevada Business License | Entity No. E0023152010-01 Expiration 01/31/2018 | Not Transferrable |
| City North Las Vegas Business License | License No. 99418 – Expiration 07/31/2017 | Not Transferrable |
| Clark County Business License | License No. 2000465-081-102 – Expiration 07/31/2017 | Not Transferrable |
| Boiler/Pressure Vessel Operating Permit – Nevada Department of Business and Industry | User Location No. 3476815 – Expiration 11/05/2016 | Not Transferrable |
| Restricted Waste Management Permit – Southern Nevada Health District | Permit No. PR0030021 Expiration 12/31/2017 | Not Transferrable |
| Wastewater Contribution Permit – City of North Las Vegas | Permit No. Class I Expiration 03/31/2020 | Not Transferrable |
| Minor Source Permit - Clark County Department of Air Quality | Source: 17210 Expiration August 16, 2017 | Not Transferrable |
| 1995 GMC Truck Nevada Vehicular License | | Not Transferrable |

33

## <u>SECTION 3. 18 LEGAL PROCEEDINGS</u>:

1)      Except for the Bankruptcy Case, no other Legal Proceedings are pending in the name of or against Seller

## SECTION 3. 20 BENEFIT PLAN:

Qualified Benefit Plan:

   1)  None


Threatened Action Relating to Benefit Plan:

   1)  None

COBRA plan(s) and employee with COBRA or in a COBRA election period:

|  |  | Sierra Health | Principal Dental |
|---|---|---|---|
| 1) | Linda Rayne | X | X |
| 2) | Michael Browne | X | X |

X denotes COBRA accepted
O denotes COBRA offered, no decision

Benefit Plan Changes:

   1)    Sierra Health renews May 1, 2017 with 3% increased premiums

## SECTION 3.22 TAXES:

1)    LLC 2016 extension filed, taxes have not been filed, but will be filed timely by Seller.

2)    Personal Property tax ~ $43,498.77.

3)    Penalty to IRS for late filing payroll taxes for 3rd & 4th Qtr. 2016 & 1st Qtr. 2017 $58,662.42.

4)    Penalty to IRS for late filing 2015 return $13,650.

5)    Payroll taxes Due 5/3/17 (~$51k), 5/17/17 (~$44k), 5/31/17 (~$43k) & 6/5/17 (~$21k).

6)    Modified Business Tax $22,906.27 (due 4/30/17) & 2nd Qtr. (not yet invoiced).

Buyer shall have no obligation to pay the Taxes set forth in this Section 3.22 of the Disclosure Schedule.

# EXHIBIT "2"

# FIRST AMENDMENT
## TO ASSET PURCHASE AGREEMENT

**THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT** ("**First Amendment**") is entered into as of May 31, 2017, by and between **SUPERIOR LINEN, LLC**, a Nevada limited liability company ("**Seller**"); and **LAS VEGAS LINEN LLC**, a Nevada limited liability company ("**Buyer**"). Seller and Buyer are referred to collectively herein as the "**Parties**" and each a "**Party**." Following the Petition Date (as defined below), the term Seller shall refer to Seller as a debtor-in-possession and include the Seller's estate.

## RECITALS

A.      Seller is engaged in the business of providing linen rental and laundry services to the hospitality and retail markets in Las Vegas, Nevada and the surrounding areas (the "**Business**").

B.      On September 30, 2016 (the "**Petition Date**") Seller filed its voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"), which is pending as case number 16-15388-mkn (the "**Bankruptcy Case**");

C.      Seller and Buyer entered into that certain Asset Purchase Agreement dated May 31, 2017 for the acquisition of the Business upon the terms, conditions and obligations set forth therein (the "**Agreement**").  Capitalized terms used in the First Amendment have the meanings set forth in the Agreement.

D.      Seller and Buyer have agreed to amend the Agreement as set forth herein.

**NOW THEREFORE**, in consideration of the foregoing recitals (incorporated herein by this reference) and the mutual promises of the parties set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller amend the Agreement as follows:

1.      Section 1.01(c) of the Disclosure Schedules for the Agreement is hereby amended, restated and replaced in its entirety with the schedule set forth in Section 1.01(c) of the Disclosure Schedules attached hereto.

2.      Section 1.01 (d) of the Disclosure Schedules for the Agreement is hereby amended, restated and replaced in its entirety with the schedule set forth in Section 1.01(d) of the Disclosure Schedules attached hereto.

3.      Section 1.05 of the Agreement is hereby amended, restated and replaced in its entirety with the following:

**Section 1.05 Total Consideration.** The aggregate consideration for the Purchased Assets shall be (a) One Million Eight Hundred Thousand Dollars ($1,800,000) in cash; (b) the amount of Two Hundred Dollars ($200.00) for each cart identified in Section 1.01(d) of the Disclosure Schedules, which shall be agreed to by Buyer and Seller at or prior to Closing, provided that the aggregate amount under this clause (b) shall not exceed Two Hundred Thousand Dollars ($200,000) (the sum of (a) inclusive with (b) being the "**Cash Purchase Price**" which shall be subject to adjustment pursuant to Section 1.09 below); plus (c) the assumption of the Assumed Liabilities (the "**Total Consideration**").

4.      Section 1.09 of the Agreement is hereby amended to include an additional sub-section "(d)" with the following:

(d)      Option to Purchase Cosmopolitan Claims and AR.

(i)      Buyer desires to have a period of fourteen (14) days after the Closing (the "**Option Period**") to consider purchasing the Cosmopolitan Claims and AR (as defined in **Section 1.02** of the Disclosure Schedules and which claims and Accounts Receivable shall not include any Avoidance Actions, the "**Cosmopolitan Claims**") for an amount of Fifty Thousand Dollars ($50,000)(the "**Claim Purchase Price**"). On or before the expiration of the Option Period, Buyer shall notify Seller in writing of its election to exercise its option under this Section 1.09(d) to purchase the Cosmopolitan Claims ("**Option Notice**"). Within three (3) Business Days from date of Buyer's Option Notice, Buyer shall deliver to Seller by wire, cashier's check or other immediately available funds the Claim Purchase Price. Upon Buyer's exercise of the above option and payment of the Claim Purchase Price, Seller agrees to transfer, assign and convey the Cosmopolitan Claims to Buyer.

(ii)      In the event Buyer elects not to exercise or consummate the option set forth in paragraph (i) above, Seller shall retain and accrue any and all monetary and interest accrual on all sums due and owing to Seller under the Cosmopolitan Claims and shall in Seller's sole and absolute discretion initiate, maintain and prosecute, any and all claims arising from or related to the Cosmopolitan Claims. Seller shall further have the sole and absolute right to compromise, settle, resolve and dismiss the Cosmopolitan Claims upon terms, sums, conditions, reservations and agreements acceptable to Seller in its sole and absolute discretion.

5.      The Parties acknowledge and agree that following the Closing, the Customer Contract between Seller and Riverside Resort and Casino, LLC ("**Riverside**") shall be superseded by a Laundry Service Agreement between Riverside and an Affiliate of Buyer.

6.      The Parties acknowledge and agree that any and all claims arising from or related the Customer Contract between Seller and FP Holdings L.P. d/b/a Palms Hotel and Casino dated as of October 10, 2015 are being transferred and assigned to Buyer at Closing.

7.     Counterparts.  This First Amendment may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same agreement. Electronic, pdf and facsimile signatures shall have the same force and effect as original signatures.  Any signature page of this First Amendment may be detached from any counterpart without impairing the legal effect of any signatures thereon, and may be attached to another counterpart, identical in form thereto, but having attached to it one or more additional signature pages.

8.     Full Force and Effect.   Except as expressly modified by this First Amendment, the Agreement remains unchanged and in full force and effect.

**[SIGNATURES APPEAR ON NEXT PAGE]**

**IN WITNESS WHEREOF**, the parties have executed this First Amendment as of the date first set forth above.

**Seller:**                                                    **Buyer:**

**SUPERIOR LINEN, LLC,**                  **LAS VEGAS LINEN LLC**, a Nevada
a Nevada limited liability company:       limited liability company:


By: _____            By: _____
Name:   Robert E. Smith                   Name:
Its:        Designated Responsible Person Its:

**Amended and Restated Disclosure Schedules**

**SECTION 1.01(c) Customer Contracts:**

1.  Avi Resort and Casino, a Fort Mojave Indian Tribe Corporation, agreement dated June 19, 2015.
2.  B B + B, LLC, d/b/a Oscar's Beef Booze Broads*
3.  Bayshore Suites, LLC, Linen Services Agreement dated April 17, 2014.
4.  Cafe Latte*
5.  Golden Gate Casino, LLC, d/b/a Golden Gate Hotel & Casino Laundry Services Agreement dated August 3, 2016.
6.  THI of Nevada II at Desert Lane, LLC d/b/a Horizon Specialty Hospital of Henderson Laundry Services Agreement dated August 8, 2015.
7.  Ike Gaming, Inc., d/b/a El Cortez Hotel and Casino, agreement dated December 18, 2013, as amended.
8.  Jean Development Company, LLC, d/b/a Gold Strike Hotel and Gambling Hall Laundry Services Agreement dated August 1, 2015.
9.  LVGV, LLC, d/b/a M Resort Spa & Casino Laundry Services Agreement dated February 1, 2015.
10. Marnell Gaming, LLC (f/b/o Colorado Belle Gaming, LLC and Edgewater Gaming, LLC) Laundry Services Agreement dated March 24, 2014.
11. Vegas Hospital Care, LLC d/b/a Mountain's Edge Hospital, agreement dated March 26, 2015
12. Pioneer Hotel and Gambling Hall, a Nevada corporation, agreement dated May 20, 2014.
13. Plaza Hotel And Casino, LLC, d/b/a Plaza, a Nevada limited liability company, agreement dated August 13, 2011.
14. R.B. Properties Inc., contracting as Bilbray Industries Inc., Linen Services Agreement dated August 19, 2014.
15. The Primmadonna Company, LLC, d/b/a Primm Valley Resort & Casino, Buffalo Bill's Resort & Casino, and Whiskey Pete's Hotel & Casino, a Nevada limited liability company, agreement dated February 2013, NO SPECIFIC DATE INCLUDED, as amended.
16. The Service Companies, Inc.*
17. Top Golf USA Las Vegas, LLC Rental Services Agreement dated March 21, 2016.

**All of the foregoing customer contracts constitute Designated Contracts under Section 1.08 of the Agreement.**

**\*Copy has not been provided to Buyer**

**Amended and Restated Disclosure Schedules**

**Amended and Restated Disclosure Schedules**

**SECTION 1.01(d) INVENTORY AND SUPPLIES:**

| Inventory Description | Number of Items | Identifying Number: |
|---|---|---|
| **NEW AND USED LINEN** | See attached schedule on following page. | LOT |
| **CARTS** | 875 carts including 50 confirmed carts located at the Cosmopolitan Hotel and within Buyer's Affiliate's possession and such other carts as identified by Seller and Buyer at Closing. | |

The a quantities of Inventory set forth herein are not exact counts as may exist on the Closing Date, but do represent the result of Seller's last count of Inventory prior to the Closing Date

The following Inventory is owned by Customers:

1. Primmadonna Company, LLC, d/b/a Primm Valley Resort & Casino, Buffalo Bill's Resort & Casino, and Whiskey Pete's Hotel & Casino, a Nevada limited liability company.

2. Sapphires pool towels and wipers

| Quantity (ea.) | BATH TOWEL WHITE 27x50 KEY | BATH TOWEL WHITE 27x54 | HAND TOWEL WHITE 16x30 KEY | WASH CLOTH WHITE 13x13 | KING SHEET 108x120 | QUEEN SHEET WHITE 90x115 | KING SHEET WHITE 90x120 STRIPE | QUEEN SHEET WHITE STRIPE | KING SHEET WHITE 90x120 | PILLOW CASE WHITE T/D 42x36 | BATH MAT WHITE | GLASS TOWEL RED STRIPE | PILLOW SLIP WHITE STRIPE | PILLOW WHITE STRIPE | HAND TOWEL BEIGE | BATH RUG | KING FITTED | QUEEN FITTED | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A4 | 7327 | 11578 | 15179 | 6997 | 2341 | | 5075 | | 8103 | 8103 | 3483 | | | | | | | | 20,073 |
| Imperial | 1900 | 11063 | 13779 | 14885 | 2847 | | 26409 | | 6893 | 23421 | 6095 | 7488 | | 5861 | | | | | 106,130 |
| Majestic | 14875 | 12730 | 16190 | 23902 | 31378 | | | | | 9121 | 1423 | | | 7935 | | | | | 134,032 |
| Cabana | 3900 | 3735 | 5375 | 2155 | | 3089 | | | | | 581 | | | | | | | | 27,247 |
| Pointe | | 1075 | 1562 | | | | | | | | | | | | | | | | 4,156 |
| Golden Gate | 933 | | | | | | | | | | | | | | | | | | 28,116 |
| El Cortez | | 3613 | 4159 | 4275 | | 1203 | 915 | | 1529 | | | | | | | | | | 56,336 |
| Plaza | 6457 | 6827 | 6195 | 656 | | 1582 | 2916 | | 13259 | | 1817 | | | | 157 | | | | 28,094 |
| Gold Strike | 2683 | 3821 | 4156 | | 1220 | | | | 2411 | | 3067 | 2568 | 16469 | 18438 | | 102 | 108 | 763 | |
| | 12382 | 4765 | 14744 | 60904 | 22005 | | 7396 | | 27142 | | 27385 | | | | | 567 | 769 | | |
| M-Resort | | | | | 23,000 | 1220 | | 854 | 15512 | 15983 | | | | | | 542 | 508 | | 26,287 |
| KEY | 3822 | 5393 | 5841 | 1327 | 905 | 2968 | | 854 | 8270 | | | | | | | | | | |

| **Hospital Linen Inventory Numbers** | **Amount** |
|---|---|
| 5150 - Pillowcase | 12116 |
| 5201 - Sheet, Hospital | 14865 |
| 5230 - Sheet, Draw | 4263 |
| 5250 - Sheet, Knitted Contour | 4058 |
| 5256 - Blue Gurney Sheets | 2461 |
| 5310 - Blanket, Thermal White | 3895 |
| 5311 - Blanket, Thermal Blue | 2169 |
| 5312 - Blanket, Thermal Green | 204 |
| 5313 - Blanket, Thermal Raspberry | 345 |
| 5350 - Blanket, Bath | 9786 |
| 5401 - Pad, Incontinent | 1457 |
| 5520 - Washcloth | 16433 |
| 5530 - Towel, Bath | 15110 |
| 5710 - Gown, Patient | 641 |
| 5713 - Gown, Patient Oversize | 693 |
| 5720 - Gown, Patient IV/Telemetry | 3792 |
| 5721 - Gown, Patient IV/Telemetry Oversize | 464 |
| 5820 - Towel, Surgery Misty Green | 2675 |
| 6075 - Pant, Pajama Adult XLarge | 346 |
| 6401 - TOWEL, MICROFIBER | 3019 |
| 6407 - Mop, Wet Microfiber Blue String Mop | 422 |
| 6410 - Mop, Flat Microfiber 18" | 3182 |
| 6410 - TOWEL, CLEANING BLUE | 4173 |
| 6412 - Mop, Wet Medium 16 oz | 464 |
| 6550 - Towel, Dish | 1522 |

| **Food and Beverage Linen Inventory Numbers** | **Amount** |
|---|---|
| 0900 - BAR TOWEL WIPER | 17207 |
| 0900 - WIPER | 13295 |
| 0901 - BAR TOWEL WHITE | 8390 |
| 0902 - UTILITY TOWEL RED | 7241 |
| 0903 - UTILITY TOWEL BLUE | 8914 |
| 0903 - UTILITY TOWEL BLUE | 5114 |
| 0904 - GLASS TOWEL RED STRIPE | 8763 |
| 0908 - DUST MOP 24" | 29 |
| 0910 - APRON BIB WHITE | 1430 |
| 0911 - APRON  BLACK BIB | 975 |
| 0920 - APRON BISTRO WHITE | 111 |
| 0921 - APRON BISTRO BLACK | 84 |
| 0930 - APRON 4-WAY WHITE | 184 |

| | |
|---|---|
| 0931 - APRON 4-WAY BLACK | 37 |
| 1000 - NAPKIN WHITE WAVE (CTN) | 2772 |
| 1000 - NAPKINS WHITE | 8413 |
| 1002 - 52X52 TABLE TOP WHITE | 1696 |
| 1003 - 52X120 TABLE TOP WHITE | 1150 |
| 1004 - 62X62 TABLE TOP WHITE | 805 |
| 1005 - 72X72 TABLE TOP WHITE | 575 |
| 1006 - 90X90 TABLE TOP WHITE | 556 |
| 1006 - TABLE CLOTH 72X72 BLK/WHT CHECK | 312 |
| 1007 - 120" ROUND WHITE | 305 |
| 1008 - 132" ROUND WHITE | 316 |
| 1009 - 90" ROUND WHITE | 115 |
| 1010 - NAPKINS BLACK | 17020 |
| 1012 - 52X52 TABLE TOP BLACK | 225 |
| 1013 - 52X120 TABLE TOP BLACK | 695 |
| 1014 - 62X62 TABLE TOP BLACK | 365 |
| 1015 - 72X72 TABLE TOP BLACK | 995 |
| 1016 - 90X90 TABLE TOP BLACK | 720 |
| 1017 - 120" ROUND BLACK | 355 |
| 1018 - 132" ROUND BLACK | 317 |
| 1019 - 90" ROUND BLACK | 71 |
| 1020 - NAPKINS BROWN | 2481 |
| 1021 - TABLE CLOTH 42X42 BROWN | 312 |
| 1022 - TABLE CLOTH 52X52 BROWN | 225 |
| 1023 - TABLE CLOTH 52X114 BROWN | 451 |
| 1024 - TABLE CLOTH 62X62 BROWN | 285 |
| 1025 - TABLE CLOTH 72X72 BROWN | 270 |
| 1026 - TABLE CLOTH 85X85 BROWN | 296 |
| 1028 - TABLE CLOTH 130" ROUND BROWN | 252 |
| 1029 - TABLE CLOTH 54X72 BROWN | 450 |
| 1029 - TABLE CLOTH 90" ROUND BROWN | 132 |
| 1030 - NAPKINS RED | 4071 |
| 1032 - TABLE CLOTH 52X52 RED | 225 |
| 1033 - TABLE CLOTH 52X114 RED | 80 |
| 1036 - TABLE CLOTH 85X85 RED | 290 |
| 1040 - NAPKINS BURGUNDY | 4639 |
| 1042 - TABLE CLOTH 52X52 BURGUNDY | 527 |
| 1043 - TABLE CLOTH 52X114 BURGUNDY | 670 |
| 1044 - TABLE CLOTH 61X61 BURGUNDY | 612 |
| 1045 - TABLE CLOTH 72X72 BURGUNDY | 0 |
| 1046 - TABLE CLOTH 85X85 BURGUNDY | 1478 |
| 1050 - NAPKINS RUST | 1600 |
| 1052 - TABLE CLOTH 52X52 RUST | 50 |

| Item | Qty |
|------|-----|
| 1053 - TABLE CLOTH 52X114 RUST | 15 |
| 1056 - TABLE CLOTH 85X85 RUST | 60 |
| 1060 - NAPKIN FOREST GREEN | 11950 |
| 1062 - TABLE CLOTH 52X52 FOREST GREEN | 50 |
| 1063 - TABLE CLOTH 52X114 FOREST GREEN | 450 |
| 1066 - TABLE CLOTH 85X85 FOREST GREEN | 430 |
| 1070 - NAPKINS PURPLE | 514 |
| 1072 - TABLE CLOTH 52X52 PURPLE | 75 |
| 1072 - TABLE CLOTH 62X62 PURPLE | 35 |
| 1072 - TABLE CLOTH 72X72 PURPLE | 0 |
| 1073 - TABLE CLOTH 52X114 PURPLE | 48 |
| 1076 - TABLE CLOTH 85X85 PURPLE | 93 |
| 1080 - NAPKIN LAVENDER | 618 |
| 1082 - TABLE CLOTH 52X52 LAVENDER | 36 |
| 1083 - TABLE CLOTH 52X114 LAVENDER | 20 |
| 1086 - TABLE CLOTH 85X85 LAVENDER | 160 |
| 1090 - NAPKINS GOLD | 4100 |
| 1092 - TABLE CLOTH 52X52  GOLD | 50 |
| 1092 - TABLE CLOTH 62X62 GOLD | 30 |
| 1093 - TABLE CLOTH 52X114 GOLD | 35 |
| 1094 - TABLE CLOTH 72X72 GOLD | 15 |
| 1096 - TABLE CLOTH 85X85 GOLD | 72 |
| 1100 - NAPKINS IVORY | 412 |
| 1102 - 52X52 TABLE TOP IVORY | 585 |
| 1103 - 52X120 TABLE TOP IVORY | 736 |
| 1104 - 62X62 TABLE TOP IVORY | 553 |
| 1105 - TABLE CLOTH 61X61 IVORY ELM (GT) | 496 |
| 1106 - 90X90 TABLE TOP IVORY | 506 |
| 1106 - TABLE CLOTH 72X72 IVORY ELM (GT) | 384 |
| 1107 - 120" ROUND IVORY | 65 |
| 1108 - 132" ROUND IVORY | 205 |
| 1109 - 90" ROUND IVORY | 120 |
| 1110 - NAPKIN HOT PINK | 317 |
| 1120 - NAPKIN LIGHT PINK | 245 |
| 1122 - TABLE CLOTH 52X52 LIGHT PINK | 43 |
| 1123 - TABLE CLOTH 52X114 LIGHT PINK | 40 |
| 1126 - TABLE CLOTH 85X85 LIGHT PINK | 24 |
| 1130 - NAPKIN NAVY | 900 |
| 1130 - NAPKIN ROYAL BLUE | 3000 |
| 1132 - TABLE CLOTH 52X52 NAVY | 147 |
| 1132 - TABLE CLOTH 52X52 ROYAL BLUE | 125 |
| 1133 - TABLE CLOTH 52X114 NAVY | 29 |
| 1133 - TABLE CLOTH 52X114 ROYAL BLUE | 457 |

| | |
|---|---|
| 1136 - TABLE CLOTH 85X85 NAVY | 36 |
| 1136 - TABLE CLOTH 85X85 ROYAL BLUE | 495 |
| 1140 - NAPKIN LT BLUE | 418 |
| 1142 - TABLE CLOTH 52X52 LIGHT BLUE | 25 |
| 1143 - TABLE CLOTH 52X114 LIGHT BLUE | 16 |
| 1146 - TABLE CLOTH 85X85 LIGHT BLUE | 36 |
| 1150 - NAPKIN CADET BLUE | 118 |
| 1152 - TABLE CLOTH 52X52 CADET BLUE | 0 |
| 1153 - TABLE CLOTH 52X114 CADET BLUE | 30 |
| 1156 - TABLE CLOTH 85X85 CADET BLUE | 90 |
| 1160 - NAPKIN MAZE | 400 |
| 1162 - TABLE CLOTH 52X52 MAZE | 25 |
| 1163 - TABLE CLOTH 52X114 MAZE | 20 |
| 1166 - TABLE CLOTH 85X85 MAZE | 30 |
| 1170 - NAPKIN STONE GREY | 102 |
| 1172 - TABLE CLOTH 52X52 STONE GREY(DARK) | 0 |
| 1173 - TABLE CLOTH 52X114 STONE GREY(DARK) | 10 |
| 1176 - TABLE CLOTH 85X85 STONE GREY(DARK) | 20 |
| 1180 - NAPKIN PEACH | 600 |
| 1183 - TABLE CLOTH 52X114 PEACH | 50 |
| 1190 - NAPKIN SEAFOAM | 427 |
| 1192 - TABLE CLOTH 52X52 SEAFOAM | 125 |
| 1192 - TABLE CLOTH 62X62 SEAFOAM | 60 |
| 1193 - TABLE CLOTH 52X114 SEAFOAM | 30 |
| 1194 - TABLE CLOTH 72X72 SEAFOAM | 0 |
| 1196 - TABLE CLOTH 85X85 SEAFOAM | 107 |
| 1200 - NAPKIN RED WHITE CHECK | 500 |
| 1202 - TABLE CLOTH 52X52 RED WHITE CHECK | 105 |
| 1203 - TABLE CLOTH 52X114 RED WHITE CHECK | 25 |
| 1206 - TABLE CLOTH 85X85 RED WHITE CHECK | 90 |
| 1210 - NAPKIN TURQUOISE | 300 |
| 1220 - NAPKIN YELLOW | 288 |
| 1230 - NAPKIN SANDLEWOOD | 3164 |
| 1230 - NAPKIN SANDLEWOOD DIAMOND WEAVE | 2593 |
| 1231 - NAPKIN BLACK DIAMOND WEAVE | 3201 |
| 1232 - NAPKIN OLIVE DIAMOND WEAVE | 4217 |
| 1232 - TABLE CLOTH 52X52 SANDLEWOOD | 455 |
| 1233 - TABLE CLOTH 52X114 SANDALWOOD | 513 |
| 1234 - TABLE CLOTH 61X61 SANDLEWOOD | 270 |
| 1235 - TABLE CLOTH 72X72 SANDLEWOOD | 375 |
| 1236 - TABLE CLOTH 85X85 SANDALWOOD | 302 |
| 1238 - TABLE CLOTH 130" ROUND SANDLEWOOD | 209 |
| 1239 - TABLE CLOTH 90" ROUND SANDLEWOOD | 85 |

| | |
|---|---|
| 1243 - TABLE CLOTH 52X114 ROSETTA | 232 |
| 1250 - NAPKIN DOVE GREY | 195 |
| 1266 - TABLE CLOTH 85X85 RASPBERRY | 42 |
| 1270 - NAPKIN ROSETTA | 300 |
| 1290 - NAPKIN WHITE W/ RED STRIPE | 5545 |
| 1300 - MAT SLATE 3 X 4 | 65 |
| 1301 - MAT SLATE 4 X 6 | 87 |
| 1302 - MAT SLATE 3 X 10 | 101 |
| 1307 - MAT NAVY 4X6 | 13 |
| 1308 - MAT NAVY 3X10 | 9 |
| 1317 - MAT RED 3 X 6 | 3 |
| 1318 - MAT RED 4 X 6 | 8 |
| 1319 - MAT RED 3 X 10 | 9 |
| 6401- TOWEL, MICROFIBER | 685 |

**Amended and Restated Disclosure Schedules**

# EXHIBIT "3"

## SETTLEMENT AND RELEASE AGREEMENT

This SETTLEMENT AND RELEASE AGREEMENT (the "Agreement") is entered into as of May 31, 2017 (the "Execution Date") by and between SUPERIOR LINEN, LLC, a Nevada limited liability company, as debtor and debtor in possession (the "Debtor" or "Superior Linen" as applicable); and the CITY OF NORTH LAS VEGAS, a Nevada municipal corporation (the "City" and together with the Debtor, the "Parties" or each as a "Party").

### RECITALS

A.        Superior Linen is a full service commercial laundry company providing the entire spectrum of laundry services to hotels and food and beverage managed restaurants and clubs.

B.        On or about July 26, 2011, Superior Linen, as tenant, entered into a Lease Agreement (as amended, the "Lease Agreement") with Prologis NA3, LLC, a Delaware limited liability company ("Prologis"), as original landlord, for a building located in the Nellis Industrial Park with an address of 4501 Mitchell Street, North Las Vegas, Nevada 89081 (as amended, the "Premises"). The Lease Agreement was later amended pursuant to that certain First Amendment to Lease dated as of June 22, 2012, and then again pursuant to that certain Second Amendment to Lease Agreement dated as of May 16, 2014. In or about 2015, Icon Pac Nevada Owner Pool 3, Nevada, LLC, a Delaware limited liability company, as successor landlord (the "Landlord") became the successor landlord of the Premises and assumed all rights, liabilities and remedies under the Lease Agreement in its then current form as amended.

C.        Superior Linen is also obligated to pay certain sums to the City over time as and for wastewater/sewerage connection fees for industrial laundries as well as normal monthly utility charges. On or about July 30, 2014, the City and Superior Linen entered into a Confession of Judgment, which included certain repayment schedules and a settlement agreement with the City. On or about February 1, 2015, the City and Superior Linen entered into a Settlement Agreement and Release, which included an additional Confession of Judgment.

D.        Prior to the Petition Date, Superior Linen defaulted on its payment arrangement(s) with the City, and thus the City recorded a Notice of Lien for Unpaid Utilities Charges against the Premises in the Official Records of the County Recorder, Clark County, Nevada on September 22, 2016 at Instrument 20160922-0000141 (the "Notice of Lien") in the amount of $893,667.33. The recordation of the Notice of Lien on the Premises is a breach of the Lease Agreement.

E.        On September 30, 2016 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), thereby commencing its bankruptcy case, Case No. 16-15388-mkn (the "Chapter 11 Case"). Debtor is authorized to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

F.        On January 24, 2017, the Bankruptcy Court entered an order granting an adequate assurance utility deposit to the City pursuant to section 366 of the Bankruptcy Code in the amount of $85,000.00 (the "Deposit"), which the Debtor has posted with the City and which

deposit remains unapplied as of the Execution Date.

      G.     On February 1, 2017, the City filed a Proof of Claim, being Claim No. 33 in the amount of $905,387.08, and on that same date the Landlord filed its Proof of Claim, being Claim No. 34, in the amount of $902,179.93.

      H.     The Debtor is indebted to the City for utility services, and wastewater/sewerage connection fees, among other items, in the total amount of $875,341.15, plus outstanding utility services bills through May 31, 2017 in the total amount of $156,731.88, plus additional monthly utility service amounts thereafter through the time the Transaction closes (the "Debtor Allocated Portion of the Final Utility Bills"), for a total amount owing of $1,032,073.03.

      I.     Debtor is proposing to sell substantially all of its assets to Las Vegas Linen, LLC, a Nevada limited liability company (the "Buyer"), pursuant to section 363 of the Bankruptcy Code, which transaction also contemplates the assumption and assignment of the Lease by the Debtor to the Buyer pursuant to section 365 of the Bankruptcy Code (collectively, the "Transaction"). Pursuant to the terms and conditions of this proposed Transaction, which is subject to approval by the Bankruptcy Court, the Buyer has agreed to pay as an assumed liability the sum of $750,000.00 of the Cure Obligation owing to the City over time as set forth herein; *provided*, *however*, that, among other matters: (1) the Transaction is approved by the Bankruptcy Court as presented on or before May 30, 2017; (2) this Agreement is approved by the Debtor, the City, and the Bankruptcy Court on or before the approval of the Transaction; and (3) the Transaction Closes. In connection with the Transaction Close the $85,000 Deposit will become the property of the Buyer. Upon the execution of this Agreement the $85,000 Deposit will be posted for the benefit of the Buyer's account with the City.

      J.     Except as expressly set forth herein, and subject to the terms and conditions herein, the Parties, without conceding or admitting liability, have concluded that it serves their respective interests to avoid the expenditure of additional time, effort and resources in litigating their disputes and in continuing their various proceedings and litigation against or involving each other, and that they now wish to fully, finally and forever settle and compromise their claims and disputes against each other, including but not limited to any and all claims to attorney's fees, costs, and other expenses, and to release, discharge and terminate all claims, demands, controversies, suits, causes of action, damages, rights, warranties, liabilities and obligations, and which either have been asserted or which could be asserted against each other.

      **NOW, THEREFORE,** in consideration of the promises, undertakings, payments, and releases stated in this Agreement, which the Parties acknowledge to be sufficient consideration, the Parties agree as follows:

      **1.**     **Bankruptcy Court Approval.** The effectiveness of this Agreement is contingent upon the entry of an order authorizing and approving the Transaction and this Agreement and the Closing of the Transaction as contemplated by the Sale Motion. Within one (1) business day of the receipt of signatures on this Agreement and the Asset Purchase Agreement for the Transaction, the Debtor shall file a motion with the Bankruptcy Court seeking to authorize and to approve this Agreement (the "Settlement Motion"), and shall use their commercially reasonable best efforts to obtain such approval of the same. The proposed form of Settlement Motion and

Settlement Order must be in a form and substance reasonably acceptable to the Parties as well as the Buyer prior to it being filed with the Bankruptcy Court.

2.    **The Assumed Payment by the Buyer**.  Subject to the terms and conditions herein, the Debtor shall assume the obligation to repay the principal sum of up to $750,000 of the Cure Obligation to the City (the "Assumed Payment"), which shall thereafter be assumed by the Buyer pursuant to the terms and conditions of the Asset Purchase Agreement. The Assumed Payment shall be made on the payment schedule as attached hereto as **Exhibit 1**.  The Assumed Payment shall be made as follows:

- Within five days of the Closing of the Transaction, the Buyer will make a payment of $60,000 to the City;

- The remaining amount of $690,000 shall accrue interest at the rate of 2.03% and shall be paid in full in thirty-six (36) equal monthly payments, with payments beginning as set forth in Exhibit 1.

- However, if the Buyer fails to make the first twenty-four (24) month payments on time, or otherwise defaulted on its obligations to the City, the City will be entitled to full repayment on the remainder of the amount owing at the end of the twenty-four (24) month period.

3.    **The Remaining Payment by the Debtor**.  Subject to the terms and conditions herein, the Debtor shall immediately pay to the City the balance of the Cure Obligation in excess of the $750,000 Assumed Payment, being the sum of $282,073.03, plus the Debtor Allocated Portion of the Final Utility Bills, shall be paid by the Debtor directly from escrow from the Transaction and thus directly from the proceeds of sale received by the Debtor from the Buyer.

4.    **Confession of Judgment by Buyer**.  The Buyer and the City shall execute a Confession of Judgment in favor of the City containing the terms and conditions of this Agreement, and that Confession of Judgment is for security purposes only and shall not be filed or executed upon unless an Event of Default occurs that is not cured or not given an extended period of time to cure.  Further, AMCP Clean Acquisition Company, LLC and AMCP Clean Subsidiary Holdco, LLC will execute a guaranty, guarantying the Buyer's obligation to the City (the "Guaranty").  The signed Confession of Judgment and Guaranty are attached hereto as **Exhibit 3** for reference.

5.    **City's Consent and Release of Current Lien(s)**.  In consideration of the payments and the assumption of liabilities in this Agreement, the City approves of, and waives any objection to the approval of the Transaction, the assumption of the Lease by the Debtor, the assignment of the Lease to the Buyer.  The City also agrees to release any and all existing liens on the Premises, which shall be effectuated by the City through the recordation of the Extinguishment and Release (the "Extinguishment & Release") attached hereto as **Exhibit 2** in the Official Records.  After the Transaction closes, the City shall have thirty (30) days to record the Extinguishment and Release. The City's release of lien shall be without prejudice to the default remedies provided under the City's municipal code, state law or elsewhere in this Agreement.  Nothing herein is intended or should be construed as a waiver or release of any

obligations that may arise under the Lease from and after the Transaction Closing, which shall be the sole and exclusive responsibility of the Buyer.

6.      **Events of Default for the Assumed Payment.**  Superior Linen or Buyer after assumption and assignment as applicable, shall be in default under this Agreement upon the occurrence and continuation of any one or more of the following events (the "Events of Default"):

a.      Superior Linen, or Buyer after the assumption and assignment of this Agreement, fails to timely make the payments contemplated in Section 2, above, or any other payment that comes due, and does not cure that failure within fifteen (15) days of being provided with written notice of such default,

b.      Buyer becomes insolvent or is the subject of any bankruptcy or other voluntary or involuntary proceeding in our out of court, for the adjustment of debtor-creditor relationships;

c.      Buyer dissolves or liquidates or is administratively suspended or dissolved.  For the avoidance of doubt, any withdrawal, removal, transfer, or change in membership interests of the Buyer shall not be an Event of Default.

d.      Any governmental, judicial, or legal authority having jurisdiction over the Buyer or its business withdraws, suspends, or revokes any required approval, license, certificate, or permit and the withdrawal, suspension, or revocation remains in effect for a period of sixty (60) days (the "Initial Cure Period").  So long as Buyer begins within the Initial Cure Period and diligently takes steps to remove the cause of the withdrawal, suspension, or revocation, and the City, after meeting and consulting with the Buyer, and the City determines that the Buyer is reasonably likely to prevail, the Initial Cure period may be extended by a period not to exceed ninety (90) days.

7.      **Default Remedies.**  If an Event of Default occurs and remains uncured, and Buyer fails to comply with the conditions of this Agreement, any or all of the following may occur:

a.      All amounts of principal and interest under this Agreement shall be accelerated and immediately due and payable within five (5) Business Days of transmission of a written notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor or other notices or demands of any kind or character;

b.      Any outstanding amounts due and owing, at the option of the City, shall bear additional interest at an annual rate of 2.03% (the "Default Rate");

c.      The City may record the Confession of Judgment and seek to enforce the Guaranties or otherwise execute the Confession of Judgment to satisfy any outstanding amounts due and owing, including amounts due for any default rate of interest; and

d.    The City may pursue any of its other rights and remedies under the City's municipal code and/or state law, including recordation of a lien on the Premises for the amount that remains unpaid and any future or additional amounts owing to the City.

8.    **Audit.**    The City may audit, no less than quarterly, then-current wastewater/sewerage flows, and after such audit, the City reserve the right to bill Buyer additional amounts for wastewater/sewerage connection fees for such percentage of additional wastewater/sewerage as may be discovered in any audit.  As long as wastewater is conveyed to the Clark County Water Reclamation District ("District"), Buyer will comply with the connection fee policy of the District.  In the event wastewater is rerouted and conveyed to the City's Water Reclamation Facility, Buyer will comply with the connection fee policy of the City. In no event will Buyer have to pay additional connection fees for Equivalent Residential Units (ERU) already paid to the District.  The Clark County Water Reclamation District ("District") informed the City and Buyer that it would not conduct an audit of the premises located at 4501 Mitchell Street, North Las Vegas, Nevada, until the earlier of (I) June 2018 for the prior twelve (12) month period or (II) improvements, equipment or fixtures, are made at the Premises.  The District's statement in this regard is a material part of this Agreement but for which the Purchaser would not have entered into either the Agreement or the Final APA. For the avoidance of doubt, the Buyer maintains that it is not assuming any obligation other than what is set forth in this Agreement.

9.    **Deposit.**  The City will maintain the $85,000 Deposit as security for water service pursuant to the City's municipal code.  Buyer will receive a refund of its $85,000 Deposit pursuant to the City's municipal code.

10.    **No Prepayment Penalty.**  There shall be no pre-payment penalty if all or any part of the Assumed Payment is made in advance of the applicable due date.

11.    **Attorneys' Fees and Costs for Agreement.**  Each of the Parties shall bear their own attorneys' fees and costs for the negotiation and preparation of this Agreement, and the related attachments.

12.    **Effects of Non-Approval.**  If the Bankruptcy Court declines to approve either this Agreement or the Transaction or the Transaction does not Close, then (i) this Agreement will be null and void and of no force or effect; (ii) no Party shall have any obligations to any other Party arising out of this Agreement; and (iii) the Parties' respective rights and remedies with respect to all matters addressed by this Agreement will be fully reserved as they exist as of just prior to the Execution Date.

13.    **Releases.**

a.    **Debtor.**  Except for the obligations set forth in this Agreement, the City hereby fully releases, acquits and forever discharges the Debtor and its bankruptcy estate, and their respective employees, officers, directors, managers, members, agents, representatives, attorneys, predecessors, successors, insiders, affiliates, assigns, partnerships, corporations, and limited liability companies of and from any and all claims, demands, causes of action, damages, costs, interest, expenses, attorneys' fees,

liabilities, indemnities, duties and obligations of any kind or nature whatsoever, whether at law or in equity or statutory, whether known or unknown, suspected or unsuspected, fixed or contingent, arising out of any cause whatsoever occurring prior to the Execution Date of this Agreement.  For the avoidance of doubt, this Agreement shall also result in the immediate full and final satisfaction and expungement of the City's Proof of Claim in the Chapter 11 Case.

**b.** **City.**  Except for the obligations set forth in this Agreement, the Debtor and Buyer hereby fully releases, acquits and forever discharges the City, and its respective employees, officials, officers, directors, managers, members, agents, representatives, attorneys, predecessors, successors, insiders, affiliates, assigns, partnerships, corporations, limited liability companies, divisions, political subdivisions and legal entities of and from any and all claims, demands, causes of action, damages, costs, interest, expenses, attorneys' fees, liabilities, indemnities, duties and obligations of any kind or nature whatsoever, whether at law or in equity or statutory, whether known or unknown, suspected or unsuspected, fixed or contingent, arising out of any cause whatsoever occurring prior to the Execution Date of this Agreement.

**c.** **Buyer.**  Except for the obligations set forth in this Agreement and those in the Asset Purchase Agreement for the Transaction, the Debtor and City hereby fully release, acquit and forever discharge the Buyer, and its respective employees, officials, officers, directors, managers, members, agents, representatives, attorneys, predecessors, successors, insiders, affiliates, assigns, partnerships, corporations, limited liability companies, divisions, parents, subs, and legal entities of and from any and all claims, demands, causes of action, damages, costs, interest, expenses, attorneys' fees, liabilities, indemnities, duties and obligations of any kind or nature whatsoever, whether at law or in equity or statutory, whether known or unknown, suspected or unsuspected, fixed or contingent, arising out of any cause whatsoever occurring prior to the Execution Date of this Agreement. For the avoidance of doubt, the City does not release the Buyer from its obligations as set forth in this Agreement and its future payment obligations to the City. Provided further for the avoidance of doubt, the releases granted to Buyer in this Agreement shall not release, amend, modify or waive any present or future obligations as set forth in the Asset Purchase Agreement for the Transaction with the Debtor.

**14.** **Representations and Warranties.**  The Parties represent and warrant to each other the following:

**a.** **Due Authority.**  Subject to approval by the Bankruptcy Court, each person signing this Agreement on behalf of a Party represents and warrants that he or she is duly authorized and lawfully empowered to execute this Agreement on behalf of the Party for whom or which he or she purports to act and to bind such Party to the terms of this Agreement.  Subject only to approval by the Bankruptcy Court, the Parties hereby represent and warrant to each other that the execution, delivery and performance by each of them of this Agreement and the other filings and transactions referenced herein and made a part hereof are within the legal power of such Parties and have been duly authorized by all necessary action by the Parties.  Subject to the entry of the Settlement Order, this Agreement constitutes a legal, valid and binding obligation of each of the

Parties hereto, enforceable against each of the Parties in accordance with its terms. Subject to the entry of the Settlement Order, all other filings and documents executed and delivered by any of the Parties to the Agreement shall, when executed by each such Party, constitute legal, valid and binding obligations of each Party thereto, enforceable against each such Party in accordance with their terms.

     **b.**    **No Prior Assignments.** Each Party releasing any right or claim under this Agreement represents and warrants that such Party has not previously assigned, sold, or transferred any interest in such right or claim, is the sole owner thereof, and has the sole right to release the same as of the date of execution of this Agreement.

**15.**    **Notices.** If any Party is required to give notice to another Party under this Agreement, notice shall be mailed to the addresses listed below as well as sent by email. The addresses for notices to a Party are:

For Notice to the Debtor:
> Larson & Zirzow
> Attn. Mathew C. Zirzow, Esq.
> 850 E. Bonneville Ave.
> Las Vegas, NV 89101
> Email: mzirzow@lzlawnv.com

> -and-

> Superior Linen, LLC
> Attn. Robert Smith
> 4501 Mitchell Street
> Las Vegas, NV 89030
> E-mail: robert.smith@superlinen.com

For Notice to the City:
> Snell & Wilmer, L.L.P.
> Attn. Robert Kinas, Esq.
> 3883 Howard Hughes Parkway, Suite 1100
> Las Vegas, Nevada 89169
> Email: rkinas@swlaw.com

> -and-

> City of North Las Vegas
> Attn. City Attorney
> 2250 Las Vegas Blvd., N. Suite 810
> North Las Vegas, NV 89030
> E-mail: moorem@cityofnorthlasvegas.com

> For Notice to the Buyer:
> Fox Rothschild LLP

Attn: Brett Axelrod and Paul Labov
1980 Festival Plaza Drive
Suite 700
Las Vegas, NV 89135

-and-

Las Vegas Linen, LLC
Attn: Chris Kane
4501 Mitchell Street,
North Las Vegas, Nevada 89081

16. **Cooperative Drafting**. The Parties to this Agreement have participated jointly in the negotiation and preparation of this Agreement. Accordingly, each Party agrees not to assert that any other Party is the sole or principal drafter of the Agreement. Each Party also agrees not to assert that any canon of construction applicable to sole or principal drafters should be applied against the other Party.

17. **Counterparts.** This Agreement may be executed in counterparts by one or more of the Parties to this Agreement, and all counterparts, when executed, shall together constitute the final Agreement, as if one document had been signed by all the Parties. Each counterpart, upon execution and delivery, shall be deemed a complete original, binding the Party or Parties that signed the counterpart upon the execution by all Parties to this Agreement.

18. **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the undersigned Parties and their respective predecessors, successors, assigns, agents, representatives, attorneys, heirs, executors, and administrators.

19. **No Confidentiality**. The Parties acknowledge and agree that this Agreement is required to be publically disclosed under applicable federal laws and regulations.

20. **Construction**. The descriptive headings of this Agreement are for convenience only and shall not affect the construction or interpretation of this Agreement.

21. **Choice of Law/Forum**. This Agreement shall be interpreted, construed, and enforced according to applicable federal law, or, in its absence, the laws of the State of Nevada. The Parties agree that any legal actions between them regarding this Agreement shall be brought in the Bankruptcy Court, or to the extent the Bankruptcy Court lacks or refuses jurisdiction over such dispute, courts in and for the State of Nevada. The Parties hereby consent to the jurisdiction of said court(s) in connection with any action or proceeding initiated concerning this Agreement and agrees that service by mail to the address specified herein shall be sufficient to confer jurisdiction in such courts.

22. **Entire Agreement and Amendments**. This Agreement constitutes the entire agreement and understanding between and among the undersigned Parties concerning the matters set forth herein. This Agreement may not be amended or modified except by another written instrument signed by the Party or Parties to be bound by the amendment or modification, or by

their respective authorized attorney(s) or other representative(s). This Agreement is a novation of and supersedes and replaces any prior claims, rights, remedies and/or obligations of the Parties.

**23.     Reasonable Cooperation**.  The Parties agree to cooperate in good faith and in a commercially reasonable manner to effectuate all the terms and conditions of the Agreement, including doing or causing their agents and attorneys to do whatever is reasonably necessary to effectuate the signing, delivery, execution, filing, recording, and entry of any documents necessary to perform the terms of this Agreement.

**24.     Advice of Counsel.**  Each Party acknowledges that it has consulted with and obtained the advice of counsel before executing this Agreement, and that this Agreement has been explained to that Party by its counsel.

**25.     Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any person or circumstance is held invalid or unenforceable, only that provision shall be affected, and the remainder of this Agreement (or the application of that provision to other persons and circumstances) shall remain in full force and effect.

**26.     Time is of the Essence.**  Time is of the essence with respect to all obligations, deliveries, and payments under this Agreement.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives on the dates indicated below.

**[Signature Pages Follow]**

DEBTOR:                                CITY:

SUPERIOR LINEN, LLC,
a Nevada limited liability company,
as debtor and debtor-in-possession:

CITY OF NORTH LAS VEGAS,
a Nevada municipal corporation:

By: _____

Its: _____

By: _____
     Dr. Qiong X. Liu, City Manager

Attest:

_____
     Catherine A. Raynor, MMC, City Clerk

Approved as to Form:

By: _____
     Micaela Rustia Moore, City Attorney

BUYER:

LAS VEGAS LINEN, LLC:

By: _____

Its: _____

GUARANTOR:

AMCP Clean Acquisition Company, LLC,
a Delaware limited liability company:

By: _____

Its: _____

GUARANTOR:

AMCP Clean Subsidiary Holdco LLC:

By: _____

Its: _____

# **EXHIBITS**

Exhibit 1 - Monthly Payment Schedule

Exhibit 2 - Extinguishment & Release

Exhibit 3 - Confession of Judgment and Guaranties

# (EXHIBIT 1)

Superior Linen Payment Schedule

| | |
|---|---|
| Loan Amount | 690,000.00 |
| Term | 36 |
| Interest | 2.03% |
| | |
| Monthly Payment | $19,772.42 |

| Scheduled Payment | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| | | | | 690,000.00 |
| 1 | 19,772.42 | 1,167.25 | 18,605.17 | 671,394.83 |
| 2 | 19,772.42 | 1,135.78 | 18,636.64 | 652,758.19 |
| 3 | 19,772.42 | 1,104.25 | 18,668.17 | 634,090.02 |
| 4 | 19,772.42 | 1,072.67 | 18,699.75 | 615,390.27 |
| 5 | 19,772.42 | 1,041.04 | 18,731.38 | 596,658.89 |
| 6 | 19,772.42 | 1,009.35 | 18,763.07 | 577,895.82 |
| 7 | 19,772.42 | 977.61 | 18,794.81 | 559,101.01 |
| 8 | 19,772.42 | 945.81 | 18,826.61 | 540,274.40 |
| 9 | 19,772.42 | 913.96 | 18,858.46 | 521,415.94 |
| 10 | 19,772.42 | 882.06 | 18,890.36 | 502,525.58 |
| 11 | 19,772.42 | 850.11 | 18,922.31 | 483,603.27 |
| 12 | 19,772.42 | 818.10 | 18,954.32 | 464,648.95 |
| 13 | 19,772.42 | 786.03 | 18,986.39 | 445,662.56 |
| 14 | 19,772.42 | 753.91 | 19,018.51 | 426,644.05 |
| 15 | 19,772.42 | 721.74 | 19,050.68 | 407,593.37 |
| 16 | 19,772.42 | 689.51 | 19,082.91 | 388,510.46 |
| 17 | 19,772.42 | 657.23 | 19,115.19 | 369,395.27 |
| 18 | 19,772.42 | 624.89 | 19,147.53 | 350,247.74 |
| 19 | 19,772.42 | 592.50 | 19,179.92 | 331,067.82 |
| 20 | 19,772.42 | 560.06 | 19,212.36 | 311,855.46 |
| 21 | 19,772.42 | 527.56 | 19,244.86 | 292,610.60 |
| 22 | 19,772.42 | 495.00 | 19,277.42 | 273,333.18 |
| 23 | 19,772.42 | 462.39 | 19,310.03 | 254,023.15 |
| 24 | 19,772.42 | 429.72 | 19,342.70 | 234,680.45 |
| 25 | 19,772.42 | 397.00 | 19,375.42 | 215,305.03 |
| 26 | 19,772.42 | 364.22 | 19,408.20 | 195,896.83 |
| 27 | 19,772.42 | 331.39 | 19,441.03 | 176,455.80 |
| 28 | 19,772.42 | 298.50 | 19,473.92 | 156,981.88 |
| 29 | 19,772.42 | 265.56 | 19,506.86 | 137,475.02 |
| 30 | 19,772.42 | 232.56 | 19,539.86 | 117,935.16 |
| 31 | 19,772.42 | 199.51 | 19,572.91 | 98,362.25 |
| 32 | 19,772.42 | 166.40 | 19,606.02 | 78,756.23 |
| 33 | 19,772.42 | 133.23 | 19,639.19 | 59,117.04 |
| 34 | 19,772.42 | 100.01 | 19,672.41 | 39,444.63 |
| 35 | 19,772.42 | 66.73 | 19,705.69 | 19,738.94 |
| 36 | 19,772.33 | 33.39 | 19,738.94 | 0.00 |

# (EXHIBIT 2)

**APN:** 140-06-210-001

**WHEN RECORDED MAIL TO:**
Matthew C. Zirzow, Esq.
Larson & Zirzow
850 E. Bonneville Ave.
Las Vegas, NV 89101

Space above this line is for Recorder's Use

## RELEASE AND EXTINGUISHMENT OF LIEN

This RELEASE AND EXTINGUISHMENT OF JUDGMENT LIEN (the "Release") is entered into as of May ___, 2017 (the "Execution Date") by THE CITY OF NORTH LAS VEGAS (the "City").

## RECITALS

A. On September 22, 2016, the City recorded a Notice of Lien for Unpaid Utility Charges, recorded in the Official Records of the Clark County Recorder as Inst# 21060922-141 and thereby claiming a lien on the real property generally located at 4501 Mitchell Street, and more particularly described as NELLIS INDST PARK UNIT #1 PLAY BOOK 10 PAGE 76 LOT 6 BLOCK 7 & LOT 7 PT LOT 8 (the "Property") of the total sum of $893,667.33 for unpaid utilities services rendered to that Property (the "Lien"). The City claimed the lien arose pursuant to NRS 268.043 and North las Vegas Municipal Code § 13.23.090.

B. On September 30, 2016 (the "Petition Date"), Superior Linen, LLC filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing bankruptcy case, Case No. 16-15388-mkn (the "Bankruptcy Case") in the U.S. Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").

C. Pursuant to the terms and subject to the conditions as set forth in that certain Settlement Agreement and Release Agreement (the "Agreement") with the City, Superior Linen, LLC, as debtor and debtor in possession ("Superior Linen"), as tenant at the Property, and Icon Pac Nevada Owner Pool 3, Nevada, LLC, a Delaware limited liability company, as successor landlord and owner of the Property, which Agreement was approved by the Bankruptcy Court by order entered on May ___, 2017, the City hereby releases its Lien, but WITHOUT PREJUDICE TO, AND WITH A FULL RESERVATION OF THE RIGHTS AND REMEDIES AS PROVIDED FOR IN THE AGREEMENT, including but not limited to the re-imposition of the Lien or recordation of a new lien in the event of a default under the Agreement.

**NOW, THEREFORE,** in consideration of the promises, undertakings, payments, and releases stated in the Agreement, which is acknowledged to be sufficient consideration, the City, agrees as follows:

1

4823-1428-2567

1.      The City hereby releases and extinguishes without prejudice and with a full reservation of its rights and remedies under the Agreement, which are incorporated herein, the Lien and the Notice of Lien referenced above on the Property.

2.      Nothing herein is intended or should be construed as altering or amending the Agreement.  This release is to effectuate the terms and conditions of the Agreement by extinguishing and releasing the foregoing Lien and Notice of Lien, and any associated liens that may have arisen and/or continue to exist or otherwise as a result of the recordation thereof, in favor of and to replace them with the obligations and claims as set forth in the Agreement.

Dated: _____, 2017.          CITY OF NORTH LAS VEGAS:

_____


### **Notarization**

State of Nevada          )

County of Clark          )

This instrument was acknowledged before be on _____ by _____.


_____
Signature of notarial officer

2

4823-1428-2567